UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

LEONARDA GARCIA,

                                   Plaintiff,

     -against-

ERIC H. KAHAN,
SPERBER KAHAN LAW GROUP PLLC,
ARTHUR RANSOME HOUSES LP, and
PRESTIGE MANAGEMENT, INC.,

                              Defendants.

-------------------------------------------------------------x

Civil Action No. 1:25-cv-08489-JGK

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO PRESTIGE MANAGEMENT, INC.'S MOTION TO DISMISS

**TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** ................................................................................................ 1

**STATEMENT OF FACTS** ...................................................................................................... 2

**ARGUMENT** ........................................................................................................................ 13

   **I.**    **Plaintiff states an actionable GBL § 349 claim against Prestige.** ............................ 13

      **a.**    **Prestige's misconduct is consumer-oriented.** ..................................................... 14

      **b.**    **There is no basis to categorically exclude tenants from the protections of GBL § 349.** ..... 14

      **c.**    **Prestige's misconduct was objectively misleading and, in any event, Ms. Garcia was actually misled.** ........................................................................................................ 18

   **II.**    **PRESTIGE HAS ITS AGENCY ARGUMENT REVERSED** ............................................ 20

      **a.**    **Prestige is liable for its own misconduct within the scope of its agency.** ............................ 20

      **b.**    **Plaintiff is not seeking to hold Ransome vicariously liable under the FDCPA.** .................. 22

   **III.**    **Negligence and gross negligence** ......................................................................... 23

      **a.**    **Duty for negligence and gross negligence claims** .................................................. 23

      **b.**    **Intent for gross negligence claims.** ..................................................................... 24

**CONCLUSION** ....................................................................................................................... 25

i

## Cases

*Belcastro v. Roman Cath. Diocese of Brooklyn, New York*, 213 A.D.3d 800, 802,  (App. Div. 2d Dep't 2023) ................................................................................................................................... 25

*Borrerro v. Haks Grp., Inc.*, 165 A.D.3d 1216, (App. Div. 2d. Dep't 2018) ............................................. 24

*Campbell v. MBI Assocs., Inc.,* 98 F. Supp. 3d 568 (E.D.N.Y. 2015) ......................................................... 16

*Collazo v. Netherland Prop. Assets LLC*, 35 N.Y.3d 987, 149 N.E.3d 30 (2020) ...................................... 17

*Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 81 N.Y.2d 821, 611 N.E.2d 282 (1993) ................. 24

*Crespo v. Gutman, Mintz, Baker & Sonnenfeldt, LLP*, No. 22-CV-6599 (JPO), 2025 WL 871637, at *9 (S.D.N.Y. Mar. 20, 2025) ..................................................................................................................... 25

*Elacqua v. Physicians' Reciprocal Insurers*, 52 A.D.3d 886 (3rd Dept. 2008) ......................................... 15

*Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 344 (1999) ...................................................... 18

*Hawkins-El v. First Am. Funding, LLC*, 891 F. Supp. 2d 402, 412 (E.D.N.Y. 2012), *aff'd*, 529 F. App'x 45 (2d Cir. 2013)............................................................................................................................... 23

*Karlin v. IVF America, Inc.*, 93 N.Y.2d 282 (1999) ................................................................................... 15

*Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, (2012) ................................................................... 18

*Lozano v. Grunberg,* 195 A.D.2d 308 (App. Div. 1st Dept. 1993) ............................................................. 16

*McCrobie v. Palisades Acquisition XVI, LLC,* 359 F. Supp. 3d 239 (W.D.N.Y. 2019) .............................. 16

*Morrow v. MetLife Invs. Ins. Co.*, 177 A.D.3d 1288, (App. Div. 4th Dep't 2019) ..................................... 24

*Myerson v. Prime Realty Services, LLC,* 7 Misc.3d 911, 921 (Sup. Ct. NY Co. 2005) .............................. 17

*Onfroy v. L. Offs. of Geoffrey T. Mott, P.C.*, 751 F. Supp. 3d 195, 205 (E.D.N.Y. 2024) .......................... 24

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995) .... 18

*Rozier v. Fin. Recovery Sys., Inc.*, No. 10-CV-3273 DLI JO, 2011 WL 2295116 (E.D.N.Y. June 7, 2011) ...................................................................................................................................................... 15

*Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, LLP*, 163 F. Supp. 3d 109 (S.D.N.Y. 2016) .............................................................................................................................. 16

*Sanchez v. Ehrlich*, No. 16-cv-8677 (LAP), 2018 WL 2084147 (S.D.N.Y. Mar. 29, 2018) ................ 16, 23

*Schmidt v. Bishop*, 779 F. Supp. 321, 324 (S.D.N.Y. 1991 ....................................................................... 24

*Small v. Lorillard Tobacco Co.*, Inc. 94 N.Y.2d 43 (1999) ....................................................................... 18

*Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 593 N.E.2d 1365 (1992) .................................................... 24

*Torres v. Gutman, Mintz, Baker & Sonnenfeldt P.C.*, No. 17-cv-4109 (KAM) (CLP), 2018 WL 1545687 (E.D.N.Y. Mar. 29, 2018) ..................................................................................................................... 16

*United Nat. Ins. Co. v. Tunnel, Inc.*, 988 F.2d 351, 353 (2d Cir. 1993) .................................................... 24

## Statutes

15 U.S.C. § 1692 *et seq.* ..................................................................................................................... passim

Gen. Bus. L. § 349 .............................................................................................................................. passim

**PRELIMINARY STATEMENT**

Ms. Garcia is a low-income home health aide and a participant in the Section 8 voucher program as administered by the New York City Department of Housing Preservation and Development ("HPD"). She has lived at 151 West 23rd St, Apt. 6-C, New York, New York 10027 (the "Building") with her children for eleven years, and has been receiving Section 8 this entire time. Under the Section 8 program, HPD was required to pay a share of the rent (the "government share") and Ms. Garcia is required to pay part of the rent (the "tenant share"). HPD may cease paying its share of the rent if the landlord fails an annual inspection and does not cure. However, under no relevant circumstances is the amount withheld by HPD chargeable to the tenant.

Arthur Ransome Houses LP ("Ransome"), the property owner landlord, and Prestige Management, Inc. ("Prestige"), its property management company (collectively the "Landlord Defendants") are required to meet basic Housing Quality Standards ("HQS") to participate in the Section 8 program and receive HPD Section 8 payments. The Landlord Defendants failed their HQS inspection in March 2022, but refused to complete repairs, and consequently HPD ceased paying the government share in May, 2022. Among other defects, the Landlord Defendants did not provide heat to Ms. Garcia in the winter.

Rather than making repairs to meet the basic HQS standards, the Landlord Defendants decided to do what the law explicitly prohibited: seek to collect the government portion from Ms. Garcia.

The Landlord Defendants retained Eric H. Kahan, Esq. and the various incarnations of his law firm, most recently Sperber Kahan Law Group PLLC (collectively the "Attorney Defendants") to unlawfully collect the government share of rent from Ms. Garcia. The Attorney

Defendants, on behalf of the Landlord Defendants, sued Ms. Garcia in 2023 for what was admitted to be solely the government share. Fortunately, Ms. Garcia was eventually able to retain a legal services organization to represent her and, after months, was able to able to get the case dismissed. Not to be deterred, the Attorney Defendants, on behalf of the Landlord Defendants, sued Ms. Garcia again in 2024—once again solely for the government share of rent.

Ms. Garcia retained a private attorney and paid him legal fees to defend herself against this second suit, and was once again able to get the suit dismissed—this time with a so-ordered stipulation in which the defendants admitted they had wrongly sought Section 8's share of the rent from Ms. Garcia and promised to update their records to reflect Ms. Garcia's timely payment of her share of the rent. But mere months after signing a stipulation to end the 2024 lawsuit, Attorney Defendants, on behalf of the Landlord Defendants, sent a demand letter threatening Ms. Garcia with a third lawsuit for the Section 8 share of rent, in flagrant violation of their promise in the stipulation to update their records to reflect Ms. Garcia's correct rent balance.

Prestige, as the property manager for Ransome, does the accounting, billing, and debt collection for the Ransome properties, including Ms. Garcia's building. During this entire period, Prestige sent to Ms. Garcia rent demands for the government share of the rent; sent a Fourteen Day Demand Notice for the full amount of the rent, a condition precedent to being able to file the 2023 lawsuit; directly appeared at the 2024 hearing to sign the stipulation of dismissal acknowledging no rent was actually owed, and, rather than correcting its records as per the stipulation, continued to send rent demand letters.

## STATEMENT OF FACTS
### Ms. Garcia's Rent-Stabilized Tenancy and Section 8 Subsidy

2

Plaintiff Ms. Garcia is a low-income home health aide and mother of three who has lived in her rent-stabilized apartment since 2014.  Complaint ("Compl.") ¶ 1, 22-22. Ms. Garcia is a participant in the federal tenant-based Housing Choice Voucher Program ("Section 8") administered by HPD. *Id.* at 22, 23. Under Section 8 program regulations, each year HPD determines the share of the monthly rent Ms. Garcia must pay based on her income. *Id.* ¶ 24. The difference between Ms. Garcia's share of the rent (the "tenant share") and the actual legally regulated monthly rent (the "contract rent") is paid through her Section 8 rent subsidy (the "government share"), which HPD should send directly to Ransome Houses, the landlord, or to Prestige, its property management agent. *Id.* ¶ 24-26. However, under no relevant circumstances is the amount withheld by HPD chargeable to the tenant. *Id.* ¶ 1.

As owner of the 151 West 123rd Street building (the "Building"), Ransome Houses is party to a Housing Assistance Payment contract ("HAP contract") with HPD, in which it agreed to comply with Section 8 program regulations in order to receive Section 8 subsidy payments. Under the terms of the HAP contract, the landlord must maintain the apartment in compliance with certain Housing Quality Standards ("HQS"). *Id.* ¶ 27-30. If the apartment fails to pass an annual HQS inspection, HPD may suspend the Section 8 subsidy until the landlord has remedied the failures, and the apartment passes inspection. *Id.* ¶ 29. The tenant is not responsible for the HPD share and the refusal of HPD to pay is not a breach of the lease. *Id.* ¶ 26.

Prestige is the property management company responsible for the day-to-day operations of Ransome Houses at the Building. *Id.* ¶ 13. While Ransome Houses is the owner of the Building and the petitioner in the rental arrears suit, on information and belief many of the relevant actions for Ransome Houses are done by Prestige. *Id*. Prestige's address is listed as the business address for Ransome in the 2023 and 2024 non-payment petitions. Comp. Exh E (2023

Petition, p. 1), Exh Q (2024 Petition, p. 1)

Prestige's management services include accounting, billing, rent collection and building maintenance. Comp. Exh. CC, (Prestige website). p. 1,  p 2 ¶ 5.  In the it accounting and debt collection property management services in relation to Ms. Garcia, Prestige generates and sends invoices and forwards accounts out for suit and even appears at court hearing if a tenant's full contract rent is not paid in full, regardless the amount sought was the government share. *Id.* ¶ 13 81-83. Prestige well knows the obligations under Section 8. Prestige has over 45 years of experience managing government regulated housing including HPD agencies.[1]  Comp. Exh. CC, p. 2 ¶ 2 (Prestige website). Prestige employs five landlord/tenant attorneys and a corporate attorney. *Id*. ¶ 5.

The two rental arrears lawsuits by Ransome Houses against Ms. Garcia list Arlyane McGlashan as the managing agent. *Id*. ¶ 13. The Prestige website lists Ms. McGlashan as the General Manager at Prestige who "aggressively monitors rent collection and legal cases to ensure our goal of zero tolerance for rent arrears." Compl. ¶ 13 *citing to* Exh. CC (Prestige website, p. 2, ¶ 3). Ms. McGlashan has "extensive knowledge of the Housing Court System, and Landlord Tenant legal issues." Compl. Exh. CC (Prestige website, p. 2, ¶ 3).

Prestige generates rental invoices to Ms. Garcia each month for rent alleged to be owed. *Id*. ¶ 13. The invoices and statements sent to Ms. Garcia have an address of "ARTHUR RANSOME 151W123 c/o Prestige Management Inc." *Id*. ¶ 13; Compl. Exh X (March 28, 2025 rent billing statement), Exh BB (June 20, 2025 rent billing statement). Rent payments for the building can be made on-line at the Prestige website, www.prestigemgt.com . *Id*. ¶ 13 Perhaps most importantly, the So-Ordered Stipulation of Dismissal of the 2024 rental arrears lawsuit—

_____

[1] HPD is primary administrator of the Section 8 program in New York. See NY Comptroller website on Section 8 vouchers. (https://www.osc.ny.gov/reports/budget/fed-funding-ny/section-8-housing-choice-vouchers (last visited March 29, 2026).

affirmatively admitting inter alia that Ms. Garcia did not owe any amount for which she was sued and pledging to correct the landlord's billing records—was signed directly on behalf of Arthur Ransome by Detra Williams, with the notation "PMI As Agent." *Id. citing to* Exh W (February 6, 2025 So-Ordered Stipulation to Discontinue). On information and belief, PMI stands for Prestige Management, Inc., and Ms. Williams is the account collection manager at Prestige Management, Inc. *Id.* ¶ 13 This shows direct involvement by Prestige in the wrongful rental arrears collection lawsuits. *Id.* For all of these reasons and others, Ransome Houses and Prestige are jointly and severally liable for the conduct that forms a basis of Plaintiff's complaint. *Id.*

HPD suspended Section 8 payment of Ms. Garcia's subsidy for the months May 2022 through February 2024, due to HQS violations for conditions Prestige and Ransome Houses had failed to repair. *Id.* ¶ 37. Building maintenance is the responsibility of Prestige. Compl. Exh. CC (Prestige website, p. 2, ¶ 5) ("we employ a team of consultants and engineers… and [a] building maintenance staff of over 200.")  Rather that the Landlord Defendants making the required repairs in order for HPD to pay the government share, they sued Ms. Garcia for it. *Id.* ¶ 38-43.

### The 2023 Lawsuit for Rent Not Owed

In May 1, 2023, the Attorney Defendants, on behalf of the Landlord Defendants, filed a non-payment petition seeking to evict Ms. Garcia and her family, and to obtain a monetary judgment against Ms. Garcia. Compl. ¶ 38 *citing* Exh. E (2023 non-payment petition). The petition attached a Fourteen Day Notice dated April 4, 2023 with the name of Ransome and no address. Compl. Exh E (2023 petition. p. 9 of 10). On information and belief the 14 Day Notice was sent by Prestige because it is responsible for accounting, billing, and debt collection is the responsibility for Ransom, and as the address listed as the business address for Ransome in the non-payment petitions is the Prestige address.

In the 2023 complaint and rent demand, Ransome Houses (falsely) claimed entitlement to $5,112.72, but did not break out the Section 8 share and the tenant share of the months of rent sought, instead claiming rental arrears of $966.70 per month without explanation or clarification for the months November 2022 through March 2023 and an additional balance of $279.22 for October 2022. Compl. Exh E (2023 petition).

The 2023 complaint and rent demand failed to credit Ms. Garcia for the following payments from October 2022 – February 2023. The rent ledger included entries for HPD's Section 8 share of the rent. The rent ledger also reflected a total monthly rent in excess of the approved total monthly rent Ransome Houses was authorized by HPD to charge. Ms. Garcia was shocked and terrified about the lawsuit seeking a judgment for rent, none of which was owed by her, as well as seeking to evict her and her family from their home of eleven years. In fact, for years Ms. Garcia had consistently been paying the entirety of her share of the rent and was bewildered the Defendants were claiming she owed the full rent balance.

The 2023 complaint sought the HPD Section 8 share of Ms. Garcia's rent. At this time, *HPD* had stopped paying *its* portion of Ms. Garcia's rent due to unremedied HQS violations. Compl. ¶ 42. The Landlord Defendants knew that it was HPD (not Ms. Garcia) that had ceased paying its share of the rent for their failure to pass the HQS inspection if for no other reason than the notice of failure to pass the HQS inspection was served by HPD on the Landlord Defendants.

On May 1, 2023, the Landlord Defendants, through the Attorney Defendants, commenced a non-payment proceeding against Ms. Garcia in New York County Housing Court. The verified petition alleged rental arrears amounting to $5,112.72 and attached to it as exhibits the Fourteen-Day Rent Demand and an Affidavit of Service. Id.

6

Defendant Eric H. Kahan, Esq. signed the complaint, affirming under penalty of perjury "that he has read the foregoing petition and knows the contents thereof; that the same are true to his own knowledge except as to matters stated to be upon information and belief; and as to those matters he believes them to be true." *Id.* Kahan knew, or through the exercise of a meaningful attorney review, should have known, there was no lawful basis to sue Ms. Garcia for rent or for possession because, *inter alia*, he was suing solely for the government share of the rent.

On May 12, 2023, after receiving notice of the 2023 Lawsuit via mail, Ms. Garcia had to spend time to go to the courthouse to file a *pro se* answer asserting that the rent had already been paid. She was assigned a May 22 court date. On May 22, 2023, Ms. Garcia appeared before the court *pro se* and nervously waited in the court room for her name to be called. At the May 22, 2023 court date, Ms. Garcia was referred to the Legal Aid Society. Ms. Garcia retained the Legal Aid Society for the purpose of defending against the 2023 Lawsuit, and an attorney from the Legal Aid Society entered her Notice of Appearance on June 20, 2023.

On July 13, 2023, the Legal Aid Society filed a motion for leave to amend the answer on Ms. Garcia's behalf, along with a supporting affirmation and a proposed amended answer asserting a number of defenses and counterclaims, including eleven specifically enumerated HQS violations. A series of subsequent stipulations demonstrate that Defendants knew that HPD had ceased making its share of the rent payments for the failure of the landlord to cure HPD violations. Defendants continued with the suit seeking rent from Ms. Garcia that they knew was not chargeable to her. Most clearly, the September 26, 2023 Stipulation indicated that it was HPD share of the rent that was withheld based on the landlord failing inspections and failing to make repairs (as opposed to Ms. Garcia failing to make her share of the Section 8 rent). Compl. Exh M ("HPD appeared in court on September 26, 2023 with court file and Rent Breakdown

7

letter indicating that the contested rent is  $908 per month and that HPD Section 8 ceased payment due to a failed HQS inspection.") Subsequent so-ordered stipulations adjourning future hearings indicated that the landlord continued to fail to cure the failed inspections, including to failure to provide heat in the winter, specifically during December 2023. Compl. Exh N (December 6, 2023 so-ordered stipulation) (adjourned for landlord "to complete repairs and cure the subject premises' HPD violations… [including] lack of heat as required by law"), Exh O (February 2, 2024 stipulation) (adjourning hearing for landlord to comply with December 6, 2023 so-ordered stipulation to cure HPD violations). It was only on April 1, 2024 – more than five months after filing and maintaining a frivolous lawsuit against Ms. Garcia – that the landlord finally stipulated to dismiss the suit. The landlord tacitly admitted that it sued Ms. Garcia for rent, none of which was chargeable to her. The stipulation stated the "petition is hereby satisfied" and that "Section 8 appeared and confirmed that they have resumed payments." Compl. Exh P (April 1, 2024 stipulation).

Despite this, Prestige was still sending monthly billing statements Ms. Garcia showing as due the HPD share of back rent. Compl. Exh CC p. 8 (emails of September 12 and 20, 2024).

**The 2024 Lawsuit for Rent Not Owed**

On November 1, 2024, seven months to the day after the signing of the stipulation of discontinuance in the 2023 case the Attorney Defendants, on behalf of Landlord Defendants, filed another non-payment petition Comp. Exh Q (November 1, 2024 complaint.) The 2024 lawsuit (falsely) represented that Ms. Garcia owed rent of $11,712.91, sought a judgment based on that amount, and sought to evict Ms. Garcia and her family from their home of eleven years. Like the 2023 Lawsuit, the complaint in the 2024 Lawsuit is signed by Defendant Kahan; seeks back rent from the period of time wherein HPD was not paying the Section 8 share due to the

landlord's HQS violations; seeks a total monthly rent in excess of that approved by HPD;  seeks

back rent including the Section 8 share of Ms. Garcia's rent from the period of more than two

years during which HPD was not paying the Section 8 share of Ms. Garcia's rent due to

Landlord Defendants' HQS violations.

Unlike the 2023 Lawsuit, the 2024 Lawsuit attached a detailed rent ledger. Compl. Exh S

(September 10, 2024 Rent Ledger). The Ledger claimed that Ms. Garcia owed $11,712.91 for

rent from July 1, 2022 to September 1, 2024. The 2024 rent ledger clearly demonstrates that

Defendants sought rent from Ms. Garcia in excess of her tenant share of the rent. The 2024 rent

ledger covers the period from July 2022 to September 2024, and shows a resumption of Section

8 payments by HPD in March 2024. *Id.* at 3. The ledger holds Ms. Garcia responsible for the full

amount of the contract rent each month—including in the months where HPD was withholding

Section 8 payments. The 2024 rent ledger states that the rent alleged to be due is for a time

period extending through May of 2024, but the listed amount of $11,712.91 in the ledger and

petition reflects the ledger's alleged balance in September 2024, when the ledger appears to have

been prepared. *Id.*

The 2024 rent ledger clearly shows that Ms. Garcia's consistent monthly payments

continued during the period where HPD had suspended payment of the Section 8 share of Ms.

Garcia's rent. *Id.* at 2-4. The Rent Breakdown Letter, the 2024 rent ledger clearly shows Ms.

Garcia paid *more* than the tenant share of her rent as defined by HPD and the HAP contract.

Exhibits B, S.

Ms. Garcia appeared *pro se* on December 10, 2024 and filed an answer asserting several

defenses, including that the rent had already been paid, that she had not been properly served

with a rent demand as required by law, and that the Landlord Defendants had not made the

9

required repairs. Ms. Garcia retained a private attorney, James Fishman of Fishman Law Group PLLC, to defend her from the frivolous lawsuit, and paid him attorney's fees for doing so. On December 15, 2024 Mr. Fishman filed a notice of appearance and verified amended answer. Compl. Exh U (December 15, 2024 Notice of Appearance and Amended Answer). The amended answer raised an affirmative defense that the landlord was suing Ms. Garcia for the HPD portion of the rent which is not chargeable to a Section 8 recipient. *Id.* at ¶¶ 22-26. The amended answer also noted that HPD had ceased making payments because the landlord had failed the HQS inspection and had not cured. *Id.*

Ultimately the parties stipulated to the discontinuation with prejudice of Defendants' lawsuit against Ms. Garcia, and the stipulation was so-ordered on February 6, 2025. Compl. Exh W (February 6, 2025 So-Ordered Stipulation of Discontinuance With Prejudice). In the Stipulation, Defendants admitted the following:

a. That the 2024 Lawsuit unlawfully sought the Section 8 share of Ms. Garcia's rent;
b. That Ms. Garcia has no obligation to pay the Section 8 share of her rent;
c. That Ms. Garcia had paid her share of the rent at the time of the initiation of the 2024 Lawsuit; and
d. That Ms. Garcia had continued to pay her share of the rent after the filing of the 2024 Lawsuit, up to the date of the stipulation.

In the stipulation (Exhibit W ¶ 4), Defendants also represented—evidently falsely—that they had updated and corrected their records to reflect that Ms. Garcia did not and does not owe her tenant share of rent. Importantly, as previously noted, So-Ordered Stipulation was signed directly on behalf of Arthur Ransome Houses, LP by Detra Williams, with the notation "PMI As Agent." On information and belief, PMI stands for Prestige Management, Inc., the property management company for the property. Ms. Williams is the account collection manager at Prestige Management, Inc.

***The 2025 Lawsuit Threat and Continued Harassment About the False Rental Arrears***

10

Despite stipulating that they had corrected their records to reflect that Ms. Garcia did not and does not owe the Section 8 share of her rent, Landlord Defendants – specifically Prestige, who is responsible for the accounting, billing and debt collection for the building -- continued to claim a right to collect the Section 8 share from Ms. Garcia, sending her a billing statement reflecting a balance of $12,478.43, including many months of Section 8's share on March 28, 2025. Compl. ¶ 13 citing to Exh X (March 28, 2025 Billing Statement).

Shortly thereafter, Attorney Defendants, on behalf of the Landlord Defendants, sent a letter to Ms. Garcia notifying her of their intent to pursue a third unlawful eviction proceeding for the same alleged balance including many months of the Section 8 share of her rent. Compl. Exh Y (April 8, 2025 Collection Letter). On May 2, 2025, Attorney Defendants, on behalf of Landlord Defendants, sent a pre-suit certification to HPD, notifying them of their intent to pursue a nonpayment eviction proceeding against Ms. Garcia. Compl. Exh Z (May 2, 2025 Certification to HPD). Crucially, the May 2 Certification to HPD includes a field which can be filled out to indicate the petitioner, in this case Ransome, also intends to seek the Section 8 share of the rent—from HPD, which is ordinarily liable for the Section 8 share, not Ms. Garcia, who as the voucher holder is not liable for the Section 8 share. Defendants did not fill out this section or otherwise indicate any intent to seek Section 8 from HPD. *Id.*

On or about May 16, 2025 Ms. Garcia sent a letter to Defendants summarizing the case and putting Defendants on notice as to Defendants' own admissions in prior cases: that Ms. Garcia did not owe the Section 8 share of her rent and that Defendants had unlawfully sought to collect the Section 8 share of Ms. Garcia's rent from her. Exhibit AA (May 16, 2025 Letter to Defendants). This letter also requested written confirmation that Ms. Garcia owes no rent and Defendants will not seek to evict her on that basis—in essence, simply requesting that

11

Defendants confirm in writing their commitment to honoring the terms of their prior stipulations. *Id.*

Ms. Garcia's letter did not produce any change in Defendants' behavior. On June 20, 2025, Landlord Defendants issued to Ms. Garcia another rent statement claiming she owed the remarkable sum of $13,237.37, once again claiming an increase to the same large balance of Section 8 back rent—a balance which plainly includes the very rental arrears Defendants had previously stipulated Ms. Garcia did not and does not owe. Compl. Exh BB (June 20, 2025 Rent Statement).

All parties, attorneys, and law firms involved in the February 6, 2025 So-Ordered Stipulation of Discontinuation with Prejudice are also involved in the ongoing efforts to collect yet again from Ms. Garcia.

Additionally, in communications with Prestige, which manages the building and serves as Ms. Garcia's point of contact for requesting and coordinating the still-uncompleted repairs, Prestige employees continue to reference Ms. Garcia's falsely alleged rental arrears, even after being informed of the prior lawsuits and stipulations of discontinuance.

### Defendants' Illegal, Baseless Lawsuits Caused Ms. Garcia to Experience Emotional Distress and to Incur Significant Expenses

Ms. Garcia life has been severely affected by Defendants' actions. Defendants' conduct caused Ms. Garcia to sustain actual damages, including legal fees, forgone wages because of missing work, and transportation costs for travel back and forth to New York County Housing Court and to meetings and consultations with her attorneys. The 2023 Lawsuit made Ms. Garcia feel afraid and powerless, and caused her to lose sleep throughout the duration of the litigation. Once the lawsuit was resolved, the stress was lifted and Ms. Garcia resumed sleeping normally.

After the ordeal of the 2023 Lawsuit, in which Defendants similarly sought to collect the

12

Section 8 share from Ms. Garcia in an eviction proceeding, Ms. Garcia was distraught and afraid when she learned of the 2024 Lawsuit. How could this be happening again, and so soon after the resolution of the prior lawsuit? When she learned of the 2024 Lawsuit, all Ms. Garcia's hopes vanished, and she cried from the stress and despair. Ms. Garcia felt very vulnerable, and became irritated and dejected. She began to lose sleep again due to the 2024 Lawsuit, and has continued to lose sleep since as Defendants continue their campaign of harassing and unlawful debt collection against her.

Ms. Garcia's reprieve from debt collection harassment in between the conclusion of the 2024 Lawsuit and the beginning of Defendants' 2025 harassment and threats lasted for less than two months. Defendants' persistent harassment of Ms. Garcia have made her feel unsafe and insecure in her own home, and made her fear for herself and her children. In each instance—in the 2023 Lawsuit, the 2024 Lawsuit, and in the case of this year's harassment and pre-litigation communications—Ms. Garcia was scared, shocked, and upset by the allegation that she owed many thousands of dollars in rent, because she generally pays her bills, including her rent, on time and in full.

Ms. Garcia paid thousands of dollars in attorney's fees flowing from the defense of the 2024 Lawsuit—fees Ms. Garcia would not have incurred but for Defendants' baseless and unlawful 2024 Lawsuit.  Ms. Garcia has continued to pay her tenant share of the rent in full throughout this ordeal.

## ARGUMENT

I.     **Plaintiff states an actionable GBL § 349 claim against Prestige.**

In order to state a claim under GBL § 349, an individual must demonstrate that (1) the conduct at issue was consumer-oriented, that (2) the defendant's act or practice is materially

13

misleading or deceptive, and (3) that the plaintiff was injured as a result. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (Ct. of Appeals 1995). Prestige challenges the first and second elements.

### a. Prestige's misconduct is consumer-oriented.

Prestige is the property manager for the Building, in charge of accounting, billing and debt collection for properties in the Ransome portfolio. In doing so as to Ms. Garcia, Prestige has demonstrated a standard practice of collecting the entire contract rate from its Section 8 tenants if, for whatever reason, HPD ceases paying the government share of the rent. That this is a standard practice is demonstrated in the sending of form billing statements seeking to collect the government share of the before the filing of the 2023 lawsuit, between the 2023 and 2024 lawsuits, and again after the 2024 lawsuit after, as well as in their form Fourteen Day Notice served before and with the 2023 lawsuit. The fact that Prestige does not correct its billing and accounting records despite so many opportunities and even with an agreed stipulation that the building records had been correct, suggests an inability or unwillingness to do anything other than collect the full contract rent from Section 8 tenants. Prestige specializes in providing property management services for government funded housing, specifically HPD, which is an administrator if the Section 8 voucher program, evidence that a significant number of its tenants would be Section 8 participants. For these reasons and others, the misconduct of Prestige has the potential to affect the public at large and thus is consumer oriented.  The misconduct is elaborated on below in the Agency section, III. (a).

### b. There is no basis to categorically exclude tenants from the protections of GBL § 349.

Prestige argues that Ms. Garcia has failed to state a claim for violations of GBL § 349, mainly on the basis that she has not adequately pleaded the "consumer-oriented" element of that

14

cause of action. In particular, Prestige argues there is a categorical exclusion of GBL § 349 claims when the business activity relates to the collection rent – as opposed to a lawsuit to collect any other type of debt. They argue a debt for rent accrues out of a lease contract between and individual tenant and an individual landlord. But any consumer debt arises from a contract between an individual consumer and an individual creditor. Prestige provides no logical reason one should be treated differently than the other and attempts to create a categorical exclusion that erodes the broad scope of GBL 349.

GBL § 349 applies "to virtually all economic activity, and [its] application has been correspondingly broad." *Karlin v. IVF America, Inc.*, 93 N.Y.2d 282, 290 (1999). Indeed, the statute has been applied to deceptive practices in all sorts of areas. The consumer-oriented requirement also "does not require a repetition or pattern of deceptive behavior." *Oswego*, 85 N.Y.2d at 25. Rather, "[a] claim brought under this statute must be predicated on an act or practice which is 'consumer-oriented,' that is, an act having the potential to affect the public at large, as distinguished from merely a private contractual dispute...." *Elacqua v. Physicians' Reciprocal Insurers*, 52 A.D.3d 886, 888 (3rd Dept. 2008) *citing Oswego*, 86 N.Y. 2d 20. The Court of Appeals noted that this holding was consistent with the legislative intent of GBL § 349 to stop consumer frauds at their initial stages rather than waiting for more persistent frauds to develop. *Id.* at 25.

The application of GBL § 349 to the landlord-tenant relationship was specifically addressed in its legislative history. GBL § 349-c, which provides heightened penalties for deceptive conduct directed at the elderly, provides a list of bad conduct for determining whether the supplemental penalty should be applied, including "[w]hether the defendant's conduct caused an elderly person or persons to suffer severe loss or encumbrance of a primary residence." GBL

§ 349-c(b)(2). The argument that deceptive landlord conduct is not covered is directly contradicted by the statutory language which makes preservation of housing an explicit purpose.

Prestige's form billing statements and form Fourteen Day Notice are similar to form collection letters that are held to be consumer oriented. *Rozier v. Fin. Recovery Sys., Inc.*, No. 10-CV-3273 DLI JO, 2011 WL 2295116, at *5 (E.D.N.Y. June 7, 2011) (deceptive form debt collection letter was consumer-oriented); and *Campbell v. MBI Assocs., Inc.,* 98 F. Supp. 3d 568, 588 (E.D.N.Y. 2015) ("sending form collection letters" that are deceptive can be consumer-oriented as opposed to letter sent particularly to one consumer by mistake).

Attempts to collect a debt that was not owed, that could not lawfully be sued upon, in whole or in part, or which misstate the amount owed, has repeatedly been found to be consumer oriented. *See McCrobie v. Palisades Acquisition XVI, LLC,* 359 F. Supp. 3d 239, 255 (W.D.N.Y. 2019) (systematically collecting debts that Defendant "did not in fact have the legal right to collect that debt" was consumer-oriented); *Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, LLP*, 163 F. Supp. 3d 109, 116 (S.D.N.Y. 2016) (demand in 147 collection lawsuits for attorney's fees that was not permitted by law or agreement was consumer-oriented).

However, the exclusion of landlord-tenant disputes from the protections of GBL § 349 is not the rule. Courts are willing to apply GBL § 349 to the landlord-tenant context where the plaintiff sufficiently alleges a pattern or practice of deceptive, consumer-oriented conduct, such seeking to collect rent not owed, as Ms. Garcia alleges here. *See e.g. Sanchez v. Ehrlich*, No. 16-cv-8677 (LAP), 2018 WL 2084147, at *11 (S.D.N.Y. Mar. 29, 2018) (suing for rent not owed); *Torres v. Gutman, Mintz, Baker & Sonnenfeldt P.C.*, No. 17-cv-4109 (KAM) (CLP), 2018 WL 1545687, at *3 (E.D.N.Y. Mar. 29, 2018) (same).

16

Prestige suggests that as a matter of law, GBL § 349 does not apply to disputes between landlord and tenants, reasoning that they are more akin to private contract disputes than situations which call for the invocation of consumer protection law.

In *Lozano v. Grunberg,* 195 A.D.2d 308 (App. Div. 1st Dept. 1993), the court reversed the Supreme Court's dismissal of the tenant's action challenging the landlord's repeated issuance of deceptive notices under GBL § 349. In *Myerson v. Prime Realty Services, LLC,* 7 Misc.3d 911, 921 (Sup. Ct. NY Co. 2005), the court held that repeated false demands that tenants were required to disclose their social security numbers was consumer-oriented because "defendants own and manage a substantial number of rent-regulated apartments, and use the challenged forms for all lease renewals, so that the dispute is not simply a private contract dispute and generally claims involving residential units are a type of claim recognized under the statute."

A recent Second Department Appellate Division decision provides further support for the application of GBL § 349 to meritless rental arrears collection lawsuits, finding that allegations of meritless or deceptive eviction suits for nonexistent or inflated arrears adequately stated a claim for violation of GBL § 349. *Calixto v. A. Balsamo & Rosenblatt, P.C.*, 244 A.D.3d 674, 678 (App. Div. 2nd Dept. 2025).

Prestige cites *Collazo v. Netherland Prop. Assets LLC*, 35 N.Y.3d 987, 149 N.E.3d 30 (2020) in support of their GBL § 349 argument. But *Collazo* expressly leaves open the question of whether GBL § 349 can be applied in the landlord-tenant context, "assum[ing] without deciding that a claim may lie under General Business Law § 349 based upon a landlord's alleged misrepresentation to the public...." *Collazo*, 35 N.Y.3d at 990. One case cited by Prestige which dismissed a GBL § 349 claim for a lack of consumer-oriented conduct *specifically invited the plaintiff to replead the claim* with "concrete allegations concerning similar conduct aimed at an

17

appreciable number of other tenants." *Brake v. Slochowsky & Slochowsky, LLP*, 504 F.Supp.3d 103, 115-16 (E.D.N.Y. 2020).

Many consumer transactions are contracts in which an individual consumer is deceived by a seller or other contracting party, but the consumer's status as an individual does not mean GBL § 349 does not apply. *See e.g., Small v. Lorillard Tobacco Co.*, Inc. 94 N.Y.2d 43 at 55 (1999). GBL § 349 is a consumer-protection statue, and consumers interact with the marketplace through individual contractual dealings. A lease between a landlord and a tenant is no different than a lease for a car, or a contract to buy a sofa, or a mortgage contract, or any other consumer transaction.

The conduct here—misrepresenting whether a debt may be lawfully collected, or indeed exists at all—is precisely analogous to debt collection activity which has been held to state a claim for GBL § 349 liability.

### c. Prestige's misconduct was objectively misleading and, in any event, Ms. Garcia was actually misled.

Prestige challenges whether its conduct was materially misleading by arguing that Ms. Garcia was not actually misled. Prestige misstates the standard. To determine whether conduct is materially misleading, courts apply an objective standard that asks whether a defendant's actions are "likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Himmelstein*, 37 N.Y.3d at 178 (quoting *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 344 (1999)); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995). This standard does not require reliance, which is not an element of a claim under § 349. *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, (2012). This standard does not require reliance, which is not an element of a claim under § 349. *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, (2012).

Prestige argues that in order to be deceptive under GBL § 349 the plaintiff must "have actually been misled." Mot. 9. In support Prestige cites *Onfroy v. L. Offs. of Geoffrey T. Mott, P.C.*, 751 F. Supp. 3d 195, 206 (E.D.N.Y. 2024). But *Onfroy* dealt with the issue of whether there was concrete injury for purposes of Article III, not whether the conduct was "deceptive" within the meaning of GBL § 349. In *Onfroy*, a landlord attorney filed two suits for the same months of rent in different fora at the same time, one in landlord-tenant civil court and one in Supreme Court. The Court held that forcing the tenant to fight in two courts instead of one violated the prohibition on "unfair and unconscionable" debt collection conduct under 1692(f) of the Fair Debt Collection Practices Act. That unfair conduct caused concrete injury because the Plaintiff "incurred extra costs from defending herself in multiple fora (such as parking fees and lost wages from missed work)." *Id*. at 200. However, the tenant did not allege she incurred the additional costs because she *herself* was "deceived" under either 1692e or under GBL § 349 "to believe that she owed the same debt twice." *Id*. at 205. In briefing, the tenant doubled down and all but expressly conceded she was not misled, arguing it was only an objective standard, stating "Whether Ms. Onfroy was actually deceived is irrelevant." *Id*. The court most certainly did ***not*** hold – or even consider – whether objective deception is actionable under 1692e or GBL § 349. Rather, the issue was whether the tenant demonstrated an injury to allow Article III standing. The Court noted that, "The Second Circuit recently confirmed that out-of-pocket expenses and lost time satisfy Article III's concrete-injury requirement when they are a "foreseeab[le]" consequence of the defendant's actions." *Id*. at 202 *quoting Bohnak v. Marsh & McLennan Companies, Inc*., 79 F.4th 276, 286 (2d Cir. 2023). As the tenant "incurred additional expenses" because "defendants forced her to fight a two-front battle when one front would have sufficed," she had Article III standing for the 1692(f) claim. Indeed, the Court could not consider the merits

19

of the deception claims because, without standing, it did not have jurisdiction to do so. Prestige does not challenge Article III jurisdiction, and Plaintiff would request briefing if the issue was raised. *See, e.g.* Compl. ¶ 103 (monetary injury).

A reasonable consumer who believes they do not owe a debt could not be lawfully collected could still be deceived by demands for payment. *Sanchez v. Ehrlich*, No. 16-CV-8677 (LAP), 2018 WL 2084147, at *11 (S.D.N.Y. Mar. 29, 2018) ("Defendants' continued demand for rent might potentially cause tenants to pay rent not owed," and is this deceptive under GBL 349); *Torres v. Gutman, Mintz, Baker & Sonnenfeldt P.C.*, No. 17CV4109KAMCLP, 2018 WL 1545687, at *3 (E.D.N.Y. Mar. 29, 2018) ("over the course of three eviction proceedings, knowingly made numerous false and misleading representations in declaring how much rent plaintiff owed") (deceptive under GBL § 349 and FDCPA);  *Martinez v. LVNV Funding, LLC*, No. 14CV00677RRMST, 2016 WL 5719718, at *3 (E.D.N.Y. Sept. 30, 2016)(falsely alleging the validity of a judgment deceptive under GBL § 349); *Somerset v. Stephen Einstein & Assocs., P.C.*, 351 F. Supp. 3d 201, 207–08 (E.D.N.Y. 2019); *Villalba v. Houslanger & Assocs., PLLC*, No. 19CV4270PKCRLM, 2022 WL 900538, at *12 (E.D.N.Y. Mar. 28, 2022).

In any event, Ms. Garcia was actually deceived. Compl. ¶ 95 ("How could this be happening again, and so soon after the resolution of the prior lawsuit?"), ¶ 100 ("Ms. Garcia was scared, shocked, and upset by the allegation that she owed many thousands of dollars in rent, because she generally pays her bills, including her rent, on time and in full."), ¶ 103.  This resulted in Ms. Garcia hiring an attorney and paying thousands of dollars to defend her from the non-payment petition that deceptively represented she owed an amount that was purely the government share of the contract rent. Compl. ¶  103.

## II.    **PRESTIGE HAS ITS AGENCY ARGUMENT REVERSED**

### a.  **Prestige is liable for its own misconduct within the scope of its agency.**

Plaintiff is not alleging that Prestige is liable for the acts of Ransome, as Prestige suggests. Mtn. p. 2 ("There is not liability flowing from any alleged acts by Ransome to its agent Prestige.") Rather, Ms. Garcia seeks to hold Prestige liable for its own misconduct it commits within the scope of its agency for Ransome. "An agent is subject to tort liability to a third party harmed by the agent's conduct only when the agent's conduct breaches a duty that the agent owes to the third party." Restatement (Third) Of Agency § 7.02 (2006) ("Restatement").  Indeed, Illustration 1 of § 7.02 deals with a property management company (agent) for an apartment owner (principal) being liable to a tenant (third-party) for its negligence in performance of its duties (the maintaining of adequate outdoor lighting for the safety of tenants). Here, Prestige is liable for its GBL § 349, negligence, and gross negligence in performing its accounting, billing, and debt collection services for Ransome, the owner of the Building. Prestige even acknowledges its "management contract with Ransome" that "explicitly specifies that Prestige is retained as Ransome's agent." (Mtn. p. 12 ¶ 2).

Prestige seems to be arguing (Mtn. p. 11, ¶ 2, p. 12 ¶ 1, 2) that Prestige can only be liable if the Complaint alleges misconduct outside the scope of agency. This is the precise opposite of agency principles. *See* Restatement § 7.02.

Prestige's liability is for its conduct as the agent for Ransome within the scope of that agency. Prestige's management services include accounting, billing and rent collection. Comp. Exh. CC, (Prestige website). p. 1,  p 2 ¶ 5.  Prestige employs five landlord/tenant attorneys and a corporate attorney. *Id*. ¶ 5. Prestige has over 45 years of experience managing government regulated housing including HPD agencies, the administrator of the Section 8 program.

Prestige generates rental invoices to Ms. Garcia each month for rent alleged to be owed. *Id*. ¶ 13. The invoices and statements sent to Ms. Garcia, both before and after the dismissal of

21

the 2024 lawsuit, have an address of "ARTHUR RANSOME 151W123 c/o Prestige Management Inc." Compl. Exh X (March 28, 2025 rent billing statement), Exh BB (June 20, 2025 rent billing statement). The address for Prestige is the same address listed as the principal business address in the 2023 and 2024 non-payment petitions. The billing statements state rent payments for the Building can be made on-line at the Prestige website, www.prestigemgt.com .

The two rental arrears lawsuits against Ms. Garcia list Arlyane McGlashan as the managing agent. The Prestige website lists Ms. McGlashan as the General Manager at Prestige who "aggressively monitors rent collection and legal cases to ensure our goal of zero tolerance for rent arrears." Compl. ¶ 13 *citing to* Exh. CC (Prestige website, p. 2, ¶ 3). Ms. McGlashan has "extensive knowledge of the Housing Court System, and Landlord Tenant legal issues." Compl. Exh. CC (Prestige website, p. 2, ¶ 3).

Perhaps most importantly, the So-Ordered Stipulation of Dismissal of the 2024 rental arrears lawsuit—affirmatively admitting inter alia that Ms. Garcia did not owe any amount for which she was sued and pledging to correct the landlord's billing records—was signed directly on behalf of Arthur Ransome by Detra Williams, with the notation "PMI As Agent." Compl. ¶ 12 *citing to* Exh W (February 6, 2025 So-Ordered Stipulation to Discontinue). On information and belief, PMI stands for Prestige Management, Inc., and Ms. Williams is the account collection manager at Prestige Management, Inc. *Id*. ¶ 13. This shows direct involvement by Prestige in the wrongful rental arrears collection lawsuits. *Id*. For all of these reasons and others, Ransome Houses and Prestige are jointly and severally liable for the conduct that forms a basis of Plaintiff's complaint.

### b. Plaintiff is not seeking to hold Ransome vicariously liable under the FDCPA.

Prestige cites decisions where the principle must be a "debt collector" in order to be

22

vicariously under the FDCPA for the FDCPA violations of their debt collector agents. Mot. p. 13. That is not surprising. The FDCPA only applies to debt collectors. 15 U.S.C. § 1692a(5) Plaintiff is not seeking to hold Ransome vicariously liable under the FDCPA. Vicarious liability does not transform a principal into a debt collector as defined by the FDCPA, nor does Plaintiff allege that it does.

### III.    Negligence and gross negligence

Prestige claims Ms. Garcia's claims for negligence and gross negligence and should be dismissed 1) for failure to demonstrate duty and 2) the claims are inconsistent as to the issue of intent and therefore both must be dismissed. Notably Prestige does not challenge whether its conduct would meet the gross negligence standard, so Plaintiff does not address that issue.

#### a.  Duty for negligence and gross negligence claims

To state a negligence cause of action, a plaintiff must allege 1) the existence of a duty on the defendant's part to the plaintiff, 2) a breach of this duty, and 3) injury to the plaintiff resulting from that breach. *Hawkins-El v. First Am. Funding, LLC*, 891 F. Supp. 2d 402, 412 (E.D.N.Y. 2012), *aff'd*, 529 F. App'x 45 (2d Cir. 2013).

Prestige contends that they have no duty to Ms. Garcia, and thus her claims for negligence and gross negligence must fail. However, Prestige is providing property management services, including accounting, billing, and debt collection for Ransome as to the tenants of Ransome. Providing those services creates a duty under GBL § 349 to the tenants. While Prestige is neither a creditor nor a debt collector as defined under the FDCPA it is acting as an agent of Ransome, who falsely alleges (falsely) that Ms. Garcia owes it rent. Consequently, Prestige owes a common law duty of reasonable care to tenants for the debt collection services it provides for Ransome. *Sanchez v. Ehrlich*, No. 16-CV-8677 (LAP), 2018 WL 2084147, at *7

23

(S.D.N.Y. Mar. 29, 2018) (GBL § 349 claim suit for rent not lawfully chargeable to the tenant); "Creditors and debt collectors owe debtors "a duty of reasonable care" in the collection of their debts." *Hawkins-El v. First Am. Funding, LLC*, 891 F. Supp. 2d 402, 412 (E.D.N.Y. 2012), aff'd, 529 F. App'x 45 (2d Cir. 2013) *quoting Colo. Capital v. Owens*, 227 F.R.D. 181, 191 (E.D.N.Y.2005).

b.  **Intent for gross negligence claims.**

Second, Prestige asserts that because Plaintiff supposedly alleges intentional misconduct, Plaintiff's negligence claims must necessarily fail. As a preliminary matter, this misstates the content of Plaintiff's complaint; Plaintiff specifically pleads negligence in the *alternative*, to the extent her complaint is deemed to allege intentional misconduct. Comp. ¶ 144. While Plaintiff alleges Defendants' actions evince a "reckless disregard" or the "appearance of intentional wrongdoing" (Compl ¶ 136) such an allegation is precisely the standard for gross negligence as articulated by the Court of Appeals under New York law: "[i]t is conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 81 N.Y.2d 821, 824, 611 N.E.2d 282, 284 (1993) (citing *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 553, 593 N.E.2d 1365, 1370 (1992).)

Prestige cites to a case that dismissed a gross negligence claim because "intentional conduct…cannot form the basis of a claim founded on negligence." *Onfroy v. L. Offs. of Geoffrey T. Mott, P.C.*, 751 F. Supp. 3d 195, 205 (E.D.N.Y. 2024) (quoting *Morrow v. MetLife Invs. Ins. Co.*, 177 A.D.3d 1288, (App. Div. 4th Dep't 2019)). But the New York cases in which that principle arose involved simultaneously asserted ordinary negligence claims and assault or battery claims, which require intentional physical contact. *See, e.g., Borrerro v. Haks Grp., Inc.*, 165 A.D.3d 1216, (App. Div. 2d. Dep't 2018); *United Nat. Ins. Co. v. Tunnel, Inc.*, 988 F.2d 351,

24

353 (2d Cir. 1993); *Schmidt v. Bishop*, 779 F. Supp. 321, 324 (S.D.N.Y. 1991); Outside of that context, this rule cannot be squared with the well-established definition of gross negligence, which is "conduct that smacks of *intentional* wrongdoing and evinces a reckless indifference to the rights of others." *Abacus Fed. Sav. Bank*, 18 N.Y.3d at 684 (emphasis added); *see also Bayerische Landesbank*, 692 F.3d at 61–62. Appellate courts have accordingly permitted gross negligence claims based on allegations of intentional conduct that do not involve physical contact. For example, in *Belcastro v. Roman Cath. Diocese of Brooklyn, New York*, 213 A.D.3d 800, 802, (App. Div. 2d Dep't 2023), the Appellate Division, Second Department, agreed that a plaintiff sexual abuse victim had a gross negligence claim against a school and church who, he alleged, "knew of the sexual abuse and condoned it, covered it up, and *intentionally* failed to prevent it." *Belcastro*, 213 A.D.3d at 802 (emphasis added). And in *Bayerische Landesbank,* the Second Circuit allowed a gross negligence claim to proceed based on allegations that "appear[ed] to 'smack' of intentional wrongdoing" and demonstrated recklessness. 692 F.3d at 62 –65. *See also Crespo v. Gutman, Mintz, Baker & Sonnenfeldt, LLP*, No. 22-CV-6599 (JPO), 2025 WL 871637, at *9 (S.D.N.Y. Mar. 20, 2025) (denying a motion for summary judgment to dismiss a gross negligence claim where there was evidence that the defendant debt collector had "intentionally lied" to the plaintiff about his statutory rights)

## CONCLUSION

For the above reasons, Prestige's motion to dismiss must be denied in full. To the degree the Court finds Plaintiff has not alleged sufficient facts in support of her claims, Plaintiff would seek leave to re-plead to add additional facts, especially in light of what has been disclosed to date in the limited discovery exchanged.

DATED: Brooklyn, New York

25

March 31, 2026

Respectfully submitted,

By: */s/ Ahmad Keshavarz*

Ahmad Keshavarz, Esq.
LAW OFFICE OF AHMAD KESHAVARZ
16 Court St., Suite 2600
Brooklyn, NY 11241
Phone: (718) 522-7900
Email: ahmad@NewYorkConsumerAttorney.com

cc: all counsel of record (via ECF)