2005 Tab 7a
NYEF 2005 Model Form- 111/05

## PROPERTY MANAGEMENT AGREEMENT

This Agreement is made as of the date set forth herein, between the Owner ("Owner") and Agent ("Agent") identified on the signature page hereof. Certain terms of this Agreement are set forth on the Information Schedule (the "Information Schedule") attached hereto and made a part hereof.

## W I T N E S S E T H:

In consideration of the terms, conditions, and covenants hereinafter set forth, Owner and Agent hereby mutually agree as follows:

1. **Definitions**. As used in this Agreement:

(a) **"Building"** shall have the meaning ascribed to such term in Section A of the Information Schedule.

(b) **"Fiscal Year"** shall mean calendar year unless specifically provided to the contrary herein.

(c) **"Gross Collections"** shall mean all amounts actually collected by Agent, as rents or other payments, but excluding (i) income derived from interest or investments, (ii) discounts and dividends on insurance, and (iii) security deposits.

(d) **"Gross Rents"** shall mean revenues collected from Tenants plus any federal assistance paid to Owner with respect to the Building.

(e) **"Lease"** shall mean any Lease in which Owner has agreed to let and Tenant has agreed to accept the dwelling unit of the Building identified in the Lease in accordance with the terms of the Lease.

(f) **"Mortgages"** shall mean, collectively, all mortgages from time to time encumbering the Building and all promissory notes secured thereby.

(g) **"Operating Account"** shall mean an account in Agent's name and designated of record in an account name identifying the Building and approved by Owner in writing, at such financial institution as Owner may specify from time to time in writing.

(h) **"Rent"** shall mean that monthly amount which Tenant is obligated to pay Owner pursuant to the terms of a Lease.

(i) **"Tenant"** shall mean a person or family occupying a dwelling unit in the Building pursuant to a Lease.

1

PRE - 000001

2005 Tab 7a
NYEF 2005 Model Form- 111/05

2.    Appointment and Acceptance.  Owner appoints Agent as exclusive agent for the management of the Building, and Agent accepts the appointment, subject to the terms and conditions set forth in this Agreement.  Agent represents that it is experienced in professional management of property of the character and occupancy of the Building, and Agent agrees to manage the Building in accordance with the highest professional standards for such property.

3.    Management Plan.  Attached hereto as Exhibit 1 and by this reference made a part hereof, if applicable, is a copy of the Management Plan for the Building (the "Plan"), prepared and approved by Owner.  The Plan, if applicable, contains a comprehensive and detailed description of the policies and procedures to be followed by Agent in the management of the Building, including but not limited to the collection of delinquent rents and charges; and the provisions of this Agreement are to be read in conjunction with and not as a limitation upon the specific obligations of Agent as set forth in the Plan.  Agent agrees to comply with all applicable provisions of the Plan, regardless whether specific reference is made thereto in any particular provision of this Agreement.

4.    Meeting with Owner.  Agent agrees to cause a representative of Agent to confer with Owner and to attend meetings with Owner at any reasonable time or times requested by Owner.

5.    Basic Information.  As soon as practicable, but not later than final completion of rehabilitation or construction of the Building or any phase thereof, Owner shall furnish Agent with a complete set of general plans and specifications for the Building and copies of all guarantees and warranties pertinent to construction and fixtures and equipment of the Building.  With the aid of this information and inspection by competent personnel, Agent shall thoroughly familiarize itself with the character, location, construction, layout, plan and operation of the Building, and especially the electrical, heating, plumbing, and ventilating system, and all other mechanical equipment in the Building.

6.    Development Phase.  Agent shall facilitate the work of Owner's general contractor in an effort to minimize disturbance of the Tenants and promote timely completion of rehabilitation or construction of the Building.  Any disputes between the Agent and the general contractor shall be immediately referred to Owner by Agent.  Further, Agent shall do the following during rehabilitation:

(a) Post notices around the construction area warning Tenants and others that area is under construction and trespass may be hazardous;

2

PRE - 000002

2005 Tab 7a
NYEF 2005 Model Form- 11/05

(b) Respond to Tenant complaints regarding the construction activity and notify Owner thereof; and

(c) Notify Owner of any dangerous condition that emanates from construction.

7. Marketing. Agent shall carry out the marketing activities prescribed in the Plan or approved by Owner in writing. Subject to the prior written approval of Owner, advertising expenses incurred by Agent on behalf of Owner shall be paid out of the Operating Account as expenses of the Building.

8. Leasing. Agent shall offer for rent and shall rent the dwelling units in the Building, upon completion of rehabilitation of each such unit and from time to time thereafter, in accordance with a rent schedule approved in writing by Owner and the leasing guidelines and form of lease referred to hereinbelow. Incident thereto, the following provisions shall apply:

(a) Agent shall show dwelling units for rent in the Building to all prospective Tenants.

(b) Agent shall take and process applications for rentals, including prospective Tenant interviews and credit checks. If an application is rejected, Agent shall promptly give to the applicant a proper written notice stating the reason for rejection.

(c) Agent shall comply with the special low-income housing tax credit requirements concerning leasing and related matters as set forth in Paragraph 9 hereof.

(d) Agent shall be responsible for or shall assist Owner in the certification and recertification of tenants covered by any Housing Assistance Payments Contract that may be applicable to the Building with respect to federal Section 8 rent subsidies, following procedures required by the U.S. Department of Housing and Urban Development ("HUD"). After the first year of certification and recertification of Tenants, the certification and recertification process shall be the sole responsibility of Agent.

(e) Agent shall, subject to prior written approval by Owner of any deviation from Owner's approved rent schedule, Lease form, and leasing guidelines, execute all Leases in Agent's name, identified thereon as agent for Owner.

(f) Agent shall negotiate any commercial leases and concession agreements called for in the Plan or approved in writing by Owner and, subject to prior written approval by Owner of all terms and conditions, shall execute the same in its name, identified thereon as Agent for Owner.

3

PRE - 000003

2005 Tab 7a
NYEF 2005 Model Form- 111/05

(g) Agent shall collect, deposit, and disburse security deposits, if required, in accordance with the terms of each Lease. The amount of each security deposit shall be as specified in the Plan or as approved by Owner in writing. Security deposits shall be held by Agent in a trust account, separate from all other accounts and funds. Such account shall be in the name of the Agent, also identifying the Building, and designated of record as "Security Deposit Account." Interest on security deposits shall be paid according to law.

(h) Agent shall maintain a current list of acceptable prospective Tenants and undertake all arrangements necessary and incidental to the acceptance of rental applications and the execution of Leases. Agent shall exercise its best efforts (including, but not limited to, placement of advertising, interview of prospective Tenants, assistance in completion of rental applications and execution of Leases, processing of documents and credit and employment verifications, and explanation of the program and operations of Owner), to effect the leasing of dwelling units, renewal of Leases, and, in accordance with the terms of the Lease, subleasing of dwelling units in the Building.

(i) Agent shall perform such other acts and deeds requested by Owner as are reasonable, necessary, and proper in the discharge of Agent's rental duties under this Agreement.

(j) Agent shall prorate the first month's rent collected from a Tenant should the Lease term commence on any other day than the first day of the month. If the Lease term occurs after the twentieth (20th) day of the month, the prorated amount, plus the next month's rent, shall be collected on or before the first day of the Lease term.

(k) Agent shall participate in the inspection of the dwelling unit identified in the Lease together with the Tenant prior to move-in and upon move-out, and shall record in writing any previous damage to the unit and any damage occurring during the Tenant's occupancy.

(l) Agent shall, unless otherwise agreed by Owner and Agent in writing, (i) comply with the leasing guidelines attached hereto as Exhibit 2 and by this reference made a part hereof, and (ii) use for each Lease the form of lease agreement attached hereto as Exhibit 3 and by this reference made a part hereof, together with the form of Low-Income Lease Rider attached hereto as Exhibit 4 and by this reference made a part hereof, if required by Paragraph 9 hereof, without any material changes.

(m) If the Project is a rehabilitation of a pre-1978 built building and contains rental units with one bedroom or

4

PRE - 000004

2005 Tab 7a
NYEF 2005 Model Form- 111/05

more that are expected to be available to tenants other than the elderly or disabled then the Agent must provide each prospective tenant a copy of the Government Printing Office published informational pamphlet entitled Lead-Based Paint: Protect Your Family and a copy of the Lead Hazard Evaluation report on the building prepared by the Owner's environmental consultant. Furthermore, the Agent agrees to indemnify and hold harmless the Owner for any damages and attorneys' fees incurred by the Owner or Agent for failure to properly implement this paragraph.

9. **Tax Credit Requirements**. Agent acknowledges that Owner is required under its limited partnership agreement to use best efforts to lease the percentage of the apartment space in the Building set forth in Section B of the Information Schedule (based on number of apartments or floor area, whichever is less) (the **"Credit Units"**) to tenants whose income and rent levels qualify such apartments for inclusion in determining federal low-income housing tax credits (the **"Credits"**) for the Building, and that the Credits will have substantial economic value to Owner and its partners. Agent shall also lease any other qualified space if and as indicated in Section B of the Information Schedule. Owner shall furnish Agent with written descriptions of such requirements as they relate to Agent's leasing and management duties hereunder. Incident thereto, the following provisions shall apply for all Credit Units:

(a) Agent shall, prior to approving each rental application and prior to allowing prospective tenant to take occupancy, (i) require prospective tenant to complete, execute, and deliver the forms of Low-Income Lease Rider, and (ii) obtain from the prospective tenant's employer (if any) the completed and executed form of Employment Verification, all attached hereto as part of Exhibit 4, as may be revised by Owner from time to time, and (iii) shall perform such other verifications of such tenant's non-employment income as are necessary or appropriate, in order to provide necessary certification and verification of the amount of such tenant's annual family income, family size, and any other information reasonably requested by Owner in writing in connection with the Credits. Agent shall require tenants to certify in writing as to such matters on an annual basis, prior to such time as the information is required for tax reporting purposes for the Credits. Owner shall give Agent advance written notice of such requirements. Agent shall, prior to leasing Credit Units, determine tenant income eligibility for purposes of the Credits pursuant to applicable laws, using the Managing Agent's Low-Income Eligibility Worksheet attached hereto as part of Exhibit 4 or such corrective revisions thereof as Owner shall furnish to Agent from time to time upon any revisions in applicable laws. Without Owner's express prior written consent, Agent shall not enter into any lease on behalf of Owner to a tenant who fails to

PRE - 000005

2005 Tab 7a
NYEF 2005 Model Form- 111/05

meet the income eligibility requirements for the Credits. Agent shall complete, execute, and deliver to Owner, upon lease-up of the Credit Units and annually thereafter prior to the time such information is required for tax reporting purposes for the Credits, the form of Managing Agent's Low-Income Leasing Certification attached hereto as Exhibit 5, including a true and correct Rent Roll of all apartment units in the Building in the format attached therewith. Agent shall deliver copies of all leases, riders, certifications, and verifications for the Credit Units to Owner on a monthly basis, and shall deliver copies of annual recertification to Owner prior to the time they are required for tax reporting purposes for the Credits.

(b) Owner shall from time to time furnish Agent with a written schedule of maximum rents for the apartments, depending on family size for purposes of the Credits. Without Owner's express prior written consent, Agent shall not enter into any lease on behalf of Owner at a rental amount exceeding the applicable maximum.

(c) Agent shall maintain and preserve all written records of tenant family income and size, and any other information reasonably requested by Owner in writing in connection with the Credits, throughout the term of the Agreement, and shall turn all such records over to Owner upon the termination or expiration of the Agreement.

(d) If requested by Owner in writing, Agent shall prepare reports of low-income leasing and occupancy in form suitable for submission in connection with the Credits.

(e) Agent shall cause the Project to be maintained in compliance with all local health, safety, and building codes to the extent of available funds, and shall promptly give written notice to Owner and to Owner's Limited Partner, as identified in Paragraph 28 hereof, if Agent receives notice of any such code violation relating to the Building.

10. **Collection of Rents, Etc.** Agent shall collect when due, directly or through an on-site manager, all rents, charges, and other amounts receivable on Owner's account in connection with the management and operation of the Building. Such receipts shall be held in the Operating Account identifying the Building, separate from all other accounts and funds.

11. **Enforcement of Leases**. Agent shall secure full compliance by each Tenant with the terms of such Tenant's Lease. Voluntary compliance shall be emphasized, and Agent shall counsel Tenants and make referrals to community agencies in cases of financial hardship or other circumstances deemed appropriate by Agent, all to the end that involuntary termination of tenancies shall be avoided to the maximum extent, consistent with sound

PRE - 000006

2005 Tab 7a
NYEF 2005 Model Form- 111/05

management of the Building. Nevertheless, and subject to any applicable procedures prescribed in the Plan, Agent may, and shall if requested by Owner, lawfully terminate any tenancy when sufficient cause for such termination occurs under the terms of the Tenant's Lease, including, but not limited to, nonpayment of rent. For this purpose, Agent is authorized to consult with legal counsel to be designated by Owner and bring actions for eviction and execute notices to vacate and judicial pleadings incident to such actions; provided, however, that Agent shall keep Owner informed of such actions and shall follow such instructions as Owner may prescribe for the conduct of any such action. Reasonable attorneys' fees and other necessary costs incurred in connection with such actions, as determined by Owner, shall be paid out of the Operating Account. Agent shall properly assess and collect from each Tenant or the security deposit the cost of repairing any damages to the dwelling unit arising during the Tenant's occupancy.

12. **Maintenance and Repairs**. Agent shall cause the Building to be maintained in a decent, safe, and sanitary condition and in a rentable and tenantable state of repair, all in accordance with the Plan and local codes, and Agent otherwise shall maintain the Building at all times in a condition acceptable to Owner, including, but not limited to, performance of cleaning, painting, decorating, plumbing, carpentry, grounds care, and such other maintenance and repair work as may be necessary. Incident thereto, the following provisions shall apply:

(a) Special attention shall be given to preventive maintenance, and to the greatest extent feasible, the services of regular maintenance personnel shall be used.

(b) Subject to Owner's prior written approval, Agent shall contract with qualified independent contractors for the maintenance and repair of major mechanical systems, and for the performance of extraordinary repairs beyond the capability of regular maintenance personnel. Agent shall obtain prior to commencement of any work appropriate written evidence of such contractor's liability and worker's compensation insurance.

(c) Agent shall systematically and promptly receive and investigate all service requests from Tenants, take such action thereon as may be justified, and keep records of the same. Emergency requests shall be received and serviced on a 24-hour basis. Complaints of a serious nature shall be reported to Owner after investigation. Owner shall have the right to receive copies of all service requests and the reports of action taken thereon.

(d) Agent shall use best efforts to take such action as may be necessary to comply with any and all orders or requirements of federal, state, county, or municipal

PRE - 000007

2005 Tab 7a
NYEF 2005 Model Form- 111/05

authorities having jurisdiction over the Building and orders of any board of fire underwriters, insurance companies, and other similar bodies.

(e) Subject to the provisions of paragraph 19 hereof, Agent is authorized to purchase all materials, equipment, tools, appliances, supplies, and services necessary for proper maintenance or repair of the Building.

(f) Notwithstanding any of the foregoing provisions, the prior approval of Owner shall be required for any expenditure exceeding $500.00 in any one instance for labor, materials, or otherwise, in connection with the maintenance and repair of the Building, except for emergency repairs involving manifest danger to persons or property, or required to avoid suspension of any necessary service to the Building. In the event of emergency repairs, Agent shall notify Owner of the fact promptly, and in no event later than 72 hours from the occurrence of the event.

13.   **Utilities and Services**. In accordance with any applicable provisions of the Plan, Agent shall make arrangements for water, electricity, gas, sewage, and trash disposal, vermin extermination, decorating, laundry facilities, and telephone service in connection with the Building.   To the extent available, all utilities shall be paid in accordance with an annual budget plan established by the utility.

14.   **Personnel**.   All on-site personnel shall be contracted service providers or employees of Agent and shall be paid from the Operating Account as an expense of the Building.   Agent shall at all times have sufficient personnel physically present at the Building for the full and efficient performance of its duties under this Agreement, including physical presence of responsible persons at such times as reasonably may be requested by Owner.

15.   **Operating Account**.   Disbursements from the Operating Account shall be governed by the following:

(a) From the funds collected and held by Agent in the Operating Account pursuant to paragraph 10 hereof, and subject to Owner's approved operating budget, Agent shall make the following disbursements promptly when payable, in the following order of priority:

(i) salaries and any other compensation due and payable to the employees referred to in paragraph 14 hereof including Agent's compensation, together with related payroll taxes;

(ii) real estate taxes and assessments, and fire and other hazard insurance premiums (including any required monthly escrow payments therefor),

PRE - 000008

8

2005 Tab 7a
NYEF 2005 Model Form- 111/05

utilities, interest on the Mortgages, amortization of the principal of the Mortgages, fees, and establishment and maintenance of all reserve funds;

(iii) other payments due and payable by Owner as operating expenses incurred pursuant to Owner's approved operating budget and in accordance with this Agreement, and

(iv) distributions to or at the direction of Owner, including distributions to Owner's partners in accordance with Owner's partnership agreement.

(b) In the event that the balance in the Operating Account is at any time insufficient to pay disbursements due and payable under subparagraph 15(a) hereof, Agent shall promptly inform Owner of the fact and Owner may then remit to Agent sufficient funds to cover the deficiency. In no event shall Agent be required to use its own funds to pay such disbursements.

16.   Operating Budget.   Agent shall prepare a recommended annual operating budget for the Building for each fiscal year during the term of this Agreement, and shall submit the same to Owner at least sixty (60) days before the beginning of such fiscal year.   The annual operating budget shall include a schedule of recommended rents to be charged for each dwelling unit, including recommended rent increases with respect to Lease renewals and new Leases.   In preparing each proposed annual operating budget, Agent shall use its best efforts to take account of anticipated increases in real estate taxes, utility charges, and other operating costs.   To the extent feasible, Agent shall support anticipated increases in real estate taxes and utility charges with written evidence or documentation.   Proposed annual operating budgets for the Building shall be subject to approval by Owner. Owner shall promptly inform Agent of any changes incorporated in the approved operating budget, and Agent shall make no expenditures in excess of the amounts set forth in such approved operating budget, for each line item of operation expense itemized, without the prior written approval of Owner, except as permitted pursuant to subparagraph 12(f) hereof for emergency repairs involving manifest danger to persons or property, or required to avoid suspension of any services to the Building.

17.   Records and Reports. In addition to any requirements specified in the Plan or other provisions of this Management Agreement, Agent shall have the following responsibilities with respect to records and reports:

(a) Upon execution of this Agreement, Agent immediately shall ascertain the general condition of the Building, including, but not limited to, the taking of an inventory of

PRE - 000009

2005 Tab 7a
NYEF 2005 Model Form- 111/05

all furniture, equipment, tools, and supplies, and shall prepare a report on the physical and financial status of the Building. Within thirty (30) days after the execution of this Agreement, Agent shall provide Owner with a copy of the reports and inventories so prepared.

(b) Agent shall establish and maintain a comprehensive system of records, books, and accounts, including computerized systems, in accordance with the Plan and in a manner satisfactory to Owner. All records, books, and accounts shall be subject to examination at reasonable hours by any authorized representative of Owner, or of Owner's limited partner as identified in paragraph 28 hereof ("Owner's Limited Partner").

(c) Agent shall prepare a monthly report, in accordance with any applicable provisions of the Plan and in form satisfactory to Owner, containing and including at least the following: (i) a statement of income and expenses and accounts receivable and payable for the preceding month, including an itemized list of all delinquent rents as of the tenth (10th) day of the current month, as well as a report on action taken thereon by Agent; (ii) a rent roll/cash receipts form for the previous month; (iii) a disbursements summary for the previous month; (iv) current bank statements with reconciliation of the Operating and Security Deposit Accounts; (v) copies of paid bills and invoices for the previous month; and (vi) a narrative of any unusual actions taken or emergencies responded to, and a full report of any accidents, claims, and potential claims, for the previous month. Agent shall submit each such report to Owner on or before the fifteenth (15th) day of each month, and shall concurrently mail a copy of the entire report to Owner's Limited Partner.

(d) Agent shall promptly furnish such additional information (including monthly occupancy reports) as may be requested from time to time by Owner or Owner's Limited Partner with respect to the renting and financial, physical, or operational condition of the Building.

(e) Agent shall prepare, execute, and file all forms, reports, and returns required by law in connection with the employment of personnel, unemployment insurance, workman's compensation insurance, disability benefits, Social Security, and other similar insurance, and all other benefits or taxes now in effect or hereafter imposed.

(f) Agent shall establish tenant files containing copies of leases, certification forms, notices, and other documentation required by HUD, if and to the extent applicable.

PRE - 000010

2005 Tab 7a
NYEF 2005 Model Form- 111/05

(g) Except as may otherwise be expressly provided in this Agreement, all bookkeeping, data processing services, and management overhead expenses shall be borne by Agent out of its funds and shall not be treated as Building expenses.

18.  **Fidelity Bond**.  Agent shall furnish and maintain, at the expense of the Building, for the duration of this Agreement and any extensions thereof, plus thirty (30) days after the expiration or termination thereof, a commercial blanket bond in favor of Owner, in an amount not less than the sum of (a) two (2) months' potential maximum Gross Rents for the Building plus (b) aggregate Tenant security deposits held from time to time, both in amounts as determined by Owner, and in a form and with a company acceptable to Owner, which commercial blanket bond shall cover Agent and all employees hired by Agent in connection with this Agreement. Such fidelity bond shall cover losses discovered by Owner within two (2) years after the occurrence of such losses.  Such fidelity bond shall be attached to this Agreement, and such fidelity bond shall contain a written provision that Owner shall be given at least ten (10) days' prior written notice of cancellation.

19.  **Bids, Discounts, and Rebates**.  Agent shall obtain contracts, materials, supplies, utilities, and services on the most advantageous terms to the Building, and shall solicit competitive bids on all contracts or purchases exceeding $10,000.00 for those items which can be obtained from more than one source.  Agent shall secure and credit to Owner all discounts, rebates, or commissions obtainable with respect to purchase, service contracts, and all other transactions on Owner's behalf.

20.  **Liability of Agent**.  Except as expressly provided to the contrary herein, the obligations and duties of Agent under this Agreement shall be performed as agent of Owner, but Agent, personally, shall be liable for its breaches of this Agreement; provided, however, that the Agent shall not be responsible for incurring any expenditures in excess of existing or reasonably projected available funds from the Building or funds supplied by Owner.  All expenses incurred by Agent in accordance with its obligations and duties under this Agreement and consistent with Owner's approved operating budget, except those due to its breaches of this Agreement and those expressly specified as Agent's expenses herein, shall be for the account of and on behalf of Owner.

21.  **Indemnification**.  To the extent permitted by law, Owner agrees to defend, indemnify, and save harmless Agent from all claims and suits in connection with the Building provided that such claims and suits are attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property, and such claims and suits arise, or are alleged to arise, in whole or in part out of any negligent act or omission of Owner, its officers, employees, or agents.  Owner agrees to include Agent as an insured in Owner's public liability policy,

PRE - 000011

11

2005 Tab 7a
NYEF 2005 Model Form- 111/05

but only while Agent is acting as real estate manager for Owner under this Agreement. Owner shall provide Agent with a certificate of insurance evidencing such liability insurance and providing not less than ten (10) days' notice to Agent prior to cancellation.

To the extent permitted by law, Agent agrees to defend, indemnify, and save harmless Owner and its partners from all claims, investigations, and suits, or from actions or failures to act of Agent, with respect to any alleged or actual violation of state or federal labor or other laws pertaining to employees, it being expressly agreed and understood that as between Owner and Agent, all persons employed in connection with the premises are employees of Agent, not Owner. Agent shall at all times keep its employees and contractors insured for statutory workers' compensation and other employee benefits required by all applicable laws, and Agent shall maintain employer's liability insurance for an amount not less than $500,000.00 covering claims and suits by or on behalf of employees and others, not otherwise covered by statutory workers' compensation insurance. Owner and its partners shall be protected in all such insurance by specific inclusion of Owner under an additional insured or alternate employer rider. Agent shall provide Owner with a certificate of insurance evidencing that workers' compensation and employer's liability insurance is in force and providing not less than ten (10) days' notice to Owner prior to cancellation.

22. **Insurance**. When specifically directed by Owner in writing, Agent shall cause insurance coverage required under the Mortgages, and such additional forms and amounts of insurance as Owner may require, to be placed and kept in effect at all times with insurance companies satisfactory to Owner. Agent shall be designated as an insured while acting as real estate manager for Owner under public liability insurance for a limit of liability acceptable to Agent and Owner. Agent shall investigate and promptly furnish to Owner full written reports of all accidents, claims, and potential claims for damages relating to the Building, and shall cooperate fully with Owner's insurers, regardless of whether the insurance was arranged by Agent or others.

23. **Escrow Payments**. From the funds collected and deposited by Agent in the Operating Account, Agent shall make any monthly escrow payments required under the Mortgages, for the purpose of funding insurance, tax, and such other reserve or escrow accounts for the Building as Owner may require pursuant to the Mortgages. Agent promptly shall present tax bills and insurance premium notices to the escrow agent for payment and shall furnish Owner with evidence of timely payment of such taxes and insurance premiums.

24. **Agent's Compensation**. As compensation for all of Agent's ongoing property leasing, management, and related services under this Agreement, beginning in the month following the month

PRE - 000012

2005 Tab 7a
NYEF 2005 Model Form- 111/05

in which a certificate of occupancy for the Building was issued, Agent shall receive a monthly fee in an amount equal to the percentage set forth in Section C of the Information Schedule of the Gross Rents received in that month (the "Management Fee"), to be paid out of the Operating Account and treated as a Building expense. Such fee shall be payable on the tenth (10th) day of the month following the month in which the services were rendered, subject to the provisions of Paragraph 25 hereof.

25. **Subordination Agreement**. Agent agrees to the following conditions governing amount and timing of payment of Agent's compensation under this Agreement:

(a) The monthly Management Fee shall be deemed earned in its entirety and accrued as an expense to the Building, but except as otherwise provided below, the amount paid in any month shall be reduced by the amount of any Operating Deficits (as defined below), and any unpaid amount shall be paid for such month in the next succeeding month or months in which there are no Operating Deficits, to the extent there is a surplus of Operating Income (as defined below) available for payment of Agent's management fee under the priorities currently specified in Owner's partnership agreement.

(b) "Operating Deficits" means any excess of Operating Expenses (as defined below) over Operating Income.

(c) "Operating Expenses" means all cash expended, reserved, or required for debts or expenses (including all required or advisable deposits into the reserves described in Owner's partnership agreement, interest, and principal payments on indebtedness, capital expenditures, replacements, expansion, or other reasonable requirements of Owner's business (excluding Agent's cost of doing business which the items of work are costs covered by the Property Management Fee and excluding cash expended from capital contributions or for capital transactions) related to the Building.

(d) "Operating Income" means all cash received from operations of Owner in the ordinary course of business (excluding capital contributions and net proceeds of capital transactions) related to the Building.

Notwithstanding the foregoing provisions, funds held in the operating reserve under Owner's partnership agreement shall be used to pay Agent's management fee to the extent that such payment does not reduce the amount of such operating reserve below the amount set forth in Section D of the Information Schedule.

26. **Compliance with Laws**. In the performance of its obligations under this Agreement, Agent shall comply with applicable local, state, and federal laws and regulations.

PRE - 000013

13

2005 Tab 7a
NYEF 2005 Model Form- 111/05

27. Term of Agreement. This Agreement shall be in effect for the period commencing as of the date hereof and ending on the first (1st) anniversary of the date hereof, and shall be automatically extended for one (1) year periods thereafter until the date set forth in Section E of the Information Schedule, subject to the following conditions:

(a) Either Owner or Agent may elect not to extend this Agreement by notifying the other party at least sixty (60) calendar days in advance of the last day of the initial period hereunder or any annual extension period thereafter.

(b) This Agreement may be terminated by mutual written consent of Owner and Agent.

(c) In the event Agent fails to perform any of its duties hereunder or to comply with any of the provisions hereof, Owner shall notify Agent in writing and Agent shall have ten (10) days thereafter within which to cure such default to the reasonable satisfaction of Owner, and if such default cannot be cured within such ten (10) day period, Agent shall have such additional time as may be necessary to cure the same provided that Agent demonstrates to the continuing satisfaction of Owner that it is diligently pursuing all necessary actions to cure such default and that the same will be cured within a reasonable time without damage or expense to Owner.

(d) In the event a petition in bankruptcy is filed by or against Owner or Agent, or in the event Owner or Agent makes an assignment for the benefit of creditors or takes advantage of any insolvency act, Owner or Agent may terminate this Agreement without notice to the other.

(e) Within five (5) days after the termination of this Agreement, Agent shall close all accounts and pay the balances or assign all certificates of deposit regarding the Building to Owner. Within ten (10) days after the termination of this Agreement, Agent shall deliver to Owner all plans and surveys of the Building in its possession and all books and records concerning the Building. Within thirty (30) days after the termination of this Agreement, Agent shall submit to Owner all reports required under paragraph 17 hereof to the date of such termination, and Agent and Owner shall account to each other with respect to all matters outstanding as of the date of termination.

28. Notices. All notices or other communications required or desired to be given under this Agreement shall be in writing and shall be delivered either personally or by U.S. certified mail, return receipt requested, which shall be deemed delivered upon personal delivery or two (2) business days after mailing, to the parties at the addresses set forth in Section F of the

PRE - 000014

2005 Tab 7a
NYEF 2005 Model Form- 111/05

Information Schedule. In the event of a change in the mailing addresses stated above, any addressee whose address changes hereby agrees to give notice of a new or forwarding address within seven (7) days of the effective date of said change to the other addressee, whereupon subsequent notices shall be addressed to such new or forwarding address.

29. Amendment. This Agreement constitutes the entire agreement between Owner and Agent, and no amendment or modification thereof shall be valid or enforceable except by supplemental agreement in writing, executed by the parties hereto or the party to be bound thereby. In addition, no such amendment or modification shall be valid or enforceable without the prior written consent of Owner's Limited Partner.

30. Enforceability. The invalidity of any clause, part, or provision of this Agreement shall not affect the validity of the remaining portions thereof. Owner's remedies under this Agreement are cumulative, and the exercise of one remedy shall not be deemed an election of remedies nor foreclose the exercise of Owner's other remedies. No waiver by Owner of any breach of this Agreement shall be deemed to be a waiver of any other or subsequent breach. Owner or Agent may apply to any court, state or federal, for specific performance of this Agreement, for an injunction against any violation of this Agreement, or for such other relief as may be appropriate, since the injury arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

31. Governing Law. The law of the state in which the Building is located shall govern the interpretation and enforcement of this Agreement.

32. Captions. The captions used in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, or describe the scope or the intent of this Agreement.

33. Execution of Counterparts. For the convenience of the parties, this Agreement may be executed in multiple counterparts, each of which shall constitute a complete original of this Agreement, which may be introduced in evidence or used for any other purpose without the production of any other counterparts.

34. Successors and Assigns. This Agreement shall inure to the benefit of and constitute a binding obligation upon Owner and Agent and their respective successors and assigns; provided, however, that Agent shall not assign this Agreement, or any of its duties hereunder, without the prior written consent of Owner. In the event Owner's current general partner or any successor general partner of Owner is removed as general partner in accordance with Owner's partnership agreement, any successor general partner

PRE - 000015

2005 Tab 7a
NYEF 2005 Model Form- 111/05

selected in accordance with such partnership agreement shall have authority to act hereunder on behalf of Owner, and until such successor is selected Owner's Limited Partner shall have temporary authority to act hereunder on behalf of Owner.

    In Witness Whereof, the parties have executed this Agreement as of the 20th day of Feb. _____, 20 07.

Owner: _Arthur Kingston Housing LP- LP._

a(n) _____ limited partnership

By: _Arthur Kingston Housing Corp. LP_,

a(n) _____ corporation,

general partner

By: _____
       Title:

Attest:

_____
Title:

    [SEAL]

Agent:

_PRESTIGE MANAGEMENT Inc_____,

a _NEW YORK_____ corporation

By: _TREVOR WILSON_____
      Title: _PRESIDENT_

Attest:
_Artyoure Mlylelo_____
Title: _SECRETARY_

    [SEAL]

PRE - 000016

16

2005 Tab 7a
NYEF 2005 Model Form- 111/05

<u>INFORMATION SCHEDULE</u>

The following provisions are incorporated into and made a part of the foregoing Property Management Agreement between Owner and Agent to which this Information Schedule is attached.

A.    <u>Paragraph 1.</u>    The term "Building" means, collectively, the real property commonly known as _____, and all improvements, appurtenances, and equipment located thereon, including _____ (___) dwelling units.

B.    <u>Paragraph 9.</u>    The percentage of apartment space (number of apartments or floor area, whichever is less) to be leased to low-income tenants is _____ percent (___%).  Any other eligible space required to qualify for the Credits and leasing requirements applicable thereto, if any, are as follows: _____.

C.    <u>Paragraph 24.</u>    The Management Fee shall be in an amount equal to (strike inapplicable provision):  *EIGHT* percent ( *8* %) of the Gross Rents received or _____ ($_____) in each month following the month in which a certificate of occupancy was issued for the Building.

D.    <u>Paragraph 25.</u>    Funds held in the operating reserve under Owner's partnership agreement shall be used to pay Agent's Management Fee to the extent that such payment does not reduce the amount of such operating reserve below _____ ($_____).

E.    <u>Paragraph 27.</u>    The date on which the Agreement will terminate, subject to the conditions contained in Paragraph 27(a) through (e) thereof, shall be _____, 20___.

F.    <u>Paragraph 28.</u>    The addresses to which all notices required or desired to be given under the Agreement shall be delivered are as follows:

Agent:  *PRESTIGE MANAGEMENT INC*
*3485 E TREMONT AVE*
*BRONX NY 10465*

Owner: _____
_____
_____

With a copy to Owner's Limited Partner:

New York Equity Fund 2005 LLC
c/o New York Equity Fund, Inc.
501 Seventh Avenue, 7th Floor
New York, New York 10018
Attn: Asset Management, Director

PRE - 000017

17

   In Witness Whereof, the parties have executed this Addendum as of
the ____ day of _____, 20__.

Owner's General Partner                    Owner: ~~Arthur Rouse and Ashourn, L.P.~~ a(n)

_____                           limited partnership

_____                    ~~Arthur Renown Houses Corp~~ of

_____                    By: _____

_____                    a(n)

                                           corporation, general partner

                                           By: _____

                                               Title: _____


Owner's Limited Partner:                   Agent:

New York Equity Fund 2005 LLC              _PRESTIGE MANAGEMENT Inc_ a(n)
                                           _NEW YORK_           corporation
                                           By: _____
                                               Title: _PRESIDENT_


c/o New York Equity Fund
501 Seventh Avenue, 7th Floor
New York, New York 10018
Attention: Director, Asset Management

PRE - 000018

8

**Housing Assistance Payments Contract**
**(HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

---

## Part A of the HAP Contract: Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract**
   This HAP contract has three parts:
   - Part A: Contract Information
   - Part B: Body of Contract
   - Part C: Tenancy Addendum

2. **Tenant**

   Leonarda Garcia Ramirez

3. **Contract Unit**

   151 West 123 Street, 6C
   New York, NY 10027

4. **Household**

   The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.

   Leonarda  Garcia Ramirez

   Jesus  Suero Garcia

   Gabriela  Suero Garcia

   Gabriel  Suero Garcia

5. **Initial Lease Term**
   The initial lease term begins on (mm/dd/yyyy): _____12/01/2015_____

   The initial lease term ends on (mm/dd/yyyy): _____11/30/2016_____

6. **Initial Rent to Owner**
   The initial rent to owner is: $ _____902.08_____
   During the initial lease term, the owner may not raise the rent to owner.

7. **Initial Housing Assistance Payment**

   The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $ _626.08_____ per month.
   The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

---

7651053
Previous editions are obsolete

Page 1 of 11

PRE - 000019
form HUD-52641 (8/2009)
ref Handbook 7420.8

8.   Utilities and Appliances.
The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for utilities and appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Specify fuel type | | | | Provided by | Paid by |
|---|---|---|---|---|---|---|
| Heating | ☑ Natural gas | ☐ Bottle gas | ☐ Oil or Electric | ☐ Coal or Other | O | O |
| Cooking | ☑ Natural gas | ☐ Bottle gas | ☐ Oil or Electric | ☐ Coal or Other | O | O |
| Water Heating | ☑ Natural gas | ☐ Bottle gas | ☐ Oil or Electric | ☐ Coal or Other | O | O |
| Other Electric | | | | | O | T |
| Water | | | | | | |
| Sewer | | | | | | |
| Trash Collection | | | | | | |
| Air Conditioning | | | | | | |
| Refrigerator | | | | | | |
| Range/Microwave | | | | | | |
| Other (specify) | | | | | | |

Signatures:

**Public Housing Agency**

NYHPD

Print or Type Name of PHA

_____

Signature

_____

Print or Type Name and Title of Signatory

_____

Date (mm/dd/yyyy)

**Owner**

Arthur Ransome Houses, LP

Print or Type Name of PHA

_____  As Agent

Kerry Branch

Print or Type Name and Title of Signatory

1/6/16

Date (mm/dd/yyyy)

Mail Payments to:

Arthur Ransome Houses, LP

Name

1200 Zerega Avenue

Address (street, city, State, Zip)

Bronx, NY 10462

Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program

Case 1:23-cv-08489-GS    Document 81-6    Filed 05/02/26    Page 21 of 59

d Urban Development
Office of Public and Indian Housing

## Part B of HAP Contract: Body of Contract

1. **Purpose**
   a. This is a HAP contract between the PHA and the owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).
   b. The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.
   c. During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.
   d. The family will reside in the contract unit with assistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

2. **Lease of Contract Unit**
   a. The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.
   b. The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.
   c. The lease for the contract unit must include word-for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).
   d. The owner certifies that:
      (1) The owner and the tenant have entered into a lease of the contract unit that includes all provisions of the tenancy addendum.
      (2) The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.
      (3) The lease is consistent with State and local law.
   e. The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

3. **Maintenance, Utilities, and Other Services**
   a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).
   b. The owner must provide all utilities needed to comply with the HQS.
   c. If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies

for such breach include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.
   d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.
   e. The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.
   f. The PHA must notify the owner of any HQS defects shown by the inspection.
   g. The owner must provide all housing services as agreed to in the lease.

4. **Term of HAP Contract**
   a. Relation to lease term. The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).
   b. When HAP contract terminates.
      (1) The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.
      (2) The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.
      (3) If the family moves from the contract unit, the HAP contract terminates automatically.
      (4) The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.
      (5) The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.
      (6) The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in aide.

(7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

5. **Provision and Payment for Utilities and Appliances**

a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

6. **Rent to Owner: Reasonable Rent**

a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:
   (1) The location, quality, size, unit type, and age of the contract unit; and
   (2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

c. The PHA must redetermine the reasonable rent when required in accordance with HUD requirements. The PHA may redetermine the reasonable rent at any time.

d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

7. **PHA Payment to Owner**

a. When paid
   (1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.
   (2) The PHA must pay housing assistance payments promptly when due to the owner.
   (3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment of rent by a

tenant; (ii) It is the owner's practice to charge such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

(4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

b. **Owner compliance with HAP contract.** Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

c. **Amount of PHA payment to owner**
   (1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.
   (2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.
   (3) The housing assistance payment for the first month of the HAP contract term shall be prorated for a partial month.

d. **Application of payment.** The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

e. **Limit of PHA responsibility.**
   (1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.
   (2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

f. **Overpayment to owner.** If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

8. **Owner Certification**

During the term of this contract, the owner certifies that:

PRE - 000022
form **HUD-52641** (8/2009)
ref Handbook 7420.8

a. The owner is maintaining the contract unit and premises in accordance with the HQS.

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

9. **Prohibition of Discrimination.** In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

10. **Owner's Breach of HAP Contract**

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

11. **PHA and HUD Access to Premises and Owner's Records**

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

12. **Exclusion of Third Party Rights**

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of the contract unit or the premises or with implementation of the HAP contract.

PRE - 000023

## 13. Conflict of Interest

a. "Covered individual" means a person or entity who is a member of any of the following classes:

(1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);

(2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;

(3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or

(4) Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

## 14. Assignment of the HAP Contract

a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:

(1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or

(2) A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):

(1) Has violated obligations under a housing assistance payments contract under Section 8;

(2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;

(3) Has engaged in any drug-related criminal activity or any violent criminal activity;

(4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;

(5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:

(a) Threatens the right to peaceful enjoyment of the premises by other residents;

(b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;

(c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or

(d) Is drug-related criminal activity or violent criminal activity;

(6) Has a history or practice of renting units that fail to meet State or local housing codes; or

(7) Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

15. **Foreclosure.** In the case of any foreclosure, the immediate successor in interest in the property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the HAP contract between the prior owner and the PHA for the occupied unit. This provision does not affect any State or local law that provides longer time periods or other additional protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

16. **Written Notices.** Any notice by the PHA or the owner in connection with this contract must be in writing.

PRE - 000024
form HUD-52641 (8/2009)
ref Handbook 7420.8

17. **Entire Agreement: Interpretation**
   a.  The HAP contract contains the entire agreement between the owner and the PHA.
   b.  The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

Case 1:25-cv-08489-JGK-GS    Document 81-6    Filed 05/12/26    Page 26 of 59

**Housing Assistance Payments Contract**
**(HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

---

## Part C of HAP Contract: Tenancy Addendum

1. **Section 8 Voucher Program**
   a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).
   b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

2. **Lease**
   a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.
   b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

3. **Use of Contract Unit**
   a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.
   b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.
   c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit making activities incidental to primary use of the unit for residence by members of the family.
   d. The tenant may not sublease or let the unit.
   e. The tenant may not assign the lease or transfer the unit.

4. **Rent to Owner**
   a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.
   b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

   c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:
      (1) The reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements, or
      (2) Rent charged by the owner for comparable unassisted units in the premises.

5. **Family Payment to Owner**
   a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.
   b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.
   c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.
   d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.
   e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.
   f. The owner must immediately return any excess rent payment to the tenant.

6. **Other Fees and Charges**
   a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.
   b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.
   c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

7. **Maintenance, Utilities, and Other Services**
   a. Maintenance

---

7651053
Previous editions are obsolete

Page 8 of 11

PRE - 000026
form **HUD-52641** (8/2009)
ref Handbook 7420.8

(1) The owner must maintain the un___d premises in accordance with the HQS.

(2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

b. **Utilities and appliances**

(1) The owner must provide all utilities needed to comply with the HQS.

(2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:

(a) Pay for any utilities that are to be paid by the tenant.

(b) Provide and maintain any appliances that are to be provided by the tenant.

c. **Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d. **Housing services.** The owner must provide all housing services as agreed to in the lease.

8. **Termination of Tenancy by Owner**

a. **Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.

b. **Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:

(1) Serious or repeated violation of the lease;

(2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;

(3) Criminal activity or alcohol abuse (as provided in paragraph c); or

(4) Other good cause (as provided in paragraph d).

c. **Criminal activity or alcohol abuse.**

(1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:

(a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);

(b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;

(c) Any violent criminal activity on or near the premises; or

(d) Any drug-related criminal activity on or near the premises.

(2) The owner may terminate the tenancy during the term of the lease if any member of the household is:

(a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or

(b) Violating a condition of probation or parole under Federal or State law.

(3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.

(4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

d. **Other good cause for termination of tenancy**

(1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.

(2) During the initial lease term or during any extension term, other good cause may include:

(a) Disturbance of neighbors,

(b) Destruction of property, or

(c) Living or housekeeping habits that cause damage to the unit or premises.

(3) After the initial lease term, such good cause may include:

(a) The tenant's failure to accept the owner's offer of a new lease or revision;

(b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or

(c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).

(4) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.

(5) In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This

provision shall not affect any State or ___l law that provides for longer time periods or addition protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

e.    **Protections for Victims of Abuse.**

(1)    An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.

(2)    Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

(3)    Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, or otherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4)    Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5)    Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demandi___ ___tandard than other tenants in determining w___ ___er to evict or terminate.

(6)    Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7)    Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

f.    **Eviction by court action.** The owner may only evict the tenant by a court action.

g.    **Owner notice of grounds**
(1)    At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.
(2)    The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.
(3)    Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

9.    **Lease: Relation to HAP Contract**
If the HAP contract terminates for any reason, the lease terminates automatically.

10.    **PHA Termination of Assistance**
The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

11.    **Family Move Out**
The tenant must notify the PHA and the owner before the family moves out of the unit.

12.    **Security Deposit**
a.    The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)
b.    When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c. The owner must give the tenant a list of items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d. If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

## 13. Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

## 14. Conflict with Other Provisions of Lease

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

## 15. Changes in Lease or Rent

a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

(1) If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

(2) If there are any changes in lease provisions governing the term of the lease;

(3) If the family moves to a new unit, even if the unit is in the same building or complex.

c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

## 16. Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

## 17. Definitions

Contract unit. The housing unit rented by the tenant with assistance under the program.

Family. The persons who may reside in the unit with assistance under the program.

HAP contract. The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

Household. The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

Housing quality standards (HQS). The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

HUD. The U.S. Department of Housing and Urban Development.

HUD requirements. HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

Lease. The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

PHA. Public Housing Agency.

Premises. The building or complex in which the contract unit is located, including common areas and grounds.

Program. The Section 8 housing choice voucher program.

Rent to owner. The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

Section 8. Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

Tenant. The family member (or members) who leases the unit from the owner.

Voucher program. The Section 8 housing choice voucher program. Under this program, HUD provides funds to an PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

NYC Dept. of Housing Preservation and Development
Division of Tenant Resources (DTR)
Continued Occupancy Unit
100 Gold Street, Room 1M
New York, NY 10038

**Arthur Ransome LP**
**1200 Zerega Avenue**
**Bronx, NY   10462**

PRE - 000030
428492


PRE - 000031
428492



**Department of
Housing Preservation
& Development
nyc.gov/hpd**

**Office of Neighborhood Strategies
Division of Tenant Resources
100 Gold Street
New York, NY 10038**

Sunday, March 03, 2024

**Arthur Ransome LP
1200 Zerega Avenue
Bronx, NY   10462**

Dear **Arthur Ransome LP:**

Please be advised that the following rent breakdown letter was sent to your tenant. If you have any questions. please call the Owner Services unit at (917) 286-4300 and press 0 to speak to an operator.

Thank you,

Jacqueline Solomon,
Rental Assistance Specialist

---

## RENT BREAKDOWN LETTER

Dear **Leonarda Garcia Ramirez (151 West 123 Street Apt. 6C, New York, NY 10027)**:

The Department of Housing Preservation and Development (HPD) has processed an update to your Housing Choice Voucher (HCV) housing rental assistance which resulted in the rent breakdown below. **This Annual Reexamination is effective Wednesday, May 01, 2024.** *This notice supersedes all Rent Breakdown Notices you may have received prior to the date of this notice.*

If you previously received a Notice of Subsidy Termination and are either waiting for an informal hearing or a decision from your informal hearing, receiving this letter does **not** mean your termination has been reversed. You will be notified of the decision from your informal hearing in a separate notice. If you do not attend the informal hearing, you will be automatically terminated from the rental assistance program.

| | |
|---|---|
| **Contract Rent:** | $902.08 |
| **Tenant Share:** | **$390.00** |
| **HPD Share:** | $512.08 |

**Tenant Share of Rent:** HPD calculated your share of the rent based on the information you provided and independent sources were used to verify that information. Your landlord will be informed of these new amounts and the effective date of the change. If you have been paying more than your share of the rent since the effective date of this change, please contact your landlord to reconcile your account.



**Department of
Housing Preservation
& Development**
nyc.gov/hpd

**Office of Neighborhood Strategies
Division of Tenant Resources
100 Gold Street
New York, NY 10038**

**Household Composition:** You must notify HPD of any changes to the household members listed on this notice within 30 days.

**Household income:** If there are any changes in your household income during the year you must report the change at your next annual recertification. You may also choose to notify HPD of any decreases in your household income before your next annual recertification so that your share of the rent may be adjusted.

**Customer Service:** If you have any questions or need assistance understanding this letter in a language other than English, please call the Client Services unit at (917) 286-4300.

If you disagree with how HPD calculated your rent share, please write us within 30 days and include a copy of this letter. Your letter may be submitted to DTRAI@hpd.nyc.gov, faxed to (212) 863-5299 or mailed to the attention of Tenant Resources at 100 Gold Street, NY, NY 10038.

Sincerely,


Jacqueline Solomon
Rental Assistance Specialist


**Household Composition:**

| **Full Name** |
| --- |
| Leonarda Garcia Ramirez |
| Jesus Suero Garcia |
| Gabriela Suero Garcia |
| Gabriel Suero Garcia |

PRE - 000033
428492

NYC Dept. of Housing Preservation and Development
Division of Tenant and Owner Resources (DTOR)
Housing Choice Voucher Tenancy Unit
100 Gold Street, Room 1M
New York, NY 10038

**Arthur Ransome LP**
**1200 Zerega Avenue**
**Bronx, NY   10462**

PRE - 000034
610541



PRE - 000035
610541



**Department of
Housing Preservation
& Development**
nyc.gov/hpd

**Housing Access and Stability
Division of Tenant and Owner Resources
100 Gold Street
New York, NY 10038**

Friday, August 22, 2025

**Arthur Ransome LP
1200 Zerega Avenue
Bronx, NY   10462**


Dear **Arthur Ransome LP:**

Please be advised that the following rent breakdown letter was sent to your tenant. If you have any questions. please call the Owner Services unit at (917) 286-4300 and press 0 to speak to an operator.

Thank you,

Jessica Luna,
Rental Assistance Specialist

---

## RENT BREAKDOWN LETTER

Dear **Leonarda Garcia Ramirez (151 West 123 Street Apt. 6C, New York, NY 10027)**:

The Department of Housing Preservation and Development (HPD) has processed an update to your Housing Choice Voucher (HCV) housing rental assistance which resulted in the rent breakdown below. **This Annual Reexamination is effective Wednesday, October 01, 2025.** *This notice supersedes all Rent Breakdown Notices you may have received prior to the date of this notice.*

If you previously received a Notice of Subsidy Termination and are either waiting for an informal hearing or a decision from your informal hearing, receiving this letter does **not** mean your termination has been reversed. You will be notified of the decision from your informal hearing in a separate notice. If you do not attend the informal hearing, you will be automatically terminated from the rental assistance program.

| | |
|---|---|
| **Contract Rent:** | $902.08 |
| **Tenant Share:** | **$902.00** |
| **HPD Share:** | $0.00 |

**Tenant Share of Rent:** HPD calculated your share of the rent based on the information you provided and independent sources were used to verify that information. Your landlord will be informed of these new amounts and the effective date of the change. If you have been paying more than your share of the rent since the effective date of this change, please contact your landlord to reconcile your account.



PRE - 000036
610541



**Housing Access and Stability**
**Division of Tenant and Owner Resources**
**100 Gold Street**
**New York, NY 10038**

**Household Composition:** You must notify HPD of any changes to the household members listed on this notice within 30 days.

**Household income:** If there are any changes in your household income during the year you must report the change at your next annual recertification. You may also choose to notify HPD of any decreases in your household income before your next annual recertification so that your share of the rent may be adjusted.

**Customer Service:** If you have any questions or need assistance understanding this letter in a language other than English, please call the Client Services unit at (917) 286-4300.

If you disagree with how HPD calculated your rent share, please write us within 30 days and include a copy of this letter. Your letter may be submitted to DTRAI@hpd.nyc.gov, faxed to (212) 863-5299 or mailed to the attention of Tenant Resources at 100 Gold Street, NY, NY 10038.

Sincerely,


Jessica Luna
Rental Assistance Specialist


**Household Composition:**

| **Full Name** |
| --- |
| Leonarda Garcia Ramirez |
| Jesus Suero Garcia |
| Gabriela Suero Garcia |
| Gabriel Suero Garcia |



PRE - 000037
610541

NYC Dept. of Housing Preservation and Development
Division of Tenant and Owner Resources (DTOR)
Housing Choice Voucher Tenancy Unit
100 Gold Street, Room 1M
New York, NY 10038

**Arthur Ransome LP**
**1200 Zerega Avenue**
**Bronx, NY   10462**

PRE - 000038
610541



PRE - 000039

610541



**Department of
Housing Preservation
& Development
nyc.gov/hpd**

**Housing Access and Stability
Division of Tenant and Owner Resources
100 Gold Street
New York, NY 10038**

Friday, August 22, 2025

**Arthur Ransome LP
1200 Zerega Avenue
Bronx, NY   10462**

Dear **Arthur Ransome LP:**

Please be advised that the following rent breakdown letter was sent to your tenant. If you have any questions. please call the Owner Services unit at (917) 286-4300 and press 0 to speak to an operator.

Thank you,

Jessica Luna,
Rental Assistance Specialist

---

## RENT BREAKDOWN LETTER

Dear **Leonarda Garcia Ramirez (151 West 123 Street Apt. 6C, New York, NY 10027)**:

The Department of Housing Preservation and Development (HPD) has processed an update to your Housing Choice Voucher (HCV) housing rental assistance which resulted in the rent breakdown below. **This Annual Reexamination is effective Wednesday, October 01, 2025.** *This notice supersedes all Rent Breakdown Notices you may have received prior to the date of this notice.*

If you previously received a Notice of Subsidy Termination and are either waiting for an informal hearing or a decision from your informal hearing, receiving this letter does **not** mean your termination has been reversed. You will be notified of the decision from your informal hearing in a separate notice. If you do not attend the informal hearing, you will be automatically terminated from the rental assistance program.

| | |
|---|---|
| **Contract Rent:** | $902.08 |
| **Tenant Share:** | **$902.00** |
| **HPD Share:** | $0.00 |

**Tenant Share of Rent:** HPD calculated your share of the rent based on the information you provided and independent sources were used to verify that information. Your landlord will be informed of these new amounts and the effective date of the change. If you have been paying more than your share of the rent since the effective date of this change, please contact your landlord to reconcile your account.



PRE - 000040
610541



**Housing Access and Stability**
**Division of Tenant and Owner Resources**
**100 Gold Street**
**New York, NY 10038**

**Household Composition:** You must notify HPD of any changes to the household members listed on this notice within 30 days.

**Household income:** If there are any changes in your household income during the year you must report the change at your next annual recertification. You may also choose to notify HPD of any decreases in your household income before your next annual recertification so that your share of the rent may be adjusted.

**Customer Service:** If you have any questions or need assistance understanding this letter in a language other than English, please call the Client Services unit at (917) 286-4300.

If you disagree with how HPD calculated your rent share, please write us within 30 days and include a copy of this letter. Your letter may be submitted to DTRAI@hpd.nyc.gov, faxed to (212) 863-5299 or mailed to the attention of Tenant Resources at 100 Gold Street, NY, NY 10038.

Sincerely,


Jessica Luna
Rental Assistance Specialist


**Household Composition:**

| **Full Name** |
| --- |
| Leonarda Garcia Ramirez |
| Jesus Suero Garcia |
| Gabriela Suero Garcia |
| Gabriel Suero Garcia |



PRE - 000041
610541

NYC Dept. of Housing Preservation and Development
Division of Tenant and Owner Resources (DTOR)
Housing Choice Voucher Tenancy Unit
100 Gold Street, Room 1M
New York, NY 10038

**Arthur Ransome LP**
**1200 Zerega Avenue**
**Bronx, NY   10462**



PRE - 000042
640796


PRE - 000043
640796



**Department of
Housing Preservation
& Development
nyc.gov/hpd**

**Housing Access and Stability
Division of Tenant and Owner Resources
100 Gold Street
New York, NY 10038**

Thursday, October 30, 2025

**Arthur Ransome LP
1200 Zerega Avenue
Bronx, NY   10462**

Dear **Arthur Ransome LP:**

Please be advised that the following rent breakdown letter was sent to your tenant. If you have any questions. please call the Owner Services unit at (917) 286-4300 and press 0 to speak to an operator.

Thank you,

Jessica Luna,
Rental Assistance Specialist



PRE - 000044
640796



**Housing Access and Stability**
**Division of Tenant and Owner Resources**
**100 Gold Street**
**New York, NY 10038**

**RENT BREAKDOWN LETTER**

**Dear Leonarda Garcia Ramirez (151 West 123 Street Apt. 6C, New York, NY 10027)**:                                              **Entity ID: AG197799**

The Department of Housing Preservation and Development (HPD) has processed an update to your Housing Choice Voucher (HCV) housing rental assistance which resulted in the rent breakdown below. **This Annual Reexamination is effective Wednesday, October 01, 2025.** *This notice supersedes all Rent Breakdown Notices you may have received prior to the date of this notice.*

If you previously received a Notice of Subsidy Termination and are either waiting for an informal hearing or a decision from your informal hearing, receiving this letter does **not** mean your termination has been reversed. You will be notified of the decision from your informal hearing in a separate notice. If you do not attend the informal hearing, you will be automatically terminated from the rental assistance program.

|  |  |
|---|---|
| **Contract Rent:** | $902.08 |
| **Tenant Share:** | **$478.00** |
| **HPD Share:** | $424.08 |

**Tenant Share of Rent:** HPD calculated your share of the rent based on the information you provided and independent sources were used to verify that information. Your landlord will be informed of these new amounts and the effective date of the change. If you have been paying more than your share of the rent since the effective date of this change, please contact your landlord to reconcile your account.

**Household Composition:** You must notify HPD of any changes to the household members listed on this notice within 30 days.

**Household income:** If there are any changes in your household income during the year you must report the change at your next annual recertification. You may also choose to notify HPD of any decreases in your household income before your next annual recertification so that your share of the rent may be adjusted.

**Customer Service:** If you have any questions or need assistance understanding this letter in a language other than English, please call the Client Services unit at (917) 286-4300.

If you disagree with how HPD calculated your rent share, please write us within 30 days and include a copy of this letter. Your letter may be submitted to DTRAI@hpd.nyc.gov, faxed to (212) 863-5299 or mailed to the attention of Tenant Resources at 100 Gold Street, NY, NY 10038.

Sincerely,

Jessica Luna



PRE - 000045
640796

**NYC Department of Housing Preservation & Development**
nyc.gov/hpd

**Housing Access and Stability**
**Division of Tenant and Owner Resources**
**100 Gold Street**
**New York, NY 10038**

Rental Assistance Specialist

**Household Composition:**

| **Full Name** |
| --- |
| Leonarda Garcia Ramirez |
| Jesus Suero Garcia |
| Gabriela Suero Garcia |
| Gabriel Suero Garcia |



PRE - 000046
640796

Case 1:25-cv-08489-JGK-GS   Document 16-103   Filed 05/12/26   Page 47 of 59

| Billing Period | Batch Number | Type | Trans Date | Charge Description | Billing/ Adjustment | Check Number | Payments | Running Balance |
|---|---|---|---|---|---|---|---|---|
| | | | | **February 2014** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 02/01/14 | 83062 | ADJ | 02/12/14 | Rent | 902.08 | | | 902.08 |
| 02/01/14 | 83062 | ADJ | 02/12/14 | Security Depos | 902.08 | | | 1,804.16 |
| | 83260A | PAID | 02/13/14 | | | 105981119332 | 902.00 | 902.16 |
| | 83260B | PAID | 02/13/14 | | | 105981119343 | 902.00 | 0.16 |
| | | | | **March 2014** | | | | |
| Opening Balance | | | | | | | | 0.16 |
| 03/01/14 | SYS | BILL | 03/01/14 | Rent | 902.08 | | | 902.24 |
| | 85138 | PAID | 03/05/14 | | | 145 | 902.00 | 0.24 |
| | | | | **April 2014** | | | | |
| Opening Balance | | | | | | | | 0.24 |
| 04/01/14 | SYS | BILL | 04/01/14 | Rent | 902.08 | | | 902.32 |
| | 89057 | PAID | 04/10/14 | | | 0 | 902.32 | 0.00 |
| | | | | **May 2014** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 05/01/14 | SYS | BILL | 05/01/14 | Rent | 902.08 | | | 902.08 |
| | 91401 | PAID | 05/07/14 | | | 148 | 902.08 | 0.00 |
| | | | | **June 2014** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 06/01/14 | SYS | BILL | 06/01/14 | Rent | 902.08 | | | 902.08 |
| | 94176 | PAID | 06/04/14 | | | 150 | 902.08 | 0.00 |
| | | | | **July 2014** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 07/01/14 | SYS | BILL | 07/01/14 | Rent | 902.08 | | | 902.08 |
| | 97477 | PAID | 07/09/14 | | | 152 | 902.00 | 0.08 |
| | | | | **August 2014** | | | | |
| Opening Balance | | | | | | | | 0.08 |
| 08/01/14 | SYS | BILL | 08/01/14 | Rent | 902.08 | | | 902.16 |
| | 458 | PAID | 08/06/14 | | | 153 | 902.80 | -0.64 |
| | | | | **September 2014** | | | | |
| Opening Balance | | | | | | | | -0.64 |
| 09/01/14 | SYS | BILL | 09/01/14 | Rent | 902.08 | | | 901.44 |
| | 3809 | PAID | 09/08/14 | | | 154 | 902.12 | -0.68 |
| | | | | **October 2014** | | | | |
| Opening Balance | | | | | | | | -0.68 |
| 10/01/14 | SYS | BILL | 10/01/14 | Rent | 902.08 | | | 901.40 |
| | 12627 | PAID | 10/06/14 | | | 157 | 902.08 | -0.68 |
| | | | | **November 2014** | | | | |
| Opening Balance | | | | | | | | -0.68 |
| 11/01/14 | SYS | BILL | 11/01/14 | Rent | 902.08 | | | 901.40 |
| | 16012 | PAID | 11/07/14 | | | 347111695 | 902.08 | -0.68 |
| | | | | **December 2014** | | | | |
| Opening Balance | | | | | | | | -0.68 |
| 12/01/14 | SYS | BILL | 12/01/14 | Rent | 902.08 | | | 901.40 |
| | 19170 | PAID | 12/10/14 | | | 352545942 | 902.08 | -0.68 |
| | | | | **January 2015** | | | | |
| Opening Balance | | | | | | | | -0.68 |
| 01/01/15 | SYS | BILL | 01/01/15 | Rent | 902.08 | | | 901.40 |
| | 21975 | PAID | 01/12/15 | | | 357811794 | 902.08 | -0.68 |
| | | | | **February 2015** | | | | |
| Opening Balance | | | | | | | | -0.68 |
| 02/01/15 | SYS | BILL | 02/01/15 | Rent | 902.08 | | | 901.40 |
| | 23949 | PAID | 02/04/15 | | | 362483403 | 902.08 | -0.68 |
| | | | | **March 2015** | | | | |
| Opening Balance | | | | | | | | -0.68 |
| 03/01/15 | SYS | BILL | 03/01/15 | Rent | 902.08 | | | 901.40 |

PRE - 000047

| Billing Period | Batch Number | Type | Trans Date | Charge Description | Billing/ Adjustment | Check Number | Payments | Running Balance |
|---|---|---|---|---|---|---|---|---|
| | 27479 | PAID | 03/10/15 | | | 368282407 | 902.08 | -0.68 |
| | | | | **April 2015** | | | | |
| Opening Balance | | | | | | | | -0.68 |
| 04/01/15 | SYS | BILL | 04/01/15 | Rent | 902.08 | | | 901.40 |
| | 30104 | PAID | 04/08/15 | | | 373499337 | 902.08 | -0.68 |
| | | | | **May 2015** | | | | |
| Opening Balance | | | | | | | | -0.68 |
| 05/01/15 | SYS | BILL | 05/01/15 | Rent | 902.08 | | | 901.40 |
| | 33523 | PAID | 05/13/15 | | | 379302626 | 902.08 | -0.68 |
| | | | | **June 2015** | | | | |
| Opening Balance | | | | | | | | -0.68 |
| 06/01/15 | SYS | BILL | 06/01/15 | Rent | 902.08 | | | 901.40 |
| | 35803 | PAID | 06/09/15 | | | 384215376 | 902.00 | -0.60 |
| | | | | **July 2015** | | | | |
| Opening Balance | | | | | | | | -0.60 |
| 07/01/15 | SYS | BILL | 07/01/15 | Rent | 902.08 | | | 901.48 |
| | 38456 | PAID | 07/09/15 | | | 389780769 | 902.08 | -0.60 |
| | | | | **August 2015** | | | | |
| Opening Balance | | | | | | | | -0.60 |
| 08/01/15 | SYS | BILL | 08/01/15 | Rent | 902.08 | | | 901.48 |
| | 40636 | PAID | 08/05/15 | | | CP_ACH | 901.48 | 0.00 |
| | | | | **September 2015** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 09/01/15 | SYS | BILL | 09/01/15 | Rent | 902.08 | | | 902.08 |
| | 43820 | PAID | 09/03/15 | | | CP_ACH | 902.08 | 0.00 |
| | | | | **October 2015** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 10/01/15 | SYS | BILL | 10/01/15 | Rent | 902.08 | | | 902.08 |
| | 47053 | PAID | 10/02/15 | | | CP_ACH | 902.08 | 0.00 |
| | 50193 | PAID | 10/30/15 | | | 159 | 18.04 | -18.04 |
| | | | | **November 2015** | | | | |
| Opening Balance | | | | | | | | -18.04 |
| 11/01/15 | SYS | BILL | 11/01/15 | Rent | 902.08 | | | 884.04 |
| | 50640 | PAID | 11/05/15 | | | CP_ACH | 902.08 | -18.04 |
| | | | | **December 2015** | | | | |
| Opening Balance | | | | | | | | -18.04 |
| 12/01/15 | SYS | BILL | 12/01/15 | Rent | 902.08 | | | 884.04 |
| 12/01/15 | SYS | BILL | 12/01/15 | Security Depos | 18.04 | | | 902.08 |
| | 53408 | PAID | 12/04/15 | | | CP_ACH | 884.04 | 18.04 |
| | | | | **January 2016** | | | | |
| Opening Balance | | | | | | | | 18.04 |
| 01/01/16 | SYS | BILL | 01/01/16 | Rent | 902.08 | | | 920.12 |
| | | | | **February 2016** | | | | |
| Opening Balance | | | | | | | | 920.12 |
| 02/01/16 | SYS | BILL | 02/01/16 | Rent | 920.12 | | | 1,840.24 |
| | 62308 | PAID | 02/26/16 | | | CP_ACH | 920.00 | 920.24 |
| | | | | **March 2016** | | | | |
| Opening Balance | | | | | | | | 920.24 |
| 03/01/16 | SYS | BILL | 03/01/16 | Rent | 920.12 | | | 1,840.36 |
| 12/01/15 | 64541 | ADJ | 03/15/16 | Adj Db-Subsidy | -1,872.32 | | | -31.96 |
| | 64541 | Reapplied | 03/15/16 | | | | 0.00 | -31.96 |
| 03/01/16 | 65122B | ADJ | 03/21/16 | Rent | -18.04 | | | -50.00 |
| 02/01/16 | 65122B | ADJ | 03/21/16 | Rent | -18.04 | | | -68.04 |
| | 65122A | Reapplied | 03/21/16 | | | | -1,872.32 | 1,804.28 |
| | 65122B | Reapplied | 03/21/16 | | | | 1,872.32 | -68.04 |
| | 65809 | PAID | 03/31/16 | | | CP_ACH | 365.96 | 434.00 |
| | | | | **April 2016** | | | | |

P-000048

| Billing Period | Batch Number | Type | Trans Date | Charge Description | Billing/ Adjustment | Check Number | Payments | Running Balance |
|---|---|---|---|---|---|---|---|---|
| Opening Balance | | | | | | | | -434.00 |
| 04/01/16 | SYS | BILL | 04/01/16 | Rent | 902.08 | | | 468.08 |
| 04/01/16 | SYS | BILL | 04/01/16 | Sec. 8 | -468.08 | | | 0.00 |
| | | | **May 2016** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 05/01/16 | SYS | BILL | 05/01/16 | Rent | 902.08 | | | 902.08 |
| 05/01/16 | SYS | BILL | 05/01/16 | Sec. 8 | -468.08 | | | 434.00 |
| | 68975 | PAID | 05/05/16 | | | CP_ACH | 434.00 | 0.00 |
| | | | **June 2016** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 06/01/16 | SYS | BILL | 06/01/16 | Rent | 902.08 | | | 902.08 |
| 06/01/16 | SYS | BILL | 06/01/16 | Sec. 8 | -468.08 | | | 434.00 |
| | 71813 | PAID | 06/03/16 | | | CP_ACH | 434.00 | 0.00 |
| | 73332 | PAID | 06/17/16 | | | 90 | 260.00 | -260.00 |
| 06/00/16 | 75515 | ADJ | 06/30/16 | Adj Db-Subsidy | -340.00 | | | -600.00 |
| | | | **July 2016** | | | | | |
| Opening Balance | | | | | | | | -600.00 |
| 07/01/16 | SYS | BILL | 07/01/16 | Rent | 902.08 | | | 302.08 |
| 07/01/16 | SYS | BILL | 07/01/16 | Sec. 8 | -468.08 | | | -166.00 |
| 06/00/16 | 76624 | ADJ | 07/21/16 | Adj Db-Subsidy | -170.00 | | | -336.00 |
| | | | **August 2016** | | | | | |
| Opening Balance | | | | | | | | -336.00 |
| 08/01/16 | SYS | BILL | 08/01/16 | Rent | 902.08 | | | 566.08 |
| 08/01/16 | SYS | BILL | 08/01/16 | Sec. 8 | -638.08 | | | -72.00 |
| | 77828 | PAID | 08/02/16 | | | CP_ACH | 188.00 | -260.00 |
| | | | **September 2016** | | | | | |
| Opening Balance | | | | | | | | -260.00 |
| 09/01/16 | SYS | BILL | 09/01/16 | Rent | 902.08 | | | 642.08 |
| 09/01/16 | SYS | BILL | 09/01/16 | Sec. 8 | -638.08 | | | 4.00 |
| | | | **October 2016** | | | | | |
| Opening Balance | | | | | | | | 4.00 |
| 10/01/16 | SYS | BILL | 10/01/16 | Rent | 902.08 | | | 906.08 |
| 10/01/16 | SYS | BILL | 10/01/16 | Sec. 8 | -638.08 | | | 268.00 |
| | 84637 | PAID | 10/06/16 | | | CP_ACH | 268.00 | 0.00 |
| | | | **November 2016** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 11/01/16 | SYS | BILL | 11/01/16 | Rent | 902.08 | | | 902.08 |
| 11/01/16 | SYS | BILL | 11/01/16 | Sec. 8 | -638.08 | | | 264.00 |
| | 87440 | PAID | 11/03/16 | | | CP_ACH | 264.00 | 0.00 |
| | | | **December 2016** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 12/01/16 | SYS | BILL | 12/01/16 | Rent | 902.08 | | | 902.08 |
| 12/01/16 | SYS | BILL | 12/01/16 | Sec. 8 | -638.08 | | | 264.00 |
| | 91389 | PAID | 12/01/16 | | | CP_ACH | 264.00 | 0.00 |
| | 93820 | PAID | 12/30/16 | | | CP_ACH | 264.00 | -264.00 |
| | | | **January 2017** | | | | | |
| Opening Balance | | | | | | | | -264.00 |
| 01/01/17 | SYS | BILL | 01/01/17 | Rent | 902.08 | | | 638.08 |
| 01/01/17 | SYS | BILL | 01/01/17 | Sec. 8 | -638.08 | | | 0.00 |
| 01/01/17 | 96410 | ADJ | 01/25/17 | Adj Db-Subsidy | 69.00 | | | 69.00 |
| | 96410 | Reapplied | 01/25/17 | | | | 0.00 | 69.00 |
| | | | **February 2017** | | | | | |
| Opening Balance | | | | | | | | 69.00 |
| 02/01/17 | SYS | BILL | 02/01/17 | Rent | 902.08 | | | 971.08 |
| 02/01/17 | SYS | BILL | 02/01/17 | Sec. 8 | -569.08 | | | 402.00 |
| | 97222 | PAID | 02/02/17 | | | CP_ACH | 264.00 | 138.00 |
| | | | **March 2017** | | | | | |
| Opening Balance | | | | | | | | 138.00 |

PRE - 000049

Building Number: 151W123

Unit Number: 6C   Case 1:25-cv-08489-JGK-GS

| Billing Period | Batch Number | Type | Trans Date | Charge Description | Billing/ Adjustment | Check Number | Payments | Running Balance |
|---|---|---|---|---|---|---|---|---|
| 03/01/17 | SYS | BILL | 03/01/17 | Rent | 902.08 | | | 1,040.08 |
| 03/01/17 | SYS | BILL | 03/01/17 | Sec. 8 | -569.08 | | | 471.00 |
| | 14 | PAID | 03/02/17 | | | CP_ACH | 471.00 | 0.00 |
| | | | **April 2017** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 04/01/17 | SYS | BILL | 04/01/17 | Rent | 902.08 | | | 902.08 |
| 04/01/17 | SYS | BILL | 04/01/17 | Sec. 8 | -569.08 | | | 333.00 |
| | 3401 | PAID | 04/05/17 | | | CP_ACH | 333.00 | 0.00 |
| | | | **May 2017** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 05/01/17 | SYS | BILL | 05/01/17 | Rent | 902.08 | | | 902.08 |
| 05/01/17 | SYS | BILL | 05/01/17 | Sec. 8 | -569.08 | | | 333.00 |
| | 6254 | PAID | 05/04/17 | | | CP_ACH | 333.00 | 0.00 |
| | | | **June 2017** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 06/01/17 | SYS | BILL | 06/01/17 | Rent | 902.08 | | | 902.08 |
| 06/01/17 | SYS | BILL | 06/01/17 | Sec. 8 | -569.08 | | | 333.00 |
| | 9337 | PAID | 06/06/17 | | | CP_ACH | 333.00 | 0.00 |
| | | | **July 2017** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 07/01/17 | SYS | BILL | 07/01/17 | Rent | 902.08 | | | 902.08 |
| 07/01/17 | SYS | BILL | 07/01/17 | Sec. 8 | -569.08 | | | 333.00 |
| | 12574 | PAID | 07/07/17 | | | CP_ACH | 333.00 | 0.00 |
| | | | **August 2017** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 08/01/17 | SYS | BILL | 08/01/17 | Rent | 902.08 | | | 902.08 |
| 08/01/17 | SYS | BILL | 08/01/17 | Sec. 8 | -569.08 | | | 333.00 |
| | 15488 | PAID | 08/04/17 | | | CP_ACH | 288.00 | 45.00 |
| 08/01/17 | 16975 | ADJ | 08/17/17 | Adj Db-Subsidy | -90.00 | | | -45.00 |
| | 16975 | Reapplied | 08/17/17 | | | | 0.00 | -45.00 |
| | | | **September 2017** | | | | | |
| Opening Balance | | | | | | | | -45.00 |
| 09/01/17 | SYS | BILL | 09/01/17 | Rent | 902.08 | | | 857.08 |
| 09/01/17 | SYS | BILL | 09/01/17 | Sec. 8 | -614.08 | | | 243.00 |
| | 18472 | PAID | 09/06/17 | | | CP_ACH | 243.00 | 0.00 |
| | | | **October 2017** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 10/01/17 | SYS | BILL | 10/01/17 | Rent | 902.08 | | | 902.08 |
| 10/01/17 | SYS | BILL | 10/01/17 | Sec. 8 | -614.08 | | | 288.00 |
| | 21632 | PAID | 10/05/17 | | | CP_ACH | 288.00 | 0.00 |
| | | | **November 2017** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 11/01/17 | SYS | BILL | 11/01/17 | Rent | 902.08 | | | 902.08 |
| 11/01/17 | SYS | BILL | 11/01/17 | Sec. 8 | -614.08 | | | 288.00 |
| | 25670 | PAID | 11/13/17 | | | CP_ACH | 288.00 | 0.00 |
| | | | **December 2017** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 12/01/17 | SYS | BILL | 12/01/17 | Rent | 902.08 | | | 902.08 |
| 12/01/17 | SYS | BILL | 12/01/17 | Sec. 8 | -614.08 | | | 288.00 |
| | 28175 | PAID | 12/08/17 | | | CP_ACH | 288.00 | 0.00 |
| | | | **January 2018** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 01/01/18 | SYS | BILL | 01/01/18 | Rent | 902.08 | | | 902.08 |
| 01/01/18 | SYS | BILL | 01/01/18 | Sec. 8 | -614.08 | | | 288.00 |
| | 30513 | PAID | 01/02/18 | | | CP_ACH | 288.00 | 0.00 |
| | 33692 | PAID | 01/31/18 | | | CP_ACH | 288.00 | -288.00 |
| | | | **February 2018** | | | | | |
| Opening Balance | | | | | | | | -288.00 |

PRE - 000050

Case 1:25-cv-08489-JGK-GS    Document 61-6    Filed 05/12/26    Page 51 of 59

| Billing Period | Batch Number | Type | Trans Date | Charge Description | Billing/ Adjustment | Check Number | Payments | Running Balance |
|---|---|---|---|---|---|---|---|---|
| 02/01/18 | SYS | BILL | 02/01/18 | Rent | 902.08 | | | 614.08 |
| 02/01/18 | SYS | BILL | 02/01/18 | Sec. 8 | -614.08 | | | 0.00 |
| | | | **March 2018** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 03/01/18 | SYS | BILL | 03/01/18 | Rent | 902.08 | | | 902.08 |
| 03/01/18 | SYS | BILL | 03/01/18 | Sec. 8 | -614.08 | | | 288.00 |
| | 37178 | PAID | 03/01/18 | | | CP_ACH | 576.00 | -288.00 |
| 03/01/18 | 38938 | ADJ | 03/14/18 | Adj Db-Subsidy | 288.00 | | | 0.00 |
| | | | **April 2018** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 04/01/18 | SYS | BILL | 04/01/18 | Rent | 902.08 | | | 902.08 |
| 04/01/18 | SYS | BILL | 04/01/18 | Sec. 8 | -326.08 | | | 576.00 |
| | 41762 | PAID | 04/10/18 | | | CP_ACH | 576.00 | 0.00 |
| | 43584 | PAID | 04/30/18 | | | CP_ACH | 576.00 | -576.00 |
| | | | **May 2018** | | | | | |
| Opening Balance | | | | | | | | -576.00 |
| 05/01/18 | SYS | BILL | 05/01/18 | Rent | 920.12 | | | 344.12 |
| 05/01/18 | SYS | BILL | 05/01/18 | Sec. 8 | -326.08 | | | 18.04 |
| | | | **June 2018** | | | | | |
| Opening Balance | | | | | | | | 18.04 |
| 06/01/18 | SYS | BILL | 06/01/18 | Rent | 920.12 | | | 938.16 |
| 06/01/18 | SYS | BILL | 06/01/18 | Sec. 8 | -326.08 | | | 612.08 |
| | 47133 | PAID | 06/05/18 | | | CP_ACH | 612.08 | 0.00 |
| | | | **July 2018** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 07/01/18 | SYS | BILL | 07/01/18 | Rent | 920.12 | | | 920.12 |
| 07/01/18 | SYS | BILL | 07/01/18 | Sec. 8 | -326.08 | | | 594.04 |
| | 50573 | PAID | 07/09/18 | | | CP_ACH | 594.04 | 0.00 |
| | | | **August 2018** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 08/01/18 | SYS | BILL | 08/01/18 | Rent | 920.12 | | | 920.12 |
| 08/01/18 | SYS | BILL | 08/01/18 | Sec. 8 | -326.08 | | | 594.04 |
| 08/01/18 | 55896B | ADJ | 08/27/18 | Adj Cr-Subsidy | -220.00 | | | 374.04 |
| 07/01/18 | 55896B | ADJ | 08/27/18 | Adj Cr-Subsidy | -440.00 | | | -65.96 |
| | 55896C | Reapplied | 08/27/18 | | | CP_ACH | 594.04 | -660.00 |
| | 55896A | Reapplied | 08/27/18 | | | CP_ACH | -594.04 | -65.96 |
| | | | **September 2018** | | | | | |
| Opening Balance | | | | | | | | -65.96 |
| 09/01/18 | SYS | BILL | 09/01/18 | Rent | 920.12 | | | 854.16 |
| 09/01/18 | SYS | BILL | 09/01/18 | Sec. 8 | -326.08 | | | 528.08 |
| | 56603 | PAID | 09/06/18 | | | CP_ACH | 308.08 | 220.00 |
| | | | **October 2018** | | | | | |
| Opening Balance | | | | | | | | 220.00 |
| 10/01/18 | SYS | BILL | 10/01/18 | Rent | 920.12 | | | 1,140.12 |
| 10/01/18 | SYS | BILL | 10/01/18 | Sec. 8 | -326.08 | | | 814.04 |
| | 59414 | PAID | 10/04/18 | | | CP_ACH | 374.04 | 440.00 |
| 10/01/18 | 61166 | ADJ | 10/17/18 | Adj Cr-Subsidy | -220.00 | | | 220.00 |
| 10/00/18 | 63889 | ADJ | 10/30/18 | Adj Db-Subsidy | -220.00 | | | 0.00 |
| | | | **November 2018** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 11/01/18 | SYS | BILL | 11/01/18 | Rent | 920.12 | | | 920.12 |
| 11/01/18 | SYS | BILL | 11/01/18 | Sec. 8 | -546.08 | | | 374.04 |
| | 62572 | PAID | 11/02/18 | | | CP_ACH | 374.04 | 0.00 |
| | | | **December 2018** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 12/01/18 | SYS | BILL | 12/01/18 | Rent | 920.12 | | | 920.12 |
| 12/01/18 | SYS | BILL | 12/01/18 | Sec. 8 | -546.08 | | | 374.04 |
| | 65432 | PAID | 12/06/18 | | | CP_ACH | 374.04 | 0.00 |

PRE - 000051

| Billing Period | Batch Number | Type | Trans Date | Charge Description | Billing/ Adjustment | Check Number | Payments | Running Balance |
|---|---|---|---|---|---|---|---|---|
| | | | | **January 2019** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 01/01/19 | SYS | BILL | 01/01/19 | Rent | 920.12 | | | 920.12 |
| 01/01/19 | SYS | BILL | 01/01/19 | Sec. 8 | -546.08 | | | 374.04 |
| | 68068 | PAID | 01/04/19 | | | CP_ACH | 374.04 | 0.00 |
| | 70747 | PAID | 01/31/19 | | | CP_ACH | 374.04 | -374.04 |
| | | | | **February 2019** | | | | |
| Opening Balance | | | | | | | | -374.04 |
| 02/01/19 | SYS | BILL | 02/01/19 | Rent | 920.12 | | | 546.08 |
| 02/01/19 | SYS | BILL | 02/01/19 | Sec. 8 | -546.08 | | | 0.00 |
| | | | | **March 2019** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 03/01/19 | SYS | BILL | 03/01/19 | Rent | 920.12 | | | 920.12 |
| 03/01/19 | SYS | BILL | 03/01/19 | Sec. 8 | -546.08 | | | 374.04 |
| | 74014 | PAID | 03/07/19 | | | CP_ACH | 374.04 | 0.00 |
| | | | | **April 2019** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 04/01/19 | SYS | BILL | 04/01/19 | Rent | 920.12 | | | 920.12 |
| 04/01/19 | SYS | BILL | 04/01/19 | Sec. 8 | -546.08 | | | 374.04 |
| | 76540 | PAID | 04/04/19 | | | CP_ACH | 374.04 | 0.00 |
| | | | | **May 2019** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 05/01/19 | SYS | BILL | 05/01/19 | Rent | 920.12 | | | 920.12 |
| 05/01/19 | SYS | BILL | 05/01/19 | Sec. 8 | -546.08 | | | 374.04 |
| | 79404 | PAID | 05/03/19 | | | CP_ACH | 471.04 | -97.00 |
| | 81880 | Reapplied | 05/30/19 | | | | 0.00 | -97.00 |
| | | | | **June 2019** | | | | |
| Opening Balance | | | | | | | | -97.00 |
| 06/01/19 | SYS | BILL | 06/01/19 | Rent | 920.12 | | | 823.12 |
| 06/01/19 | SYS | BILL | 06/01/19 | Sec. 8 | -546.08 | | | 277.04 |
| | 82265 | PAID | 06/06/19 | | | CP_ACH | 471.04 | -194.00 |
| 06/01/19 | 84105 | ADJ | 06/21/19 | Adj Db-Subsidy | 97.00 | | | -97.00 |
| 05/01/19 | 84105 | ADJ | 06/21/19 | Adj Db-Subsidy | 97.00 | | | 0.00 |
| | 84105 | Reapplied | 06/21/19 | | | | 0.00 | 0.00 |
| | | | | **July 2019** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 07/01/19 | SYS | BILL | 07/01/19 | Rent | 920.12 | | | 920.12 |
| 07/01/19 | SYS | BILL | 07/01/19 | Sec. 8 | -449.08 | | | 471.04 |
| | 84757 | PAID | 07/05/19 | | | CP_ACH | 471.04 | 0.00 |
| | | | | **August 2019** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 08/01/19 | SYS | BILL | 08/01/19 | Rent | 920.12 | | | 920.12 |
| 08/01/19 | SYS | BILL | 08/01/19 | Sec. 8 | -449.08 | | | 471.04 |
| | 87608 | PAID | 08/01/19 | | | CP_ACH | 471.04 | 0.00 |
| | | | | **September 2019** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 09/01/19 | SYS | BILL | 09/01/19 | Rent | 920.12 | | | 920.12 |
| 09/01/19 | SYS | BILL | 09/01/19 | Sec. 8 | -449.08 | | | 471.04 |
| | 90830 | PAID | 09/06/19 | | | CP_ACH | 471.04 | 0.00 |
| | | | | **October 2019** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 10/01/19 | SYS | BILL | 10/01/19 | Rent | 920.12 | | | 920.12 |
| 10/01/19 | SYS | BILL | 10/01/19 | Sec. 8 | -449.08 | | | 471.04 |
| | 93501 | PAID | 10/04/19 | | | CP_ACH | 471.04 | 0.00 |
| | | | | **November 2019** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 11/01/19 | SYS | BILL | 11/01/19 | Rent | 920.12 | | | 920.12 |
| 11/01/19 | SYS | BILL | 11/01/19 | Sec. 8 | -449.08 | | | 471.04 |

PRE-000052

**Building Number:** 151W123      **Tenant Ledger**      **Page 7 Of 13**

**Unit Number:** 6C   Case 1:25-cv-08489-JGK-GS   GARCIA, LEONARDA   Filed 05/12/26   Page 53 of 59   Printed: 01/15/26 at 04:23pm

| Billing Period | Batch Number | Type | Trans Date | Charge Description | Billing/ Adjustment | Check Number | Payments | Running Balance |
|---|---|---|---|---|---|---|---|---|
| | 96695 | PAID | 11/07/19 | | | CP_ACH | 471.04 | 0.00 |
| | | | **December 2019** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 12/01/19 | SYS | BILL | 12/01/19 | Rent | 920.12 | | | 920.12 |
| 12/01/19 | SYS | BILL | 12/01/19 | Sec. 8 | -449.08 | | | 471.04 |
| | 98788 | PAID | 12/03/19 | | | CP_ACH | 471.04 | 0.00 |
| | | | **January 2020** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 01/01/20 | SYS | BILL | 01/01/20 | Rent | 920.12 | | | 920.12 |
| 01/01/20 | SYS | BILL | 01/01/20 | Sec. 8 | -449.08 | | | 471.04 |
| | 1791 | PAID | 01/03/20 | | | CP_ACH | 471.04 | 0.00 |
| | | | **February 2020** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 02/01/20 | SYS | BILL | 02/01/20 | Rent | 920.12 | | | 920.12 |
| 02/01/20 | SYS | BILL | 02/01/20 | Sec. 8 | -449.08 | | | 471.04 |
| | 4767 | PAID | 02/05/20 | | | CP_ACH | 471.04 | 0.00 |
| | | | **March 2020** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 03/01/20 | SYS | BILL | 03/01/20 | Rent | 920.12 | | | 920.12 |
| 03/01/20 | SYS | BILL | 03/01/20 | Sec. 8 | -449.08 | | | 471.04 |
| | 7482 | PAID | 03/02/20 | | | CP_ACH | 471.04 | 0.00 |
| | | | **April 2020** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 04/01/20 | SYS | BILL | 04/01/20 | Rent | 920.12 | | | 920.12 |
| 04/01/20 | SYS | BILL | 04/01/20 | Sec. 8 | -449.08 | | | 471.04 |
| | 10575 | PAID | 04/01/20 | | | CP_ACH | 494.04 | -23.00 |
| | | | **May 2020** | | | | | |
| Opening Balance | | | | | | | | -23.00 |
| 05/01/20 | SYS | BILL | 05/01/20 | Rent | 920.12 | | | 897.12 |
| 05/01/20 | SYS | BILL | 05/01/20 | Sec. 8 | -449.08 | | | 448.04 |
| | 13861 | PAID | 05/05/20 | | | CP_ACH | 494.04 | -46.00 |
| | | | **June 2020** | | | | | |
| Opening Balance | | | | | | | | -46.00 |
| 06/01/20 | SYS | BILL | 06/01/20 | Rent | 943.12 | | | 897.12 |
| 06/01/20 | SYS | BILL | 06/01/20 | Sec. 8 | -449.08 | | | 448.04 |
| 06/01/20 | SYS | BILL | 06/01/20 | Security Depos | 23.00 | | | 471.04 |
| | 16485 | PAID | 06/03/20 | | | CP_ACH | 494.04 | -23.00 |
| | | | **July 2020** | | | | | |
| Opening Balance | | | | | | | | -23.00 |
| 07/01/20 | SYS | BILL | 07/01/20 | Rent | 943.12 | | | 920.12 |
| 07/01/20 | SYS | BILL | 07/01/20 | Sec. 8 | -449.08 | | | 471.04 |
| | 19356 | PAID | 07/01/20 | | | CP_ACH | 471.04 | 0.00 |
| | 22034 | PAID | 07/30/20 | | | CP_ACH | 494.04 | -494.04 |
| | | | **August 2020** | | | | | |
| Opening Balance | | | | | | | | -494.04 |
| 08/01/20 | SYS | BILL | 08/01/20 | Rent | 943.12 | | | 449.08 |
| 08/01/20 | SYS | BILL | 08/01/20 | Sec. 8 | -449.08 | | | 0.00 |
| | | | **September 2020** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 09/01/20 | SYS | BILL | 09/01/20 | Rent | 943.12 | | | 943.12 |
| 09/01/20 | SYS | BILL | 09/01/20 | Sec. 8 | -449.08 | | | 494.04 |
| 09/01/20 | 29110A | ADJ | 09/18/20 | Adj Cr-Subsidy | -119.00 | | | 375.04 |
| 09/00/20 | 29110B | ADJ | 09/18/20 | Adj Db-Subsidy | -476.00 | | | -100.96 |
| | 27928 | PAID | 09/30/20 | | | CP_ACH | 297.08 | -398.04 |
| | | | **October 2020** | | | | | |
| Opening Balance | | | | | | | | -398.04 |
| 10/01/20 | SYS | BILL | 10/01/20 | Rent | 943.12 | | | 545.08 |
| 10/01/20 | SYS | BILL | 10/01/20 | Sec. 8 | -449.08 | | | 96.00 |

PRE - 000053

| Billing Period | Batch Number | Type | Trans Date | Charge Description | Billing/ Adjustment | Check Number | Payments | Running Balance |
|---|---|---|---|---|---|---|---|---|
| 10/01/20 | 32604 | ADJ | 10/22/20 | Adj Cr-Subsidy | -119.00 | | | -23.00 |
| | | | **November 2020** | | | | | |
| Opening Balance | | | | | | | | -23.00 |
| 11/01/20 | SYS | BILL | 11/01/20 | Rent | 943.12 | | | 920.12 |
| 11/01/20 | SYS | BILL | 11/01/20 | Sec. 8 | -449.08 | | | 471.04 |
| | 31257 | PAID | 11/04/20 | | | CP_ACH | 375.04 | 96.00 |
| 11/01/20 | 35607 | ADJ | 11/27/20 | Adj Cr-Subsidy | -119.00 | | | -23.00 |
| | | | **December 2020** | | | | | |
| Opening Balance | | | | | | | | -23.00 |
| 12/01/20 | SYS | BILL | 12/01/20 | Rent | 943.12 | | | 920.12 |
| 12/01/20 | SYS | BILL | 12/01/20 | Sec. 8 | -568.08 | | | 352.04 |
| | 33988 | PAID | 12/03/20 | | | CP_ACH | 375.04 | -23.00 |
| | | | **January 2021** | | | | | |
| Opening Balance | | | | | | | | -23.00 |
| 01/01/21 | SYS | BILL | 01/01/21 | Rent | 943.12 | | | 920.12 |
| 01/01/21 | SYS | BILL | 01/01/21 | Sec. 8 | -568.08 | | | 352.04 |
| | 36747 | PAID | 01/04/21 | | | CP_ACH | 375.04 | -23.00 |
| | 39168 | PAID | 01/29/21 | | | CP_ACH | 352.04 | -375.04 |
| | | | **February 2021** | | | | | |
| Opening Balance | | | | | | | | -375.04 |
| 02/01/21 | SYS | BILL | 02/01/21 | Rent | 943.12 | | | 568.08 |
| 02/01/21 | SYS | BILL | 02/01/21 | Sec. 8 | -568.08 | | | 0.00 |
| | | | **March 2021** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 03/01/21 | SYS | BILL | 03/01/21 | Rent | 943.12 | | | 943.12 |
| 03/01/21 | SYS | BILL | 03/01/21 | Sec. 8 | -568.08 | | | 375.04 |
| | 42167 | PAID | 03/02/21 | | | CP_ACH | 375.04 | 0.00 |
| | 45220 | PAID | 03/31/21 | | | CP_ACH | 375.04 | -375.04 |
| | | | **April 2021** | | | | | |
| Opening Balance | | | | | | | | -375.04 |
| 04/01/21 | SYS | BILL | 04/01/21 | Rent | 943.12 | | | 568.08 |
| 04/01/21 | SYS | BILL | 04/01/21 | Sec. 8 | -568.08 | | | 0.00 |
| | | | **May 2021** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 05/01/21 | SYS | BILL | 05/01/21 | Rent | 943.12 | | | 943.12 |
| 05/01/21 | SYS | BILL | 05/01/21 | Sec. 8 | -568.08 | | | 375.04 |
| | 48888 | PAID | 05/06/21 | | | CP_ACH | 375.04 | 0.00 |
| | 50951 | PAID | 05/28/21 | | | CP_ACH | 375.04 | -375.04 |
| | | | **June 2021** | | | | | |
| Opening Balance | | | | | | | | -375.04 |
| 06/01/21 | SYS | BILL | 06/01/21 | Rent | 943.12 | | | 568.08 |
| 06/01/21 | SYS | BILL | 06/01/21 | Sec. 8 | -568.08 | | | 0.00 |
| | | | **July 2021** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 07/01/21 | SYS | BILL | 07/01/21 | Rent | 943.12 | | | 943.12 |
| 07/01/21 | SYS | BILL | 07/01/21 | Sec. 8 | -568.08 | | | 375.04 |
| | 54007 | PAID | 07/01/21 | | | CP_ACH | 375.04 | 0.00 |
| | 56510 | PAID | 07/29/21 | | | CP_ACH | 375.04 | -375.04 |
| | | | **August 2021** | | | | | |
| Opening Balance | | | | | | | | -375.04 |
| 08/01/21 | SYS | BILL | 08/01/21 | Rent | 943.12 | | | 568.08 |
| 08/01/21 | SYS | BILL | 08/01/21 | Sec. 8 | -568.08 | | | 0.00 |
| | | | **September 2021** | | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 09/01/21 | SYS | BILL | 09/01/21 | Rent | 943.12 | | | 943.12 |
| 09/01/21 | SYS | BILL | 09/01/21 | Sec. 8 | -568.08 | | | 375.04 |
| | 59895 | PAID | 09/02/21 | | | CP_ACH | 375.04 | 0.00 |

PRE-000054

| Billing Period | Batch Number | Type | Trans Date | Charge Description | Billing/ Adjustment | Check Number | Payments | Running Balance |
|---|---|---|---|---|---|---|---|---|
| | | | | **October 2021** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 10/01/21 | SYS | BILL | 10/01/21 | Rent | 943.12 | | | 943.12 |
| 10/01/21 | SYS | BILL | 10/01/21 | Sec. 8 | -568.08 | | | 375.04 |
| | 62780 | PAID | 10/01/21 | | | CP_ACH | 375.04 | 0.00 |
| | | | | **November 2021** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 11/01/21 | SYS | BILL | 11/01/21 | Rent | 943.12 | | | 943.12 |
| 11/01/21 | SYS | BILL | 11/01/21 | Sec. 8 | -568.08 | | | 375.04 |
| | 65755 | PAID | 11/02/21 | | | CP_ACH | 375.04 | 0.00 |
| | | | | **December 2021** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 12/01/21 | SYS | BILL | 12/01/21 | Rent | 943.12 | | | 943.12 |
| 12/01/21 | SYS | BILL | 12/01/21 | Sec. 8 | -568.08 | | | 375.04 |
| 12/01/21 | SYS | BILL | 12/01/21 | Security Depos | 23.58 | | | 398.62 |
| | 68562 | PAID | 12/02/21 | | | CP_ACH | 375.04 | 23.58 |
| | | | | **January 2022** | | | | |
| Opening Balance | | | | | | | | 23.58 |
| 01/01/22 | SYS | BILL | 01/01/22 | Rent | 943.12 | | | 966.70 |
| 01/01/22 | SYS | BILL | 01/01/22 | Sec. 8 | -568.08 | | | 398.62 |
| | 71649 | PAID | 01/05/22 | | | CP_ACH | 375.04 | 23.58 |
| | 72539 | PAID | 01/12/22 | | | 966074310 | 23.58 | 0.00 |
| | | | | **February 2022** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 02/01/22 | SYS | BILL | 02/01/22 | Rent | 966.70 | | | 966.70 |
| 02/01/22 | SYS | BILL | 02/01/22 | Sec. 8 | -568.08 | | | 398.62 |
| | 74497 | PAID | 02/02/22 | | | CP_ACH | 398.62 | 0.00 |
| | | | | **March 2022** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 03/01/22 | SYS | BILL | 03/01/22 | Rent | 966.70 | | | 966.70 |
| 03/01/22 | SYS | BILL | 03/01/22 | Sec. 8 | -568.08 | | | 398.62 |
| | 77311 | PAID | 03/03/22 | | | CP_ACH | 398.62 | 0.00 |
| | | | | **April 2022** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 04/01/22 | SYS | BILL | 04/01/22 | Rent | 966.70 | | | 966.70 |
| 04/01/22 | SYS | BILL | 04/01/22 | Sec. 8 | -568.08 | | | 398.62 |
| | 80336 | PAID | 04/01/22 | | | CP_ACH | 398.62 | 0.00 |
| | | | | **May 2022** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 05/01/22 | SYS | BILL | 05/01/22 | Rent | 966.70 | | | 966.70 |
| 05/01/22 | SYS | BILL | 05/01/22 | Sec. 8 | -568.08 | | | 398.62 |
| | 83001 | PAID | 05/02/22 | | | CP_ACH | 398.62 | 0.00 |
| | | | | **June 2022** | | | | |
| Opening Balance | | | | | | | | 0.00 |
| 06/01/22 | SYS | BILL | 06/01/22 | Rent | 966.70 | | | 966.70 |
| 06/01/22 | SYS | BILL | 06/01/22 | Sec. 8 | -568.08 | | | 398.62 |
| | 85940 | PAID | 06/01/22 | | | CP_ACH | 398.62 | 0.00 |
| | 88404 | PAID | 06/30/22 | | | CP_ACH | 398.62 | -398.62 |
| | | | | **July 2022** | | | | |
| Opening Balance | | | | | | | | -398.62 |
| 07/01/22 | SYS | BILL | 07/01/22 | Rent | 966.70 | | | 568.08 |
| 07/01/22 | SYS | BILL | 07/01/22 | Sec. 8 | -568.08 | | | 0.00 |
| 05/01/22 | 90653 | ADJ | 07/22/22 | Adj Db-Subsidy | 568.08 | | | 568.08 |
| | 90918 | PAID | 07/29/22 | | | CP_ACH | 398.62 | 169.46 |
| | | | | **August 2022** | | | | |
| Opening Balance | | | | | | | | 169.46 |
| 08/01/22 | SYS | BILL | 08/01/22 | Rent | 966.70 | | | 1,136.16 |

PRE-000055

| Billing Period | Batch Number | Type | Trans Date | Charge Description | Billing/ Adjustment | Check Number | Payments | Running Balance |
|---|---|---|---|---|---|---|---|---|
| | | | | **September 2022** | | | | |
| Opening Balance | | | | | | | | 1,136.16 |
| 09/01/22 | SYS | BILL | 09/01/22 | Rent | 966.70 | | | 2,102.86 |
| | 94471 | PAID | 09/06/22 | | | CP_ACH | 398.62 | 1,704.24 |
| | | | | **October 2022** | | | | |
| Opening Balance | | | | | | | | 1,704.24 |
| 10/01/22 | SYS | BILL | 10/01/22 | Rent | 966.70 | | | 2,670.94 |
| | 97121 | PAID | 10/04/22 | | | CP_ACH | 398.62 | 2,272.32 |
| | | | | **November 2022** | | | | |
| Opening Balance | | | | | | | | 2,272.32 |
| 11/01/22 | SYS | BILL | 11/01/22 | Rent | 966.70 | | | 3,239.02 |
| | 99804 | PAID | 11/01/22 | | | CP_ACH | 398.62 | 2,840.40 |
| | | | | **December 2022** | | | | |
| Opening Balance | | | | | | | | 2,840.40 |
| 12/01/22 | SYS | BILL | 12/01/22 | Rent | 966.70 | | | 3,807.10 |
| | 2825 | PAID | 12/06/22 | | | CP_ACH | 398.62 | 3,408.48 |
| | | | | **January 2023** | | | | |
| Opening Balance | | | | | | | | 3,408.48 |
| 01/01/23 | SYS | BILL | 01/01/23 | Rent | 966.70 | | | 4,375.18 |
| | 5090 | PAID | 01/03/23 | | | CP_ACH | 398.62 | 3,976.56 |
| | 7733 | PAID | 01/31/23 | | | CP_ACH | 398.62 | 3,577.94 |
| | | | | **February 2023** | | | | |
| Opening Balance | | | | | | | | 3,577.94 |
| 02/01/23 | SYS | BILL | 02/01/23 | Rent | 966.70 | | | 4,544.64 |
| | 10662 | PAID | 02/28/23 | | | CP_ACH | 398.62 | 4,146.02 |
| | | | | **March 2023** | | | | |
| Opening Balance | | | | | | | | 4,146.02 |
| 03/01/23 | SYS | BILL | 03/01/23 | Rent | 966.70 | | | 5,112.72 |
| | | | | **April 2023** | | | | |
| Opening Balance | | | | | | | | 5,112.72 |
| 04/01/23 | SYS | BILL | 04/01/23 | Rent | 966.70 | | | 6,079.42 |
| | 14316 | PAID | 04/04/23 | | | CP_ACH | 398.62 | 5,680.80 |
| | | | | **May 2023** | | | | |
| Opening Balance | | | | | | | | 5,680.80 |
| 05/01/23 | SYS | BILL | 05/01/23 | Rent | 966.70 | | | 6,647.50 |
| | 17224 | PAID | 05/02/23 | | | CP_ACH | 398.62 | 6,248.88 |
| | | | | **June 2023** | | | | |
| Opening Balance | | | | | | | | 6,248.88 |
| 06/01/23 | SYS | BILL | 06/01/23 | Rent | 966.70 | | | 7,215.58 |
| | 20408 | PAID | 06/06/23 | | | CP_ACH | 398.62 | 6,816.96 |
| | | | | **July 2023** | | | | |
| Opening Balance | | | | | | | | 6,816.96 |
| 07/01/23 | SYS | BILL | 07/01/23 | Rent | 966.70 | | | 7,783.66 |
| | 23099 | PAID | 07/05/23 | | | CP_ACH | 398.62 | 7,385.04 |
| | 25857 | PAID | 07/31/23 | | | CP_ACH | 398.62 | 6,986.42 |
| | | | | **August 2023** | | | | |
| Opening Balance | | | | | | | | 6,986.42 |
| 08/01/23 | SYS | BILL | 08/01/23 | Rent | 966.70 | | | 7,953.12 |
| | | | | **September 2023** | | | | |
| Opening Balance | | | | | | | | 7,953.12 |
| 09/01/23 | SYS | BILL | 09/01/23 | Rent | 966.70 | | | 8,919.82 |
| | 29278 | PAID | 09/01/23 | | | CP_ACH | 398.62 | 8,521.20 |
| | | | | **October 2023** | | | | |
| Opening Balance | | | | | | | | 8,521.20 |
| 10/01/23 | SYS | BILL | 10/01/23 | Rent | 966.70 | | | 9,487.90 |
| | 32098 | PAID | 10/03/23 | | | CP_ACH | 398.62 | 9,089.28 |
| | | | | **November 2023** | | | | |

PRE-000056

| Billing Period | Batch Number | Type | Trans Date | Charge Description | Billing/ Adjustment | Check Number | Payments | Running Balance |
|---|---|---|---|---|---|---|---|---|
| Opening Balance | | | | | | | | 9,089.28 |
| 11/01/23 | SYS | BILL | 11/01/23 | Rent | 966.70 | | | 10,055.98 |
| | 35030 | PAID | 11/01/23 | | | CP_ACH | 398.62 | 9,657.36 |
| | | | **December 2023** | | | | | |
| Opening Balance | | | | | | | | 9,657.36 |
| 12/01/23 | SYS | BILL | 12/01/23 | Rent | 966.70 | | | 10,624.06 |
| | 38248 | PAID | 12/05/23 | | | CP_ACH | 398.62 | 10,225.44 |
| | | | **January 2024** | | | | | |
| Opening Balance | | | | | | | | 10,225.44 |
| 01/01/24 | SYS | BILL | 01/01/24 | Rent | 966.70 | | | 11,192.14 |
| 01/01/24 | SYS | BILL | 01/01/24 | Security Depos | 26.58 | | | 11,218.72 |
| | 40496 | PAID | 01/03/24 | | | CP_ACH | 398.62 | 10,820.10 |
| | 41608 | PAID | 01/12/24 | | | 8641 | 26.58 | 10,793.52 |
| | | | **February 2024** | | | | | |
| Opening Balance | | | | | | | | 10,793.52 |
| 02/01/24 | SYS | BILL | 02/01/24 | Rent | 993.28 | | | 11,786.80 |
| | 43158 | PAID | 02/01/24 | | | CP_ACH | 425.20 | 11,361.60 |
| | 44837 | PAID | 02/27/24 | | | CP_ACH | 425.20 | 10,936.40 |
| | | | **March 2024** | | | | | |
| Opening Balance | | | | | | | | 10,936.40 |
| 03/01/24 | SYS | BILL | 03/01/24 | Rent | 993.28 | | | 11,929.68 |
| 03/01/24 | 48730 | ADJ | 03/20/24 | Adj Cr-Subsidy | -568.08 | | | 11,361.60 |
| 02/01/24 | 48730 | ADJ | 03/20/24 | Adj Cr-Subsidy | -195.89 | | | 11,165.71 |
| | 47321 | PAID | 03/28/24 | | | CP_ACH | 334.00 | 10,831.71 |
| | | | **April 2024** | | | | | |
| Opening Balance | | | | | | | | 10,831.71 |
| 04/01/24 | SYS | BILL | 04/01/24 | Rent | 993.28 | | | 11,824.99 |
| 04/01/24 | 50979 | ADJ | 04/08/24 | Adj Cr-Subsidy | -568.08 | | | 11,256.91 |
| | 49762 | PAID | 04/30/24 | | | CP_ACH | 390.00 | 10,866.91 |
| | | | **May 2024** | | | | | |
| Opening Balance | | | | | | | | 10,866.91 |
| 05/01/24 | SYS | BILL | 05/01/24 | Rent | 993.28 | | | 11,860.19 |
| 05/01/24 | 50982 | ADJ | 05/10/24 | Adj Cr-Subsidy | -512.08 | | | 11,348.11 |
| | | | **June 2024** | | | | | |
| Opening Balance | | | | | | | | 11,348.11 |
| 06/01/24 | SYS | BILL | 06/01/24 | Rent | 993.28 | | | 12,341.39 |
| 06/01/24 | SYS | BILL | 06/01/24 | Sec. 8 | -512.08 | | | 11,829.31 |
| | 52550 | PAID | 06/04/24 | | | CP_ACH | 390.00 | 11,439.31 |
| | 54428 | PAID | 06/27/24 | | | CP_ACH | 390.00 | 11,049.31 |
| | | | **July 2024** | | | | | |
| Opening Balance | | | | | | | | 11,049.31 |
| 07/01/24 | SYS | BILL | 07/01/24 | Rent | 993.28 | | | 12,042.59 |
| 07/01/24 | SYS | BILL | 07/01/24 | Sec. 8 | -512.08 | | | 11,530.51 |
| | 56783 | PAID | 07/30/24 | | | CP_ACH | 390.00 | 11,140.51 |
| | | | **August 2024** | | | | | |
| Opening Balance | | | | | | | | 11,140.51 |
| 08/01/24 | SYS | BILL | 08/01/24 | Rent | 993.28 | | | 12,133.79 |
| 08/01/24 | SYS | BILL | 08/01/24 | Sec. 8 | -512.08 | | | 11,621.71 |
| | 59501 | PAID | 08/30/24 | | | CP_ACH | 390.00 | 11,231.71 |
| | | | **September 2024** | | | | | |
| Opening Balance | | | | | | | | 11,231.71 |
| 09/01/24 | SYS | BILL | 09/01/24 | Rent | 993.28 | | | 12,224.99 |
| 09/01/24 | SYS | BILL | 09/01/24 | Sec. 8 | -512.08 | | | 11,712.91 |
| | | | **October 2024** | | | | | |
| Opening Balance | | | | | | | | 11,712.91 |
| 10/01/24 | SYS | BILL | 10/01/24 | Rent | 993.28 | | | 12,706.19 |
| 10/01/24 | SYS | BILL | 10/01/24 | Sec. 8 | -512.08 | | | 12,194.11 |
| | 61918 | PAID | 10/02/24 | | | CP_ACH | 390.00 | 11,804.11 |

PRE-000057

**Building Number:** 151W123     **Tenant Ledger**     **Page 12 Of 13**

**Unit Number:** 6C    Case 1:25-cv-08489-JGK-GS    GARCIA, LEONARDA    Filed 05/12/26    Page 58 of 59    Printed: 01/15/26 at 04:23pm

| Billing Period | Batch Number | Type | Trans Date | Charge Description | Billing/ Adjustment | Check Number | Payments | Running Balance |
|---|---|---|---|---|---|---|---|---|
| | | | **November 2024** | | | | | |
| Opening Balance | | | | | | | | 11,804.11 |
| 11/01/24 | SYS | BILL | 11/01/24 | Rent | 993.28 | | | 12,797.39 |
| 11/01/24 | SYS | BILL | 11/01/24 | Sec. 8 | -512.08 | | | 12,285.31 |
| | 64651 | PAID | 11/01/24 | | | CP_ACH | 390.00 | 11,895.31 |
| | | | **December 2024** | | | | | |
| Opening Balance | | | | | | | | 11,895.31 |
| 12/01/24 | SYS | BILL | 12/01/24 | Rent | 993.28 | | | 12,888.59 |
| 12/01/24 | SYS | BILL | 12/01/24 | Sec. 8 | -512.08 | | | 12,376.51 |
| | 67038 | PAID | 12/03/24 | | | CP_ACH | 390.00 | 11,986.51 |
| | 69181 | PAID | 12/31/24 | | | CP_ACH | 390.00 | 11,596.51 |
| | | | **January 2025** | | | | | |
| Opening Balance | | | | | | | | 11,596.51 |
| 01/01/25 | SYS | BILL | 01/01/25 | Rent | 993.28 | | | 12,589.79 |
| 01/01/25 | SYS | BILL | 01/01/25 | Sec. 8 | -512.08 | | | 12,077.71 |
| 01/01/25 | SYS | BILL | 01/01/25 | Security Depos | 31.78 | | | 12,109.49 |
| | | | **February 2025** | | | | | |
| Opening Balance | | | | | | | | 12,109.49 |
| 02/01/25 | SYS | BILL | 02/01/25 | Rent | 1,025.06 | | | 13,134.55 |
| 02/01/25 | SYS | BILL | 02/01/25 | Sec. 8 | -512.08 | | | 12,622.47 |
| | 71925 | PAID | 02/04/25 | | | CP_ACH | 390.00 | 12,232.47 |
| | | | **March 2025** | | | | | |
| Opening Balance | | | | | | | | 12,232.47 |
| 03/01/25 | SYS | BILL | 03/01/25 | Rent | 1,025.06 | | | 13,257.53 |
| 03/01/25 | SYS | BILL | 03/01/25 | Sec. 8 | -512.08 | | | 12,745.45 |
| | 74305 | PAID | 03/04/25 | | | CP_ACH | 390.00 | 12,355.45 |
| | 76309 | PAID | 03/27/25 | | | CP_ACH | 390.00 | 11,965.45 |
| | | | **April 2025** | | | | | |
| Opening Balance | | | | | | | | 11,965.45 |
| 04/01/25 | SYS | BILL | 04/01/25 | Rent | 1,025.06 | | | 12,990.51 |
| 04/01/25 | SYS | BILL | 04/01/25 | Sec. 8 | -512.08 | | | 12,478.43 |
| | 78868 | PAID | 04/30/25 | | | CP_ACH | 390.00 | 12,088.43 |
| | | | **May 2025** | | | | | |
| Opening Balance | | | | | | | | 12,088.43 |
| 05/01/25 | SYS | BILL | 05/01/25 | Rent | 1,025.06 | | | 13,113.49 |
| 05/01/25 | SYS | BILL | 05/01/25 | Sec. 8 | -512.08 | | | 12,601.41 |
| | | | **June 2025** | | | | | |
| Opening Balance | | | | | | | | 12,601.41 |
| 06/01/25 | SYS | BILL | 06/01/25 | Rent | 1,025.06 | | | 13,626.47 |
| 06/01/25 | SYS | BILL | 06/01/25 | Sec. 8 | -512.08 | | | 13,114.39 |
| | 81695 | PAID | 06/03/25 | | | CP_ACH | 390.00 | 12,724.39 |
| | | | **July 2025** | | | | | |
| Opening Balance | | | | | | | | 12,724.39 |
| 07/01/25 | SYS | BILL | 07/01/25 | Rent | 1,025.06 | | | 13,749.45 |
| 07/01/25 | SYS | BILL | 07/01/25 | Sec. 8 | -512.08 | | | 13,237.37 |
| | 85556 | PAID | 07/01/25 | | | CP_ACH | 390.00 | 12,847.37 |
| | | | **August 2025** | | | | | |
| Opening Balance | | | | | | | | 12,847.37 |
| 08/01/25 | SYS | BILL | 08/01/25 | Rent | 1,025.06 | | | 13,872.43 |
| 08/01/25 | SYS | BILL | 08/01/25 | Sec. 8 | -512.08 | | | 13,360.35 |
| | 88198 | PAID | 08/01/25 | | | CP_ACH | 390.00 | 12,970.35 |
| | 90621 | PAID | 08/29/25 | | | CP_ACH | 390.00 | 12,580.35 |
| | | | **September 2025** | | | | | |
| Opening Balance | | | | | | | | 12,580.35 |
| 09/01/25 | SYS | BILL | 09/01/25 | Rent | 1,025.06 | | | 13,605.41 |
| 09/01/25 | SYS | BILL | 09/01/25 | Sec. 8 | -512.08 | | | 13,093.33 |
| | 93165 | PAID | 09/30/25 | | | CP_ACH | 902.08 | 12,191.25 |

PRE-000058

**Building Number: 151W123**      **Tenant Ledger**      **Page 13 Of 13**

**Unit Number: 6C**    Case 1:25-cv-08489-JGK-GS    GARCIA, LEONARDA    Filed 05/12/26    Page 59 of 59    Printed: 01/15/26 at 04:23pm

| Billing Period | Batch Number | Type | Trans Date | Charge Description | Billing/ Adjustment | Check Number | Payments | Running Balance |
|---|---|---|---|---|---|---|---|---|
| | | | | **October 2025** | | | | |
| Opening Balance | | | | | | | | 12,191.25 |
| 10/01/25 | SYS | BILL | 10/01/25 | Rent | 1,025.06 | | | 13,216.31 |
| 10/01/25 | SYS | BILL | 10/01/25 | Sec. 8 | -512.08 | | | 12,704.23 |
| | 95795 | PAID | 10/31/25 | | | CP_ACH | 902.08 | 11,802.15 |
| | | | | **November 2025** | | | | |
| Opening Balance | | | | | | | | 11,802.15 |
| 11/01/25 | SYS | BILL | 11/01/25 | Rent | 1,025.06 | | | 12,827.21 |
| 11/01/25 | SYS | BILL | 11/01/25 | Sec. 8 | -512.08 | | | 12,315.13 |
| | | | | **December 2025** | | | | |
| Opening Balance | | | | | | | | 12,315.13 |
| 12/01/25 | SYS | BILL | 12/01/25 | Rent | 1,025.06 | | | 13,340.19 |
| 12/01/25 | SYS | BILL | 12/01/25 | Sec. 8 | -512.08 | | | 12,828.11 |
| | 98285 | PAID | 12/01/25 | | | CP_ACH | 478.00 | 12,350.11 |
| | | | | **January 2026** | | | | |
| Opening Balance | | | | | | | | 12,350.11 |
| 01/01/26 | SYS | BILL | 01/01/26 | Rent | 1,025.06 | | | 13,375.17 |
| 01/01/26 | SYS | BILL | 01/01/26 | Sec. 8 | -512.08 | | | 12,863.09 |
| | A0234 | PAID | 01/02/26 | | | CP_ACH | 478.00 | 12,385.09 |
| 04/01/24 | A05N3 | ADJ | 01/15/26 | Bad Debt | -12,497.76 | | | -112.67 |
| | A05N3 | Reapplied | 01/15/26 | | | | 0.00 | -112.67 |