# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------:

LEONARDA GARCIA, : Case No.: 25-cv-8489

Plaintiff, :

v. :

ERIC H. KAHAN, et al., : New York, New York

Defendant. : April 16, 2026

-------------------------------:

TRANSCRIPT OF STATUS CONFERENCE HEARING

BEFORE THE HONORABLE GARY STEIN

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff: LAW OFFICE OF AHMAD KESHAVARZ
BY: Ahmad Keshavarz, Esq.
16 Court Street
Brooklyn, New York 11241

For Defendant: KAUFMAN DOLOWICH & VOLUCK LLP
BY: Adam M. Marshall, Esq.
135 Crossways Park Drive
Woodbury, New York 11797

For Defendant: Prestige Mgmt. SAFRAN KEST PLLC
BY: Asher Kest, Esq.
60 E. 42nd Street
New York, New York 10165

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

THE DEPUTY CLERK: In the matter of 25-cv-8489, Garcia v. Kahan, et al., Counsel, would you please state your name for the record, starting with the plaintiff.

MR. KESHAVARZ: Ahmad Keshavarz for the plaintiff. Good morning, your Honor.

THE COURT: Good morning.

MR. MARSHALL: Good afternoon, your Honor. Adam Marshall, Kaufman Dolowich, LLP, for defendants, Eric Kahan and Sperber Kahan Law Group.

THE COURT: Good afternoon.

MR. KEST: Good afternoon, your Honor. Asher Kest from Furman, Kornfeld & Brennan on behalf of defendant, Prestige Management.

THE COURT: And good afternoon to you as well.

The impetus for this proceeding was an April 1 letter from Mr. Keshavarz -- sorry.

MR. KESHAVARZ: No, perfect.

THE COURT: I'll do my best.

-- which relates to discovery requests propounded by the plaintiff of defendant, Prestige. I have received and reviewed not only that letter, but also Mr. Kest's response dated April 15, 2026, which was yesterday.

THE COURT: Also yesterday I received an additional letter in support of a second motion to compel from Mr. Keshavarz to which neither set of defendants has had an opportunity to respond yet. I don't know if we can make any progress on those issues today or not, but why don't we begin with Mr. Keshavarz's -- or plaintiff's letter about Prestige's discovery responses.

Mr. Kest, I read your letter. You said you're responding; you just need to get your reply done first.

That was filed yesterday. When are you going to provide responses?

MR. KEST: Your Honor, we expect that we will have all of our documents from our clients at some point next week. We have some of them. We don't have all of them yet. And once we remove any items which are privileged, should be easy enough to get those over to plaintiff. So I imagine we won't need very long. If it -- if we need longer than next week, it would only be a few days further, so let's say two weeks at most.

THE COURT: I just want to take a look back at the letter for a moment.

Yeah, this is interrogatories and request

for production, correct?

MR. KEST: Correct.

THE COURT: And so you'll be able to respond to both --

MR. KEST: Absolutely, your Honor.

THE COURT: -- within two weeks?

MR. KEST: Absolutely.

THE COURT: Is there any reason, because you mentioned that you have some documents already, not to make a rolling production rather than waiting until the end?

MR. KEST: Absolutely, your Honor. We could certainly do that if that is the Court's preference. I typically find that it ends up with, kind of, confusing everyone if there's multiple -- you know, we're not going to have that many documents to begin with, but I'm happy if -- at the Court's preference or plaintiff's preference, I'm happy to do a rolling production or whatever would be most convenient.

THE COURT: All right. Let me hear from Mr. Keshavarz.

MR. KESHAVARZ: Thank you, your Honor.

The discovery answers were due on March 15th. Currently, discovery closes, I think, in the

first or second week of May. And our deadline to amend, which your Honor graciously have been extending twice now, we haven't been able to amend because the third parties we've been subpoenaing have ignored our subpoenas, and Prestige won't answer any of our discovery.

There apparently is another entity that's in between, or perhaps an owner that's not been disclosed, that apparently is a liable party because the landlord entity is defaulted. An owner of a building of those assets -- that level of assets doesn't just default, there's got to be a reason. There's got to be an owner that's in there somewhere.

Interestingly enough, Ransome, who's the landlord who defaulted, their address is Prestige. The collection lawsuit says "care of Prestige" at this address.

So all the information that Ransome has should be in the possession, custody, or control of Prestige. So I'm very concerned that we're only going to get some very limited documents, and everything that Ransome has should be in their possession.

I can't -- I could amend and get on what

I know now, but it doesn't do anyone any good for me to have a good reason to think that another entity is liable and then to find out that the information I have is not enough.

For example, out of the blue, my office got a letter from an insurance company directed to Prestige and a different company called Apsiyon. I forget the exact name. And they said, oh, we're not going to -- we're not going to cover the claim, even though Apsiyon is the policyholder and may be liable for some of the claims, but we think it's outside of the scope.

So this Apsiyon entity is a party. I've asked, informally, opposing counsel, who are they? And apparently they're an owner of the building. Well, that might make some sense if they're the real owner of the building and the one I have served is defaulted and is not really the owner of the building, that would be, kind of, important to know. This is all information in the possession of Prestige, and to not provide any answers after all this time is very detrimental.

The other thing I'm concerned about is, if they just get a week or two weeks to answer -- I don't want to get a bunch of objections. So a

concern I would have is that, except for privilege, they waive other objections other than the privilege to the request for production and interrogatories because I don't want to come back here in a month and argue, oh, it's not relevant.

I can touch on a few of the main things that they owe, that they could give us, like documents related to their attempts to collect the debt. Our client -- is the law firm really your law firm, or is it the law firm of Ransome? Are you contending that there's privilege?

THE COURT: Well, there would be privilege if Prestige was acting as -- even if Ransome was the actual client, the property management company acting as agent for the landlord would clearly be within the scope of the privilege.

MR. KESHAVARZ: That may be, but their motion to dismiss was suggesting that Prestige is almost a stranger to this because the lawsuit was on behalf of Ransome and not by Prestige. And they're trying to suggest in a motion to dismiss --

MR. MARSHALL: That's different from the privilege question.

MR. KESHAVARZ: No, but I just need to know an answer one way or the other about their

position as to that.

THE COURT: And I'm not suggesting you can't challenge the privilege. I'm not making a ruling about that.

MR. KESHAVARZ: Yeah.

THE COURT: But I wouldn't be surprised if they invoke privilege as to certain communications.

MR. KESHAVARZ: Some of the main things are -- and they're both in requests for production, interrogatories and requests for admission, which I filed yesterday -- is, did you sue my client for the Section 8 share, which is the government's share?

Let me just say a sentence or two about -- a couple sentences about what the case is about.

THE COURT: I know what the case is about. I read the complaint.

MR. KESHAVARZ: Okay. All right.

THE COURT: That said, if you want to give me a couple sentences --

MR. KESHAVARZ: Yeah.

THE COURT: -- so you can set the backdrop for your argument, I don't mind.

MR. KESHAVARZ: Sure.

I'm just trying to get in request for

Case 1:25-cv-03489-JCK-GS Document 91-2 Filed 05/14/26 Page 9 of 73

admissions and other amounts -- requests. Is the amount that you're seeking in each of these lawsuits and each of these letters -- are some of them Section 8 or all of them Section 8?

I can't get an answer from their request for admissions, for example. And a basic question is, identify other tenants that you sued for the Section 8 share.

THE COURT: Yeah, I do want to talk about that. And I'm not sure you're entitled to that.

But I do hear your argument, at least as to Prestige, they may have waived their objections, and that is a concern.

Let me talk to Mr. Kest for a moment.

MR. KESHAVARZ: Well, at least as to the number of times they've done this.

THE COURT: Well --

MR. KESHAVARZ: -- because that goes to consumer-oriented gross negligence and judiciary law.

THE COURT: Let me hear what the defense --

MR. KESHAVARZ: Thank you.

THE COURT: Well, let's just keep the issues straight.

Mr. Kest, first of all, do you anticipate having any objections to any of the discovery requests?

I believe your letter indicated that you would, so tell me.

MR. KEST: That's correct, your Honor. And having reviewed them with my junior associate on this matter who will be drafting them, I can advise the Court that we will have substantial objections.

As an initial matter, the interrogatories far exceed 25. So on that basis alone, we won't be answering the latter half of those.

Additionally, just in terms of the interrogatories, a number of them are outside the bounds of what are permitted to be asked at this juncture of the case. A number of them seek irrelevant information. And, similarly, for the --

THE COURT: Which ones seek irrelevant information?

MR. KEST: Well, for example, I think your Honor discussed the -- any other back-rent issues that may have been pursued.

Additionally, I would say such things as, you know, who repaired --

THE COURT: I'm sorry. What is the

background issue? I'm not sure I know.

MR. KEST: Oh, my apologies, your Honor.

The -- one of the issues that plaintiff is looking to investigate in discovery is, as was just discussed, other rent-dispute lawsuits or other attempts to collect rent from other tenants.

THE COURT: People other than the plaintiff.

MR. KEST: Correct. Other than the --

THE COURT: That, I understand.

MR. KEST: Additionally, you know, there -- my understanding is that there was some sort of violation, an HPD violation in Ms. Garcia's apartment, so plaintiff is seeking documents relating to, like, who fixed the issue or whatever it is.

I mean, this is all, kind of, beyond the scope of what is even being alleged in the first place. The issue is not whether her apartment had any issues. The issue is, was rent sought from her that she did not owe? And if so, did such actions violate the FDCPA and, in the case of my client, GBL 349?

So, I mean, I'm concerned that there is an effort to extend discovery beyond the bounds of

what is at issue in this case.

Now, obviously, plaintiff is entitled to, you know, broad discovery demands in order to investigate their claims, but I think that, especially when it comes to fee-shifting cases, there is a risk of discovery far outpacing the necessities of the case.

That's particularly so here, where the damages, to the best of my understanding, appear to be garden-variety emotional distress. So before three attorneys spend a great deal of time, you know, going back and forth on, you know, whether attorney-client privilege is applicable to an attorney-client relationship or whether, you know, other tenants that are unrelated to this case have ever been -- you know, been in arrears on their rent, or whether, you know, the accounting software that they use -- I mean, you know, all of this is, kind of, far outside what is necessary for plaintiff to prove her claims as stated in the complaint.

So, you know, in addition to -- I guess now I'm getting on to another topic, which I was going to save toward the end.

I mean, I would ask that the parties seek to resolve this action in a settlement conference or

private mediation. I think that there's -- you know, FDCPA, at least -- I'm understanding that my client is not being sued under FDCPA, but FDCPA is a strict liability statute, and it's not typically a very complicated area of law.

THE COURT: All right.

MR. KEST: But returning to the discovery.

So, ultimately, yes, for having reviewed the discovery demands pretty thoroughly, certainly, when it comes to the documents, there are -- you know, they are very lengthy demands -- again, which is plaintiff's right -- but they are -- many of them go outside the bounds of what is necessary for this case, so I'm reluctant -- like, I couldn't possibly say, yes, we're not going to object to anything. We, of course, will be objecting to a great deal of them, both on the basis of relevance to the actual claims of the complaint, even if they're all true, and on the basis of, of course, privilege.

THE COURT: So we will talk about a settlement at the end. We will see if there's any appetite for that. I feel reasonably confident that one thing the plaintiff will say is, in order to have a productive settlement conference, they would

need some discovery. All right?

So let's stay focused for the moment on the discovery requests.

MR. KEST: Absolutely.

THE COURT: It's not apparent to me that there's been any genuine meet and confer process that's taken place yet. You may view the demands as broad and as overly broad, particularly in the context of what is proportionate in this case.

Typically, what happens is the lawyers get together, they talk about that, they try to reach an accommodation. The plaintiff agrees -- or if it's the defendant serving the discovery request, the defendant agrees -- to narrow the scope of the request.

I don't think that process has taken place yet. And as far as I can tell from the record -- and I'll give you the opportunity to tell me why I have a misimpression -- it's because you did not engage with plaintiff's counsel. The reasons that you gave in your letter were totally unsatisfactory in that regard.

There's no stay of discovery in this case, correct?

MR. KEST: Correct, your Honor.

THE COURT: But you're making a motion to dismiss, but either you didn't seek a stay of discovery or you did seek one and Judge Koeltl refused to impose one. It doesn't matter, really, which one it is; the fact is there's no stay of discovery.

So he served you with document requests. There needs to be a dialogue. There needs to be a response.

MR. KEST: Absolutely, your Honor.

And, you know, this is not any of our side of the table's. First case was Mr. Keshavarz. I think that, in the past, we've always managed to find accommodation. I don't think Mr. Keshavarz is being discourteous. I think he's just very anxious, you know, for understandable reasons, that he wants to proceed with this case.

You know, as I advised, you know, Mr. Keshavarz, it is just -- this was something that I need more time on, you know, between the accelerated schedule to get the motion out the door, a number of other matters unrelated to this case.

You know, like I said, we're certainly willing to have that discussion with plaintiff, you know, in good faith. For example, to the extent

that Prestige has documents for Ransome because, of course, Prestige is Ransome's agent, of course, you know, we will provide those documents.

You know, there's not -- and we are certainly happy to dialogue, even, on the relevancy issues, and, undoubtedly, we can come to compromise, at least on some of them, I'm sure.

So I certainly apologize to the Court and to Mr. Keshavarz for -- you know, for my delay. That's not on my client; that's on me. Like I said, it's just the nature of the business sometimes where, you know, it's like, okay, I have to get this out to get this done, and then I'm, you know, out of town, finally, for the first time in some time. And it's like, okay, then Judge Koeltl gave me three days upon my return to get the reply out, which if that's the court's preference, then that's what I did. And now we can -- you know, and I understand that that's not a -- there's no stay, and that's not a -- I'm not trying to ask the Court to excuse my delay, but rather just explain to the Court that, the nature of the delay.

THE COURT: All right. Look, I practiced mostly in big firms or the U.S. Attorney's Office, which itself is a big firm, but I completely

appreciate that not all lawyers do that, and whether it's plaintiff's counsel, defense counsel, it's difficult, and I have a fair amount of empathy for that.

MR. KESHAVARZ: May I speak to that briefly, your Honor?

THE COURT: One second.

What you do have to do is, at a minimum, communicate, and seemed from the record in plaintiff's counsel's letter, that you just weren't responding. If you've worked with him in the past, you know, I hope there's a reasonable degree of professional courtesy. And you said -- you would say, I need more time. He would probably say yes if he can.

I realize -- and we should talk about this -- that there is a rather short period for discovery in this case. Discovery deadline is May 11, and I think we should talk about that.

I don't know. Even at this juncture, that doesn't seem likely to me to be met. I didn't set it. I don't know the background to it. I don't know if Judge Koeltl had reasons or if this is something that the two of you proposed, and now at least some of you may be having buyer's regret. I

don't know.

But go ahead, Mr. Keshavarz.

MR. KESHAVARZ: Thank you.

I have one licensed attorney in my firm, me. And I have an associate who is not licensed yet. I understand about being overwhelmed.

There is a partner who is on the case and now, recently, another associate. I've called 15 times since March 16th. 15 times. The first time I got a return call was yesterday.

THE COURT: I read your letter. I saw it. That's what I was referring to when -- in my discussion with Mr. Kest. And it's not acceptable. You don't need to persuade me of that. I don't think you need to persuade Mr. Kest of that, but we do need Mr. Kest's actions to match his words.

MR. KESHAVARZ: If I could touch briefly on interrogatories because it's going to be an issue, they're breaking down requests, like, are you seeking Section 8 rent? And I list each suit: The 2024 suit, the 2025 suit. And they're considering each request for each suit a separate request.

THE COURT: Yeah.

MR. KESHAVARZ: Which is the whole -- which is basically the main objection they're going

to have.

THE COURT: Look, I'm not going to decide that now. You have to meet and confer about it. It should have happened and that's not your fault, but it needs to happen now.

And it needs to happen, Mr. Kest, in this next two-week period. In other words, it's not going to work that plaintiff's counsel doesn't hear from you again until April, whatever it is, 30th, and then you provide him a sprinkling of documents and perhaps more than a sprinkling of objections.

You need to be meeting and conferring now during this two-week period and, hopefully, for your clients' sake, trying to narrow things so they do not even have to collect certain categories of documents, potentially. Obviously, it's subject to reasonable negotiation, and you may not agree on everything, and you come back to me and I'll decide.

And I don't want to -- I'm not going to decide any of those issues now, but I'll make a few comments.

First of all, I think you should all be aiming at providing information that is necessary to get this case adjudicated properly and resolved. And when I say "resolved," I am referring to the

possibility of settlement.

Having looked at the interrogatories and requests for production of documents, generally speaking, they seem to be asking for relevant information. I haven't thought through what the burden is associated with each of those requests, but to the extent they were focused on the plaintiff and her situation, you know, generally speaking, they seemed reasonable.

I would say, you know, whether they're a little too much in terms of every scrap of paper and all of the accounting records, I don't know. You can have -- you can talk about that. But, you know, the gist of the information that is relevant to the issues that you all agree with are in dispute in this case does need to be provided.

The one aspect in which, as a general matter, I thought these went too far does relate to the request for other situations in which either -- in which the defendants may have brought non-payment proceedings that included demands for payment of Section 8 share of funds.

Both of you can tell me whether I have this right, but it seems to me that that would require some sort of examination of hundreds, if not

thousands, of eviction lawsuits or non-payment lawsuits that have been brought because, as I understand from the complaint in this action, the pleading itself doesn't necessarily identify what is Section 8 -- what is a Section 8 share and what is not a Section 8 share, and so you would have to be going through -- you would have to do some forensic examination for hundreds, maybe thousands, of lawsuits what -- whether and what portion of those related to Section 8.

Is that right, Mr. Marshall?

MR. MARSHALL: Thank you, your Honor.

I think you have it right. And I don't -- I don't want to give an inaccurate response here, but, generally speaking, if you're not talking -- if the requests are deemed to include something that could be, like, a rounding error in the sense of, did the dollar amount to the dollar include any Section 8, that is precisely the type of thing that would require a case-by-case review over hundreds of files. You know, at the end of the day, was any part of the amount due against the Section 8 tenant found to be inaccurate?

What my client has done is they polled the office. I mean, the time frame for the response

for that particular request was January 1, 2023 forward.

Now, the Sperber Kahan Law Group has only been in existence since 2025, but, as it happens, a number of attorneys with the firm also practiced at the other law firms referenced in the complaint, which began with Sperber Kahan.

And none of those attorneys could recall an instance remotely comparable to this in the sense that an amount is sought in a non-payment petition which is clearly traceable to amounts that were supposed to be paid by the government by -- pursuant to a HAP contract.

My client acknowledges that this was a mistake. This is wrong. This is the only instance that they can recall having polled individual attorneys for anything like this. And I told Mr. Keshavarz -- we objected to these requests, but I have told Mr. Keshavarz, you know, to the extent that a response is required, this is to be -- going to be the response, that they're not aware of anything like this happening in the past -- certainly, within the time frame of January 1, 2023 forward -- which is recent enough that attorneys would remember.

So that's our response on this. If --

THE COURT: Have your inquiries within the firm encompassed identifying any situation in which an allegation was made, presumably by the tenant or their lawyer, but by anybody that your firm was seeking Section 8 funds?

MR. MARSHALL: Yes. Yes. And just for reference, in the 2024 lawsuit, which the existing law firm, the Sperber Kahan Law Group, was involved in at the tail end, they're the ones that signed the stipulation of discontinuance. That's exactly the sort of allegation that was made in the 2024 case, and so that's the archetype, has anyone been involved in anything like that?

And, quite frankly, not just 2023, you know, within memory. And no one can. And I think given the tangential relevance for that information within this case -- and I think it has something to do with amounts that have been -- I think the relevancy segues with proportionality in terms of what this case could be resolved for. But I think just in terms of pure relevance, that sort of poll, in terms of the attorneys who handled files, should be sufficient.

THE COURT: So this case is a unicorn.

MR. MARSHALL: Yes. And to that point, Judge --

THE COURT: And -- but a multiple -- a multi-headed unicorn or multi-horned unicorn, perhaps, because, as I understand the allegations, is it happened to the plaintiff not just once, but at least twice, and there was a threat potentially of a third time. So -- but, nonetheless, that's the only time?

MR. MARSHALL: Yes, your Honor. We're confident of that.

I will note that the 2023 lawsuit was more, say, fiercely contested or unclear in terms of what may be Section 8 and what wasn't. I mean, HPD actually had to be subpoenaed in that case to clarify what amounts were actually still owed.

So I think that there are distinguishing factors with respect to the 2023 lawsuit. The 2024 lawsuit, there's no debate. You got us. It was a mistake. We've responded to discovery demands and said, look, we got information including a rent ledger from -- it was Prestige acting on behalf of Ransome. As the law firm, we relied on information from our client which turned out to be inaccurate. It's not the first time in the history of the world

that that's happened to an attorney. And that lawsuit was discontinued with prejudice.

The third situation which your Honor alluded to, which we discussed with Judge Koeltl during the initial conference, was basically a highly experienced, longtime employee, not just of the Sperber Kahan Law Group -- but some firms that Mr. Kahan had been affiliated with prior who handled intake from the client for new non-payment cases -- had a family emergency and was out of the office. And, unfortunately, another employee who, let's say, was not as attentive to detail, handled the intake for that 2025 collection letter which is attacked in the complaint, and the 2025 collection letter largely mirrored the amount -- well, did mirror the amount sought in the 2024 lawsuit.

So that's another situation where, you know, boy, we wish that the other employee had not been out of the office. This would have been caught. But it wasn't caught. We acknowledge the mistake.

But to your Honor's point, we do believe that this was a unicorn. I understand it repeated itself, but as far as, numbers of tenants, who has this happened with, it happened with Ms. Garcia.

THE COURT: Okay. Let me hear from plaintiff's counsel on that particular issue.

MR. KESHAVARZ: There's a very simple way to do this. We need to know arithmetic and numbers that were given. If the Ransome is -- if Ransome or Prestige is just giving Kahan the total amount of contract rent owed, doesn't break it out by Section 8, or does say some of it is Section 8 but doesn't say that it's the Section 8 program that stopped paying, I just need to know if that information is provided. And I'm pretty sure the information is not provided. And that's their policy. If they got their policy, then I don't need to know --

THE COURT: You're talking beyond the plaintiff.

MR. KESHAVARZ: Right.

THE COURT: You're asking as a general matter?

MR. KESHAVARZ: Yeah.

THE COURT: So you want them to produce all of their records for all of the eviction proceedings they brought?

MR. KESHAVARZ: For my client. So --

THE COURT: For your -- so you are just talking about your client.

MR. KESHAVARZ: That's one way to get it, but they're going to object as to privilege, and one way to get it easily is if the information coming from Prestige does not break out the amount that is Section 8, that Section 8 program has stopped paying -- if they don't break that out and tell the law firm not to sue for that, that's their policy. Every time they sue someone in the Section 8 program, that's going to be the -- that is going to happen because they're not -- they don't know not to sue for the government share because the information isn't broken out that way.

It's the government that stopped paying for whatever reason. Had it been broken out that way and someone actually looked at it, they would know not to file suit. It's that policy.

If their screenshots -- if their data is not broken out by the amount that is the Section 8 program's share, and it is not broken out, that the Section 8 program has stopped making that payment -- if it doesn't break that out, then this is going to happen every time they sue someone for -- who has Section 8 because there are lots --

THE COURT: Well --

MR. KESHAVARZ: -- of times that Section

8 doesn't pay; primarily, when the place is a dump and it does not -- they do not repair it, which is the standard, the norm. Instead of fixing my client's apartment, they sued her for it.

THE COURT: Let me ask, Mr. Marshall, are you asserting privilege over, with respect to the relevant information for this plaintiff, information that your law firm received from -- the factual information that the law firm received from the client in terms of how it was portrayed and what it was categorized as?

MR. MARSHALL: Well, at this point, I think we are asserting privilege. There is a firm form which we have redacted. And to be clear, we fully redacted it. You can't see any of the form.

But it's listed on the privilege log, a firm form, which basically contained line items of information concerning the tenant, concerning the lease, concerning the nature of the amount due that was filled out. I don't know for certain whether it was filled out by Prestige in conjunction with Ransome Houses, but it came from Prestige. It was given to my client along with other documentation.

Now, we are not going -- we are not asserting privilege with respect to, let's say, a

rent ledger that was provided to my client and subsequently used in pleadings, motion practice, collection letters. Those are not privileged. But at this point in time, subject to further input from Prestige, we've asserted privilege over that entire law firm form.

THE COURT: And you wouldn't allow a witness to testify at deposition -- it's not you. I guess it's the client. But a privilege assertion would prevent a Prestige witness testifying about -- let's start with, as a general matter -- how information is provided to the law firm and whether it is categorized in terms of Section 8 or non-Section 8; you would assert privilege over that?

MR. MARSHALL: No. I mean, it's not our privilege to assert, so certainly not.

THE COURT: Well, I understand.

Mr. Kest?

MR. KEST: Thank you, your Honor.

THE COURT: Whose privilege is it to assert, first of all, Mr. Marshall?

Who do you get your marching orders from here?

MR. MARSHALL: Oh, well, that's a wrinkle, Judge. And as we've informed plaintiff's

counsel and set forth in interrogatory responses, all information that my client received came from Prestige. It's Prestige that retained my client.

Now, Prestige did it as an agent for a disclosed principal. This is one of the landlords for whom we are assigning work to your firm.

It's not the only landlord that Prestige has, but we have not made the representation that we communicated directly with Ransome Houses, the landlord.

THE COURT: All right. But just to use the plaintiff as a real-life example, who was your client?

MR. MARSHALL: We --

THE COURT: Who was your client's client?

MR. MARSHALL: Well --

THE COURT: You're not proceeding -- are you proceeding pro se here?

MR. MARSHALL: No. No, your Honor.

THE COURT: You're a different law firm representing --

MR. MARSHALL: Different law firm representing Sperber Kahan, yes.

THE COURT: Who was Sperber's client?

MR. MARSHALL: Well, our client

considered both Prestige and Ransome Houses as clients, so both the management company and the named --

THE COURT: Who's the engagement letter with?

MR. MARSHALL: There was no engagement letter. It was a longtime relationship. My client --

THE COURT: You're required under New York law, as I understand it, to have an engagement letter.

MR. MARSHALL: I understand, your Honor. There was --

THE COURT: Again, not you.

MR. MARSHALL: I appreciate that.

There was -- to Mr. Kahan's recollection, there was a written retainer agreement many years ago that they had been unable to locate, but it's been a standing relationship since then.

So they have not been able to locate, let's say, an individual engagement letter for the cases against Ms. Garcia.

THE COURT: So does your privilege assertion depend on both being clients?

MR. MARSHALL: No.

THE COURT: Okay. What's the alternative theory?

MR. MARSHALL: Well, I think your Honor touched upon it, which is that, even if Prestige is not the client per se and it's Ransome Houses, they are still acting as the agent for a disclosed principal. And in that capacity, the communications would still be privileged.

THE COURT: Okay.

MR. MARSHALL: But I'm trying to be helpful, and I was trying to be helpful in my discussions with plaintiff's counsel. We are not representing, and we have no reason to expect that we will locate any communications directly with Ransome Houses.

THE COURT: Okay.

MR. MARSHALL: The communications are with Prestige.

THE COURT: So I think you told me that you -- well, no. Maybe you didn't tell me that. Maybe that's -- it was the one I was going to ask Mr. Kest.

So, Mr. Kest, would Prestige assert privilege over a question of one of its witnesses at a deposition along the lines of, as a general

matter, trying to get at what information is provided to the law firm and whether it is broken down in terms of Section 8 share or non-Section 8 share?

MR. KEST: Your Honor, first, my apologies for sitting in my earlier responses. I was in front of Justice Andrew Borrok in Commercial Division for some time yesterday, and he prefers that the attorneys sit. Muscle memory.

Yes, we would assert -- you know, it's unclear to us, for the same reasons that Mr. Marshall described, who exactly is the client. To the best of my understanding, it would appear to be Ransome is the client and Prestige is the agent of the client because that is, in fact, their contractual relationship.

But as your Honor pointed out and Mr. Marshall pointed out, in any event, however you, you know, slice that pie, it's still -- all of those communications are going to be privileged. And indeed, you know, were plaintiff to ask a question of a Prestige witness, or if Ransome ever shows up, a Ransome witness that was, you know, subject to privilege in that it was a request to an attorney for legal representation, then, yes, we would -- you

know, that information would, in fact, be privileged.

You know, that being said, there is -- plaintiff said there's an easy solution. There is an easy solution, which is -- and I understand -- recognizing that this is our obligation, but we will produce our discovery.

Certainly, as your Honor pointed out, anything related to Ms. Garcia herself is what will be produced. That's not some -- you know, we're not saying that anything regarding Ms. Garcia is not relevant. And to the extent that that information includes the way that records are kept, that those documents will be provided. So there's not even a need to seek to invade the attorney-client privilege here, regardless of the holder, either way of which, you know, would not be waived.

THE COURT: All right. Plaintiff's counsel?

MR. KESHAVARZ: I indicated to you the basic information I need, and they could just tell me now if they will provide it or not. And that is, when they get the information from Prestige, is it broken out?

Do they -- one, do they ask if the person

is Section 8?

Two, do they ask how much the rent is in total, contract? The government's rent and the client's rent? Tenant's rent, did they break that out?

Do they find out if the reason that there's an amount due is because Section 8 has stopped paying for some reason?

And when they sue or send a collection letter, do they take out that amount that the government is responsible for paying from the amount they seek to collect from my client?

If they can tell me now, if I can get that information about my client, that's a good part of what I need.

THE COURT: I think they're saying it's privileged.

MR. KESHAVARZ: Well, then I don't know what to do. That's what I need. You know, if they don't want to get into pattern and practice, it's a simple request.

The other way to do it, I mean --

THE COURT: Well, it does sound as if, at least potentially -- and I don't know that would answer all your questions, but seeing how Prestige

keeps the records could go a long way to answering your question.

MR. KESHAVARZ: It's that breaking-out part. It's the breaking-out part about how much the government is supposed to pay and if they track that, if they take that amount out from what they seek from the tenant.

That's the -- not the million-dollar question. That's a major question.

THE COURT: Let me ask you, Mr. Marshall, another question.

You mentioned this form that has been redacted to the extent of fully redacted, but it's a form, it has questions or fields or boxes?

MR. MARSHALL: Yes.

THE COURT: And did you redact the names of the boxes or the fields?

MR. MARSHALL: It's all redacted as of now.

THE COURT: Well, that, I'm not sure I understand.

In other words, there's a form that is used to provide information, and the form asks for whatever it asks for, different sets of information.

Why is the form itself privileged?

I can understand that in respect of any particular lawsuit and tenant, the information -- even with respect to plaintiff, maybe that's privileged. I'm not asking plaintiff's counsel to agree with that. I don't know that he does agree with that, that's a different issue. But I'm really focused for the moment on the form. Why can't you provide the form?

And, again, I know it's -- you are the -- you are representing the lawyer. It's not the lawyer's privilege. It's the client's privilege. So you can sit down.

And, Mr. Kest, you can answer my question.

MR. KEST: Your Honor, I haven't seen the form. Of course, it is totally redacted. You know, if the Court is asking --

THE COURT: But doesn't Prestige have the form? It's filling these out, so they must have the form.

MR. KEST: So I just --

THE COURT: You may not have seen it.

MR. KEST: Correct, your Honor, I -- if we have it, I have not yet seen it. It doesn't mean we don't have it.

I would argue, of course, that the form, from our side of things, is privileged as well, since it's a request to an attorney for legal representation.

If the Court is asking, could a blank version of the form be produced, I mean, it's not -- we don't have a blank version that is in our possession, but I would not object to -- were the attorney defendants to produce a blank form, I would not have an issue with that.

THE COURT: Well, let's define what "blank" means.

MR. KEST: Sure.

THE COURT: If "blank" means it's totally redacted so that no letters are visible, that's probably not going to answer many questions.

What I'm talking about, if I wasn't clear, is -- I'm assuming a form, like many forms one sees, they have fields, and they have instructions like, you know, in this box, you're supposed to put this type of information.

So when I say "blank," what I mean is you are not going to provide what the answers were, but, yes, you would provide the form showing what the various fields were titled.

MR. KEST: Right. Just with the responses redacted.

THE COURT: Yes.

MR. KEST: Or even better, just a fresh form of the same type that is --

THE COURT: Conceivably -- and it sounds like there's a blank form, you know, the form itself somewhere around. Yes.

MR. KEST: Right. I mean, again, we -- it's not a form that is in our possession, so I don't answer for Mr. Marshall. But in terms of if we would have an objection to that, we would not.

THE COURT: Okay.

Well, that sounds like it could be useful. I don't know that plaintiff's counsel will be completely satisfied, but between that and production of the way in which the records are kept, it seems like it would go potentially a long way, and maybe as far as he needs to go.

But, Mr. Keshavarz, you know, we can figure out the privilege issues as it relates to the information concerning plaintiffs, but I'm having a hard time -- and, again, I'm not trying to make any definitive rulings here today, but I'm having a hard time seeing how it is possibly relevant and

proportionate for them to literally respond to your interrogatories and document requests with regard to your pattern and practice requests. I'm really not seeing that.

MR. KESHAVARZ: Well, the first thing is as to my client. And one thing about the form -- I am sure if the form is by the landlord -- by the attorney, they are going to ask for a thousand data points, but as a matter of practice, they're not going -- they're going to file suit even if the law Prestige just says the amount due. So to have the blank form is not going to necessarily tell me what information in the ordinary course is provided because if the --

THE COURT: Well, you told me you wanted to learn about the policy. I'm trying to get you that information.

MR. KESHAVARZ: All right. Well, the question --

THE COURT: No. You're raising the point that, well, the form itself doesn't really tell me the actual policy. Or put differently, you might say whether the policy, if you want to call a form a policy, is adhered to because, for all I know, the form breaks things down, but as a matter of

practice, they only fill in the top line and they don't fill in the other columns.

MR. KESHAVARZ: Well, the question is going to be, in the ordinary practice, is this how you do -- in ordinary practice, do you break out the government's share, in your ordinary practice? In your ordinary practice, do you relay that to the law firm? In ordinary practice, do you take any steps to make sure the unpaid government share is not charged to the client, in their ordinary practice?

That's the policy type of thing that I need. That would be a big part of what I would need. And if they -- as a policy matter, as an ordinary course, if they can answer it as an ordinary course of what they do, that's a good part of what I need.

THE COURT: Mr. Kest?

MR. KEST: Your Honor, if I could just respond, it sounds -- you know, plaintiff or Counsel earlier said that I don't know what to do, and that seems apropos, that -- I'm not sure if plaintiff's counsel is asking us attorneys to testify as to facts in -- underlying facts in this case. The point of discovery and depositions and document production is for plaintiff to come to a conclusion

about these matters, but we can't tie it in a bow for him, and if the record that he's seeking is either privileged or doesn't exist, then that's not something that can be handed to him, that's a matter for plaintiff to try to prove their case.

I would go one step further, though. I'm not even sure how relevant any of this is. As far as the FDCPA claim, which is not against my client but it's a strict liability statute, so whether or not there was a mistake or negligence does not seem to be relevant.

In terms of the 349 claim, which is against my client, the fact of the matter is, is that this is a lot of speculation that we're hearing. It's like, oh, well, if they sued on this, it must be their practice, it must be their procedure, it must be -- that's what usually is called a fishing expedition because there's no "must" anything. There's these allegations that this happened to this individual plaintiff. To the extent that those things happened to her, either they affect consumers at large or it doesn't.

In fact, the case law -- I just finished writing the reply last night. The case law is quite clear that repetition of -- if, for example, some

company is advertising something fraudulently, right, let's say, you know, they're selling widgets, and the widget does not do what they say it does. It doesn't need to have been purchased by a million consumers for it to be a violation of 349, it only need be purchased by one.

At the same time, even if something was done more than once, it may not, in fact, be aimed at consumers. What is or is not aimed at consumers at large is a totally separate question. So I'm not even sure how relevant any of this is in the first place, you know, in terms of having a compelling reason to try to invade attorney-client privilege.

Like I said, to the extent documents exist, to the extent that anything to do with Ms. Garcia exists -- and not having seen it myself, for all I know, it won't look good for my client -- of course, we will produce those things, and plaintiff is welcome to make their case from what exists, but what we can't do is create things that don't exist, and we can't testify on behalf of our clients, especially when it's not clear that this information would even prove any of plaintiff's claims in the first place.

THE COURT: Well, look, I agree that, to

the extent plaintiff's counsel is asking for what the ordinary practice is, it doesn't seem to me susceptible to answer by means of a document production because you would have to produce a vast amount of documents related to other plaintiffs to get at it that way. It also doesn't strike me as suitable for an interrogatory response or a request to admit. It does strike me as a fair ground for a deposition question. So ...

And I don't -- I hear your argument about relevance. I'm not making any rulings about that. The only thing I do feel relatively strongly about is, given the relevance and the proportionality and the burden, the notion of having the law firm comb through hundreds of lawsuits to try to identify what was Section 8 and what wasn't is disproportionate and overly burdensome, and I won't allow that.

I would allow you to ask if there have been allegations or court findings that they have done this in the past. I think Mr. Marshall's answer is, we've made inquiries and determined that that's not the case.

But if you think there is more they should be doing to get a reliable answer to that question, you can talk to them about that, but I'm

not going to authorize a fishing expedition into hundreds or thousands of files. I'm not doing that.

Let me ask Mr. Keshavarz this, the May 11th discovery deadline, what was the impetus for that?

MR. KESHAVARZ: We didn't have much of a choice. It was the form order, and the form order said, if there's consensus, the Court will extend that by 60 days if there's a stipulation by the parties. So that would be one thing.

I had spoken with --

THE COURT: 60 days beyond May 11th here or --

MR. KESHAVARZ: Yeah. Yeah.

THE COURT: Oh, you already used the 60 days.

MR. KESHAVARZ: Well, I mean, that's what the existing order says.

THE COURT: Right. But you haven't used those 60 days, so to speak, yet. No. Okay.

MR. KESHAVARZ: I guess our request would be -- and I think we would make this jointly -- is that all -- the entire scheduling order, all the deadlines be shifted 90 days. The deadline for fact discovery, the deadline for moving for summary

judgment, the deadline to move to amend -- all the deadlines just moving forward by 90 days.

And since you're involved in scheduling, it was a little unclear to me when I was drafting the letter for extensions who I should be addressing it to. So I guess the request would be -- and I think it's a joint request -- that all deadlines in the scheduling order be pushed back 90 days. That's the request.

THE COURT: Is that a joint request?

MR. KEST: Your Honor, we would join in that request in the sense, you know, certainly, we think that more time would be helpful, especially -- hopefully, we'll come to this in terms of perhaps scheduling time to address a resolution.

The only part that we would not join in this request is in extending the time to amend. To the extent plaintiff wishes to add other parties, that's -- we don't -- you know, I'm not sure how relevant it is, but not our -- that's not our concern.

What is a concern is that, as we just noted, you know, there are issues with -- you know, in terms of a fishing expedition. And what can commonly happen is plaintiffs seek to -- and I'm

not -- not Mr. Keshavarz, but what can happen is that plaintiffs will, you know, replead and replead and replead as more discovery, you know, drips and drabs out. And it's like, okay, now we could, you know, couch the complaint like this; now, we could couch the complaint like that.

You know, as plaintiff's instant complaint alleges against the attorney defendants, that they should do their due diligence and do their homework before they file a complaint, and we would ask the same here, let discovery be extended, but let the time to amend be limited so that it does not become, you know, a ball to be thrown back and forth every time some new documents are produced.

THE COURT: So I think the current deadline is April 27. Is that what I extended it to?

MR. KESHAVARZ: Somewhere along those lines. And the reason for it was to be able to get the discovery to move to amend so --

THE COURT: I understand.

Let me ask, Mr. Kest, are you objecting to any extension of that deadline?

MR. KEST: Your Honor, I mean, if --

THE COURT: Having failed to produce

discovery?

The schedule originally was drafted in such a way that he could propound discovery, you could answer the discovery, and he could decide whether to amend the pleading.

MR. KEST: Sure. And --

THE COURT: So what's your point?

MR. KEST: Perhaps I should -- it's my fault for not speaking as clearly as I could have.

We would, of course, provide our discovery. In other words, perhaps an extension of the time --

THE COURT: You've asked for April 30th. The deadline is April 27th.

MR. KEST: I'm sorry. Did we --

THE COURT: You asked for two weeks from today. What is two weeks from today?

MR. KEST: Oh, right. Yes. I'm sorry. Yes, two weeks for us to produce discovery. Right.

So I would ask -- sorry. Let me catch up.

I'm saying that, yes, if the Court -- we would say extend all the deadlines and extend the time to amend, but not as much as the other ones; perhaps at some time suitable to the Court after two

weeks for us to provide discovery.

THE COURT: Okay. That's the position I thought you would take because --

MR. KEST: I apologize for not being clear.

THE COURT: -- any other position would be totally unreasonable.

Did you want to be heard on this, Mr. Marshall?

MR. MARSHALL: We join in the request, your Honor. We, too, defer to the Court's discretion as to the date for the amendment.

THE COURT: Okay. But you join in the 90-day general extension. All right.

MR. MARSHALL: Yes, absolutely, your Honor.

THE COURT: So what was the original date for amendment?

MR. KESHAVARZ: Well, I think it's been pushed back two weeks twice now.

THE COURT: Yeah.

MR. KESHAVARZ: And the reason was in order to get the discovery.

THE COURT: So the original date was no additional parties may be joined or causes of action

asserted after March 27, and no additional defenses --

MR. KESHAVARZ: Cause.

THE COURT: -- may be asserted after April 10th. So --

MR. KESHAVARZ: Without good cause. Yeah.

THE COURT: Excuse me?

MR. KESHAVARZ: Without good cause shown.

THE COURT: Correct; except for good cause shown.

So what do you -- in terms of those dates, what sort of extension are you looking for? Like, give me a precise date.

MR. KESHAVARZ: I'm sorry, I didn't hear that.

THE COURT: So in terms of revised dates for when additional parties can be joined or causes of action asserted, as well as, while we're at it, additional defenses, what dates should I adjourn those to, in your view?

MR. KESHAVARZ: Well, my request would be 90 days, but at least until the end of May, May 30th. I would request at least that. But, I mean, if we're going to push everything back 90 days, I

don't know why that one can't be pushed.

THE COURT: Well -- but you've already gotten some discovery for these --

MR. KESHAVARZ: I haven't gotten any discovery.

THE COURT: No, no. Excuse me. From the attorney defendants.

MR. KESHAVARZ: I got blacked-out pages. Everything was blacked out.

THE COURT: All right. I don't know that we need to get into that.

Well, Mr. Marshall, is that true, that you haven't provided any actual discovery?

MR. MARSHALL: No. I mean, the --

MR. KESHAVARZ: Except for what's been publicly filed. Excuse me.

MR. MARSHALL: We produced the intake e-mail. I think at this point, it may have been several weeks ago, we produced the intake e-mail for the 2025 collection letter, which, as I referenced, your Honor, included that form. That's blacked out. We blacked out the draft certifications to HPD that weren't actually submitted. It was attorney work product. They were working on what would ultimately be submitted.

So our privilege log is very short; it's just a few pages. Our production is not complete. We are conducting an e-mail search, but it is not accurate to say we've only produced blacked-out pages.

The -- I believe the subject matter of the amendment that Mr. Keshavarz is referring to all stems from this insurance coverage letter that he was copied on. We have nothing about that. And --

THE COURT: Okay. But it sounds like you haven't produced that much. You're still producing.

MR. MARSHALL: We're still producing, but I just -- your Honor's initial reaction was correct. We've not blacked out -- we've not just produced blacked-out pages.

THE COURT: Okay.

So if I granted the 90-day extension, the deadline for fact discovery itself would be August 11th, right, 2026?

And -- fair enough.

And why don't we set the date for amending the complaint, in effect, to the end of May, as you suggested, to May 31st. And edit deadlines will be adjusted by the 90 days referred to.

Obviously, Mr. Keshavarz, as you have already done, if we are nearing the May 31st date and you still have not gotten any meaningful discovery, and you say, I would like more time on that date, you will let me know and make an application.

MR. KESHAVARZ: Yes, your Honor.

THE COURT: All right. So I have a grant -- I have granted the extension of the schedule. I don't want that to lead to everybody breathing a great sigh of relief and working on other cases between now and the middle of May.

The deadline for production by Prestige is April 30th, and what I said before still goes. I'm directing you to meet and confer about the scope of the discovery demands. That includes with you, Mr. Marshall, as well, in terms of the discovery demands propounded to your clients, to see if you can come to resolution on any of the areas of disagreement with the benefit, or lack thereof, of what I've had to say during this conference. And then you'll let me know if there are any remaining issues.

MR. KESHAVARZ: Just for clarity, your Honor, April 30th, is both for the interrogatories

and production.

THE COURT: Yes.

MR. KESHAVARZ: Thank you.

MR. KEST: Your Honor, I would just ask for clarification about the discovery letter that plaintiff filed yesterday.

Obviously, we've addressed a number of discovery issues today. Is it -- does it still make sense for Prestige to respond to that letter, or should we --

THE COURT: I don't think so. I think there's --

MR. KEST: Right.

THE COURT: -- been a form of response from both of you today. I don't know that we've covered all of the issues raised in that because I don't have a total recall of it. But whatever it is, I'm basically directing you to meet and confer about them further.

MR. KEST: Okay. Thank you, your Honor.

THE COURT: And then let me know if there are other issues.

MR. MARSHALL: I'm sorry, your Honor.

So just in terms of how the defendants should react to that letter motion for a conference,

is plaintiff going to withdraw that application now? Is it being -- is it deemed addressed now at this conference, denied without prejudice?

I just don't want to bill my client for responding to a letter that we seem to have made serious progress on today.

THE COURT: Yeah, I'm not expecting you to submit the letter either, at least at this juncture.

MR. MARSHALL: Okay.

THE COURT: I think what I will do with the motion is I will issue an order after today's proceeding where, among other things, I'll say that the parties are directed to meet and confer about it.

I think I'll leave it open for the moment, but I'm assuming that, if it comes back to life, it may start with a totally new letter from plaintiff's counsel telling me what the remaining areas of dispute are, but I'll just leave it open for the moment.

MR. MARSHALL: Thank you, your Honor.

THE COURT: But you need not respond.

MR. MARSHALL: Thank you.

THE COURT: Okay. Shall we talk about

the issue of settlement? And if you'd like to, would you like to do that off the record or on the record?

MR. KESHAVARZ: Off the record, usually, but it can be on the record if you would like because we had it on the record with the district judge. My position is the same as what I said on the record with the district judge a few months ago.

THE COURT: All right. Well, since you said it on the record, why don't you repeat it for my benefit.

MR. KESHAVARZ: It's very simple. They're punitive-damage questions. As Mr. Kest has suggested, garden-variety emotional distress is one of the main claims of damages, which, as you know, in the Second Circuit, allows for recoveries up to $125,000. Trying to --

THE COURT: It depends on which cases you read, but, yes, some of them do.

MR. KESHAVARZ: Well, trying to evict this person and her family three times -- or twice, and then threatening a third time, you've been there for 11 years, I could see why that could upset someone, but -- so there's that.

There's a gross-negligence claim against

both defendants and a judiciary law claim. And if the claim is, we don't break out how much the government's share is and we just file suit, that, kind of, sounds like gross negligence to me, and that sounds like something that's very close to judiciary law.

Now, Mr. Marshall and I have had a number of cases on that that have gone both ways; glad to say, most recently, my way. But if that is the testimony, then we go to -- we survive summary judgment on gross negligence, according to our most recent cases together. *Wilson* is the most recent one, and *Calixto*, who wasn't on, was also another one.

Those go forward for punitive-damage questions, so that's what I need to know. What I just asked for is, is your policy to do this? I told the judge, we don't have to fight about this. Just give me this information. Let's take a quick deposition. Let's just find out. Let's not fight over it for three months, five months.

I need this information. As soon as I get this information -- I suggested some mediators. We can get referred to the mediation program. I am all for that. And I say that on my record. Let's

go to the mediation program, or let's pick our own mediator. We have had some that have worked for us.

But I need this information. I very much want to go to mediation, but not in the dark with a punitive-damage question here which seems to be fairly easy to answer, so ...

THE COURT: Okay.

MR. MARSHALL: If I may, your Honor?

THE COURT: Yeah.

MR. MARSHALL: I think it is more appropriate to talk about numbers in this case because just saying punitive damages, you really get nowhere.

Under the FDCPA, there are no punitive damages. That's really where the garden-variety emotional-distress component comes in. I know I have read the cases and have been disturbed by just plaintiff's counsel in FDCPA matters throwing out the $100,000 figure for garden-variety emotional distress. There's never been an FDCPA case that remotely approaches that. We're talking about, like, a tenth of that.

And I know in the rare, you know, occasion that Mr. Keshavarz has actually tried one, I think it came out at six grand. And that was

another instance where, in the Southern District, he had argued all through the years leading up to that, it's up to $125,000, your Honor. He got six grand.

So we have made two offers of judgment, the most recent of which was for $40,000 plus attorneys' fees.

THE COURT: We are still on the record.

MR. MARSHALL: I understand.

As far as I know, it's not going to be accepted. And that is not a number that is remotely tied to reality in the sense that it's way above it.

But, as I said -- and my client has been forthright here -- a mistake was made. We should not be litigating this case to trial when it can be resolved now. So that's why I state the number on the record. That was the second offer of judgment, by the way.

THE COURT: What was the number again?

MR. MARSHALL: $40,000 plus attorneys' fees as determined by the Court.

So whatever Mr. Keshavarz believes he could be awarded under the law in terms of reasonableness is what he will get. So that was the most recent offer.

And in terms of punitive damages, Judge,

the claims in this case, FDCPA does not permit punitive damages.

GBL 349, another statute that Mr. Keshavarz, in past cases, for years, I have been on the receiving end of the argument that it allowed for uncapped punitive damages.

The New York State Court of Appeals ruled last year, once and for all, it's a thousand dollars tops. That's your punitive component. So take whatever garden-variety emotional distress plaintiff says she has, add a thousand bucks. You know, where do you want the check sent? So that's GBL 349.

Judiciary Law 487. I don't think the allegations, even as pled, support that, but let's assume that they do. Judiciary Law 487 trebles pecuniary damages. Plaintiff alleges that she incurred some liability to a defense attorney in connection with the 2024 lawsuit. Whatever that number is, you know, fine. Let's assume for the sake of argument you treble that if there's a judiciary law violation. It's not emotional distress.

The New York State Appellate Division has ruled on this repeatedly. It's treble pecuniary damages. If a plaintiff doesn't have pecuniary

damages, there's nothing to treble. It's not emotional distress.

And, finally, with respect to gross negligence, which is plaintiff's only avenue to, I guess, true punitive damages -- the law firm relied on information from its client. What I have said is what my client will testify to at his deposition, that the final collection letter in 2025 was made as a result of human error because due to a personal emergency, an unexperienced, now-former employee of the firm did the screening for that collection letter.

The 2024 lawsuit was resolved with a representation and a promise by Ransome that it would ensure that its records accurately reflected the Section 8 component for the plaintiff going forward.

So my client's position is, yes, the 2025 letter went out after that. It was human error by an inexperienced employee who was subbing in for the person that would have done the screening. And we had a right to rely on the accuracy of it -- generally speaking, for this plaintiff, the accuracy of information that we received from Prestige on behalf of Ransome because we had just resolved the

2024 lawsuit, and Prestige was -- the person who signed that stipulation in the 2024 lawsuit was Prestige on behalf of Ransome. It was -- literally, a representative of Prestige was on that stipulation.

So I don't think that there's an avenue for punitive damages there. And, of course, I would say, at the end of the day, if there is some component of punitive damages, how are we ever going to approach the numbers that exceed the offer of judgment that my client has already made?

And we're willing -- we are willing to negotiate. The whole point of settlement is to have a dialogue. We haven't had a dialogue. Our first offer of judgment went out, wasn't formally responded to. Unprompted, we made another one because we could see from what is going on in this case -- again, through no fault of my client's -- that there is motion practice and disputes over discovery.

My clients would like this case resolved. In the initial conference with Judge Koeltl, we said -- and Judge Koeltl was receptive to it before he heard that there was going to be a motion to dismiss by one defendant. We said we wanted a

prompt settlement conference, that we are prepared to make plaintiff a fair offer, and we have. We have done it twice. We want to have a settlement dialogue.

THE COURT: I do want to ask you one thing just so I understand it.

In terms of the mistake that you referred to, it was a junior employee at Prestige?

MR. MARSHALL: At Sperber Kahan, Judge.

Now, of course, we would, I think, inevitably say that a mistake was made on Prestige's part, but as to why that -- as to why the 2025 collection letter went out, our position is the employee who ordinarily would have done the screening for that type of information, who was out because of a family emergency, would have caught the error that Prestige had made before the collection letter was sent out. So that's -- if anyone --

THE COURT: You mean employee at the law firm. Okay.

MR. MARSHALL: Yes.

THE COURT: I had thought you were referring to an employee at Prestige.

MR. MARSHALL: Notwithstanding whatever error was made client-side, that's the explanation

for why the letter still got out through the law firm. Just the right person was not in place at that point in time, unfortunately.

THE COURT: So the person did not catch the mistake in the information provided by Prestige?

MR. MARSHALL: That's correct.

THE COURT: Haven't you just disclosed the information that Prestige provided to your law firm?

MR. MARSHALL: Uh-huh.

THE COURT: Why isn't that a waiver?

MR. MARSHALL: Well, your Honor, if -- I understand if the case ultimately goes to the merits, we are going to be constrained by what is and is not produced in discovery.

THE COURT: Well -- but you're also potentially constrained in terms of what you can tell this court about those communications that you want to disclose, for whatever reason, because they, you think, are in your client's interest, and simultaneously take the position, well, the other communications that we don't want to talk about, those are privileged.

MR. MARSHALL: No, I understand, Judge.

THE COURT: No. Well, you should think

about whether you've already crossed that rubicon.

MR. MARSHALL: Well, we can.

And, ultimately, we're having a settlement discussion. I know it's on the record. This is the difference between evidence and what we can discuss for settlement purposes and why we want to have a dialogue.

THE COURT: It was very clear that we were on the record.

MR. MARSHALL: I understand.

What I am saying -- and it's already in -- you know, it's already in the HPD filing. It's already in the 2024 lawsuit. What we got was -- and what has been disclosed is a rent ledger from Prestige. Now, if the rent ledger is inaccurate, then it's inaccurate.

Now, there was additional information which, you know, is -- I'll call it cumulative and has other factors which, again, we've -- on behalf of the client, we've said that it's privileged. But if we are ultimately constrained by privilege that we can't litigate those issues, then we'll live with it.

What I'm saying is, in terms of my client's desire to discuss settlement, we can

acknowledge a mistake was made. I'm saying, notwithstanding "erroneous information" from Prestige, my client still made a mistake -- they're not disputing that -- independent of Prestige. That's why the 2025 letter went out. We made an independent mistake.

So my client is prepared to make payment. The offer that we made, I would respectfully submit, is in excess of what plaintiff could hope to achieve, but it is not the final offer, and that is why we want the dialogue.

Thank you, your Honor.

THE COURT: Yes?

MR. KEST: If I can just add a few things on -- Mr. Marshall is correct, that Judge -- we did discuss possibility of resolution with Judge Koeltl. And indeed it was we who brought that to the Court's -- it was we who made the initial request in the first place, even though we're the ones who made the motion to dismiss, because, of course, motions cost money. As the Court has noted, you know, discovery is not stayed in this matter and typically is not stayed in federal jurisdiction.

You know, we are very confident that GBL 339 does not apply to the instant claims as

elaborated in our motion. Nonetheless, we are, of course, willing and able to contribute to a settlement that would resolve this matter. I can't say it better than Mr. Marshall did in terms of the value of these claims.

I would add that, leaving aside the plaintiff's inability to show that this is not just an individual dispute with this tenant, but 349 typically does not permit for emotional-distress damages. That's just right off the top.

In terms of gross negligence -- you know, I won't bore the Court by reciting the standard for gross negligence. I think that none of us in this room are going to be surprised that it is not going to be applicable here.

You know, it's a -- gross negligence is something that is either very obviously applicable to certain kinds of reprehensible behavior or it's very much not. And to the extent that plaintiff thinks that they will somehow elucidate a basis for moving forward on that, I don't think that -- if plaintiff truly thinks that that's going to be the mother lode, then it's true, this case will not settle.

But if we are going to reasonably discuss

the reasonable damages and what can actually be accomplished here, then I think the parties can absolutely come to a resolution.

And I don't think that -- you know, even based on the absolute upper limits of garden-variety damages -- which, again, don't even apply to 339 -- three attorneys' time litigating this matter is going to quickly exceed that number, even once -- you know, once we start taking depositions, that number will already start to be in the rearview mirror.

Obviously, document discovery -- completely understand that plaintiff will need document discovery in order to evaluate and assess a settlement. I would not suggest that they don't deserve that, as the Court noted, and, as you know, we have -- you know, of course, we'll provide that in the next two weeks.

But I think after that, once, you know, the document issues are resolved, I think it makes sense before more value is expended than the case is worth.

THE COURT: I'm not asking for a number from you, but can I assume that the $40,000 plus attorneys' fees offer of judgment that was made does

not include Prestige as part of that settlement, and that, to the extent Prestige contributed, it would be above and beyond that?

MR. KEST: That's correct, your Honor.

You know, I did not know that they -- that the attorney defendants made an offer of judgment, not that there's any reason why I should know, but that was made on their behalf, and we would certainly be open to contributing above what -- in addition, I should say, to what the attorney defendants are willing to offer.

MR. KESHAVARZ: As to valuation, *Nunez v. Christina Smyth*, my last Section 8 case, where the defendants gave me the information, no motion practice, one deposition, settled for $294,000.

THE COURT: Are you allowed to say that? We're still on the record.

MR. KESHAVARZ: I'll say that. I'll put it on my website. It's not confidential.

THE COURT: Okay.

MR. KESHAVARZ: To say this has --

THE COURT: Just checking.

MR. KESHAVARZ: To say this has no value has not been my experience. And that firm didn't fight me. It just gave me the depositions, like,

wow, this is your pattern and practice. You sue for Section 8 and you don't check to see if Section 8 program has paid for it. Exactly what I'm alleging here.

They gave me that testimony very quickly, no motion practice. It settled for $294,000. Now, they can infer from that how much of that went to my client, but since I didn't workup the case a whole bunch, they can infer what they like.

So to suggest this has no value, and yet, in practice, it doesn't have any value, is just not the case.

THE COURT: Well, I don't think they're saying it has no value, but all right.

The bottom line is it seems that the plaintiff does not believe now is the right time for settlement and needs to see some additional information and discovery first.

MR. KESHAVARZ: Yes.

THE COURT: Yes?

MR. KESHAVARZ: Yes.

THE COURT: All right.

Well, look, my position is, I never force anybody to settle. I will say what is obvious to you all, which is, the case should settle. And I

would think, in particular, it's in the plaintiff's interest to -- as well as the defendants' to reach a settlement that makes her happy and that she may have less of an interest in crusading for -- you know, against law firms and/or landlords who may engage in practices that are deemed undesirable.

But I may be wrong about that. Maybe that's one of her chief goals in bringing the lawsuit. I would assume it's more along the lines of compensation for her.

So there is going to be information exchanged, finally. We will see to what extent it is to plaintiff's satisfaction, but if and when you're ready, as you probably know, there's two things I can do for you. One is I can refer you to the Southern District Mediation Program, which I'm happy to do. And the second is, I can host a settlement conference, which I'm also happy to do. So if at any point, including in the near future, as opposed to the distant future, you would like me to do that, just let me know, and I will do it.

Okay. So we will issue an order that reflects the new schedule, including the April 30th date. I will also order a status update by, say, a week after that, May 7th, so you can tell me where

you are, whether there are any remaining discovery disputes, either that have ripened or that are still brewing but you're still meeting and conferring on and trying to avoid the need for court intervention, and also with regard to settlement, whether you think now is the appropriate time. Okay?

So May 7th for an update.

Anything further on behalf of plaintiff?

MR. KESHAVARZ: No, your Honor. Thank you.

THE COURT: Anything further on behalf of Prestige?

MR. KEST: Nothing, your Honor, although if we could go off the record for just one minute ...

THE COURT: That's fine with me, but let me first ask if Mr. Marshall has anything on the record.

MR. MARSHALL: No, your Honor. Thank you.

THE COURT: All right. Thank you, all.

0o0

C E R T I F I C A T E

I, Adrienne M. Mignano, certify that the foregoing transcript of proceedings in the case of Garcia v. Kahan, et al.; Docket #25CV8489 was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature Adrienne M. Mignano ___________________________

ADRIENNE M. MIGNANO, RPR

Date: May 6, 2026