UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
LEONARDA GARCIA,
Plaintiff,
- against -
INDEX NO.
1:25-cv-08489-JGK-GS

SPERBER KAHAN LAW GROUP PLLC, ERIC H. KAHAN,
PRESTIGE MANAGEMENT, INC., and
ARTHUR RANSOME HOUSES LP

Defendants.
------------------------------------------------------X
Zoom Videoconference
Remote

DATE: August 7, 2026
TIME: 10:10 a.m.

DEPOSITION OF PRINCESS PALMER, the non-party witness herein, taken by the Defendant, pursuant to Article 31 of the Civil Practice Law & Rules of Testimony, held at the above-mentioned time and place before SUSAN CONNORS, a Stenographic Reporter and Notary Public of the State of New York.



A P P E A R A N C E S

LAW OFFICES OF AHMAD KESHAVARZ
Attorneys for Plaintiff
Leonarda Garcia
16 Court Street - Suite 2600
Brooklyn, New York 11241
BY: AHMAD KESHAVARZ, ESQ.
(347) 308-4859
ahmad@newyorkconsumerattorney.com

KAUFMAN DOLOWICH, LLP
Attorneys for Defendants
Sperber Kahan Law Group, PLLC,
Eric H. Kahan, Prestige Management, Inc., and
Arthur Ransome House
135 Crossways Park Drive - Suite 201
Woodbury, New York 11797
BY: ADAM MARSHALL, ESQ.
(516) 681-1100
amarshall@kaufmandolowich.com



INDEX


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Princess Palmer | Mr. Keshavarz | |

DEFENDANT'S EXHIBIT

| DESCRIPTION | PAGE |
|---|---|
| A. | |
| B. | |
| C. | |

INSERTS

| DESCRIPTION | PAGE |
|---|---|
| 1. | |
| 2. | |

REQUESTS FOR PRODUCTION

| DESCRIPTION | PAGE |
|---|---|
| 1. | |
| 2. | |




S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for respective parties herein, and in compliance with Rule 221 of the Uniform Rules for the Trial Courts:

THAT the parties recognize the provision of Rule 3115 subdivisions (a), (b), (c), (d) and/or (e). All objections made at a deposition shall be noted by the officer before whom the deposition is taken, and the answer shall be given and the deposition shall proceed subject to the objections and to the right of a person to apply for appropriate relief pursuant to Article 31 of the CPLR.

THAT every objection raised during a deposition shall be stated succinctly and framed so as not to suggest an answer to the deponent and, at the request of the questioning attorney, shall include a clear statement as to any defect in form or other basis of error or irregularity. Except to the extent permitted by CPLR Rule 3115 or by the rule, during the course of the examination persons in attendance shall not make statements or comments that interfere with the questioning.

THAT a deponent shall answer all questions at a deposition, except (i) to preserve a privilege or

Page 5

right of confidentiality, (ii) to enforce a limitation set forth in an order of a court, or (iii) when the question is plainly improper and would, if answered, cause significant prejudice to any person. An attorney shall not direct a deponent not to answer except as provided in CPLR Rule 3115 or this subdivision. Any refusal to answer or direct not to answer shall be accompanied by a succinct and clear statement on the basis therefore. If the deponent does not answer a question, the examining party shall have the right to complete the remainder of the deposition.

THAT an attorney shall not interrupt the deposition for the purpose of communicating with the deponent unless all parties consent or the communication is made for the purpose of determining whether the question should not be answered on the ground set forth in Section 221.2 of these rules and, in such event, the reason for the communication shall be stated for the record succinctly and clearly.

THAT failure to object to any question or to move to strike any testimony at this examination shall not be a bar or waiver to make such objection or motion at the time of the trial of this action, and is hereby reserved; and

Page 6

THAT this examination may be signed and sworn to by the witness examined herein before any Notary Public, but failure to do so or to return the original of the examination to the attorney on whose behalf the examination is taken shall not be deemed a waiver of the rights provided by Rules 3116 and 3117 of the CPLR, and shall be controlled thereby; and

THAT certification and filing of the original of this examination are hereby waived; and

THAT the questioning attorney shall provide counsel for the witness examined herein with a copy of this examination at no charge.

Page 7

COURT REPORTER: Will Counsel please stipulate on the record that in lieu of formally being in the presence of the witness, and swearing him in, the reporter will instead remotely swear in the witness, and that Counsel will not object to the admissibility of the transcript based on proceeding in this way, and that the witness has verified that he is, in fact, Princess Palmer, will Counsel stipulate to that?

MR. KESHAVARZ: Yes, for the plaintiff.

MR. MARSHALL: Yes.

COURT REPORTER: Ms. Princess Palmer, please raise your right hand.

P R I N C E S S P A L M E R, after having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

THE WITNESS: Yes, ma'am.

COURT REPORTER: Please state your name and address for the record.

THE WITNESS: Princess Palmer, 163 Mount Pleasant Avenue, West Orange, New Jersey 07052.

COURT REPORTER: Thank you.

Counsel, you may proceed.

MR. KESHAVARZ: Okay. Ms. Palmer, thank you for your time, I appreciate it. I know we've had

Page 8

some issues trying to get this set, and I appreciate your time this morning, so thank you.

THE WITNESS: No problem. Thank you for your patience.

MR. KESHAVARZ: Okay. So I need to make certain disclosures. I think we've done this every time we've talked. So just -- I just need to get it out of the way.

I represent Ms. Garcia in a lawsuit against Ransome LLP, the collection Law Firm of Kahan, and Prestige, although they are no longer a party.

I don't represent you. I don't represent your interests. My client's interests conflict with yours. I cannot give you legal advice. The only thing I can tell you is to advise you to get your own attorney. Do you understand that?

THE WITNESS: Yes, sir.

MR. KESHAVARZ: And every time we've communicated, I've essentially said the same thing to you.

THE WITNESS: Yes, sir.

MR. KESHAVARZ: Okay. All right, so let's start then.

So just a couple of ground rules.

Have you ever had your deposition taken

Page 9

before?
THE WITNESS: Yes.
MR. KESHAVARZ: Okay. About how many times?
THE WITNESS: Maybe two, three.
MR. KESHAVARZ: Okay. All right, I'm going to go back into that in a second.
But you probably know this already then, during the course of the deposition -- well, actually, no.
If you don't understand my questions, will you please ask me to rephrase.
THE WITNESS: Yes.
MR. KESHAVARZ: And if I ask you a question and you don't ask me to rephrase, is it reasonable to conclude -- to assume that you understood the question?
THE WITNESS: Yes.
MR. KESHAVARZ: The court reporter is taking notes, so it's important for you just to pause. It's important for you to wait until I finish asking the question before you begin to answer. Do you understand?
THE WITNESS: Yes.
MR. KESHAVARZ: It's also normal to signal

Page 10

an answer by nodding or shaking your head or saying a-ha, that's very normal. But since the court reporter is transcribing this, it's important that you verbalize your answers like yes, no, or whatever your answer might be. Do you understand that?
THE WITNESS: Yes.
MR. KESHAVARZ: Okay. Okay. So let's start from the depositions.
EXAMINATION BY MR. KESHAVARZ:
Q. You said you previously had your deposition taken before.
MR. KESHAVARZ: I'm sorry for that, because that's usually not the most fun experience.
Q. What are the two cases that you had -- what were the -- what's the first time you had your deposition taken?
A. First time I had a deposition taken was maybe 25 years ago.
Q. And what was the nature of that, was it a personal?
I didn't need you to go into the particulars, just generally.
A. Sure. It was a work-related matter. At that time I worked as an auditor for a public accounting firm. One of our clients was under

Page 11

investigation by the SEC, and we were called to provide testimony in that matter.
Q. Okay. And what is the second time that you have testified?
A. Second time was maybe, oh, gosh, five years ago.
Q. And what was -- go ahead.
A. In connection with a -- what's it called?
It was a lawsuit against the -- I guess alleging breach of fiduciary responsibility in connection with a lawsuit that was brought by a co-general partner in one of a -- in a real estate project with Abyssinian Development Corporation.
COURT REPORTER: I'm sorry, what was the name?
A. So the lawsuit was filed by a partner in a real estate project of Abyssinian Development Corporation.
Q. Okay. So why don't you tell me a little bit more about that. Can you give me more detail about what that was.
A. More de -- well, there is a confidentiality agreement. I'm not sure how much I can tell, other than there was a real estate project between Abyssinian Development Corporation and another

Page 12

organization, and that other organization alleged breach of fiduciary duty, and I provided a deposition in that matter.
Q. Okay. Do you know, was that case filed in Federal Court or in State Court, or do you know?
A. It was filed in State Court.
Q. Do you know what borough it was filed in?
A. Manhattan.
Q. And do you remember what the name of the lawsuit was?
A. No. Let me see, it was -- the lawsuit was brought by Derrick Taitt as a board member of the development partner. So he brought the suit on behalf of the development partner entity that he was a board member of.
MR. KESHAVARZ: Okay. So let me just ask you about the public disclosure. You probably can't talk about a settlement, so I'm not going to ask you about a settlement.
THE WITNESS: Okay.
MR. KESHAVARZ: Let's talk about things that are not a settlement.
Because I would imagine --
Q. Is that what this confidentiality is regarding, is regarding the settlement; is that your

Page 13

understanding?
A. That's my understanding, yes, and -- yes, yes, yes.
MR. KESHAVARZ: Okay. So let me not talk to you about the settlement.
THE WITNESS: Okay.
MR. KESHAVARZ: Let me talk about other things about it.
Q. So Derrick Taitt as a board member. A board member of -- of what?
A. Name of the organization that he brought the suit on behalf of was the Community Association of East Harlem Triangle, I believe was the legal name of the entity that he brought the suit on behalf of.
Q. And I'm sorry if I asked you this already, about how long ago was that, what year was that in?
A. Maybe five years ago. It was around the time I was working through the, umm, mediation. So the mediation was about five years ago.
Q. Okay. And who was the defendant in that case, do you remember the name, was it Abyssinian, or was it --
A. There were multiple defendants in the case.
Q. All right. Do you remember any of their names?

Page 14

A. Abyssinian Development Corporation, Windows Marks as general counsel, Charles Simpson as the attorney at Windows Marks. Victor Sozio, as the broker. His firm, Ariel Advisors. A-R-I-E-L, is the spelling. And individually James Howard, who was a former Abyssinian employee. And the late Dr. Reverend Calvin O. Butts, III, was also named an individual. He was the board chair for Abyssinian Developement Corporation at that time.
Q. Okay. And you said Derrick Taitt as a board member of Developement Community East Harlem.
A. Community -- Community Association of East Harlem Triangle, yeah.
Q. Okay. So you talked about it being breach of fiduciary duty. Can you just tell me a little more about that, in what was it a breach of fiduciary duty, what were the -- just generally, what were the allegations as you understood them?
A. So my understanding is that there was a property that Abyssinian Developement Corporation and Community Association of East Harlem Triangle owned jointly. That property was later sold to an unrelated third party, and there was a question regarding process to that various offers for that property that was ultimately sold.

Page 15

Q. You said it was basically some sort of allegations of fraud, essentially.
A. Fraud, no. Fiduciary responsibility regarding disclosures regarding multiple offers, how those offers were vetted.
Q. Oh, I see, I see.
And who is the third party?
A. That purchased the property?
Q. Yes. You said an unrelated third party.
A. So the property was sold to a company Extel, E-X-T-E-L, was the buyer of the property.
Q. And was Prestige related -- involved in that in any way?
A. No, sir.
MR. KESHAVARZ: Okay. All right, so what else do we have for ground rules?
Q. And in what capacity were you being deposed?
A. As a -- as an employee officer of Abyssinian Development Corporation.
Q. Okay. All right, so -- well, first of all, what do you do for a living, what do you do for work?
A. So I'm an employee of the Abyssinian Development Corporation. My title is chief operating and financial officer.

Page 16

Q. And what does that entail?
A. So that entails overseeing our mission-based work. Mission-based work includes case management services through our social service coordinator team at two of our affordable housing properties, one for seniors and one for low income housing.
Also under the operational piece, we have a public school partnership with Thurgood Marshall Academy, where we provide them with college and readiness services. I oversee the college counselor that is assigned to that particular public school. She works with their guidance counselor. She assists in their postsecondary plans.
I also oversee the Asset Management Department of Abyssinian Developement Corporation. That's a team of two employees. We have just over 600 units of affordable housing. We have property management agents who have responsibility for the day-to-day. And we do monitoring through reviewing financial reports, periodic meetings.
I also supervise the IT director and have responsibility for human resources through the assistance of an HR consultant.
On the finance side I oversee the

accounting department for Abyssinian Development Corporation.
Q. All right. Sounds like you have a lot of roles.
A. Just a couple.
Q. So you said 600 units of property. Are those properties that are owned by Abyssinian, or in what -- what is the relationship with those properties?
A. So the 600 or so is maybe just over 600 units of low income housing. Those properties are typically structured as low income housing tax credit projects where Abyssinian Development Corporation would be the general partner in those partnerships. We also have a handful of entities, maybe two or three, that are structured as housing development fund corporations, where we would be the sole member.
And as the general partner, we would hire the property management agent. We would also have correspondence communication with the limited partners in those respective limited partnership entities.
Q. Okay. When you say 16 units -- 600 units, you mean 600 like apartments, or 600 properties?
A. I'm sorry 600 apartments.
Q. Okay. And approximately how many



properties?
A. Let's see. 21 properties, so 21 buildings. So within -- I should probably -- let me clarify.
Q. Yeah, please.
A. Because there is also some commercial units in there.
Okay. So within the property, 16 -- so there is 600 -- no, crap.
So the 600, so it's probably closer to 650 units of affordable housing, and that's across 21 buildings.
Q. Okay. What documents do you know of that kind of explain this relationship?
A. Can you clarify the relationship that you are referring to.
Q. So, I can talk to you in a little more detail about Abyssinian and 21 properties. You are the general partner -- Abyssinian is the general partner for those 21 properties.
A. So not all properties are structured as limited partnership entities. So out of the 21 or so buildings, 14 -- 17 of them are structured as limited partnerships. So for those 17, Abyssinian Development Corporation would be the general partner. There would typically be a general partner entity that -- that ADC



-- Abyssinian Development Corporation would be the sole member.
So, for example, the limited partnership entity would have a limited partner. We would then have an entity that would be structured as the general partner, and then Abyssinian would be the sole member of that general partner entity. So like it's more of an indirect relationship coming into the Abyssinian Development Corporation through that intermediary entity.
Q. Okay. But what is the role of Abyssinian in terms of those properties?
A. The role was as general partner?
Q. Yes.
A. So as the general partner, we would be responsible for engaging or hiring a property management agent who would be responsible for the day-to-day operation. Day-to-day operation being, collecting rent, managing hiring, maintenance, handling compliance for the property, collections. If there is a capital improvement project, that property manager, you know, would go through that process, and they would -- you know, they come to us for approval.
As the general partner, we receive monthly financial reports outlining collections, expenses,



financial performance for the limited partnership entities.
Q. All right. Would those reports indicate whether the tennants were on Section 8 or not?
A. Yes, they would.
Q. Okay. And would they indicate how much money is being collected as to those tennants?
A. Yes.
Q. Okay. And would it -- what else would -- what else would these reports indicate about the tennants?
A. About the tennants?
Q. About the tennants for where Abyssinian is the sole shareholder, sole shareholder of a general partnership?
MR. MARSHALL: Objection to the form.
MR. KESHAVARZ: Let me clarify. Maybe I should put it in a more specific context.
Let's talk about Ransome L.P., and what is -- let me get the full name.
Q. All right. When I've been using the term Prestige, you understand that to be Prestige Management, Inc.
A. Yes.
Q. Okay. And so there is an entity called Ran

Page 21

-- Arthur Ransome Houses L.P. Are you familiar with that entity?
A. Yes.
Q. Okay. I'm going to use just the term Ransome L.P., you understand that's what I mean, just as a shorthand.
A. Yes.
Q. Okay. So let's talk about the relationship between Abyssinian and -- well, first of all, let me just go back to Abyssinian.
Does Abyssinian still exist?
A. Yes.
Q. What's its -- do they have employees, other than you?
A. Yes.
Q. Okay. How many employees do they have?
A. Roughly 12 employees.
Q. Okay. And what's the -- do they all work in one physical location?
A. No, they do not.
Q. Okay. What's the address, I guess, of Abyssinian?
A. So our main address is 22-83 Adam Clinton Powell Jr. Boulevard, New York New, York 10030.
Q. All right. 22 -- 22-83 Adam Powell, okay.

Page 22

And about how many employees work there?
A. Three.
Q. Okay. And what are their roles?
A. Can you clarify?
Can you repeat the question, I couldn't hear you.
Q. Yeah, what are the roles of the three employees?
A. So one of them is myself.
Q. Okay.
A. And the other two are in the accounting department.
Q. Okay. What are their names?
A. Their names?
Q. Yeah.
A. Renee Wicks would be the office assistant, and Bernetta Alexander is the accounting manager.
Q. Okay. And you oversee them.
A. Yes.
MR. KESHAVARZ: All right, that's fine, okay.
Q. And who runs Abyssinian?
A. So I would be the most senior employee as the CO or CFO. I report directly then to the board chair for Abyssinian Development Corporation. I

Page 23

reported to the board.
Q. You report to what?
A. I reported to the board of directors for Abyssinian Development Corporation.
Q. And who was the head of the board of directors?
A. Dr. Sandra Johnson.
Q. And does she work at the 22-83 Adam Powell address?
A. She serves in a volunteer capacity as a board member. So to the extent there is mail related to her role, it will would come to the 22-83 Adam Clinton Powell Jr. address.
Q. Okay. So who at Abyssinian -- who at Abyssinian would have the most knowledge as to the rent collection for the properties that Abyssinian is the -- is affiliated with?
A. Can you clarify the question.
Q. So it sounds like, you know -- are you the main person who I would ask about the income and the buildings -- the income from the buildings for which Abyssinian is the sole member of the general partner?
MR. MARSHALL: Objection to the form.
MR. KESHAVARZ: You are on mute.
THE WITNESS: I'm sorry, I was asking

Page 24

someone to turn the air conditioning off. Sorry.
MR. KESHAVARZ: You are at home right now, I take it.
THE WITNESS: Yes. I'm sorry about that.
MR. KESHAVARZ: No, that's fine.
Q. Who is with you, your family members or...
A. My boyfriend.
Q. Okay. All right. That's fine.
Well, maybe I will PUT in the specific context.
Who is the Arthur Ransome Houses L.P., who -- who is the general partner of that?
A. General partner entity is Arthur Ransome Houses Corporation.
Q. Okay. So I'm just going to call that the Ransome Corporation, just to keep it simple; is that okay?
A. Yes.
Q. Okay. And, I'm sorry, did you say that was the general partner, or the limited partner, I'm sorry?
A. General partner.
Q. Okay. And who are the limited partners, if you know?
A. Limited partner is National Equity Fund,

Page 25

NEF is the abbreviation.
Q. National --
A. Equity fund.
Q. And is the role of National Equity Fund as to Arthur -- the L.P., the Ransome L.P., what do -- what do they do?
A. So National Equity Fund would have come in as the limited partner as part of the tax credits syndication. So I think it's Internal Revenue Code Section Number 42 that outlines the Low Income Housing Tax Credit Program. The way it is typically structured is the limited partner would bring equity capital into the partnership in exchange for tax credits. Those tax credits would earn out over a period of10 to 15 years over the initial compliance period.
There is also minimum affordability levels that both limited partner and general partner agree to over the term of the regulatory agreement as part of, you know, making sure that those tax credits are deductible by the limited partner. So there are specific income bands, area median income bands, that the families residing in the apartment need to be in in order for those tax credits to be deductible by the limited partner.

Page 26

The limited partner would also get periodic quarterly reporting from the general partner and from the management agent.
Q. Okay. So for the 21 units -- I'm just making sure I wrote that down.
For those 21 buildings that we talked about, there is a limited partner and general partner for all of those.
A. No, there is not.
Q. For most of those?
A. Yes, for most of them.
Q. And there is a corporation that's the general partner for all of those limited partnerships for those buildings, right?
A. Yes.
Q. And Abyssinian is the sole member for the general partners of those properties; is that right?
A. With the exception of one where we have a co-general partner.
Q. Okay. For which building?
A. So there are two buildings in that count that are under the name ADC/Ennis Francis Owner L.P. That partnership has a co-general partner with Abyssinian Development Corporation along with the limited partner.

Page 27

Q. All right. So what is the general partner's role at -- Ransome Corporation is the general partner of Ransome L.P., right?
A. Yes.
Q. Okay. And Abyssinian is the sole shareholder for the corporation, right?
A. Yes.
Q. Okay. So in this context, what does Abyssinian do for the corporation?
A. What do we do for the corporation?
Q. Yeah, what's your relationship?
You're the sole member, but do you provide any services for the Ransome Corporation?
A. So Ransome Corporation is really a -- it's a dormant entity. There are no operations at Ransome Corporation. So the -- it's really they're more so from a legal entity structure standpoint. And Abyssinian Development Corporation is a general partner has specific responsibilities, but Ransome Corporation is just a passive entity.
Q. You said Abyssinian has certain part -- has certain responsibilities.
I don't know if I heard that right.
A. As the general partner.
Q. Okay. What are those responsibilities?

Page 28

A. So as the general partner, we would hire the property management agent. We would provide oversight of the property management agent. They provide periodic financial reports. We would make sure that the property management agent is completing in audits, compliance filings are happening according to the regulator requirements. We would make sure that the -- what else do we do?
We handle the reporting to the limited partner. And that -- and we periodically will do limited inspections, property inspections.
Q. Limited inspections and property inspections.
What other oversight -- well, the property management company for Ransome L.P. is Prestige, right?
A. Yes.
Q. And how long has it been Prestige?
A. Hum, since 2008.
Q. All right. Now you said you did oversight for Prestige for Ransome L.P., right?
A. Yes, there would be a property management agreement that we would execute that would outline the responsibilities of Prestige Management as the property agent, and it would outline the monthly or

the periodic reporting that the Prestige Management would provide to us as the general partner.
Q. And what type of reporting would that be?
A. Balance sheet, income statements, rent role, accounts payable reports, accounts receivable reports, annual budgets, vacancy reports.
Q. Would it list the number of Section 8 tennants in those -- for the properties that Prestige manages for Ransome P.C.?
A. All the monthly reports include, it's called a monthly status report that would tell you -- that would have a notation letting you know which tennants are Section 8 tennants.
Q. And for Section 8 tenants, the tenants are responsible for their tenant's share of the contract rent -- let me just ask you, what's the -- what's the responsibility of the tenants in the Section 8 units that Prestige manages for Ransome -- for the Ransome properties?
MR. MARSHALL: Objection to the form.
Q. In other words --
MR. KESHAVARZ: Oh, by the way, Adam is going to say objection form. That means a lot of technical things that you don't have to worry about. You still go ahead and answer the question; do you



understand.
THE WITNESS: So does it mean that you need to rephrase the question?
MR. KESHAVARZ: No, it means that you ignore Adam. You just -- there is a technical reason why he -- he makes it, but you don't need to get into the technical reason.
Unless he comes in and tells you not to answer, although I'm not sure how he would, but unless he tells you not to answer for some reason, you still go ahead and answer, okay.
THE WITNESS: I see. Okay, thank you for the clarification.
MR. KESHAVARZ: No. By the way, if you ever need clarification to any of my questions, please ask me.
THE WITNESS: Sure.
MR. KESHAVARZ: All right.
THE WITNESS: Because you've been rephrasing when he does that, so that's why I assumed.
MR. KESHAVARZ: Oh, oh.
THE WITNESS: That's how this conversation has been going. To the extent he objects, you have been rephrasing, so I was waiting for the rephrase.
MR. KESHAVARZ: Oh, okay.



THE WITNESS: But if you could repeat the question.
MR. KESHAVARZ: Yes, sure.
Q. So let me just ask, what is Section 8?
A. What is Section 8?
Q. Yeah.
A. So Section 8 is a government program that provides rent subsidy, rent abatement support to qualified families.
Q. All right. And how much -- for the properties -- for these Section 8 properties that -- for the Ransome buildings, let me talking about that for a second. For those Section 8 tenants, if the Section 8 program stops paying their share for whatever reason, does Prestige attempt to collect from the tenant the full amount of the contract?
A. So a clarification point, and then I will answer the question.
So Arthur Ransome Houses L.P. is not a Section 8 property, it's a rent stabilized property. Section 8 property, I think is typically project-based contract. We have -- Arthur Ransome has individual tenants who have Section 8 vouchers.
Q. Okay.
A. So this is a rent stabilized property.



And then to your question, in the event that a tenant's subsidy -- Section 8 subsidy is suspended or terminated, the tenant continues to be responsible for their tenants share, except in a situation where the tenant has failed to recertify with Section 8, or the tenant has, you know, voluntarily surrendered their voucher, for whatever reason. Under those situations is typically when the tenant is responsible for the full contract rent.
Q. Okay. So let me define some the of these terms.
What is the full con -- what do you mean by the full contract rent?
A. So full contract rent would be the legally registered rent. So as being a rent stabilized apartment, there is an annual -- there is annual guidelines from the rent stabilization board on what those annual rent increases can be. And then within the regulatory agreement, either HPD or New York City Housing Preservation Development or New York State Homes Renewal will set the maximum tax credit rate that we are allowed to charge tenants.
Q. Okay. Is the contract rate the actual rate on the lease?
A. Yes. So the -- yes, so the contract rent

Page 33

would be the total rent within the contract rent for a Section 8 tenant. There would be a tenant portion and there would be a subsidy portion, and Section 8 would determine that allocation between the tenant portion and Section 8 subsidy portion.
Q. Okay. So there is the tenant's share, and then there is the Section 8 share, is that -- and you add those together and that equals the contract rent.
A. Yes.
Q. Okay. And for the -- what is project-based Section 8?
A. So project-based Section 8 would be when you have a contract with Section 8 that covers multiple units. So project-based unit would cover 10, 20, a hundred units, as opposed to individual vouchered units. Project-based vouchers are attached to the unit. So as the unit -- as the unit is turned, the subsidy benefit remains with the unit, as opposed to a tenant-lease voucher which ports out, and stays with that particular resident.
Q. Okay. So do you know what properties Ransome L.P. owns?
A. Do I know what physician locations?
Q. Yeah.
A. What physical addresses Ransome owns?

Page 34

They own seven buildings. I probably -- I have most of them committed to memory, there may be a couple that I don't have the full address, but I'm familiar with the seven buildings.
Q. Do you remember the addresses for any of them off the top of your head?
A. Yes.
Q. What do you recall as the addresses?
A. So 6264 West 124th Street. 152 West 110th Street. 151 West 120 -- 123rd or 124th or 122nd. I think it's 122nd Street. There is a 1221 West 121st Street. There is a 356, that one I can't remember the street. And, let's see, there is two more that I'm drawing a blank on.
Q. That's fine.
About how many units are -- does the L.P. -- how many units are in the properties that the L.P. owns, roughly?
A. Roughly 116 units.
Q. Okay. And none of those are project-based Section 8, right?
A. Right.
Q. And you said the Section 8 program where the program follows the tenant, as opposed to the full building, about what percentage of the units that

Page 35

Ransome L.P. owns are Section 8?
A. What percentage of tenants?
Q. Yeah, what percentage of the tenant are Section 8 for the L.P.?
A. Roughly 20 percent. So there are Section 8 tenants, and then there is also City FHEPS tenants. It works similar to Section 8. I think Section 8 is typically associated with NYCHA, which is the HUD passthrough. City FHEPS they are vouchers, but they are a City program.
Q. Okay.
A. So they are about 20 percent between Section 8 NYCHA. HPD also has vouchers, along with City Pass.
Q. All right, so about 20 percent is Section 8, right?
A. If we are referring to Section 8 as being vouchers, which could be, you know, from various City agencies, yes.
Q. Okay. And about what percent are FHEPS, if it's a City FHEPS, or whichever FHEPS program, roughly, if you know, how many?
A. It might be 50/50. It might be 50 percent Section 8, 50 percent City FHEPS.
Q. So 50/50 of the 20 percent, or 50/50 of all

Page 36

the tenants?
A. 50/50 of the 20 percent.
Q. Got it.
And then the other tenants are not affiliated with any programs, or?
A. That's correct. So the other 80 percent of tenants receive no subsidy. They are in rent stabilized housing.
Q. Okay. Who -- does the Ransome general partner have the ability to control the operation of Prestige?
A. No.
Q. Okay. Who controls Prestige for the Ransome L.P. units?
A. Prestige, I believe, is a private company, and they have owners within that -- within their corporation.
Q. Okay. Do you have an ownership interest in Prestige?
A. No.
Q. What's your relationship with Prestige?
A. Prestige is the property management agent that we hired -- that we hired to run the day-to-day operations of Arthur Ransome Partnership.
Q. By we, you mean Abyssinian hires through

Page 37

the P.C.
A. Hires through the limited partnership.
Q. Sorry.
A. So through the limited partnership. I believe the property management agreement is between Arthur Ransome Housing L.P. and Prestige Management. As a general partner we have the ability to execute that contract on behalf the limited partner.
Q. Okay. So for the general part -- for the Ransome General Partner, you said the general partnership entity is a passthrough entity, is that the phrase you used?
A. Yes.
Q. Okay. What do you mean by passthrough entity?
A. Passthrough entity, meaning that it doesn't have operations on a standalone basis. There are no employees at Arthur Ransome Corporation.
Q. Okay. And so is essentially Abyssinian the same thing as Ransome P.C.?
A. When you say --
MR. MARSHALL: Objection to form.
A. Can you clarify who Ransome P.C. is.
Q. Isn't that the general partner of ELP, of Ransome L.P. or no?

Page 38

A. You are using that to mean Arthur Ransome Corporation.
Q. Corporation.
A. Okay.
MR. KESHAVARZ: I apologize. Thank you for clarifying that.
THE WITNESS: Okay.
Q. Ransome Corporation is a passthrough entity.
So my question is, Abyssinian essentially the same thing as the corporation in relation to the Ransome properties?
A. Yeah, we are the same, we are the general partners, so yes.
Q. So Abyssinian is essentially the general partner for the Ransome properties?
A. Yes.
Q. Okay. And why do you say that?
A. Why do I say that?
Q. Yeah.
A. Well, there is a limited partnership agreement for Arthur Ransome Houses L.P. that identifies the corporation and Abyssinian Development Corporation, are all outlined in the limited partnership agreement with their representative

Page 39

ownership interest.
Q. All right.
A. Arthur Ransome Corporation documents also support that relationship.
MR. KESHAVARZ: All right. So I'm going to say, I called for the production of -- and that basically means after our deposition, can you check to see if you can get the documents.
So I call for the production of any of the contracts that -- or other documents that delineate the relationship between Abyssinian and the corporation, or the corporation and the limited partnership.
Will you look to see if you have those documents.
THE WITNESS: Yes.
Q. Okay. What documents would they be, what kind of documents would show that, that relationship? Would it be --
A. It would be limited partnership agreement would show that relationship. And the formation documents for Arthur Ransome Corporation.
Q. The formation documents you said.
A. Yes, the bylaws and the I don't know if there is an operating agreement for the corporation,

Page 40

but I can check to see. It was formed well before my time. So the corporation documents would be the other -- the Arthur Ransome Corporation documents would speak to the relationship.
Q. Okay. And you have the ability to access those.
A. Yes.
Q. Okay. And the -- are there documents delineating the relationship between Abyssinian and the corporation or the L.P.?
A. That would be under the partnership agreement.
Q. Okay. So the limited partnership agreement includes Abyssinian.
A. It would include Arthur Ransome Corporation. It would speak to responsibilities of the general partner, and then the corporate documents would identify Abyssinian Development Corporation as the general partner in Arthur Ransome Corporation.
Q. Okay. What documents would delineate the role between Arthur Ransome and the corporation, or are those the documents you are talking about?
A. Those would be the documents I'm referring to, the limited partnership agreement.
Q. Okay. Now what is the -- you started

Page 41

talking before about the role of Prestige with the Arthur Ransome properties. Tell me about that relationship. What is that relationship?
MR. MARSHALL: Objection to the form.
MR. KESHAVARZ: You can answer. Go ahead.
A. Okay. Prestige Management would be the property management agent hired by Arthur Ransome Houses L.P. Prestige Management would be responsible for the day-to-day operation of Arthur Ransome Houses L.P. There would be a property management agreement that would outline responsibilities of Prestige Management.
Q. Okay. So is Prestige the one that does all of the debt collection for the Ransome properties?
A. Yes.
Q. Is Prestige the one who hires the law firms to collect on the rent for the Ransome properties?
A. Yes.
Q. And is the law firms essentially -- and the law firms that -- strike that.
You said Prestige hires the law firms to collect on the rent, right?
A. Yes.
Q. So is it your understanding that Prestige is the client for these law firms?

Page 42

MR. MARSHALL: Objection.
Q. Or do you know?
A. Prestige is the -- can you -- can you repeat your question.
Q. Yeah, sure.
So Prestige hires the law firms to collect on the rent for the Ransome properties. Would you say essentially that Prestige is the client for the law firms that it hires?
MR. MARSHALL: Objection to the form.
A. That Prestige is the client.
I would say that the client is Prestige, and the entity that the lawsuit was being brought on behalf of. So Arthur Ransome Houses L.P. would be the entity that the monies were owed to. And so Arthur Ransome Houses L.P. and Prestige would both be clients of the firm. And Prestige is representing the interests of the limited partnership entity in their role as the property managing agent.
Q. Okay. And as the sole member of the corporation, would Prestige be essentially collecting rent for Abyssinian?
MR. MARSHALL: Objection to the form.
A. Are they -- no, they are not collecting rent for Abyssinian, no.

Page 43

Q. They're collecting it for the corporation and the limited partnership.
A. They are collecting for the limited partnership.
Q. And the general partner -- okay, I got it. I got it.
A. The general partner, we don't have a -- there is no -- you know, they're not collecting on behalf of the general partner, no, I don't know that I would view it that way. It's on behalf of the limited partnership. The limited partnership is a legal entity. The limited partnership is providing the apartment, etc., so --
Q. Okay.
A. -- it is for Arthur Ransome to basically pay -- to be able to deliver the services.
Q. Okay.
A. Whether it is water, maintenance, etc.
Q. Who deliverers those?
A. So the L.P. would be delivering those services to families.
Q. So for the rent that Prestige collects for the Ransome properties, where does that -- how does that rent get divided, where does that money go?
A. So Prestige would have bank account opened

Page 44

in the name of Arthur Ransome Houses L.P., and tenant rents would be deposited into that account.
Q. Okay. Do you know what bank that account is in?
A. I believe it was Santander. I know they changed it a few years back. It may be Santander. I'm drawing a blank on the name of the other bank. It's not Santander, I'm sorry, that's incorrect. That's the wrong partnership entity.
I don't recall the name of the bank that Prestige is currently using to collect the rents.
Q. Okay, that's fine.
But the bank account name is in the name of the L.P., is that what you're saying?
A. Yes.
Q. Okay. So rent -- Prestige takes the money from the rent, and it puts some of it into the bank account for the L.P., right?
A. All of it in the bank account of the L.P.
Q. All of it, okay.
So how does Prestige get paid?
A. Prestige receives -- receives a management fee. In some cases it could be a flat fee, based upon a flat fee per unit. I've also seen it where it is a percentage of rents collected. I don't recall how the

Page 45

Arthur Ransome Houses L.P. management is structured.
Q. Understood, thank you.
So the money that is collected, it goes to the L.P. How does the money -- how does the financial benefit, if any, go to the limited partner for Ransome?
A. So the financial benefit to the limited partner would be in the form of tax credits that are delivered. So at the formation of the limited partnership agreement, the limited partner has an equity contribution.
You know, for example, the equity contribution could be 8 million. That $8 million comes into the limited partner. It is used to rehab buildings owned by Arthur Ransome L.P., so maybe a new boiler, new roof, rehabbing kitchen and bathrooms.
And in exchange for that $7 million equity investment, there are tax credits that are delivered to the equity partner annually that the equity partner would then take on their, you know, tax return. So that would be the -- you know the tax credits are the financial benefit that go to the limited partner.
Q. Okay. And do you have possession, or access -- do you have possession of documents that would show that division?

Page 46

A. Documents that would show the division of the tax credits that were delivered?
Q. Yeah.
A. So the taxes -- so there would be a annual tax return that would be filed for the limited partnership entity. And there are specific schedules within that tax return that have the dollar amount of the tax credit that was delivered to the limited partner for that particular tax year.
Q. Okay, got it.
Now who -- does Prestige issue bills to tenants for the Ransome properties, bills for rent?
A. Yes.
Q. The bills for the rent?
A. Yes.
Q. Okay. And does Prestige calculate the amount that it says the tenant owes in rent?
A. No.
Q. Who does?
A. So you are speaking in reference to a Section 8 voucher tenant.
Q. Yes?
A. So Section 8 determines the tenant portion. Annually tenants -- tenants who are voucher holders have an annual requirement to recertify with

Page 47

Section 8. As parts of that annual recertification, Section 8 will look at income and access of the household, and make a determination on what the tenant's portion of the contract rent will be for that particular year.
Q. All right.
A. And then Prestige will bill -- there is a statement or a correspondents that the Section 8 issues, post the completion of the annual recertification, and that will outline the tenant's portion based upon the recertification. And then Prestige will bill based upon that annual determination from Section 8.
Q. Now have you ever seen the -- did you call them -- strike that.
What is the name of the document that Prestige issues to tenants to collect the rent, what is that document called?
A. Typically it's called a rent bill. I don't know if Prestige has another name. Particularly it's a -- it's a monthly rent bill.
Q. Okay. And does that just say the bill -- how much is owed just for that month?
In other words, is there a bill every month that goes out?

Page 48

A. Yes, there is monthly bills that go out, yes.
Q. All right. Now do they also generate -- does Prestige also generate statements for the total amount that's owed by the tenant?
A. Are you referring to a tenant ledger?
Q. Yes.
A. So tenant ledgers are not mailed monthly. Tenant ledgers, typically the resident has to make the request for the tenant ledger. So the tenant ledger would have the history of rent charged and rent collected over a period of time. The rent bills would have the prior balance, carried forward balance along with the current charge and total due. The rent bill wouldn't delineate, you know, month-by-month charges and month-by-month collection in the way the tenant ledger does.
Q. And does Prestige generate those documents?
A. Which documents?
Q. The rent bill and the ledger, do they generate them both?
A. Yes, yes, they generate both. They have a tenant ledger software that's used to maintain those records.
Q. And do you know what the tenant software

Page 49

is, the name of it?
A. Currently they are using Yardi, Y-A-R-D-I. I think they transitioned to Yardi maybe three years ago. They were previously using a software -- I think MDS was the software they were using for the ledger system prior to Yardi.
Q. Do you know what NDS stands for?
A. No, I think it's, M -- yeah, MDS.
Q. M as in Mary?
A. M as in Mary, D as in dog, S as in Sam.
Q. All right. Now let's talk about Yardi.
Yardi is the software that Prestige uses.
A. Yes.
Q. Okay. And then Prestige uses the Yardi program to generate the rent ledgers and the rent bills.
A. The rent ledgers, yes. The rent bills, I don't know if they use Yardi to generate the rent bills.
Q. Okay. Is there any other document that Prestige generates for tenants to show the tenants how much is owed?
A. Any the other document that they would show the tenants to show how much is owed?
Q. Yeah.

Page 50

A. The rent ledger would be the primary document, and then the monthly rent bill would be the second.
You know the resident ledger is helpful to the extent that a tenant has a specific question about a month, because the resident ledger would have the history of monthly charges and rent collected over a period of time.
Q. All right. Now if a tenant tries to go in an online portal to find out how much money is owed, they go through a portal that's run by Prestige.
MR. MARSHALL: Objection. Objection to the form.
I mean, have we established that there is a portal yet?
Q. Is there a portal that -a?
MR. MARSHALL: I drifted off for a moment.
MR. KESHAVARZ: Well, that's what you get for sleeping during a deposition, Adam.
Q. So is there an online portal that tenants can access to get a list of how much money they owed and how it's calculated?
A. Well, again, the calculation of the tenant portion is a function of the Section 8 recertification process if it's a voucher holder.

Page 51

I'm aware that tenants can use an online portal to pay their rent.
Q. Okay.
A. Beyond that, I'm not familiar with any other functionality of the tenant portal.
Q. Okay. Do you know what the name of the tenant portal is?
A. No, I don't.
Q. Is the tenant portal run by Prestige?
A. Yes.
Q. So the information in the tenant portal would come from Prestige.
A. Hum, yes.
Q. Okay. Now do you know of any instances where if -- strike that.
THE WITNESS: I can make a clarification?
MR. KESHAVARZ: Please, any time you need to clarify anything, even if it's a prior question, please feel free to jump in and do that.
A. So my understanding of the tenant portal is limited. I'm aware that tenants can make their payments in the tenant portal. I am not aware of any other functionality in the tenant portal.
To the extent a tenant has a question on their balance, they would typically come into the

Page 52

office and request a ledger.
Q. Whose office?
A. They would come into a Prestige office and request a copy of their rent ledger.
I don't want to speak to the -- I'm not familiar with the sophistication or the functionality of the tenant portal, other than being able to pay -- pay rent.
Q. Okay, thank you.
Now did you -- let's get back to the reports that Prestige generates for Abyssinian.
A. Okay.
Q. For -- that's generated -- well, strike that.
Do you know how many properties Prestige does the property management for?
A. No, I don't.
Q. Do you have any idea, is it like a thousand, is it two?
A. In terms of units or apartments, I don't know. At one point maybe I heard there was 80 or so, 90 different entities. How many units, how many buildings, I don't know.
Q. You heard that Prestige was the property manager for 80 to 90 buildings; is that right?

Page 53

A. 80 to 90 entities.
Q. Oh, entities.
A. Yeah.
Q. So each entity --
A. Go ahead, I'm sorry. No, no, you go.
Q. Now the entities can own more than one property; is that right?
A. Yes.
Q. Okay. Like Ransome L.P. owns seven properties, would it be similar to that?
A. Yes.
Q. And when Ransome -- strike that.
Well, Prestige makes the decision about when to file a lawsuit as to the tenants it does the property management for.
A. Yes.
Q. Okay. And do you know if Prestige uses more than one law firm to do that?
A. Do I know -- no, I don't know if they use more than one.
Q. Now for the lawsuits that -- I'm sorry, you answered this question, and I forgot the phrase that you used, so -- so I apologize, I'm asking the same question.
Did you say that Prestige makes the

Page 54

decision about whether a collection lawsuit should be filed against a tenant?
A. Yes.
Q. And does Prestige make the decision about how that litigation proceeds?
A. When you say how that litigation proceeds, you mean in terms of whether they can go to petition, a marshal notice can be issued, is that what you are referring in terms of procedures?
Q. Yes.
A. Then that -- yes, yes would be the answer to the question.
Q. All right. And -- so Prestige is the one that tells the law firms how much is owed for rent.
A. Yes.
MR. KESHAVARZ: And so I'm just -- when I talk about lawsuits from here, I'm just interested in nonpayment petitions for rent for residents. So just to be clear, when I talk about lawsuits, I mean those types of lawsuits, okay.
THE WITNESS: Yes.
MR. KESHAVARZ: So if you are ever unclear about what lawsuits I mean, would you please ask me to clarify.
THE WITNESS: Yes.

Page 55

Q. Okay. Now for the lawsuits that Prestige directs its law firms to file, did you say that Prestige provides the accounting for how much is owed to the law firm, or do you know?
A. Prestige would provide the tenant ledger, and the tenant ledger would speak to what's owed.
Q. Do you know if in the ordinary course whether Prestige provides any other document to the law firm to -- to determine how much to sue for, or is all the information coming from the tenant ledger?
Basically I'm trying to find out, is all the information that goes from Prestige to the law firm about how much to sue for, is that information just the tenant ledger?
A. Yes.
Q. Okay. So in the ordinary course, Prestige doesn't give the law firm any other documents, you said, to tell the law firm how much to sue for.
A. In the ordinary course. Yeah, in the ordinary course, the rent ledger is the primary document of what to sue for. What to sue for would come from the ledger.
You may give other -- typically you may give other documents, you may give a copy of the lease to show, you know, the tenancy relationship. Yes, it

Page 56

would be the rent ledger.
Q. So in the ordinary course -- I just want to make sure I'm clear.
In the ordinary course, Prestige would send the ledger, and that ledger would be the only basis for the law firm to say how much is owed; is that accurate?
A. Yes.
Q. Okay. Do you know, in the ordinary course, what other documents, if any, that Prestige gives to the law firm to file the lawsuit?
A. Can you repeat the question.
Q. Sure. You mentioned a lease. Do you know if Prestige gives any other information. You said the ledger, do you know if Prestige gives any other information to the law firms?
A. No, I don't.
Q. To your knowledge, they don't provide any other information to the law firms.
A. I'm not familiar enough with their document process to be able to answer the question.
Q. Okay. But in terms of the amount that's sought, that's -- that amount is only sought -- is only provided by the ledger, right?
A. Yes.

Page 57

Q. All right, got that.
For the Ransome properties, do you know if the Kahan Law Firm is the only law firm that Prestige uses?
A. No, I don't know.
Q. Okay. Generally for the nonpayment lawsuits that Prestige files, or directs the initiation of, do you know if Kahan is the main law firm it uses?
MR. MARSHALL: Objection to the form.
A. As it relates to the Arthur Ransome Houses L.P.?
Q. Let's take it one step at a time.
One, as the Arthur Ransome is the primary firm that Prestige uses.
A. I don't know.
Q. All right, that's fine.
And generally do you know if Pres -- the Kahan firm is -- is one of the main firms that Prestige uses for any of the lawsuits it files, or do you know?
MR. MARSHALL: Objection to the form.
A. I don't know.
Q. That's fine.
Now do you know if for the lawsuits that

Page 58

Prestige files for -- strike that.
So there is seven buildings that Ransome is the property management company for, right?
A. Are you asking if Arthur Ransome has seven buildings?
Q. Yes.
A. Yes.
Q. All right. So when Prestige directs the firms to file a law -- nonpayment lawsuit, do you know if Prestige generally has one of their employees go to court for those cases, or do you know?
A. Yes, it would be -- if the law firm requested it, it would be a Prestige employee who goes to court in connection with the nonpayment.
Q. Do you know, is that common for -- let me rephrase that.
Is it common for a Prestige employee to go to court for the lawsuits Prestige -- that Prestige files for the Arthur Ransome properties?
A. Well, it really depends on the request of the counsel, the landlord/tenant counsel. I think generally in some cases the landlord/tenant counsel will go without a member, will go without an employee of Prestige Management. There may be various points in the case where a Prestige employee has to appear.

Page 59

Q. Do you know when that -- what situations in which a Prestige employee would appear in court?
A. Specifically, no.
Q. Generally do you know?
A. Generally for nonpayment. Maybe if the nonpayment has to do with repairs, and Prestige needs to give information on those repairs in connection with the nonpayment, they may be asked to appear to provide that context. That's I guess one situation where I've heard of them having to go to court with the attorney.
Q. To your knowledge, are there any other common situations where Prestige would to court with its law firm to collect on nonpayment?
A. No, it's really kind of facts and circumstances that I wouldn't know.
Q. All right. And I will get into the particulars of Ms. Garcia's case.
But it appears that someone from Prestige went to court and physically signed a stipulation to discontinue. You don't know one way or the other whether that's common for Prestige to do.
A. It's common for the agent -- it's common for a property management agent to sign the stipulation. I don't know if they always have to be

Page 60

physically be in court to do that, or if they can do that electronically. I'm not -- I'm not familiar if we have to go to court and actually sign that, or if you can, you know, sign and subsequently provide to counsel.
Q. Okay. But is it Prestige that makes the decision about whether to settle a nonpayment case?
A. Yes.
Q. And it makes that decision for each case that it -- that the law firm collects for.
A. Yes.
Q. Okay. Does Prestige make the decision about telling the law firm how much to settle for?
A. Yes.
Q. Okay. So it's Prestige's decision about whether to settle or how much to settle for; is that right?
A. Yes, that's correct.
Q. And would it be Prestige who would know whether the tenant was on Section 8, or would the law firm make that determination?
A. Prestige would know.
Q. Okay. And Prestige would tell the law firm whether the tenant was on Section 8.
A. Yes.

Page 61

Q. Okay. And Prestige would tell the law firm how much of the rent is the tenant's share and how much is the Section 8 program's share, correct?
MR. MARSHALL: Objection to the form.
MR. KESHAVARZ: You can answer.
A. Yes.
MR. KESHAVARZ: Now I don't remember the question.
Madam Court Reporter, can you read back that last question.
(WHEREUPON, THE REQUESTED TESTIMONY WAS READ)
Q. Okay. And it would tell the law firm that through the rent ledger, right?
MR. MARSHALL: Same objection.
A. Ledger. Umm, hum. Well, the rent ledger -- depending upon the sophistication of the Yardi system, the rent ledger would denote Section 8 charges and tenant charges on the same ledger.
Q. Okay. In the ordinary course of the Yardi program, would generate a ledger that would break out how much Prestige says is the Section 8 share and the tenant's share for each month, correct?
A. Yes.
Q. All right. It's Prestige that makes the

Page 62

determination in the ledger about how much of the contract rent is owed by the tenant and how much is owed by the Section 8 program; is that fair?
A. To make the determination in the ledger, yes.
Q. Okay. Now do you know or not know whether Prestige generates a ledger that charges the tenant the Section 8 share regardless of the reason that the Section 8 program ceases to pay?
A. Can you repeat the question.
Q. Sure, I'm glad to.
COURT REPORTER: Do you want me to repeat it?
MR. KESHAVARZ: I will repeat it. Let me have a sip of water.
I think it is hard to answer the questions, it's hard to formulate the questions in a way that make sense. Especially for a program that you are the expert for and I'm not.
So I apologize if my questions need to be rephrased, but you are doing the right thing and you are asking me to rephrase, so thank you for that.
Q. So do you know, one way or the other, whether the ledgers that Prestige sends to the law firm breaks up the tenant's share and the Section 8

Page 63

share based on if Section 8 has stopped paying for whatever reason, do you know one way or the other?
A. No, I don't know.
Q. Okay. Because if the Section 8 program ceased making it's monthly share because Prestige had to make -- to comply with HQS inspection, that's one reason why Section 8 would cease payments, right?
MR. MARSHALL: Objection to the form.
A. You are asking why Section 8 would no longer make payments of the subsidy?
Q. Yeah. Let me rephrase.
Under what circumstances does -- just as a matter of course, would Section 8 cease payments in a manner that the tenant is still not required to pay the Section 8 share?
A. Would they stop paying the subsidy and the tenant isn't responsible, is that your question?
Q. Correct, they are not responsible for the Section 8 share.
A. Not responsible for the Section 8 share.
So the tenant wouldn't be responsible for the Section 8 share if the subsidy was suspended due to a HQS failure. The tenant would be responsible for subsidy if the suspension was due to tenant's failure to recertify with Section 8, or for whatever reason

Page 64

the tenant voluntarily surrendered their voucher through Section 8.
Q. Okay. In the ordinary course, Section 8 would inform Prestige whether it is suspending the payments for the Section 8 share, right?
THE WITNESS: I just need a minute to take my headset out. Just give me one second.
MR. KESHAVARZ: Take your time. Do you want to take a break for a few minutes?
THE WITNESS: No, I just needed to take the headset out.
MR. KESHAVARZ: So --
Okay, give me one second, I just got to disconnect the headset, because they are going to die.
Can you hear me now?
MR. KESHAVARZ: Perfectly.
THE WITNESS: Okay. Okay, sorry about that.
Q. Okay. Now prior to Section 8 suspending payment of the Section 8 share, in the ordinary course, the Section 8 program would provide Prestige notice of that prior to ceasing payments.
A. Yes, that's correct.
Q. Okay. And -- and in the ordinary course, Section 8 would say the reason that it is suspending

payments, correct?
A. Yes.
Q. And the tenant is not responsible for the Section 8 share if the reason for the suspension is the failure to do the HQS inspections, to pass the HQS inspections, correct?
A. Yes.
Q. And what is an HQS inspection?
A. So HQS is housing quality standards. Similar to, I guess, or modelled after the HUD quality standards.
There is a unit inspection that's typically done annually. And Section 8, or the representative through HPD goes out and conducts an inspection of the apartment using a standard check list. They will then -- you know, to the extent that there is a finding, it could be GFI doesn't work, or there is an issue with the stove, etc., then those findings would be listed on a failure notice that the Section 8 agency would issue.
Other way that they are generated is if the tenant calls -- so the HQS inspection is an annual inspection process for voucher holders.
Other route is if the tenant calls and makes complaints through 311. And 311 then sends HPD



out to do inspections. They can issue violations. Depending on the nature of the violations the violations, those violations could trigger a suspension in the subsidy.
Q. Okay. In the ordinary course, are those suspensions for HQS inspections failure or a complaint, in your experience, are suspensions by Section 8 for those reasons in the ordinary course fairly common?
A. Is the inspection process or -- or findings of failures common?
Q. So -- well, let me break it down.
By the way, you said GFI. What is GFI?
A. Oh, that the outlet that you have to have near a water source. I think it's a special type of out -- special type of plug you got to have near the outlet to prevent a electrical fire or hazard, because its, you know, near a water source.
So that's typically -- I was just using that as an example of one of the things that they look for on the inspection.
Q. Okay, thank you.
Now -- so we talked about the annual HQS inspection, and -- and the tenant complaints made to 411.



So failure of the HQS inspection, or the failure to address a legitimate tenant complaint, those would be two common reasons for H -- for the Section 8 program to suspend its payments.
A. Yes, with a clarification point.
So on the tenant complaint, they come through 311. As the result of the 311 complaint, HPD, New York City Housing Preservation Development, would send an inspector out in response to the complaint. That inspector would then issue an HPD violation. If that HPD violation wasn't cured within the specified period of time, it could trigger the suspension of the Section 8 voucher.
Q. And Prestige would get notice of that suspension prior to it happening.
A. Yes, you would.
Q. So let me -- let me use shorthand for those two reasons.
A. Umm-hum.
Q. HQS inspection and the complaint, can I just call -- would it be fair to call those repair issues, would that be a fair generalization about how to describe those two?
A. I guess I would describe them as HQS and HPD violations, because every complaint does not



translate into a suspension of a subsidy. The complaints are verified by HPD. And to the extent it's verified and HPD agrees, then they issue a violation. And so you would get notice of the violation, and you would get notice of the HQS failure.
Q. Okay. So would a shorthand for those two reasons for Section 8 to suspend payments, would that -- a good shorthand be HQS and -- or HPD violation?
A. Yes.
Q. I can't read my --
A. Yes, violations, umm-hum.
Q. Okay. Now would you say it's fairly common for -- well, strike that.
Would you say it's not uncommon for Section 8 to suspend payments for HQS or HPD violations?
A. It's not uncommon, no.
Q. Okay. And it's not uncommon for that suspension for the Prestige properties that they manage, right?
A. That, I wouldn't know.
Q. Well --
A. You said --
Q. Go ahead.

Page 69

A. Okay. Yeah, because you said it's not uncommon for Prestige, I don't -- that I don't know.
Q. All right. So let me ask, in the ordinary course --
A. Umm-hum.
Q. -- it's not uncommon for HQS or HPD violations to trigger say suspension in Section 8 programs, correct?
A. Yes, that's correct.
Q. Would you say it's in the ordinary course that it's fairly common for HQS or HPD violations to trigger a suspension, would you say that's fairly common?
A. Yes.
Q. Okay. It's something that happens pretty regularly.
A. Yes.
Q. Okay.
A. Yes.
Q. And would that be -- would the HQS and HPD violations be the main reason why the Section 8 subsidy would be terminated or -- or strike that.
Would you say that in the ordinary course that the HQS and HPD violations would be the most common reason for Section 8 to suspend its payments?

Page 70

A. Yes.
Q. Okay. Would you say that would be like -- I don't need an exact number, but when you say it's the most -- would you say it's the most common reason that Section 8 stops paying, because of HQS or HPD violations, would you say that's the most common reason?
A. Yes.
Q. Okay. It's far more common than a suspension of the Section 8 program for the tenant, right?
A. When you say suspension of the program for the tenant, I'm not sure what that means.
Q. Well, you said suspension, I didn't know what you meant before. But strike that.
Let me just ask you --
A. Umm.
Q. Go ahead.
A. Well, I think we were -- I think I was responding to a question on when -- under what circumstances can a subsidy be -- under what circumstances would the tenant be responsible for the subsidy, if the subsidy is suspended.
So if the subsidy is suspended for HQS or for violations, the tenant is not responsible for the

Page 71

subsidy.
If the subsidy is suspended for the tenant's failure to recertify with Section 8, or if the tenant voluntarily surrenders their voucher, that happens not that often, but, those are the two situations where the tenant would be responsible for the -- for the subsidy.
Q. But those two reasons are not very common; is that right?
A. No, they are not very common. Maybe -- I don't know, maybe in my experience, out of suspensions that I've seen, you know, the majority are going to be for HQS or violations.
Q. Would you say, you know, 80 percent or 90 percent of the reasons for the suspensions are HQS or HPD violations?
MR. MARSHALL: Objection to the form.
A. Ninety percent, in my experience.
Q. Okay. Are there other reasons for Section 8 to suspend payments where the tenant would also not be responsible for the Section 8 share?
A. Not that I'm aware of, in my experience.
Q. All right. Now for the time period that Section 8 ceases its payments because of HQS, HPD violations, is the landlord or the property management

Page 72

company entitled to get retroactively reimbursed by Section 8 for the time period that Section 8 suspended for HQS, HPD violations?
A. That retroactive payment would be at the discretion of Section 8.
Q. And would you say that's very common?
A. Common to receive retro payment?
Q. Yeah.
A. Ah, hum, I wouldn't say that it's very common. It's really a facts and circumstances.
I've seen retro payments from the agency in the situation where there may have been a processing delay on the part of Section 8.
So, for example, property management agent submitted correspondence, work orders, etc., to the agency to show that the HQS failures had been cured. Let's say, for example, they submitted it on April 1st, agency was slow, Section 8 was slow in processing, Section 8 didn't get to it until three months later, but there is evidence that the repairs were completed the three months prior, they would give a retro payment in that situation.
So really at the discretion of the agency, not a -- there is no, you know, guarantee or matter of fact that you are going to get the retro payment.

Page 73

Q. Okay. In the ordinary course, would the reason that Section 8 would use its discretion to authorize a retroactive payment would generally be because Section 8 had made some mistake?
A. In my experience, yes.
Q. Okay. But the retroactive payments are not common, they're uncommon in the ordinary course.
A. Yes, that's correct.
Q. All right. Now --
MR. KESHAVARZ: Do you want to take a break?
I'm going to start a different line of questioning. Do you want to take a break, use the restroom, or are you good to keep on going?
This is not an endurance test.
THE WITNESS: No, that's okay. If we are getting ready to transition to different questions, a five minute bathroom break.
MR. KESHAVARZ: Why don't we say 15 minutes.
THE WITNESS: Okay.
MR. KESHAVARZ: 12:10 get back on.
THE WITNESS: That's fine.
MR. KESHAVARZ: Okay. All right, I will see you then.

Page 74

THE WITNESS: All right, thank you.
(Time noted: 11:52 a.m.)
(WHEREUPON, A RECESS WAS TAKEN)
(Time noted: 12:11 p.m.)
MR. KESHAVARZ: All right. Let me go back on the record.
Okay. So let me start asking you stuff about my client specifically.
CONTINUED EXAMINATION BY MR. KESHAVARZ:
Q. So how well would you say you understand what a tenant ledger looks like?
A. How well would I say I understand?
Q. How many tenant -- how many tenant ledgers would you say you've seen over the years?
A. I don't know, hundreds maybe.
Q. A hundred?
A. Yeah, I've seen a lot of tenant ledgers.
Q. You said a couple of hundred, I couldn't hear you.
A. Yes, a couple of hundred tenant ledgers, yes.
Q. All right. So -- so you know how, for a Section 8 tenant, how the ledger should breakdown the Section 8 share and the tenant share; is that correct?
A. Yes.

Page 75

Q. Okay. And is that part of your job when you are at Abyssinian for all these years?
A. It's part of my job in cases where we are -- we are providing our monitoring, you know, oversight of the property management agents for our analysis that my team would do at times in connection with the third party, the independent auditors. They ask us to do analysis where we look at tenant ledgers to assess collection collectability. So I've done it in my role you, know, as a general partner supporting the compliance.
MR. KESHAVARZ: So you are very choppy for your connection.
THE WITNESS: I am, okay. Let me see if -- let me see if it's the headsets, because I put some different headsets in, so maybe it's the headsets.
MR. KESHAVARZ: Is there a way that you can get back into your apartment or somewhere.
THE WITNESS: Let me see if I can fix the headsets, because it may be the headset. Let me see if that fixes it.
MR. KESHAVARZ: Okay.
THE WITNESS: Give me one second.
(WHEREUPON, THE WITNESS TURNS HER AUDIO AND VIDEO OFF)

Page 76

(WHEREUPON, A DISCUSSION WAS HELD OFF THE RECORD)
(WHEREUPON, THE WITNESS TURNS ON HER AUDIO AND VIDEO)
MR. KESHAVARZ: Hi, Ms. Palmer.
THE WITNESS: Hi. I'm so sorry for the connection.
Is this better?
MR. KESHAVARZ: Partially. But let's pretend like I didn't hear a single thing you said when you were talking a few minutes ago.
THE WITNESS: Okay.
MR. KESHAVARZ: Is there a place, either you could go back to your home or where your destination is, where you can be somewhere stable that gives you a wifi connection, because I think that might be part of the issue.
THE WITNESS: I should be -- I can probably be stationary in about 10 minutes.
MR. KESHAVARZ: Okay. You are going to be like in a building that you can sit down at a table, sit down in a chair.
THE WITNESS: Close.
MR. KESHAVARZ: I need --
THE WITNESS: I will do my best to get

Page 77

stationary, how's that?
MR. KESHAVARZ: I need somewhere where you can --
THE WITNESS: Where I can get on wifi.
MR. KESHAVARZ: Yes.
THE WITNESS: Okay. I need about 10 minutes.
MR. KESHAVARZ: Okay. So why don't you call me --
THE WITNESS: Okay.
MR. KESHAVARZ: -- when you are somewhere -- are you going to be somewhere fairly private that we can talk?
THE WITNESS: Yes.
MR. KESHAVARZ: Okay. Why don't we go off the record, and why don't you call me when you're free, and then we will start up the deposition again in around 10 minutes, or maybe 15 minutes.
THE WITNESS: Okay. Okay, I'm so sorry.
MR. KESHAVARZ: Okay. We will go off the record.
THE WITNESS: Thank you.
MR. KESHAVARZ: You're welcome.
(Time noted: 12:17 a.m.)
(WHEREUPON, A RECESS WAS TAKEN)

Page 78

(Time noted: 1:06 p.m.)
MR. KESHAVARZ: All right, let's go back on the record then.
All right, so let's try to pick up where we left off.
Madam Court Reporter, can you read back the last answer.
(WHEREUPON, THE REQUESTED TESTIMONY WAS READ)
MR. KESHAVARZ: Okay, there was a lot there.
THE WITNESS: Umm-hum.
MR. KESHAVARZ: So let me try to break that out.
THE WITNESS: Sure.
CONTINUED EXAMINATION BY MR. KESHAVARZ:
Q. All right, so I'm going to go back to the predicate question.
How well would you say you understand rent ledgers and -- how well would you say you understand rent ledgers and how they work?
A. I have a good understanding of rent ledgers.
Q. And how often have you read or interpreted rent ledgers?

Page 79

A. How often?
Q. Yeah, like how many rent ledgers I mean.
A. Maybe about a hundred or so rent ledgers I've looked at over the course of several years.
Q. Okay. I thought before you said hundreds, plural.
A. Maybe not hundreds, because it could be for the same -- I may have looked at a rent ledger for the same tenant on two different instances, and that's really one. So maybe about a hundred or so residents, as opposed to -- you know some of them may be repeat ledgers, following up with your question.
Q. Okay. How many ledgers total, even if they are repeats?
A. Then probably a couple of hundred, because I may have looked at them at different points. Maybe quarterly or semiannually, depending on the situation.
Q. All right. Let's talk about the supervision reports.
A. Umm-hum.
Q. And just tell me -- tell me a little more about what you mean, what are these supervision reports?
A. So each of the entities has a annual audit requirement. So their party auditor, independent

Page 80

auditor, we do an audit of the books and records of the partnership. That's a requirement under the partnership agreement.
One of the schedules or analyses of the auditors request is a review of collectability of tenant arrears. In looking to see how much of the tenant arrears are collectible, what percentage of the reserve needs to be provided in connection with the audit.
So oftentimes -- oftentimes we will assist or support the property management agent in preparing that analysis for the audit. And in preparing that analysis, when we are looking at tenant delinquencies, we will also look at the tenant ledger to get an understanding on payment pattern for a particular resident.
Q. Would you get a copy of a tenant ledger for the different properties that -- I'm sorry, how would you describe that, I was going to say the properties that Abyssinian manages, but I'm not sure if that's the right phrase.
You said there were 21 properties. How would you phrase the relationship of Abyssinian to those 21 properties?
A. We have monitoring oversight

Page 81

responsibility. So I would say we monitor performance of the limited partner of the different entities, looking to understand, you know, revenues, expense trends, financial viability of the properties, would be, you know, some of what we do in our role as general partners.

So we have that oversight responsibility. We do financials. Asking questions on those financials. Making sure that all of the compliance is done on a timely basis.

Q. Okay. About which ones would you say of those 21 -- strike that.

When you say 21, you mean 21 of those limited partnerships that own multiple buildings, right?

A. So there is not 21 limited partnerships, there is 21 buildings. In terms of limited partnership entities, there are five -- five, there is five limited partnership entities that own, collectively, you know, between those five limited partnerships it's about 17 or so buildings between those five.

Q. What are the names of those five?

A. Arthur Ransome Houses L.P., Laura B. Thomas Houses L.P., ADC/Ennis Francis Owner L.P.

Page 82

MR. KESHAVARZ: You have to slow down for the court reporter.

THE WITNESS: I'm sorry.

MR. KESHAVARZ: And definitely for me.

THE WITNESS: I'm sorry.

MR. KESHAVARZ: Take your time.

A. The first one would be Arthur Ransome Houses L.P.

Q. Yes.

A. Second, Laura Thomas Houses L.P.

Q. Thomas Houses L.P., yes.

A. The third would be ADC/Ennis Francis Owner L.P.

Q. Did you say ABC?

A. I'm sorry, apple, dog, cat, so the --

Q. ADC.

A. So ADC/Ennis Francis Owner L.P.

Q. ADC Francis?

A. No, I'm sorry. So ADC, then there is a back slash, Ennis, E-N-N-I-S, Francis, F-R-A-N-C-I-S.

Q. Okay. Okay, and next?

A. Fourth one would be Abby Towers Apartments L.P. That's A-B-B-Y Towers Apartments L.P.

And then the fifth one is MZ, so mother, zebra, 2640 Owner L.P.

Page 83

Q. And did I understand you to say that between those one, two, three, four, five L.P.s, they own 21 buildings?

A. No, they own 18.

Q. They own 18 buildings, okay.

A. Yes.

Q. Got it.

And the total number of units, or approximately how many for those 20 -- for those 18 buildings?

A. Give me one second. I have to just add it up.

About right around 600, actually. Just under 600.

Q. Okay.

A. Between those five entities. About 600, well, 598.

Q. And about how many are Arthur Ransome -- how many units are for Arthur Ransome L.P.?

A. 116 units, seven buildings.

Q. 160?

A. One, one, six.

Q. One, one, six. Thank you.

And let me see if I got this down right for the buildings that Arthur Ransome L.P. own.

Page 84

62 West 124th Street.

A. Yes.

Q. Correct?

141 West 107th Street -- 117th Street, correct?

A. Yes.

Q. 151 West 123rd Street, correct?

A. Yes.

Q. 152 West 118th Street, correct?

A. Yes.

Q. 221 West 121st Street, correct?

A. Yes.

Q. 280 West 109th Street, correct?

A. You said 109?

Q. 119th.

A. Oh, 119, okay, yes.

Q. And 356 West 116th Street, correct?

A. Yes.

Q. And in the last 10 years, did they own additional buildings?

A. Yes, there is a minor correction.

Q. Yes, go ahead.

A. So 62 West 124th Street is actually 62-64. So it's -- yeah, 62-64 is actually kind of a tenement building, one building, but it is actually 62-64 West

Page 85

124th Street.
Q. So for all these buildings, if Ransome L.P. was going to file a suit to collect rent, they would do it in the name Ransome L.P., correct?
A. Yes.
Q. Would they ever do it in the name of Ransome Corporation?
A. No.
Q. All right. So now let's go back to the audits, annual audits.
A. Okay.
Q. So you said review of collectible percentage reserve. What do you mean by that?
A. Sure. So as part of the financial statement audit, there's an analysis to determine collectability of arrears or outstanding tenant balances.
Q. Okay.
A. You would start with the aged accounts receivable report. The aged accounts receivable report would show you outstanding balances on a tenant -- a tenant basis, aged out, you know 30, 60, 90 days. We would use that -- we would then review that ledger to determine what balances are collectible.
So, is everything over 90 days?

Page 86

Has an estimate zero collectability.
We would then establish a reserve.
Alternatively you know, you would look at the tenant ledger to understand the payment pattern of that tenant, and then make a determination on whether the balance over 90 days, 50 percent of it will be collected, is the tenant a slow payer, so there is zero collectability.
So we would then go through, make assumptions based upon tenant payment pattern, to determine how much of your accounts receivable is collectible. And then you would reserve -- you would then put a monetary reserve on the balance sheet.
So instead of saying my receivable -- maybe my receivables at the gross level are an outstanding balance of a million dollars. Based upon that analysis, I may say I need a 30 percent reserve, and it should be reflected at 700,000 in the balance sheet, because that's what we believe to be collectible based upon, that analysis.
Q. What is a reserve?
A. A reserve is a write down of the assets based upon the collectability assumption.
Q. What does that mean?
I'm sorry, I have no idea what you just

Page 87

said.
A. No, no, so my -- so I'm trying to think of a comparable.
So when you look at the balance sheet, the balance sheet is a representation of assets and liabilities of the legal entity. And the reserve is really to say what's the true carrying value, or what's a -- what's the carrying value of those assets?
So cash is typically cash. You know, accounts receivable, you would normally do a collectability analysis to say how much of that am I going to get? Am I going to get 50 cents on the dollar, 30 cents on the dollar? And you write down, based upon the percentage that you believe is collectible.
Q. Okay. So do you -- do you get the tenant ledgers for these 18 buildings?
A. My involvement -- my -- my involvement, or analysis, of the 18 buildings varies. For some buildings, you know, I may have more of a hands on role than others. So it will vary, depending upon the entity and the facts and circumstances and the sophistication of the property management to do the analysis.
Q. What do you mean vary by hands on?

Page 88

A. So some of our entities require -- some of our entities have a more hands-on asset management oversight, depending upon financial performance.
So, for example, we have one entity within this group that has a very high economic loss. Economic loss being high percentage of vacancy, poor tenant collections. And so that entity, you know, we have more -- more hands-on involvement in preparing that analysis than you would for, you know, an entity where collections is quite low.
Q. So when you mean hands on, you mean Abyssinian's hands on.
A. Yes. Doing the analysis that I described, yes.
Q. Okay. Now how -- by the way, am I saying it correctly? How do you say it, Abyssinian?
A. Yes, you said it correctly.
Q. Abyssinian.
Okay. How much of a hands-on approach would you say you have for the Ransome L.P. properties?
A. I -- historically, not much. I probably became a little bit more hands on in the last six months or so. Prior to that, I would say we were not, you know, hands on. We would just do our normal, kind

Page 89

of traditional level of reviewing the financials, you know, meeting periodically with Prestige. I wouldn't be doing -- I don't think I've done in quite some time actually the bad debt analysis. I haven't done liabilities for Arthur Ransome.
COURT REPORTER: I'm sorry, what analysis?
A. I'm sorry, the accounts receivable analysis, the collectability analysis.
THE WITNESS: I'm sorry, I shouldn't be -- I have to take my accountant hat off and use words.
A. The collection analysis. I have not done the collection analysis for Arthur Ransome.
Q. Okay. So what's changed in the last six months, if anything, that has had -- have a more of a hands-on approach as to the Arthur Ransome L.P. properties?
A. Sure. So we are -- I'm trying to think of a way to not explain it where it gets too technical.
So I mentioned earlier that Arthur Ransome was a low income housing tax credit project, and that typically those have a -- they have an initial 15-year compliance period where the tax credits are delivered to the equity investigator. We are maybe three or four years past that 15- year compliance period. And so now we are looking at different options to

Page 90

re-syndicate the property.
So, for example, re-syndication would involve refinancing the debt to bring in additional capital to do repairs and renovations, to do upgrades of units. You are also looking to see to bring in a new equity partner. The existing limited partner has received their benefit, so there is no financial benefit for them to remain in the property at this point in time.
So we are now looking, do we bring in a new equity partner? And as part of that, we we've been -- you know, we look at financials looking to understand what the -- what the underwriting would look like. As part of a, you know, recapitalization, re-syndication strategy for that property. So we become more hands on.
Arthur Ransome also has a high number of HPD violations. We've been working with Prestige on different strategies to reduce the number of HPD violations.
Q. What do you mean by that? Go ahead.
A. No, no, it's okay.
Along with looking to understand, you know, different strategies on approving tenant collections. Tenant collections have declined for Arthur Ransome,

Page 91

so there is more conversation around. How to support tenants, to increase the -- or improve the collection experience on the tenant bills.
Q. And by hands on, you mean these are hands on with trustees.
A. Yes. Hands on with Prestige. So it can be biweekly meetings, reviewing reports specific to violations, talking with brokers with potential development partners, as we prepare to go to New York City Housing Preservation and Development to get into a recapitalization program.
Q. When you say for the Arthur Ransome L. P. properties they have a higher rate of HPD violations, did I understand you right?
A. We have a high number of HPD violations.
Q. And --
A. So one of the things --
Q. Go ahead.
A. -- we are doing is how to reduce that number of violations.
Q. What is -- when you say high number, about what are you thinking of?
A. So I have one -- we have one property in that 18 that has nine HPD violations. Arthur Ransome Houses L.P. currently has around 300 HPD violations.

Page 92

Typically you try to have no more than one violation per unit. So using that analysis, really no more than 116 violations, given you have 116 apartments. 300 violations is roughly three per unit, which is higher than, you know, the industry norm.
Q. And so when you say 300 violations, about how many units roughly would that cover?
A. I'm not sure, maybe it's in the range of -- it might be in the range of 15 to 30. That would be an approximate range.
I know we have some that have what we call a high concentration. So there are some units that may have 20 violation. But I would say somewhere between 15 and 30 units, within the hundred -- within the 300 violations.
Q. And that's a snapshot of about now, that's a snapshot of one period of time.
A. Yes.
Q. Okay. So going back, let's say, to the last -- let's say, the last 10 years --
A. Umm-hum.
Q. -- about how many units would you estimate Arthur Ransome L.P. had HPD violations for -- over that 10-year period, about how many units are we talking about?

Page 93

A. Over a 10-year period, I wouldn't know. You know, our -- our focus on the violations, maybe we initially started talking about violations maybe two, three years ago. And our focus has increased because of our desire to recap the loss. And one of the things that when we go to New York City Housing Preservation Development to recapitalize, they will look at the HPD violations, and they will have questions around our plan to reduce the violations to get closer to that, you know, one-to-one ratio, as opposed to a three-to-one ratio.
So as we look to explore recapitalization, we are prepared to go to HPD with a plan, one of the things we have to do to ready ourselves is to bring down the number of HPD violations.
Q. Okay. Throughout the deposition you have been saying we. I assume you mean Abyssinian.
A. I'm sorry, I mean Abyssinian Development Corporation.
Q. Don't be sorry. I assume that's what you meant.
A. Yes, that's correct.
Q. That's fine. You can keep saying we. You keep on saying we. I just want to make sure that's what you meant, Abyssinian, when you say we, right?

Page 94

A. Yes, that's correct.
Q. Okay.
A. Well, we and Prestige are working together on a strategy to the reduce the violations.
Q. Okay.
A. We can't do it without the management company, it is as a joint effort.
Q. Okay.
A. So I need to be clear and not use we.
Q. Well, when you mean jointly Abyssinian and Prestige, when -- when you've been saying Prestige and Abyssinian so far, have you generally meant jointly, or did you generally mean only Abyssinian, or vary?
A. I would say I generally meant Abyssinian. And I think this is really the first time in our conversation that we are talking about something that we've done jointly. So up until the -- previously it was Abyssinian Development Corporation, this is the first instance that I would be talking about Prestige and Abyssinian together.
Q. Okay. So are you saying in the last two or three years Abyssinian and Prestige jointly have been trying to work on reducing the number of HPD violations; is that accurate?
A. No, we -- we jointly started working maybe

Page 95

late fall of 2025. Prior to the fall of 2025, Prestige would give us an update on where they were with their plan. We saw that their plan was moving slower than we were anticipating, because the total number of HPD violations was not declining at a pace that we thought was reasonable.
And then as we are now preparing to re-syndicate, we are now increasing focus on getting the number of HPD violations down, so that our, you know, applications for HPD is approved.
Q. So prior to the fall of 2025, it was Prestige, not jointly, that was trying to get the number of HPD violations down; is that what you were saying?
A. Yes.
Q. Okay, thank you.
And because you said it was a very high -- how would you describe it again, as high -- in what way is it high?
A. High in -- based upon industry standards. So industry standard is no more than one violation per unit. We currently are at about three violations on average per unit.
Q. And for these that are Section 8 units, when you say HPD violations, that means that Section 8

Page 96

would suspend its payments for some period of time.
A. Depends. So I don't know -- so out of the 300 violations, I don't know if there are any HPD residents, or HPD voucher residents in that 300 violations. I'm only looking at total violations, the nature of the violation. I wouldn't be looking at -- I wouldn't be asking, or I don't have information on how many of those 300 violations are for HPD, or Section 8 voucher holders.
Q. Would you have any reason to think that Section 8 voucher holders would have violations that are a lower rate than other units, do you have any reason to think that?
A. No.
Q. So it is probably the same violation rate nor Section 8 tenants as other tenants.
A. That I wouldn't know.
Q. Okay.
A. I wouldn't be able to say yes or no.
Q. Okay. But you don't have any reason to think that it would be different.
A. Reason to think it would be different?
Q. Between Section 8 tenants and non Section 8 tenants.
A. You know, tenants are interesting. You

Page 97

know, facts and circumstances. You know, we have, generally speaking, some tenants just call HPD because that's just what they choose to do. You know, there are other tenants who will report their repairs to the management office and walk through the preferred process. So it's really difficult to say. I don't -- I wouldn't generalize and say that this ratio is comparable to Section 8 tenants.
Q. You don't know.
A. Yeah, I don't know. I mean, they are only 20 percent roughly, so I wouldn't know.
Q. Okay. You wouldn't know.
But you don't have any reason to think it would be different, do you, in any significant way?
A. Umm, no, I don't have a reason, no.
Q. You don't have a reason to think it would be different.
A. Hum. So my -- you know, my industry experience, or my work experience, would tell me that they are, you know, in a situation where you've got vouchers, or tenant-based vouchers, that you're getting -- you are getting notices from a couple of different sources in terms of the fact that a violation is out there.
If it's a rent stabilized unit, okay, I

Page 98

have to go on the HPD portal, and maybe I've got a third party website that allows me to aggregate my violations.
You know, but you get your notification -- if it's a Section 8 unit, you are getting notices beyond the typical -- you know go on the HPD portal to see what's open, you are getting notices from Section 8. You know your are getting -- you're going to get that initial letter that you didn't pass the HQS inspection. And then you are going to get a reminder as you get closer. I guess the reminder being, hey, you haven't satisfied the requirement and your subsidy is about to be terminated.
So your -- the volume of paper, the volume of notifications for a Section 8 tenant is going to be higher than a non Section 8 voucher tenant, which lends itself to increased -- I guess you have to be paying to those more, because you are going to be getting more notices.
Q. Okay.
A. In a typical setting.
Q. And all of those notices are going to Prestige for the --
A. Yes.
Q. -- for the properties that Prestige

Page 99

manages, all those notices are going to Prestige.
A. Yes.
Q. Okay. Now do you have the ability to generate a report to the number -- as to the number of units that had their Section 8 subsidy paused or -- or terminated for some period of time?
A. No, I don't have the ability to generate a report that would tell me that. Prestige would have to provide me with copies of the correspondence from Section 8 when a tenant's voucher was suspended and when it was restored. There is no way for me to pull a report for that.
Q. But is your understanding that Prestige would be able to generate such a report?
A. They wouldn't generate a report. They would go into the tenant file and pull the correspondence. You know, from Section 8 on the -- because they would get a letter from Section 8 with the HQS failures. They would get a letter on upcoming subsidy suspension. They would get a letter from Section 8 on restoration of the subsidy.
So there wouldn't be a report, per se., it would be go into the tenant file and accumulating the Section 8 correspondence.
Q. Okay. And you would -- you said the HPD

Page 100

portal, is that you what said?
A. So there is -- there is a public HPD portal. You can go into the -- go on the website, you go into the HPD portal, you put in the building address, and you can get a listing of open -- you can get a listing of complaints and you can get a listing of open HPD violations as of a point in time. The public website does not allow you to look backing in history. It's only as of a point in time.
So as of today, it will tell me how many open violations per building. It won't tell me how many open violations that building had two months ago or six months ago.
Q. In the ordinary course when there are open HPD violations, Section 8 would generally suspend payments for that period of time; is that accurate?
A. Well, Section 8 does allow you a period of time to cure before they suspend, depending upon the classification of the violation. So you are allowed a cure period.
If it's an HQS failure, your cure period -- maybe last year the cure period was about 30 to 45 days. Currently I know for Night Share, the cure period is 90 days. I don't know if HPD changed their period, so they may still be at 30 days.

Page 101

And then with HPD violations, they're categorized between Class A, Class B and Class C. Class C being the most serious. Depending upon the class of violation, you are given X number of days to -- to cure the violation.

So if it's a class A, which is the most -- or the least concerning, you typically have 60 to 90 to cure those violations. On a Class C violation, which is the most serious, you could have to clear those in 30 days, in five days, depending upon the nature of the violation.

So if it's a smoke alarm that was missing, you normally only have about three or four days to rectify a missing smoke detector. So you could end up with a suspension pretty quickly.

You know, if you have five days to cure, depending upon when in the month it gets issued, let's say you had a violation issued in June for a smoke detector, and you didn't clear it within that five-day window, your subsidy could be suspended as of July 1. So there are certain violations that are more, you know, time sensitive in how quickly they can trigger the suspension of the subsidy benefits.

Q. All right. Well, given the HPD violations in Arthur Ransome L.P. buildings are higher than

Page 102

industry standard, would you say it's -- that it's fair to think that the number of suspensions of Section 8 for those units would be higher than the industry standard, generally speaking.

A. Umm, you know, I -- I pause with being able to say a definitive yes or no, because only about 20 percent of the units are receiving a Section 8 voucher. So the -- you know, the exposure should be low, honestly, if only 20 percent of our tenants are getting Section 8 vouchers. I don't know which -- or I don't know how many units currently have open violations, so it is tough for me to give a yes or no response to the question.

Q. Okay. Who can get access -- you said there is some sort of HPD portal.

A. Umm-hum.

Q. Is there more than one -- is there a different portal for the public than there is for the property management company, or do you know?

A. No, the port -- well, yes, there are two portals, yes. There is a public portal, that anybody can access by putting in the building address, and then there is a password protected HPD portal that the property manager can access. And it is that HPD -- that HPD portal that's password -- user ID password

Page 103

specific for the property manager that will give you violations. That will also tell you that split between contract rents and tenant portion. When tenants go and recertify, they normally get a letter that tells them their Section 8 portion, I think it's called a rent breakdown letter. Those rent breakdown letters are only available in the private HPD portal that a property manager would access.

You also use that private HPD portal to get -- to get your letters on upcoming HQS inspections.

Q. Okay. So the private HPD portal, that's something that Prestige has access to.

A. Yes. There is a -- there is an owner portal for HPD. I don't have -- my owner portal is not set up for HPD, so I don't log in. I only go to the public site to get information on total violations, you know, to understand how many units concentration, as we look and try to get a strategy to reduce the number of violations.

Q. So is there an owner portal and a property management portal, or are they the same portal?

A. You know, I've never logged into the owner HPD portal. There may be some differences, but I'm not sure. I've never logged in, so I can't say.

Q. Okay. When you mean the owner portal, what

Page 104

do you mean by that exactly?

A. The owner portal being -- so as an owner I can get my own user ID and password and log into the HPD private portal.

Q. Okay.

A. In theory, I should be able to see the same information as Prestige when I log into the HPD portal.

Q. Okay. So -- so Prestige could get access to the -- this private portal for the properties that it manages; is that right?

A. Yeah, it's pretty customary for the property management agent to have access and log into the HPD portal. Because that's where -- that's the system that you are going to use to track and monitor your Section -- the Section 8 vouchers for the tenants in your building.

So to the extent there is an HQS inspection, if there is an HQS failure letter, if there are updated rent breakdown letters telling you how much the tenant is responsible for, how much is the subsidy portion, you would go into this -- Prestige Management, or any management agent, would go into this, you know, this HPD portal, private portal, to get that information. It wouldn't be available --

Page 105

and they mail to you, but, you know, as a routine property managers with Section 8 tenants would be going into the portal.

Q. So for the Ransome L.P. properties, does Abyssinian have the ability to go into the private portal?

A. We have the ability to go into the private portal, but we haven't registered to go in. We just haven't done the registration to go in. We haven't had a need to do so.

Q. But you have the ability to do so.

A. Yes, we have the ability to do so.

Q. And how difficult would that be?

A. Let's see, there is some validation check you have to do. I think you've got to use your -- now I'm going to get too technical.

So every month there is an H P -- so every month when you receive your subsidy payment, there is an HPD voucher that lists all the tenants and the subsidy amounts for those tenants, and it has information similar to a -- like there is a unique number on that voucher, almost the equivalent of a check number, on that voucher, and you have to use the check number and the dollar amount to, you know, credentialize yourself when you are creating a user ID

Page 106

password. And I've tried to set mines up before and it never work, so I just stopped --

Q. Fair enough.

A. -- so...

And if I need anything, I ask the property manager to send it to me.

Q. Okay. And -- but for the Arthur Ransome L.P. properties, that's Prestige who has access to those units; is that right?

A. For the HPD portal?

Q. Yeah, for the Arthur Ransome units.

A. For the -- for the Section 8 voucher units, yes.

Q. Okay.

A. It's only going to be for the Section 8 voucher units that you are going to go into the HPD portal.

Q. Okay. Would Section 8 be in another portal, other than the HPD portal?

A. So my understanding is that there are, you know, three types of vouchers. There's the vouchers that HPD issues, which people sometimes interchangeably call them all Section 8 vouchers. There is also NYCHA vouchers, so NYCHA has their own portal separate from HPD. There is a third type of

Page 107

voucher, it is a City voucher. I don't know if there is a private portal for City FHEPS. I know there is one for NYCHA and one for HPD, I don't know if there is one for City FHEPS. And FHEPS is spelled F-H-E-P-S.

Q. But generally for both the HPD portal and the NYCHA portal, Prestige should have access to those generally; is that right?

A. Yes.

Q. Okay. All right, so -- and you said that there is a separate portal for FHEPS?

A. I don't know if there is a separate portal for FHEPS.

Q. Okay.

A. I know there is a separate portal for NYCHA, because I have a user ID and password. So I know there is one for NYCHA. I know my HPD one, I haven't been able to get through the credential process. And City FHEPS I'm not familiar with whether or not there is a portal.

Q. Are there -- for the Section 8 tenants in the Ransome L.P. properties, is -- are the Section 8 tenants listed on HPD or NYCHA, or it could be either one?

A. I believe they have all three. I want to

Page 108

say Arthur Ransome Houses has City FHEPS vouchers, some HPD vouchers, and NYCHA vouchers. And Section 8 we kind of use interchangeably to talk about all three. But if you are granular, then they probably have some of each of the three types.

Q. Okay. But so far we've been using the term Section 8.

A. Section 8, umm-hum.

Q. So far in the deposition I've been using the term Section 8 program.

A. Umm-hum.

Q. I have not been meaning to use -- include FHEPS.

Has it been your understanding that you thought of it as HPD and NYCHA when I've used the term Section 8, has that been your understanding from this deposition?

A. Yes.

MR. KESHAVARZ: All right. Thank goodness, because I didn't want to go back.

A. No, no, no. No, and it's -- you know, I think Section 8 is general, you lump them all together.

Q. All right.

A. Because it's a subsidy at its most basic

level so...
Q. So is -- are project-based Section 8, is that only by NYCHA, or is it also by HPD?
A. Both.
Q. They're both.
A. Yes.
Q. Okay. So the -- also the Section 8 vouchers that move with the tenant, those could be both HPD and NYCHA.
A. Yes.
Q. And that's also true for the Arthur Ransome properties; is that right?
A. No. The Arthur Ransome -- so when you say true, you mean -- well, Arthur Ransome -- Arthur Ransome doesn't have any project-based vouchers. Arthur Ransome only has tenant-based vouchers.
Q. Okay. But tenant -- I'm just trying to get the lingo straight.
Tenant vouchers can be both HPD and NYCHA.
A. Correct.
Q. Okay. So Arthur Ransome properties, could those Section 8 vouchers be coming from either HPD or NYCHA, or only from HPD?
A. Either or.
Q. All right, got it.



Now have you ever seen the inside of an HPD portal?
A. The private portal?
Q. Yeah.
A. No.
Q. Okay. Do you know --
A. No.
Q. Okay.
A. Umm-umm.
Q. Even if you haven't seen it, do you know if you can run reports through the HPD portal?
A. I don't know.
Q. Okay. What's your understanding about what information is in the HPD portal?
A. Let's see. So HQS inspection notices. HQS suspension. Subsidies suspension notices. Subsidy termination notices. And rent breakdown letters.
Q. And those would -- go ahead.
A. I was just going to describe what a rent breakdown letter.
Q. What is a rent breakdown letter?
A. So the rent breakdown letter is generated once the tenant completes their annual recertification, and the rent breakdown letter would give you the total contract rent, tenant portion and



subsidy portion.
And also in the HPD private portal are leases. So if you are submitting a lease for an increase based on the rent stabilization guidelines, you submit those leases to HPD for approval through the HPD portal.
Q. And are those the general -- are those basically all the documents that are in HPD portal. Or are there different ones?
A. Well, that's my understanding of what's in there. I've never been in.
Q. Okay. So the property management company can both put in documents and take out documents, or only take out documents?
A. Typically, you are taking out documents, with the exception of submitting leases for an increase in the contract rent.
Q. So if there is an increase in the contract rent that is for someone on Section 8, the property management company is supposed to upload that to the HPD portal.
A. Yes, they would upload the signed lease, and HPD would approve or deny the increase of the contract rent.
Q. Okay. So if HPD denies the increase in the



contract rent, the amount of the HPD subsidy wouldn't change.
A. Correct.
Q. If -- in other words, for Section 8 tenants, does HPD have to approve an increase in the contract rent?
A. Yes, they do.
Q. Okay. All right. So if it's denied, if HPD denies it for Section 8 tenants, the -- neither the HPD share nor the tenant's share goes up.
A. No, that's incorrect.
Q. In what way is that incorrect?
A. So the -- if the contract rent increases, the subsidy is typically what will increase. If the tenant portion increases or decreases, that's the function of a change in the tenant's income.
So annually when tenants go to HPD to recertify, they provide information on their income. So it could be pay stubs, tax returns, 1099s. They also provide -- I think they also provide that information on bank statements, bank information.
So HPD looks at the income for the household and makes a determination on what their share of the contract rent should be. Typically it should be no more than 30 percent of the contract

Page 113

rent. So if a household's income has increased or decreased, you will then see a fluctuation in the tenant portion.
Q. Okay.
A. With, you know, corresponding increase or decrease of the subsidy.
Q. Okay. But if HPD denies the increase, the contract rent and the tenant's share approved by HPD doesn't change, then the tenant's share would stay the same; is that right?
A. Yes.
Q. Okay. Okay.
A. Yeah. The world of recertification and subsidy, it's complicated. It can -- it's a little nuanced. I guess that rent stabilization, controlling contract rent, and then you've got a separate, you know, income certification process with tenants, that's the tenant portion.
Q. Well, I'm just interested in kind of -- in the ordinary course. I don't really need go into the weeds, unless going into the weeds is very important.
A. No, that is the ordinary course. The ordinary course is that rent stabilization sets the guidelines, whether that is a one percent or two percent increase annually, depending on whether the

Page 114

tenant signs a one year or two-year lease. Leases are either -- so tenants opt to renew leases annually, or they opt to do a two-year lease. That then dictates the increase or the percentage increase in the contract rent that you can request from the HPD or from NYCHA.
Q. Okay. Are all of the properties that Arthur Ransome has an ownership interest in, what are those 18 properties? Did you say 18 properties?
A. Well, that would be at the Abyssinian Developement Corporation level, if you are referring to the 18. Arthur Ransome has just seven buildings.
Q. Okay, thank you.
So how many buildings does Abyssinian, would you say, own, or what phrase would you use?
A. Number of buildings?
Q. Yeah. Because I have -- I -- I see 21 properties under Abyssinian, and I don't know why I did that.
A. Well, 21 properties, 21 buildings roughly.
Q. Okay. Those are 21 buildings that Abyssinian owns; is that what you are saying?
A. Yes. So we own, either through or general partner interests, or we own as a sole member. So not all of the --

Page 115

So out of the 21 buildings, there is two different structures. There are some that are structured as limited partnerships, where we would be the general partner, and there are others that are structured as housing development fund corporations, or HDFCs would be the acronym, and those we are the sole member --
Q. Okay.
A. -- in those. So it may be 70, may be 80/20 split between limited partnerships and the HDFC structured entities.
Q. Okay. So let me just call those -- I will just say 21 properties to mean everything you just said.
A. Sure.
Q. For those 21 property, is Prestige the property management company for them?
A. No.
Q. About -- about how many units from these properties are Prestige -- is Prestige the property management company for?
A. So I think earlier I mentioned this, out of the 598 units roughly, how many are Prestige managed?
Q. Yeah.
A. So out of the 598 limited partnership

Page 116

entities that we discussed, they are the property management agent for -- for about 200 of the 598.
Q. Okay.
A. No, I'm sorry, 300 of the 598. Excuse me.
Q. All right. And I'm trying to think if I were to -- I'm trying to find out what buildings that Section -- that Prestige does the property management -- well, strike that.
If I were to try to find out the name that a nonpayment petition would be brought in for the properties that Prestige manages for Abyssinian, how would I do that?
A. So the nonpayment petition would be brought in the name of the limited partnership entity.
Q. All right. Let me just ask, what limited partner entities for Abyssinian does Prestige do the property management for?
A. So the first one is Arthur Ransome Houses L.P.
Q. Umm-hum.
A. The second one is Laura Thomas Houses L.P.
The third one is Abby's Towers Apartments L.P.
Q. Okay. We went through those before, I'm sorry.

Page 117

A. No, no, that's okay. We listed the entities, we didn't differentiate which ones were managed by Prestige.
MR. KESHAVARZ: Okay. Well then, I should have written that down a little more closely.
A. And just for -- just for clarity, I mentioned that there are some HPD or Housing Development Fund Corporation entities, there are two of those that Prestige manages which would be separate from the limited partnership entities. Those are a 28 unit maybe, yeah. Yeah, a 27 in addition to the 300, so 327.
Q. And what are the names of those entities that those two additional entities?
A. 36 West 131st Street Housing Developement Fund Corporation. The second one is 301 West 148th Street Housing Development Fund Corporation.
Q. Okay. So the L. P.s are Abby Towers L.P.
A. Abby Towers Apartments L.P.
Q. And the other one was Laura Thomas Houses.
A. Yes.
Q. And the other one, of course, is Arthur Ransome L. P.
Were there any other properties that Ransome owns that Prestige does the property

Page 118

management for?
A. You mean any other properties that Abyssinian Development Corporation owns that Prestige manages?
Q. Yes, yes.
A. Other than these five, no.
Q. You have Arthur Ransome, you have Laura Thomas -- Thompson?
A. Thomas.
Q. Thomas. You have Abby Towers, you have 36 West 131st Street, and you have 301 West 148th Street. Those -- those are the only five?
A. Yes.
Q. That -- the only five that Prestige manages that Abyssinian owns.
A. Yes.
Q. Okay. Got it, thank you.
All right. So if I wanted to find out how -- how many units and which units that Abyssinian owns that Prestige does the property management for, how would I find out how many of those units had Section 8 suspend payments for over -- over a period of time?
A. So I'm going to need to go into the weeds a little bit to answer the question.
Q. Please.

Page 119

A. And I will answer the question for those five on an entity-by-entity basis for the five that we said were managed by Prestige.
Q. Okay.
A. So for the first one -- so I shouldn't say the first one.
So for 36 West 131st Street Housing Development Fund Corporation, I don't believe there are any Section 8 voucher holders in that building. There may be some City FHEPS, maybe one or two.
Same case for 301 West 148th Street HDFC. I'm not -- there may be one City FHEPS voucher holder in the Section 8 tenants.
Abby Towers Apartments L.P., entity number three, that is what's called a Direct HUD Program. So Abby Towers Apartments L.P. has a project-based contract with U.S. Housing and Urban Development Corporation. So instead of the subsidy passing through HPD or NYCHA, the subsidy comes direct from HUD to the project. So there would be -- you know, there is no HPD vouchers for that Abby Towers Apartments. Everything -- all -- all units, a hundred units, are all HUD subsidy units, or are direct HUD subsidy units.
Q. And of those direct HUD subsidy -- HUD

Page 120

subsidy units, how many for Section 8?
A. Well, in the context -- throughout the call we have been talking about Section 8 in the context of, I guess, passthrough at the City level, whether it be through NYCHA or HPD. I think you -- I guess you could refer to HUD direct as a Section 8. But that would be -- I guess that would fit the definition of Section 8 that you have been using throughout the call.
Q. Okay. Because if the HUD direct programs suspends payments for a -- for an HQS violation, the tenant wouldn't be responsible for the HUD share, right?
A. So let me think through your question as it pertains to direct HUD properties.
So for a direct HUD property, the property manager has the responsibility of completing the annual building certification. So if it's NYCHA or HPD, the tenant has to go to NYCHA or HPD to have the tenant portion set. If it's a direct HUD project, the property manager has that responsibility.
Q. So go to HPD or NYCHA.
A. No, tenants -- so, in a HUD building, tenants do not go to NYCHA or HPD for their annual recertification. They do not go to HPD or NYCHA to

Page 121

have their tenant portion set. That's all done by -- that's all done through the property management agent.
There is a different oversight agency, CGI, is the HUD oversight agency for properties that are direct HUD recipients. So it's a different process than HPD and NYCHA.
Q. Okay. But the way we've been thinking about Section 8 program throughout the deposition, are you saying those hundred units at the Abby Towers property would be Section 8 units the way we've been kind of talking about the program so far?
A. No, because there is no HQS failure for a HUD property. There is a different -- there is a different inspection process for HUD-direct recipients. There is an HQS concept, but it doesn't work the same as the HQS failure process we have been discussion with HPD and NYCHA so far.
Q. It's -- it's something about repairs or maintenance that are in issue that would lead to -- well, let me just ask you.
Under the circumstances, would HUD suspend its payments in the ordinary course for these direct HUD subsidies, what is the main reason or reasons that it would do that?
A. So for a HUD direct program, there are two

Page 122

ways in which the subsidy can be suspended.
The first way that the subsidy can be suspended is if the building fails HUD's inspection. But that would be a building-wide suspension of the subsidy, not a unit-by-unit suspension of the subsidy.
So HUD has their own annual inspection process. It was typ -- it was historically known as REAC, R-E-A-C, is the abbreviation. About two years ago it changed -- the acronym changed to NSPIRE, so the letter N-S-P-I-R-E. And so that's HUD's inspection process. When they come out, inspect 20 percent of the units and give a grade on a scale of zero to 100.
If you fail the inspection, I think if your score is less than a 65, you have a cure period. If you don't satisfy the failures within the cure period, then your subsidy for the entire building could be suspended, because it is a project-based subsidy, as opposed to a tenant based.
Q. Has that ever happened for Abby Towers?
A. No. We had a -- we've had a failure of the building-wide inspection maybe seven years ago. But we were able to cure prior to any subsidy suspension.
Q. Okay.
A. Second instance on when a tenant's subsidy

Page 123

can be suspended, is when the tenant fails to complete their annual recertification. So the property -- because it's a HUD direct property, the property manager has the responsibility of completing the annual building recertification, and also setting the tenant portion of the contract rent. If the tenant fails to provide the documentation to the property manager for the annual building recertification, if it's not cured within 90 days, then the property manager self reports to HUD that the tenant was noncompliant, and that the subsidy -- they no longer will be requesting the subsidy each month.
So there is a process known as vouchering the subsidy, where you submit your request, where you do 100 units to HUD monthly. It is reviewed by CGI, they pay you.
But if a tenant didn't complete their certification, Prestige has the responsibility to report that that tenant was noncompliant, and to not request that subsidy, which would in effect be a subsidy suspension.
Q. Has that ever happened for the Abby -- Abby Towers building, or property?
A. Yes, it's -- it's happened to the Abby Towers building.

Page 124

Q. How common is that?
MR. KESHAVARZ: You are on mute.
THE WITNESS: I'm sorry, I just had to tell them to turn the TV down, it was getting too loud. I'm sorry about that.
Your question was again, I'm sorry.
Q. How common is it that the subsidy gets suspended for the Abby Towers properties because of this issue of certification by Prestige?
A. Annually there may be between, one and two. So no more than two a year, from my recollection, of tenants whose subsidies will be suspended because they did not recertify. So about two on average.
Q. Do you know if there are ever instances where the tenant says, I have given you the information, but Prestige says I haven't -- you haven't. Do you know, one way or the other, if that's ever happened --
A. No.
Q. That resulted in a suspension?
A. No.
Q. No, you don't know one way or the other, or you know and the answer is it has never happened?
A. I'm not aware that it's ever happened, no.
Q. Would you -- in the ordinary course, would

Page 125

you be aware of happening?
A. Yes.
Q. Okay. Now Laura Thomas Houses --
A. Umm-hum.
Q. -- we were talking about the number of tenants that were Section 8 recipients over time.
A. Umm-hum.
Q. About how many?
A. About how many tenants that Laura Thomas receive Section 8?
Q. Yeah.
A. It -- it's about 20 percent. It's similar to the Arthur Ransome House, about 20 percent.
Q. Okay. All right, one thing -- so over a period of time some people have Section 8, they don't have Section 8, they have Section 8 again, that happens, right?
Or no it doesn't happen, I don't know, I'm asking.
A. No, typically, no, once you have your Section 8 voucher, you typically always have your Section 8 voucher. Unless you fail to recertify, you don't cure, and then you lose it, but then you could also go through a -- what's that, a restoration or appeal to get it reinstated.

Page 126

Within the past year or so we have seen instances where tenants, where their subsidy at one of our other properties, not at Arthur Ransome or Laura B. Thomas, we've seen a couple of instances at one of other properties where Section 8 has terminated the voucher because the family was over income for a period of time.
Q. All right. But for -- in the ordinary course, if a tenant has Section 8, they will continue to have Section 8 for the length of time that they are tenants in Abyssinian buildings; is that accurate?
A. Yes.
Q. So if a tenant ledger showed Section 8 payments, and then showed a gap in Section 8 payments, or -- would that -- what would that suggest to you, if anything?
A. A gap in payment -- a gap of the Section 8 payment would suggest a suspension for a period of time -- for that period of time.
Q. And that -- about 90 percent of the time that's because of an HQS failure.
A. Yes.
Q. And so if were you to look at a ledger for Abyssinian properties and it showed Section 8, and then it showed Section 8 subsidy stopping, would you

Page 127

infer in the ordinary course that the subsidy stopped because of an HQS violation?
A. How would it show on the ledger?
Would it show -- hum. So it could show on the ledger one of two ways when there is a suspension. And that would be -- it will vary depending upon the process or the style of the property manager and the system that they use.
So in some cases if the subsidy is suspended, the ledger will continue to reflect the billing of the -- of the subsidy portion, and then at some point if there was a suspension, you would see a write off of the suspended subsidy.
Other instances, if the -- if the subsidy is suspended, they will stop billing. And then you, know you, will see that gap in the ledger that you mentioned previously.
So I've seen it both ways. We have three property managers that handle our portfolio, so it -- it varies a little bit. But typically a gap is indicative of a suspension for HQS.
Q. So the tenant -- so -- so in that instance, where there is a gap --
A. Umm-hum.
Q. -- then the tenant would not be responsible

Page 128

for the Section 8 share during that period of time that there is a gap, would that be accurate?
A. For an HQS violation, yes.
Q. Okay. And -- so if -- but if you saw a ledger, and the whole ledger said Section 8, and then lists Section 8, you would still infer from that that it was an HQS violation that led to a suspension of payments from Section 8; is that correct?
A. Say that again. Can you repeat the question.
Q. Sure.
So regardless, if Section 8 shows up as -- on a particular ledger as, you know, Section 8, gap, Section 8, in an instance where it's Section 8 and the ledger just shows no more payments by Section 8, would you still infer in the ordinary course that that is because of a failure to cure a HQS violation?
A. Yes.
Q. Okay. All right. So what type of billing does Prestige do?
You said there are two types of billing. And, frankly, I'm not sure I wrote down which one is which.
But which one of the two does Prestige do?
A. Which one does Prestige do?

Page 129

Hum. I believe -- so I believe Prestige continues to bill, and then they will later record a write off of any unpaid subsidies.
So, to your example, you would see the billing every month, and then you would see, you know, that there weren't any payments. And later on you may see a write off of the unpaid subsidy. Because of the suspension, there is typically no retro payment, unless there was an error on the side of the agent, so you would just see a write off of the -- the subsidy the assumption would be it was an HQS violation.
Q. And -- so that's the second way of billing. You said first and second. So Prestige uses --
A. Yeah, they use the second. I -- we had -- I have seen the other one done, where you just stop billing, but that's not -- I've only seen that -- it's been a long time since I've seen it that way. Typically it's you continue to bill and then you write it off. That's the preferred way to do it so that your income statement reflects the proper gross rent.
Q. So in the ordinary course, that's how Prestige does the billing, first, second.
A. Yes.
Q. And what would you call that method of billing if I were to use that?

Page 130

A. That method of billing, hum, there is a contempt called gross potential rent. So your gross potential rent is you bill the contract rent. So you bill the tenant portion, you bill the subsidy portion, and that's my maximum rent that I can collect on my -- on my -- you know, contract rent.
And then to the extent there is a subsidy suspension, you know, that would come through as a -- if I'm looking at an income statement, that would come through on a -- on a -- what do you call that? The bad debt expense. It would be a write off of the subsidy.
Q. Well, I'm just trying to get something simpler. Would that be called a stop billing method? Would that be a good abbreviation for this manner of billing?
I'm just trying to think of a phrase to use. What would be a phrase that would be accurate?
A. Well, stop billing method would imply that you stop billing the subsidy. In this situation they continue to bill -- they continue to bill the subsidy.
Q. Okay. So if I were to call this method of billing -- so in the deposition, I want to call this method of billing, without going through a long explanation, what -- what would you call it, what

Page 131

would be a roughly accurate way to call it?
A. You're -- you're billing the gross potential rent. I can't think of anything else. I'm sorry.
It's a gross potential rent concept, so it is an affordable housing concept.
I'm trying to think of a layperson.
I mean, I'm going to continue to bill the full contract rent. I'm still billing the total rent that -- the total rent is billed.
Q. Okay. So I will call this will process the billing gross potential.
A. Yes, that's fine.
Q. All right. Now, so Prestige uses the billing gross potential method.
A. Yes.
Q. And it use that is method when it generates ledgers, right?
A. Yes.
Q. Okay. Now what -- at some point there may be a write off under the billing gross potential method. In what circumstance would that happen, and when in the ledge would that be shown?
A. So circumstances when that happen -- two circumstances.

Page 132

So circumstance number one is when the tenant vacates or surrenders the unit, and they don't -- they leave an unpaid balance. Whether it is an unpaid tenant balance or an unpaid subsidy balance, you would then see a write off in connection with the date that the tenant vacated the apartment or move out.
Second instance where you would see a write off would be, subsidy was suspended. The subsidy -- subsidy was suspended for, you know, a two to three month, six month, what have you period of time. Subsidy was reinstated. So now you have to write off the subsidy that the agency will not pay, you know, for the suspension, for the time you know that the subsidy was under suspension.
Q. So if I were to generate a ledger using the billing gross potential method --
A. Umm-hum.
Q. -- and Section 8 had stopped paying because of a HQS violation --
A. Umm-hum.
Q. -- at what point in the ledger, if any, would Prestige reflect that?
A. So it would depend on how long the subsidy was suspended. So if a subsidy could be suspended for

Page 133

two months, a subsidy could be suspended for six months. So it would be a function of when the suspended subsidy was reinstated.
So you could have a situation where your subsidy is suspended for HQS. Depending on how long it took the property management agent to make the repairs and to submit the, you know, cure paperwork to HPD, they need to approve. Once HPD reinstates the subsidy, then you know how much of that subsidy needs to be written off. Because in that subsidy statement they tell you if you received any retro payment.
Q. Well, do you know if in the ordinary course, Prestige using the billing gross potential, if a -- if a Section 8 is never reinstated, then there is, in the ordinary course it wouldn't be a write off on the ledger -- on the ledger; is that right?
A. No. So if -- if Section 8 seldom, if ever, does a retro payment of the subsidy once it is reinstated, there will always be a write off.
Q. Say that again, please.
The way you said it is fine.
A. No, no, no. So if Section 8 -- if Section 8 does not typically give a ret -- if they don't typically do a retro reinstatement of the subsidy, there will always be a write off of the

Page 134

unpaid subsidy.
Q. Okay. But at what point -- is there any particular point in time where in the ordinary course Prestige would reflect that write off in its ledger?
A. Well -- well, the earliest you can reflect the write off would be when the subsidy was reinstated, because the length of time that the subsidy could be suspended will vary. And the length of time it takes you to move through the reinstatement process could vary.
There is no, you know, standard 60 day, 120 days, there is no standard per se., in how long it takes to you get the subsidy back in good standing. Getting it reinstated, that will vary, you know, depending on the nature of the failure, the nature of the repairs that need to be made, how quickly the property manager makes those repairs. I've seen, you know, subsidies get reinstated very quickly, within 30 days. And I've seen subsidies be suspended for six or seven months.
So you are not able to do the write off until it is reinstated, because once it is reinstated, the agency, HPD is telling you, this is how much of the suspended subsidy we are willing to pay. Sometimes it's, no, they're not going to reinstate any

Page 135

of it, they are only going to start paying prospectively.
Q. Okay. Now let me -- this next set of questions, I want to ask you in what way ledgers should reflect suspended payments in a way to be accurate.
So --
A. Umm-hum, okay.
Q. -- if -- and I am using this billing gross potential approach that Prestige uses.
I'm going to -- this next set of questions are about how that ledger should look for it to be accurate, okay?
A. Okay.
Q. All right. So let's say the ledger has a balance owed by the tenant, and it shows, you know, HPD, Section 8 for some period of time, then it credits the Section 8 payment, and the balance -- the balance for that month reflects that payment, okay, will you assume that for a second?
A. Yes.
Q. Okay. Now if Section 8 suspended the payment for an HQS violation, the ledger, the billing gross potential, the ledger will still show -- it won't reflect any payment by Section 8, there will be

Page 136

no indication of Section 8 at all; is that correct?
A. Yes.
Q. Or would that be accurate?
A. Yes, that's accurate.
Q. And that's how it shows up on these ledgers, right?
A. Yes.
Q. But the balance owed on the end, the total balance owed, that includes the amount that Section 8 would normally pay, but didn't because of the HQS violation; is that right?
A. Yes.
Q. Isn't that the way -- hum?
A. Yes, that's the way it would show in the ledger.
Q. Okay. So if I were to look at the whole ledger for the time period that Section 8 suspended its payments for an HQS violation, if I were to look at the whole ledger, it will say at the end a number that is owed, correct?
A. Yes.
Q. Okay. And that number would include an amount that includes the suspended Section 8 share, correct?
A. Yes.

Q. And it wouldn't break out how much of that total is the Section 8 share that's suspended; is that right?
A. It wouldn't break out how much of the...
MR. MARSHALL: I'm going to object to the form of that question.
A. It wouldn't break out of the -- hum.
Well, it wouldn't -- well, the balance -- in that example, the balance would equal the unpaid subsidy, unless there was another reason why the subsidy wasn't being paid. So I don't -- I don't know that that would work.
Q. All right. So -- go ahead.
A. No, I'm done.
Q. Okay. Well, let me give it to you in a specific example, maybe that will help out.
A. Okay.
MR. KESHAVARZ: So I am going to -- let me see if I can share the screen.
You may see my son with my -- with his grandmother in a second, because that's my desktop, which wouldn't be a terrible thing, but -- but let me see if I can share my screen with you.
(WHEREUPON, MR. KESHAVARZ DISPLAYS HIS SCREEN)



MR. KESHAVARZ: What are you seeing? Are you seeing my son and my mom?
THE WITNESS: Yes.
MR. KESHAVARZ: Okay. You know, if you could --
MR. MARSHALL: Allegedly.
MR. KESHAVARZ: Allegedly. If you could believe that son of mine has grown three inches since then. He's an inch and a half taller than his dad in less than a year.
Anyway, I digress.
So I'm going to mark -- this as Exhibit A.
And we will give this to the court reporter at the end of the deposition.
But let me identify it.
(WHEREUPON, DEFENDANT'S EXHIBIT "A", A PHOTOGRAPH, IS MARKED)
(WHEREUPON, MR. KESHAVARZ DISPLAYS DEFENDANT'S EXHIBIT "A")
MR. KESHAVARZ: This is what is, would be Exhibit Q on the original complaint in this Federal action.
And it's noted at the top as NYSCEF Document 1, and it's a Document of 23 page.
(WHEREUPON, MR. KESHAVARZ WILL BE SCROLLING



THROUGH DEFENDANT'S EXHIBIT "A" WHILE IT IS DISPLAYED)
MR. KESHAVARZ: And I will represent to you that this is a nonpayment petition as to my client Leonarda Garcia.
Let me go to this ledger on -- on the 18th page of the document.
This is a case where HPD -- Prestige was the property management company.
I'm showing you the 18th page.
Q. Is this --
MR. KESHAVARZ: And I will scroll down here, 18th, 19th, 20th page.
Q. Is this a -- a rent ledger that is the billing gross potential that Prestige would generate?
MR. KESHAVARZ: I can scroll down.
A. No, it's okay.
No this doesn't -- this doesn't appear to be using the gross potential method.
Q. Okay. What would you describe this method as being?
A. This is the -- I don't know that we ever defined the other method, because it's not typical.
This, I think, is the -- this is -- this is the initial -- can you go back to the prior page.
MR. MARSHALL: Stop moving the document.



MR. KESHAVARZ: I'm trying to be helpful.
MR. MARSHALL: You are scrolling.
THE WITNESS: Yeah, can you go to the next page, for a second, the second page.
A. Okay. If it -- it looks like -- you were mentioning earlier a gap method.
You can go back to the first page.
So you were mentioning earlier that one of the ways is -- we were talking -- I guess the opposite of the gross method is when you just -- is when you stop billing the subsidy because of the suspension. And that that's not necessarily the preferred method, but it's a method, right.
And so this ledger is showing that for the month of July there was a tenant portion of $966.76. There was an adjustment to the subsidy for 568, and then they wrote off the subsidy of a minus 568, so... And then they applied the tenant portion of the ACH, so there was a net balance owed for the tenant portion of $169 for the month of July.
And then for August --
Q. Let me pause you for a second.
What's the A -- the ACH?
A. The ACH is -- is probably the tenant portion.

Page 141

Q. Okay. Just so the record --
A. They get paid through the -- it will show up as an ACH. Sometimes when the tenant goes in and pays through the online portal, there is a payment portal, and the ACH is -- usually that's the acronym for the notation that's used when someone pays through -- when the tenant pays through the portal. If the tenant had a check, usually the check number would appear here has opposed to the ACH.
Q. Okay. So just so the record is clear, we are looking at the entries for July of 2022 on the top of Page 18; is that correct?
A. On the top of Page 18 -- 1723.
Q. Let me rephrase the question.
A. A-ha.
MR. KESHAVARZ: So let me just -- let me see if I can just extract this page.
(WHEREUPON, MR. KESHAVARZ REMOVES DEFENDANT'S EXHIBIT "A")
(WHEREUPON, MR. KESHAVARZ DISPLAYS DEFENDANT'S EXHIBIT "B")
MR. KESHAVARZ: All right, we are going to mark this -- maybe this will be easier if I say Exhibit B. And this we will call the ledger printed on September 10, 2024.

Page 142

(WHEREUPON, DEFENDANT'S EXHIBIT "B", A LEDGER PRINTOUT, IS MARKED)
(WHEREUPON, MR. KESHAVARZ WILL BE SCROLLING THROUGH DEFENDANT'S EXHIBIT "B" WHILE IT IS DISPLAYED)
MR. KESHAVARZ: It's three pages.
THE WITNESS: Umm-hum.
MR. KESHAVARZ: And I will represent to you that this is a ledger that was attached to a lawsuit by Arthur Ransome L.P. against my client on November 1, 2024. I will just make that representation to you.
Now, I figured it might be easier to see one page -- well, three pages, rather than 28 pages.
Now, let me go to the first page.
Q. On the top it shows the payments for July 2022. That's what we were just talking about when you were talking about the ACH payment and the Section 8 payment, correct?
A. I would assume that that's a tenant payment.
Q. Okay. And why would assume that?
A. Because it's -- the subsidy billed for the month is -- the subsidy information on July '22, the billing of $568.08, and then there is a write off, I guess, on July 1st of the Section 8 of $568, so it's a little confusing of why it was set up that way, but it

Page 143

would --
And then if the subsidy is 568, HPD or Section 8 is not going to do a patient payment unless there is a change in the subsidy for whatever reason.
So the 398.62, I would assume that was a partial payment by the tenant.
The ledger's a little confusing, because then they start to just bill the 968 per month.
(WHEREUPON, MR. KESHAVARZ REMOVES DEFENDANT'S EXHIBIT "B")
THE WITNESS: Oh, it changed to your family on the share screen.
MR. KESHAVARZ: Oh, sorry.
THE WITNESS: No problem.
(WHEREUPON, MR. KESHAVARZ DISPLAYS DEFENDANT'S EXHIBIT "B")
MR. KESHAVARZ: I'm sorry, go on.
A. Yeah, it gets -- so -- so my initial assumption was that the tenant portion was 966.70, because it says rent, and then Section 8 is the 568.08. They didn't credit it out, or write off, so that the balance net of the payment on July 29th would be the tenant portion of -- the balance on the tenant portion of -- no, that's not right.
Q. What's not right?

Page 144

A. What I'm -- how I was thinking about this isn't right, because -- okay, because there is a credit balance coming forward. Okay, that's where I got confused.
So there is a -- in the running balance, there is a credit of $398.62. I wasn't following why there was only a balance at the end of July of $169.46, but I was missing the fact that the opening balance is a credit as opposed to a positive balance or a zero balance.
Q. I see.
A. So at the beginning of July this ledger shows a credit balance of $398.62. They have got the tenant portion, which is the rent of 966.70. And then there is some adjustments for Section 8 of 568.08, they write it off as opposed to -- I guess they billed it and they wrote it off the same month.
Q. And we are talking about July --
A. July --
Q. -- of 2022.
A. -- of 2022, umm-hum.
Then there is a tenant -- there is a partial payment by the tenant of $398.62.
I'm assuming CPACH is the tenant payment coming in through the portal.

Page 145

Q. And why would you say that?
A. Because you normally don't use an ACH notation on the ledger to note the HPD or the payment.
Q. Okay.
A. Then it looks like they billed the tenant portion of 966.70 every month, and they stopped billing the subsidy portion. So this isn't using the billing gross potential.
Q. Okay. How would you describe the accounting method in the ledger that's Exhibit B, what term would you use?
A. I guess it's billing net potential as opposed to billing gross potential.
Q. Okay.
A. The billing --
Q. And what the difference?
A. The billing gross potential, I'm going to bill the full contract rent. So the subsidy portion and the tenant portion. If I'm billing net potential, I'm only billing the tenant portion.
Q. So the billing gross rent is -- only fills the tenant portion, not the full contract rent; is that what you are saying?
A. No, the billing gross would bill the tenant and the subsidy portion. If I -- If I do -- if I'm

Page 146

billing net potential, I'm only billing the tenant portion.
Q. Okay. So --
A. That -- this appears to be billing just the tenant portion, starting in August of 2022.
Q. So would you say, looking at the full document, that is Exhibit B, that would you call this a billing net potential method?
A. Can you -- can you go to Page 2 and Page 3 before I answer.
Q. Yes, yes, ma'am.
A. So it looks like they -- can you scroll up to the top of this -- this is Page 2.
Q. This is --
A. So that --
Q. -- Page -- would it be helpful if I put this document in the chat, and you could actually control it, would that be helpful to you?
A. No.
Q. This is fine.
A. No. This is fine. If you could just go to Page 2.
Q. Yes.
A. So then in -- and then can you scroll to the bottom, past March 2024.

Page 147

Okay. So it look like then in April of 2024 they make adjustments to the subsidy to write off subsidy. But I don't see a subsidy bill, which would cause me to question the rent of 993.28. Is that the contract rent, or just the tenant portion?
Because it's -- it's a different billing pattern than what I'm seeing on Page 1. So I'm not clear now, because if I just look at -- if I look at Page 2, it would -- and you are writing off -- if you look at May 2024 --
Q. Yes.
A. -- the rent is billed at $993.28, which I assumed was the tenant portion. But then there is a subsidy credit, which is a write off, of $568, which would imply that the 993 is not solely tenant, that it's tenant and subsidy, because you wouldn't be applying a subsidy credit to the tenant rent, you would only be applying that to subsidy that you billed. And I don't seem a subsidy billed on this ledger for May.
Q. So that's how would you interpret --
(WHEREUPON, MR. KESHAVARZ REMOVES DEFENDANT'S EXHIBIT "B")
(WHEREUPON, MR. KESHAVARZ DISPLAYS DEFENDANT'S EXHIBIT "B")

Page 148

A. Oh, can you -- it switched.
Q. Oops.
A. That's okay. There you go.
Q. That's how -- that's how you would interpret Exhibit B.
A. Yes, but I'm not done, because I didn't go to Page 3 yet.
Q. I apologize.
A. No, that's okay. No, go back up.
So when did they start?
So it looks like starting in May or April of 2024, they then have -- the ledger has a monthly write off of the Section 8 portion, but it wasn't billed.
Q. So what does that mean to you?
A. That means that there is a subsidy charge missing from this ledger, because what's happening is the tenant portion of 993 is being reduced by a subsidy credit, and you wouldn't apply a subsidy write off to the tenant portion, you would only apply that to the subsidy bill. So that would mean that there is a subsidy bill -- a subsidy portion missing from the ledger for X number of months, and that it's understating the amount owed by the tenant.
Q. The running balance -- the running balance

Page 149

is understating the amount owed by the tenant, is that what you are saying, or are you saying something else?
A. No, it -- yes, that's what I'm saying. The running balance is understated, because of -- due to the error in the other write off as being applied on this ledger.
MR. KESHAVARZ: All right. Let me --
A. Now, I guess that's one explanation, is that -- so one explanation is that the Section 8 charge is missing, and that they were attempting to follow the billing gross potential method, but there is an error in this ledger. So the error would be the Section 8 charge is missing, looks like from April 2024 to September 2024. So there is a credit of $512 to write off the subsidy charge, but there is no subsidy charge for those months.
So that would be, I guess, the first assumption of what's wrong with the ledger, or what I see is to be questionable on this ledger.
Second possibility is that the rent of 993.28 is not the tenant portion, that it's the contract rent, and that -- and that the 993 includes the tenant portion and the subsidy portion. And so that the rent label is incorrect.
Q. You mean, the running balance would be

Page 150

incorrect.
A. Well, the -- you see where it says rent, that notation there on May 1 or June 1, it says rent.
Q. Yes.
A. So -- so normally that rent notation, when it says rent, that usually denotes the tenant portion. So you would say, rent, and you would say Section 8, to show the Section 8 charge. So right now this rent is showing as 993. I assume that it was the tenant portion only, and that it was not the contract rent.
Q. Why?
A. Because -- hum?
Q. Why do you assume that?
A. Because usually when it says rent, that's usually the -- usually the notation for the tenant portion only.
Q. Okay.
A. So that could be the contract rent, it could be the tenant portion and the subsidy portion. Someone would need to clarify what the 993 is. You would need to go to the written breakdown letter from HPD to get -- to understand what the 993 rent was. You would have to confirm it to understand what correction was needed to the ledger.
MR. KESHAVARZ: Okay. Let me see if this

Page 151

is it.
(WHEREUPON, MR. KESHAVARZ REMOVES DEFENDANT'S EXHIBIT "B")
(WHEREUPON, MR. KESHAVARZ DISPLAYS DEFENDANT'S EXHIBIT "C")
MR. KESHAVARZ: I will mark as Exhibit C, a document with the header, Rent Breakdown Letter, dated Thursday, October 30, 2025, addressed to Leonarda Garcia Ramirez.
(WHEREUPON, DEFENDANT'S EXHIBIT "C, A RENT BREAKDOWN LETTER, IS MARKED)
Q. Did I --
THE WITNESS: Okay.
Q. Did I read that correctly?
A. Yes.
Q. So how would -- this is a one-page document. How would you identify what this document is, and what it means?
A. So a written breakdown letter is the standard letter that's issued annually by HPD or NYCHA that tells you the total contract rent, the tenant share and the HPD subsidy share.
And so this is showing that there is a contract rate of 902. Tenant share was $478 a month, and the HPD subsidy is $428.08.

Page 152

Q. So as of the date of this rent breakdown from NYCHA of October 30, 2025, my client shouldn't be -- Ms. Garcia shouldn't be paying more than 478 a month.
A. Correct, yes.
MR. KESHAVARZ: Now let's compare this back to Exhibit B, the ledger.
(WHEREUPON, MR. KESHAVARZ REMOVES DEFENDANT'S EXHIBIT "C)
(WHEREUPON, MR. KESHAVARZ DISPLAYS DEFENDANT'S EXHIBIT "B")
Q. Now the ledger payments are for September 2023 through September 2024; is that correct?
A. Can you just go back to Page 1.
(WHEREUPON, MR. KESHAVARZ WILL BE SCROLLING THROUGH DEFENDANT'S EXHIBIT "B" WHILE IT IS DISPLAYED)
A. October. July -- actually July, 2022.
Q. Okay. So the ledger that's Exhibit B, or payment is a ledger from July 1, 2022 through September 1, 2024, correct?
A. Yes.
Q. Okay. Now the HPD letter that was Exhibit C that we went over, that's dated October, 2025, right?
A. Yes.

Page 153

Q. Okay. So assuming that -- given that --
A. Umm-hum.
Q. -- would it be reasonable for you to conclude that where the ledger says rent, for example, in July 1, 2022 of 968.70, that that would be the total contract rent?
A. Yes.
Q. Okay. Now, so --
A. So this is the billing gross potential, just the notations are not great.
Q. This is a really gross potential.
Now in what way -- what's not great, did you say?
A. The fact that it says rent of 966.70, as opposed to saying, you know, rent being the tenant portion and then another line for the Section 8 charge.
Q. Okay. Let me go back.
A. Umm-hum.
Q. Just so the testimony is clear.
A. Umm-hum.
Q. It might be crystal clear in the transcript, but I'm trying to understand the counted words, so I apologize.
A. Umm-hum.

Page 154

Q. So given what you've just seen, are you saying that Exhibit C is the billing gross potential method, or the -- or is it the billing net potential method?
A. Exhibit C is the billing gross potential method.
Q. Okay. All right, so -- all right, given what the -- we've concluded that where it says rent, that's the contract rent, right?
A. Yes.
Q. And where it says Section 8, that is the Section 8 share of the rent, correct?
A. Yes.
(WHEREUPON, MR. KESHAVARZ WILL BE POINTING AT LOCATIONS ON DEFENDANT'S EXHIBIT "B" WHILE IT IS DISPLAYED)
Q. And my -- the tenant's share would only be the difference between that, it would be roughly around $400, roughly, is the tenant's share, correct?
A. Yes.
Q. Okay. All right. So -- and -- and so the record's clear, I'm looking at the entries of July 12th of 2022. I don't know -- why is -- this is interesting.
The entry underneath July 1, 2022, the

Page 155

second entry of it, it seems to be dated May 1, 2022; is that the way you read it?
A. I see July 1st. I don't -- maybe you have to scroll to the other -- does the May 1st show --
Q. Look where my mouse is.
A. Umm-hum. I can't see the mouse. Is it --
Q. It seems like a hand.
A. Yeah, it is moving, I see it now, umm-hum.
Q. Okay. Now the second line --
A. So you -- you have to scroll more to the left for me to be able to see that date. I only see the transaction dates, I don't see that beginning period column. I can't see that beginning period column in its entirety. The column that's to the right of the batch number, I think that's where your cursor is.
Q. Where it says type.
A. Umm-hum.
Q. What I'm trying to get, the billing period on the left -- are you saying there should be a whole additional column, or are you saying the column that's billing period is slightly cut off?
A. It's slightly cut off.
MR. KESHAVARZ: Okay, fair enough. This is the only copy I have.

Page 156

A. Oh, okay, I see. Okay, because you mentioned a May date, I didn't see the May date on the chart.
Q. Well, I'm just trying to read this.
You have two entries for July 1, 2022, right?
A. Yes.
Q. And then there is a third entry with a type adjustment; is that right?
A. Yes.
Q. And on the right the transaction date is July 22, 2022, correct?
A. Yes.
Q. But the opening balance date where it says May 1, 2022, what does that mean to you?
A. I don't see May 1, 2022.
Q. Where my mouse is, the third date.
A. I actually just see the '22, I don't see what's in front of the '22.
Q. Okay. All right. So it's --
A. Yeah, I don't know if you can --
MR. KESHAVARZ: Zoom in, let me see.
THE WITNESS: Umm-umm.
Q. Does that help you?
A. No, I just see July dates, I don't see a

May date.
Q. Do you see the third entry is July 1st, July 1st, and what do you see as the third entry?
A. July '22.
Q. Oh, you are looking in the transaction date.
A. Yes, you were mentioning a May date, I don't see a May date, unless it's in that column to the left that's cut off. Maybe it's not showing on the screen. Maybe you have to minimize it on the screen for me to be able to see that very first column. Or did you say it's cut off and you can't see it?
Q. It's cut off. This is what we got.
A. Okay.
Q. So the billing period on the left column, it says an opening balance. One, it says July 1, 2022, and then it says July 1, 2022; is that right?
A. So I can only see a transaction date column, I can't see a beginning balance column.
MR. KESHAVARZ: That's odd.
Adam, can you see it.
MR. MARSHALL: At the risk of being helpful to adversary --
THE WITNESS: Okay. When I minimize the



screen on my side, I can now see it.
MR. MARSHALL: Yes, you can manipulate the image as well.
THE WITNESS: Okay. I'm sorry, I forgot I can do that. Thank you.
MR. MARSHALL: Never say I don't do anything nice for you.
MR. KESHAVARZ: You just saved us 20 minutes, Adam. Thank you.
THE WITNESS: I'm like, I can't see it.
I'm so sorry, I can see it now. Okay.
MR. KESHAVARZ: Don't be sorry at all.
THE WITNESS: Okay.
Q. Do you know why -- so on the billing period it says July 1, 2022 and July 1, 2022, correct?
A. Umm-hum, yes.
Q. And what is --what is listed for those two dates?
A. So July 1, 2022 is billing contract rent of 966.70. On July 1, 2022 there is a write off of the Section 8 subsidy of $568.08.
Q. Okay. And if Section 8 has suspended its payments because of an HQS violation, is that the way that suspension should be reflected in the ledger?
A. Yes.



Q. Okay. Now let's look at the third line on the billing period, it's the third line, it is July 1, July 1, then there is a third date. Dose that appear to be May 1, 2022?
A. Yes.
Q. Okay. And it has a batch number. Do you have any idea what that is?
A. So the SYS in the back column, those would be the recurring ledger entries. So whenever you set up a tenant in the ledger, you can set up the ledger to auto bill. And so what that seems to be doing with the SYS, it is -- there is a recurrent entry to bill the full contract rent of 966.70, and there was a recurrent entry in the system to write off the subsidy of $568.08, is what I would assume when it says SYS in the batch number column.
Q. Okay. So that is -- that's the way -- that would be an accurate reflection of the amount for July 1, 2022; is that right?
A. Well, I wouldn't be able to say that it's accurate, because I don't have the rent breakdown letter, that would be the only way to verify the accuracy, is to see is the rent breakdown letter for 2022.
But based upon how this ledger seems to be



working, the billing contract rent and then they are writing off the subsidy amount.
Q. So that's the way -- for the entry for July 1, 2022, that's the way the ledger should work in order for the numbers to be accurate; would that be fair to say?
A. For the July 1, 2022 transactions, yes.
Q. Okay. Because that would show that my client, on July 1, 2022, actually owed zero dollars in rent; is that -- is that right?
A. Yes, because of the credit balance from the prior -- from the running balance is what's taking it to zero.
Q. Okay. And that would be accurate.
A. Assuming that she had a credit.
MR. MARSHALL: Objection to the form.
Q. Okay. Because the top line says there is a credit of 398.62, right?
A. Umm-hum.
Q. You have to say yes or no.
A. I'm sorry, yes.
Q. All right. Would there -- that's odd.
A. Well, still a credit balance would show if the tenant paid a month in advance, or if there was a, you know, other adjustment to the account. My

assumption would be that there was an advanced payment by the tenant, and that's why there was a credit.
MR. KESHAVARZ: All right, I did some handy dandy math on my phone, and lawyers should never try to do math.
Q. But doing the subtraction between the contract rent of 966 and the Section 8 share of 568, that comes out to a tenant share of 398; does that sound about right?
A. Yes.
Q. All right. So are you reading this ledger to read that my client paid the July rent in advance, they paid the tenant share, her -- she paid her tenant's share in advance, and that's the 398 entry; that's the way you would read it.
A. No.
Q. In what way is that not correct?
A. Well, she -- if she had paid it in advance, she wouldn't have paid on July 29th.
Q. Well, there is no -- it's hard to say when -- are you able to tell when that credit was done for 398?
A. No. No, she -- she had an overpayment from a prior date. She made two payments prior to, I guess -- some time prior to July '22 she made -- this tenant



made an extra rent payment.
Q. Okay. So the given all of that, it would be accurate that on July 1, 2022 my client owed nothing; would that be accurate?
A. Yes.
MR. MARSHALL: Objection to the form.
Q. So looking at the next entry of -- with a billing period appears to be May 1, 2022; is that right?
A. Yes.
Q. All right. What does that mean to you? Just -- tell me what that entry means to you.
A. So this entry means that the tenant wasn't billed the subsidy portion in May of 2022, and they are correcting it in the month of July 2022.
Q. Okay. So -- but in order to know if that is correct, the May 1st entry, you would have to get a balance -- would you have to get a tenant ledger that goes before July 1, 2022, you'd have to get -- you'd have to get earlier payments in the ledger in order to determine whether that line-entry billing period of May 1, 2022 is accurate; is that right?
A. Yes, that's correct.
Q. All right. So we don't know why there is an adjustment of adding 568 to her bill on May 1, 2022



without going -- a ledger going back, back earlier in time; is that accurate?
A. Yes.
Q. Okay. Now you see here if you start going through the July '22 -- 2022 balance, the September '22 balance, all the way through October, November, December, January, 2023 --
A. Umm-hum.
Q. -- there is no entry for Section 8 on those dates, correct?
A. That's correct, yes.
Q. So you would interpret this to mean that Section 8 had suspended the -- in all likelihood -- strike that.
Would you interpret this to mean that Section 8 had stopped paying the Section 8 share from August 2022 to July 2023; is that what would you interpret it as?
A. Yes.
Q. And would you interpret that to mean, in all likelihood, that's failure to pay by Section 8 was because of an HQS violation?
A. Yes.
Q. Okay. So it appeared to be from July, August, September, October, going down, that Prestige



is billing my client for the full contract rent.
A. Yes.
Q. Okay. All right, so why don't we go down -- I'm going to go page by page.
A. Umm-hum.
Q. And so let's go until May 1, 2024. So from July 2022 through -- I'm sorry, February 2024, and I can scroll back if you like.
A. Umm-hum.
Q. Does it appear to you that Section 8 has suspended its payments because of an HQS violation?
A. That would be my assumption, given that they typically suspend for HQS failures.
Q. Yeah. Roughly 90 percent of the time for a suspension it's because of a failure for an HQS inspection, right?
A. Yes.
Q. All right. So in that event, the tenant is not responsible for the Section 8 share, correct?
A. Yes.
Q. So if you look at the balance for May, excuse me, for February 2024, it -- after actually February 20 -- strike that.
If you look at the entry for February 27, 2024, it shows that Prestige is claiming that my

Page 165

client owes $10,938 -- 36 in rent; is that how you read this?
A. Yes.
Q. Okay. But that would not be accurate based on the ledger in front of you, correct?
A. Yes, that's correct.
Q. Okay. Because -- and I will scroll up.
It appears my client actually made each and every payment of her tenant's share from July 2022 through February 2024, correct?
A. Yes, that's correct.
Q. So the entry for February 1, 2024 should be zero, correct?
A. The entry for February 1, 2020 --
Q. No, I'm sorry, February 27, 2024, that should be -- the entry should be zero, correct?
A. No.
Q. In what way is that not correct?
A. Well, there was a beginning balance, a credit of $396.62.
Q. Yes.
A. And then the tenant made two payments in February of $425.20.
Q. Yes.
A. So the balance should being the $376 of

Page 166

beginning credit, plus the extra payment of 425.20 made in February, because as you mentioned, the tenant didn't miss any payments from July 2022 to February 2024.
Q. That's accurate, she, in fact, didn't miss any payments, according to the ledger, from July 2022 to February 2024.
A. So she should -- so the tenant would still have the credit of the $376, the beginning balance from Page 1.
Q. Yes.
A. That number, plus the extra payment that's made in February. So she -- there was a payment on February 1st of $425.20, and then there was a second payment on February 27, 2024 for $425.20.
Q. So are you saying on February 27, 2024, my client actually had overpaid by that point?
A. Yes.
Q. Okay.
A. Because if you -- if you go back to Page 1 and you are paying every month, that credit should carry forward.
Q. Okay --
A. Month to month. And part of the credit was wiped out in July 2024 with the subsidy adjustment

Page 167

that we have -- that there is a question on.
Q. Okay. So roughly how much should this ledger say my client owes at February 27, 2024, what is -- what would be the correct amount?
Well, actually that's overpaid.
What would be the correct amount of the balance as of February 27, 2024?
A. So I would say as of February 2024, the credit should be $800, pending explanation on the May 2022 subsidy adjustment that added the $500 back to the ledger, assuming that -- because you would have to get the ledger prior to July to understand that adjustment was appropriate. So if you assume that adjustment was appropriate, 500 and something, 568, 568. So if you assume that adjustment was proper, the credit should be $235. If you assume that the adjustment was incorrect, the credit will be $800.
Q. As of February 27, 2024.
A. Yes.
MR. KESHAVARZ: Okay. Now I asked you this question, but the way I asked it wasn't very good.
So let me --
THE WITNESS: Umm-hum.
MR. KESHAVARZ: You don't have to agree with that.

Page 168

THE WITNESS: Adam told me I should agree.
Q. So looking at this ledger, my client had, in fact, paid every month from July --
A. Can you --
Q. -- 27th --
A. I'm sorry, can you scroll back for a second.
Q. Yes.
A. So can you -- can you go slowly, because I think there was another month where there was an extra payment made that I didn't see initially.
So February 2023 there was a payment on January 3, 2023 and February 3, 2023. I didn't see that extra payment before.
Q. Okay. So how much extra did she pay?
A. Can you scroll through to make sure that I didn't miss anymore extra payments.
Can you -- you can scroll down past August.
Can you -- can I see September.
Oh, I guess scroll up. I'm sorry, I'm going the wrong way.
So it looks like there was an extra payment in January 2023, and again in February 2024. So I would say the credit would be at least five, six -- the credit is anywhere from $620 to $1,189, with the

variants being the adjustment from May 2022 that's in question.
Q. Now starting in -- for the entries in -- the entries for -- with an opening balance on 3/1/2024, 3/1/2024, what -- how do you interpret those entries?
A. For the month of -- how do I interpret the entries for the month of March?
Q. Yes. And then there is a third entry for another negative 195.89. So how would you interpret these entries for March 2024?
A. So on March 1, 2024, the billing for the contract rent of 993.28, there is then a write off of the subsidy portion for the month of March, on March the 20th, for $568.08. And then there is another adjustment to write off subsidy of $195.89. It seems to be a correction of February 2024 that they recorded on March 3rd -- on March 20th of 2024 for the subsidy of February by 195.89. And then the tenant payment on March the 28th for $334.
Q. Okay. How would you -- so the adjustment credits listed from -- listed on the opening balance from 3/1/2024 through September 1, 2024, how would you interpret those adjustments?
A. From what period, starting when?



Q. When you start seeing these negative numbers again, it says, subsidy, adjustment credit subsidy, adjustment credit subsidy, I'm starting in March 2024 and I'm going through April 2024, May 2024, they all say adjustment credit subsidy of negative --
A. Umm-hum.
Q. -- well, it all says negative 568.08 except for the May 1, 2024, which says 512.08. How would you interpret these negative numbers, what do they -- how would you interpret them -- what would you interpret them to mean?
A. So the negative numbers of the $568.08 per month, I would interpret that as being the write off of the monthly subsidy.
When the write off changes from $568.08 to $512.08 in May of 2024, I would assume that there was a change -- there was a new rent breakdown where the subsidy decreased and the tenant portion increased. The rent breakdown letter would need to confirm -- would be needed to confirm the change in the subsidy write off where it was lowered from $568.08 to $512.08.
Q. Okay. But -- go ahead.
A. I would also have an open question on the $195.89 of write off for March 20th. I don't see



anything in the February 2024 activity that helps me to clarify or understand the write off of the $195.89 that was noted on March 20th.
Q. Okay. I'm more wondering about the larger number, the 568.08. If we go up --
A. Umm-hum.
Q. -- to the beginning, that appears to be the Section 8 share, correct?
A. Yes.
Q. Okay. So it's -- so there are entries called -- beginning in March 2024, it says adjustment credit subsidy, and it has entries for 568 and 568, I'm talking March and April. How do you -- what do you interpret that to mean?
A. That would be write off of the subsidy -- of the monthly subsidy.
Q. Do you interpret that to mean it's the write off for that month?
A. Yes, it's the write off for that month.
Q. Okay. So for March 1, 2024 the contract billing rate of 938, and then March 1, 2024, credit adjustment of 568, that is showing that Section 8 had paid its tenant's Section 8 share for the month of March 1, 2024, right?
A. No.



Q. In what way is that not right?
A. Well, if it's a negative, it's a write off, it means that Section 8 didn't pay. Because we've said that the rent of $993.28 is the contract rate, that the that 993 includes the tenant portion and the subsidy portion. And if I see adjustment credit subsidy of $568.08 for the month of March, that's the amount that Section 8 didn't pay, because the subsidy is suspended.
Q. Oh. But -- but that -- thank you.
But does that mean that it's -- the entry for May -- March 1, 2024, if Section 8 had suspended the payments, that would be an accurate reflection of the suspension.
A. You mean the adjustment credit subsidy?
Q. Yeah.
A. Yes, the adjustment credit subsidy is writing off the subsidy that Section 8 will not pay because of a suspension. So for the month -- because 9 -- the rent of the 993 includes tenant portion and subsidy. And this is saying out of that 993 of contract rent, Section 8 is not paying their share of $568.08.
Q. Okay.
A. So they have to write that off.

Q. So that's just for that month, that's not for prior months.
A. Correct, yes.
Q. All right. Now any idea why beginning in May 2024 the contract rent stays the same at 993, but the --
A. Umm-hum.
Q. -- the adjusted credit subsidy, and then the entry on May -- June 2024, Section 8, those negative numbers are only 512, what -- how do you interpret that?
A. I would interpret that to mean that the tenant had a income recertification with HPD. HPD looked at the household income and determined that the household income had increased. And so the household was able to pay a higher portion of the contract rent, which would result in a reduction in the subsidy.
Q. Okay. But -- but my client is still paying rent, it's actually increased the amount that she's paying from 3 -- 398 -- well, strike that.
How do you interpret beginning in June 2024 whether my client is paying the correct amount of rent?
A. So the month -- can you scroll up back the other way.



So for the month of March 2024, the tenant had been paying -- the tenant paid $334. For the month of May 2024, the tenant paid $390.
I would take that to mean that the tenant's share -- that HPD changed the tenant share, or increased the tenant's share, based upon the annual recertification, that the tenant is -- the tenant had experienced an increase in their income, and HPD has said that the tenant is able to pay a higher portion of the contract rent based upon the increase in the income for the household.
Q. Okay. Just going all the way down to the end.
A. Umm-hum.
Q. Are you -- it has a running balance as of September 1, 2024 of $11,712, correct?
A. Yes.
Q. Okay. And that means that the -- Prestige's letter -- ledger is claiming that my client owes $11,712 in rent as of September 1, 2024, correct?
A. Yes.
Q. How much, based on your review of the ledger, and the typical process of H -- of HPD suspending its share of the payments for HQS violations, based on -- my question is this.



Based on your review of the ledger, should my client have that, actually a negative balance as of September 1, 2024?
A. I need you to scroll up so I can see one thing before I answer the question.
Can you scroll up a little bit more. I just want to confirm something.
Okay. Okay, so you can scroll back down. I'm sorry, there is another month where the tenant made -- you've gone too far, sorry. So go up a little bit more.
So for the month of July 2024, the tenant made an extra payment. They paid $390 twice, so that would increase my estimate of the credit to be in the range of -- 393, 967, 1,189 plus 390, nine, seven, four, five, 11.
So prior to -- so as of -- as of July 30, 2024, I would estimate the client has a credit in the range of $713 or $579. The tenant then did not pay for August and September, there are no payments of $390 -- no, I'm sorry, I see August on the other page. So they paid August of $390. I don't see a payment on here for September.
Assuming that the tenant didn't pay for September, the credit comes down to the range of $400



to $1,200 as of September 1st.
Q. So as of September 1st --
A. 500 -- yeah, somewhere between 500 and $1,200 was the credit owed to the tenant.
I'm sorry, that should be the credit balance as of September 1st. There were a couple of subsidy adjustments that went against the tenant that may put them closer to a $1,300 credit as opposed to what's reflected here.
Q. Okay.
A. So it's either $600 or a $1,200 credit.
Q. Okay. So just to kind of incapsulate this.
A. Umm-hum.
Q. The ledger that's Exhibit B is generated from the billing gross potential method; is that right?
A. Yes.
Q. And the billing gross potential method is how Prestige generates its ledgers, correct?
A. Yes.
Q. And if there are other instances where Section 8 suspended payments because of HQS violations, in the ordinary course, all of the Prestige ledgers would be charging inappropriately the tenant for the Section 8 share, correct?

MR. MARSHALL: Objection to the form.
A. No, because the -- no.
Q. In what way is that no?
A. Because on this ledger, the Prestige ledger in some months didn't bill the tenant for the Section 8 portion. There was a credit of the Section 8 portion in some months, not all months.
Q. But only for a few months. Only for a few months out of the two years, correct?
A. Maybe five or six.
Q. Okay.
A. So I belive your comment was -- it would be a generalization that I wouldn't be able to comment on.
Q. Okay. Fair enough.
And you can't comment on that, because there are some months where there is a credit from -- a credit subsidy adjustment; is that why you can't comment on that?
A. Correct, yes.
Q. Okay. But aside from that, if this is generate -- Exhibit B is generated by the billing gross potential method, and Section 8 stopped paying rent because of HQS violations, would it be fair to say that at least some of the total that Prestige



would be charging would be the Section 8 share for the rent; would that be accurate?
A. Yes.
Q. Okay. The only question would be, how much of the Section 8 share they're overstating it by, right?
A. Well, the billing gross potential, you're billing the full -- you are billing the tenant on the subsidy portion each month.
Q. Yeah.
A. Under that, you know, billing gross potential, what seems to be missing here is every month should have a subsidy adjustment write off, every month, pending the reinstatement -- pending when Section 8 starts to resume payments, and that's not consistent here.
Q. They should be doing that, but they are not.
A. Right. So when we see -- when we see the break -- so when we see the break in the write off, there shouldn't be a break in the write off, because there are no payments coming in from Section 8 in those months.
So that write off that we see in April 2024, for example, we should see that for all months



presented here, since there are no -- there are no subsidy payments being made for any of these months.
Q. Okay. Well, given what you are seeing here, would it be your conclusion that as an ordinary -- as an ordinary practice, that Prestige appears to be charging tenants the Sec -- the Section 8 share of the rent for at least some months when HPD suspended payments because of HQS violations?
MR. MARSHALL: Objection to the form.
A. No.
Q. In what way no?
A. So Prestige is using the billing gross potential method, where they are billing each month the full contract rent. They are not reflecting the monthly write off every month for the suspended subsidy. So the write off of the suspended subsidy is inconsistent.
There should be a write off of the suspended subsidy every month until it's reinstated. I don't see a reinstatement on this ledger, because I don't see HPD payments on this ledger. That's what would tell me that the subsidy has been reinstated.
Q. Okay. Do you know if this is a ledger that's generated by Yardi, through the Yardi program?
A. I'm not sure if this is a Yardi report.



Q. Okay. Now the way these reports are generated by Prestige, is the way that they're -- Prestige would be calculating the rent owed using the billing gross potential, as a matter of course, would Prestige be inaccurately reflecting the total amount due by tenants who are on Section 8 who have their payments suspended because of HQS violations?
MR. MARSHALL: Objection to the form.
A. Can you repeat the question.
MR. KESHAVARZ: Yeah. Madam Court Reporter, can you re-read the question, please.
(WHEREUPON, THE REQUESTED TESTIMONY WAS READ)
A. I wouldn't -- I wouldn't know that. The inconsistency that I'm seeing on this ledger with the write off of the suspended subsidy, that error may not have happened for another tenant, so I wouldn't be able to say that this is a general practice or a general occurrence.
Q. You'd have to just see how the program that generates these ledgers are set up.
A. Well, I would have to --
MR. MARSHALL: Objection to form.
A. I would first under -- I would first ask why the system adjustment to write off the subsidy was

Page 181

stopped. So if you go back to maybe -- if you go to Page 1.

You see where it's got the -- the SYS for July 1, 2022 for the batch number.

Q. Yes.

A. So whenever I see -- so my assumption, when I see SYS, that would be the recurring entry that's being made in the system.

So whenever you create a tenant profile, you -- the ledger system allows you to set up recurrent entries for your monthly billing. So you are going to tell the system every month on a recurring basis, bill the contract rent using the billing gross potential.

And if I know the subsidy is suspended, it looks like they went in under -- using SYS instead of also write off the recurring entry each month to write off the subsidy of the $568.

That then gets -- that system entry then goes away beginning in August of 2022, so I would ask why it was stopped.

Q. Would that be an adjustment on their computer system that they would use?

A. You would have to go -- you would go in and change the recurring entry to no longer write off the

Page 182

subsidy.

Q. Okay. But is that a standard practice, I mean, would they have to set up the computer in a way when they generate rent ledgers generally?

A. It really depends on that property management agent's practice. You could have a practice where it's easy enough to go in and change the recurring entries, or create a recurring entry to write off the subsidy every month. And then once I side get notification from the site team or the property manager, once I get my letter from HPD that the subsidy has been reinstated, I then go in to my recurring entries and I stop the write off of the subsidy portion, is one way to do it.

Another practice is you continue to bill under the billing gross potential method, and then once the subsidy is reinstated, you then do the write off of the cumulative amount that Section 8, or that Section 8 or HPD didn't pay. So that there is a couple of different ways that you can do your write off.

This situation seems as though there was a system entry to have a recurring entry to write off the subsidy in July 2022. That recurring entry to write off the entry was then stopped, and then was

Page 183

resumed. When you go further down the ledger, I think it's in mid 2020 -- mid 2024 I think it starts back. You'd have to go to maybe the bottom of Page 2 to see when the recurrent entry, or maybe they did it as a manual adjustment.

You can scroll down some more, I don't see it.

Okay. So on March 20, 2024 there is an adjustment to write off the subsidy of $568. So when it says ADJ, or there is a number, 48730, that would be a -- that would be, I guess, a manual adjustment to the ledger, as opposed to a SYS, or a systems recurring entry into the ledger.

Someone went in and did a manual write off of the subsidy portion, because the subsidy was still suspended. So those numbers in the transaction mean it was a manual entry, as opposed to a system recurring entry.

Q. Given that, do you infer, since there is -- you are saying Prestige should have had their system set up where the Section 8 payment was supposed to be an SYS automatic credit; is that what you are saying?

A. Well, that's what they did as of July 2022, and then it stopped on this ledger in August of 2022.

Q. Okay. But you don't know why.

Page 184

A. No.

Q. No.

A. No, because the only reason you would stop would be if the -- my assumption would be the write off was stopped because the subsidy was reinstated. But I don't see any subsidy payment on this ledger. I only see tenant payments on this ledger.

I wouldn't need clarity on why the system entry was stopped to write off the subsidy, and it was suspend.

Q. Would someone have to go and manually change the system to take it off of the system billing credit, so that the change from July 1, 2022, where there is a billing credit for Section --

A. Umm-hum.

Q. -- 8, and August 2022, where there is no system adjustment, would somebody have to go in and manually make that change?

A. Manually make the change to the system entry, other than -- yes, but you would go in and make -- in the -- you know, in the normal course, you will make changes to the system entry.

So, for example, if the contract rent increases or decreases because you received a rent stabilization increase, you would go in and change the

recurring entries based upon the most recent rent breakdown letter. You would also go in and make changes to the system entries, if the rent breakdown letter shows that the subsidy increased or decreased, or if the tenant portion increased or decreased.

So there are times where you go in and modify those system recurrent entries based upon the rent breakdown letters.

MR. KESHAVARZ: All right. I can show you three more ledgers for my client, but they also show the same thing for this gap --

THE WITNESS: I see.

MR. KESHAVARZ: -- even though the ledgers are made months apart, or even a year apart. I can go through those.

Q. But if that were true would that -- would you infer that Prestige may be operating its rent ledgers, so that as a matter of course it doesn't show that the reason its a Section 8 payment is because there is HQS violation?

MR. MARSHALL: Objection to the form.

MR. KESHAVARZ: I didn't -- I didn't ask that very well.

THE WITNESS: Yeah, I was actually going to ask you if you could repeat the question.



MR. WEINSTOCK: All right. Let me just -- let me just show you a couple of more documents.

MR. MARSHALL: Not to -- not to interrupt, but how much longer do you intend to go?

MR. KESHAVARZ: I don't know. I'm surprised I went this long.

MR. MARSHALL: Right, we've been going for, what about, three hours. Is anyone in the mood for a 10-minute break.

COURT REPORTER: Yes.

MR. MARSHALL: Susan, I think you have been typing continuously for three hours.

MR. KESHAVARZ: You want to say -- when do you want to come back, Ms. Palmer, or anybody, when do you all want to come back?

COURT REPORTER: Come back in -- 10 minutes fine.

MR. KESHAVARZ: Is that okay with everyone else?

THE WITNESS: That's fine.

MR. MARSHALL: Okay.

MR. KESHAVARZ: Off the record.

(WHEREUPON, DEFENDANT'S EXHIBIT "B" IS REMOVED)

(Time noted: 3:56 p.m.)



(WHEREUPON, A RECESS WAS TAKEN)

(Time noted: 4:07 p.m.)

MR. KESHAVARZ: All right, let's go back on the record.

Okay. We were off the record.

Just to get a couple of things. We have an agreement that Ms. Palmer's deposition will continue on Friday the 14th at 8:30 with a hard stop of 12:00. And is that agreed by everyone?

MR. MARSHALL: Subject to the seven hour limit.

MR. KESHAVARZ: Yes.

MR. MARSHALL: So if we have some long breaks between 8:30 --

MR. KESHAVARZ: No, no.

Is that time agreed, Ms. Palmer, 8:30 on Friday?

THE WITNESS: Yes.

MR. KESHAVARZ: Okay, great.

All right so -- all right so -- go ahead.

THE WITNESS: I'm sorry, were you going to pause here for the day?

MR. KESHAVARZ: No, let me try to finish up as much as I can now, and then maybe another 10, 15 minutes, if that's okay, then we will wrap up.



CONTINUED EXAMINATION BY MR. KESHAVARZ:

Q. So if I showed you multiple ledgers from Prestige that kept on showing the same thing, like three of them for my client alone that had suspensions of payments from Section 8, but the ledger looks just like it did in Exhibit B, would you infer from that that it may be a regular practice for Prestige to do that?

A. To do -- to do what?

Q. To do -- to do -- charging tenants the Section 8 share of their rent when HPD or Section 8 suspended its payments for HQS violations.

MR. MARSHALL: Objection. Objection to form.

Q. In other words, if I showed saw few more ledgers that showed that would you infer that -- would you infer that one reason that could be is that Prestige does that as a matter of course?

MR. MARSHALL: Objection to the form.

A. No, I wouldn't infer that, no.

Q. All right, fair enough. The -- all right. What if I -- what would it -- what -- how many ledgers would I have to show you that did the same thing as the first ledger, I would have to show you for you to think that Prestige's system that prints out the

Page 189

ledgers is doing this as a matter of course, the same thing it did to my client?

MR. MARSHALL: Objection to the form.

A. I wouldn't necessarily say that it was a matter of course. I would ask a different series of questions if I saw the same pattern on other ledgers.

Q. What questions would you ask?

A. I would ask if there was a change in personnel where there were -- maybe the person wasn't trained properly.

I would ask if there was turnover in the position.

I would ask if there were any other system conversion issues or other system challenges that resulted in the billing or the write off inconsistency.

I would also request that there be a tenant-by-tenant review. It could be an isolated incident with a tenant. I wouldn't assume that this is a practice without going through those diligent steps.

Q. Understood.

Well, assuming there wasn't a change -- a significant change in personnel, assuming there wasn't a conversion problem with the software, assuming that

Page 190

those two things weren't an issue, about how many tenant ledgers from the same tenant over a period of time, or different tenants, would have you to see to -- to infer that that may be a reason why it's happening, that it's something about the way their system is set up?

MR. MARSHALL: Objection to form.

A. It's difficult to say how many ledgers I would need to see to come to that conclusion.

Q. Okay. Well, do you have tenant ledgers for the Prestige properties that Abyssinian is involved with?

A. When you say ledgers that we are involved with, can you clarify what that means.

Q. So for the -- I think there were five properties that Ransome owns that Prestige does property management for; is that right?

A. Yes.

Q. Now they generate reports every year, at least once a year, that Prestige has regarding the tenants at those buildings, right?

A. There are monthly reports.

Q. Monthly.

A. The aged accounts receivable report is a monthly report that would list balances owed on a

Page 191

tenant-by-tenant basis. I think it's called a status report in the Prestige system.

Q. Would you be able -- would you be able to tell from those reports if there were tenants who had Section 8 payments being made, and then had the payments stopped, would you be able to tell that from your reports, or from the information you have?

A. From those reports, no.

Q. The information that is the basis of those reports -- in other words, from any of the data that you have right now from Prestige, from any source --

A. Umm-hum.

Q. -- for all the years that Prestige has been doing property management for Abyssinian, in any of the properties --

A. Umm-hum.

Q. -- for Section 8 tenants, is there anything in any of that information that Abyssinian has, or can get, that would show whether Prestige is generating ledgers similar to the ones from my client where it shows Section 8, and then it shows stop Section 8 payments?

A. No. So the reports that we receive, that we receive monthly, are summary level reports. They would tell you the balance owed by tenant. They would

Page 192

tell you of that balance, how much is 30, 60, 90 days. Those reports are not at a comparable level of detail as the tenant ledger.

So the only way to see the pattern that we were discussing earlier for this particular tenant, would be to get the tenant ledgers.

The only thing that would show in the monthly report would be a -- if it's the case of a suspended subsidy, there would be a, I guess, a high accounts receivable balance, or a high unpaid tenant arrears for the tenant. That would be, you know, the only indicator. Then again, without getting the ledger, you wouldn't be able to tell how much of that is -- you wouldn't be able to tell if there was a suspended subsidy without getting the ledger.

Q. From the reports that you have or information you have access to at Abyssinian --

A. Umm-hum.

Q. -- are you able to tell which of the tenants are on Section 8?

A. Yes.

Q. Okay. Would you be able to tell that even if Section 8 had suspended its payments for some period of time?

A. Yes.

Page 193

Q. But you wouldn't have -- but would you show payments that are made by Section 8 for those tenants?
A. This report would show if a payment was made for a particular month. It wouldn't show activity over, you know, several months. It's a month-to-month report. It doesn't show me cumulatively for a year or for a six-or-seven-month period the Section 8 payments. I can only see for a particular month if Section 8 didn't pay a subsidy.
Q. Okay. So you'd have to look -- do you have those reports month to month?
A. Yes.
Q. Do you have those reports month to month going back for the entire time that Prestige was doing property management for Abyssinian properties?
A. No, based upon our achieve policy, we wouldn't keep reports going all the way back to 2008. 2008 would be when Prestige started managing Arthur Ransome Houses L.P. Our records wouldn't go back to 2008.
Q. How far back would the records go back?
A. I would have to check how far back. I know we easily have the last two or three years. I would have to look to see how far back we go in terms of what we would have saved between, you know, our

Page 194

archives, and what would be in e-mail.
Q. Would the information be in spreadsheets?
A. It would be a pdf report.
Q. Is the pdf report generated from a spreadsheet?
A. I don't know much about the report writer function at Prestige. I believe most reports can be generated as Excel reports. They provide them to us as pdfs, because it's a user-friendly format. Most reports can be requested in an Excel format.
Q. Well, I have to check the agreements, but if you request information from Prestige, according to the property -- your agreement, your contract with them, they are suppose to provide that to you, right?
A. Yes. I don't -- when I reply to the question, I'm not implying that Prestige is not providing information.
My comment was that the reports are provided monthly in a pdf format, because that the just a more user friendly way for to us get through the reports. At times when I have requested an Excel version of the report, that's been provided without an issue.
Q. How many Excel reports would you think you might have?

Page 195

A. I don't typically request the Excel reports, because the pdf reports have the information that I need. I don't recall that I have any Excel reports. I would have the monthly, you know, pdf report.
Q. And how does -- how do you save those monthly reports?
A. They either reside in my in-box, or we download them to our share file folder. We use Microsoft, we use Office 365. We would download to a, you know, a file folder, or I would just leave them in e-mail and go to them as needed.
MR. KESHAVARZ: Can you share those files with me?
I know we issued a subpoena for documents, and if you want, I can issue a second one if you want, if -- if that makes you feel more comfortable.
Are you able to provide me those monthly reports?
THE WITNESS: Yes.
MR. KESHAVARZ: Okay. Did you need a subpoena to from me to do that?
THE WITNESS: I have your subpoena.
MR. KESHAVARZ: Okay. So you will produce them.

Page 196

THE WITNESS: Yes.
MR. KESHAVARZ: Okay, great.
THE WITNESS: I guess, what period of time for the monthly report.
MR. KESHAVARZ: So the monthly reports by Prestige, for as far as back as you have them. If you still have them, whatever you have.
THE WITNESS: Okay.
MR. KESHAVARZ: All right. So if a few of them are in Excel, that would be better. But I will take whatever you can get.
You think you can get those to me by say Tuesday?
THE WITNESS: Yes, I should be able to.
MR. KESHAVARZ: Okay.
THE WITNESS: Is there a Dropbox, or should I set up access to a -- send you a link to a share file with the report?
What's the best way -- they are going to be too much for me to send in an e-mail.
MR. KESHAVARZ: I can send you as a Dropbox link, if you want to do that.
THE WITNESS: Okay.
MR. KESHAVARZ: Or if it is easier -- or when you look and see, if it's easier for you to put

Page 197

it on your end, I could do that.
But the easiest thing for me, is I will send you a Dropbox link.
All right.
THE WITNESS: That's fine.
MR. KESHAVARZ: So those are the reports.
Q. So that would list all the tenants in the -- in the buildings that Abyssinian owns, and it will also list which ones are on Section 8, and it will show the payments for each month in every report.
A. Yes.
Q. And would it show if the payments are made by Section 8 or by the tenant?
A. Yes.
MR. KESHAVARZ: Okay. All right. So that's that.
And just for the court reporter -- just so I can say on the record, I call for the production of those documents. Just so when I look at the transcript I can see where it is.
Q. Let me just touch on, you said report writer, what's that?
A. So when the reports are downloaded from Yardi, they have a -- another, I guess, software that sits on top of, or that interfaces is probably a

Page 198

better word. So there is a report writer or software that interfaces with the ledger system that allows them to pdf the system reports. And then there is also other reports that they add. So a bank reconciliation report, accounts payable report, open vendor report, balance sheet, income statements. So there is a host of financial reports in the -- in the monthly pdf, not just specific to tenants with open balances.
MR. KESHAVARZ: Okay. Whatever is in the reports.
THE WITNESS: Umm-hum.
MR. KESHAVARZ: All right. So then --
THE WITNESS: Yes, understood.
MR. KESHAVARZ: -- just one thing, and then we can wrap it up for the afternoon.
I appreciate your time.
Q. You said FHEPS. Are there periods of --
A. What's the first thing you said, I'm sorry, you said FHEPS.
Q. Yeah, did you say FELPS -- FHEPS, what did you call that?
A. FHEPS, the other City voucher program?
Q. Yeah.
A. Okay.

Page 199

Q. Just tell me what that is briefly, what's FHEPS?
A. So let me think of a way to describe the comparison.
So when people refer to Section 8, they're typically referring to the passthrough that comes from U.S. HUD. So New York City Housing Authority, or NYCHA, would be the passthrough entity for HUD funding coming into New York City. City FHEPS would be money coming from the New York City -- from New York City budget to fund the City FHEPS -- the City FHEPS voucher program.
Q. Okay.
A. Just a different -- just a different funding source for -- for vouchers.
Q. If FHEPS -- go ahead, I didn't mean to interrupt you.
A. And I think -- I think earlier we talked about, you know, losing your subsidy, if you have -- if a family moves in with subsidy, they always -- do they just have a subsidy in perpetuity. For Section 8, yes. I think City FHEPS, there may be some limitations on how many years you can have the subsidy. So it's not as -- it's not perpetual in the way a Section 8 voucher would be.

Page 200

Q. Okay. If -- in the ordinary course, if a ledger shows FHEPS for some period of months and then stops showing it --
A. Umm-hum.
Q. -- would that be an indication that FHEPS has suspended its payments for some reason?
A. Yes.
Q. All right. And would those payments be something that the tenant, in the matter of -- in the matter of course, that most of the time the tenant wouldn't be responsible for those missed payments; would that be accurate?
A. So I'm not as familiar with City FHEPS as I am with HPD and NYCHA.
For City FHEPS, I know that subsidies can be suspended if the tenant fails to recertify with City FHEPS. Beyond that, I'm not familiar with any other reasons to why City FHEPS would suspend.
I guess the only other reason would be if you had a short-term voucher. So if your voucher was a five-year City FHEPS voucher and you came to the expiration of that voucher, then it would -- then it would terminate.
I'm not familiar with -- you know, if City FHEPS has a an inspection similiar to HQS, that I

wouldn't know.
Q. If -- okay. If a ledger showed FHEPS payments, and then stop, would that -- was that something that would be flag for you to want to look into why that happened, so the tenant wasn't accidentally charged for rent that wasn't owed?
A. If the City FHEPS voucher payment stopped, yes, you would inquire and ask why. Yes, you would make the inquiry and ask why.
MR. KESHAVARZ: All right, that's that.
Do you know if -- I know norm -- are there any of the rent ledgers that Abyssinian has from Prestige property, so are there any at all.
THE WITNESS: Are there any rent ledgers.
I would have to check archives to see if we have any rent ledgers. Off the top of my head I'm not recalling that I have gotten any rent ledgers recently. But I can he take it as a followup point and check to see if we have any rent ledgers.
MR. KESHAVARZ: Yeah, from any period of time.
THE WITNESS: Okay.
MR. KESHAVARZ: As far back as you can go, for anything from Prestige that would be for -- that could be for a Section 8 tenant. And if you are not



sure --
THE WITNESS: For Section 8 tenant or any tenant.
MR. KESHAVARZ: If could you -- if you could limit it to Section 8 tenants, that would be good. If you can't do that, then -- then I will take what you can get. But the preferable would be Section 8.
THE WITNESS: Okay. We will look to see what we have in the archives on that.
MR. KESHAVARZ: All right. And then that's that. And I think we will adjourn and --
THE WITNESS: Okay.
MR. MARSHALL: I would just like to ask a few questions, since we are adjourning.
MR. KESHAVARZ: Yeah.
MR. MARSHALL: Just procedurally for my clarification.
Good afternoon, Ms. Palmer.
I will be very brief.
But to introduce myself, my name is Adam Marshall. I'm an attorney with Kaufman Dolowich. We represent Mr. Kahan and the Sperber Kahan Law Group in this same lawsuit where Mr. Keshavarz represents the plaintiff.



I won't keep you much longer. I just have a few questions for clarification, particularly since we are continuing for a second day.
EXAMINATION BY MR. MARSHALL:
Q. The first is, to your understanding, are you appearing today as Princess Palmer, or are you appearing in some corporate capacity for either a limited partnership or entity?
MR. KESHAVARZ: Objection, form.
MR. MARSHALL: You can answer.
A. So I'm appearing in my corporate capacity as an employee of Abyssinian Development Corporation, who is the general partner of Arthur Ransome Houses L.P.
Q. Okay. Does Abyssinian have a general counsel, an in-house attorney of some sort?
A. In-house attorney, no. General counsel -- hum, our general counsel, he retired back in -- when did he retire? Maybe March or April of this year. We have defense counsel working on a variety of matters. I don't know that any of those defense counsels would be considered general counsel, since they get engaged on a, you know, project by project or specific matters basis.
Q. Okay. And without divulging the substance



of any conversation, is there an attorney affiliated with Abyssinian for Ransome L.P. that's aware that you are testifying today in connection with the Garcia lawsuit?
A. Yes.
Q. Okay. Can you name that person.
A. I can name the attorney, but they haven't completed their process of vetting conflicts to see if they will take on the case. But I have -- there is actually two attorneys that are familiar with my deposition today.
Q. Okay. And again, without divulging the substance of any conversation, have either or both of those attorneys -- withdrawn.
Without revealing the substance of the conversation --
A. Umm-hum.
Q. -- have either of those attorneys reviewed the documents subpoena that was served on you and on Ransome L.P.?
A. Reviewed the subpoena?
Umm, let me think.
One of the attorneys has reviewed the subpoena, yes.
MR. MARSHALL: Okay. I'm going to

represent for the record that some of the documents that plaintiff's counsel requested at the tail end of your testimony are not encompassed within the --

MR. KESHAVARZ: Well, Adam, I don't think that that's accurate.

MR. MARSHALL: Okay. So that we are clear, my understanding of the subpoena, is that it did not encompass the scope of documents that Mr. Keshavarz has asked you to produce by next week.

So I don't know whether there will be an attorney that appears with you or on your behalf next week, but I just wanted to be clear as to, you know, the capacity in which you were testifying and whether there were attorneys aware of the sort of documents that you have been asked to produce today.

And so I can't give you legal advice, all I can do is ask you questions.

But certainly for my client, I will ask that Mr. Keshavarz's request for the documents that was directed to Ms. Palmer be memorialized in writing.

MR. KESHAVARZ: I don't even know what that means, but -- okay, go ahead, next question.

MR. MARSHALL: All right. I have nothing further for today.

MR. KESHAVARZ: All right. I appreciate



your time, Ms. Palmer. I will see you on -- on Friday at 8:30.

THE WITNESS: Yes. Thank you.

(Time noted: 4:36 p.m.)



C E R T I F I C A T I O N

I, SUSAN CONNORS, a Shorthand Reporter and notary public within and for the State of New York, do hereby certify:

THAT Princess Palmer, the witness whose examination is hereinbefore set forth, was first duly sworn by me and that this transcript of said testimony is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of August, 2026.

[signature]

__________________
Susan Connors



DEPOSITION ERRATA SHEET

Our Assignment No.: J15277700

Case Caption: Leonarda Garcia
v.
Sperber Kahan Law Group PLLC,
Eric H. Kahn,
Prestige Management, Inc. And
Arthur Ransome House L.P.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save an except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I will offer these changes as if still under oath.

Signed on the day of , 20 .

Princess Palmer

DEPOSITION ERRATA SHEET

Page No. Line No. Change to:

Reason for change:

Page No. Line No. Change to:

Reason for change:

Page No. Line No. Change to:

Reason for change:

Page No. Line No. Change to:

Reason for change:

Page No. Line No. Change to:

Reason for change:

Page No. Line No. Change to:

Reason for change:

Page No. Line No. Change to:

Reason for change:

SIGNATURE: DATE:

Princess Palmer



DEPOSITION ERRATA SHEET

Page No. Line No. Change to:

Reason for change:

Page No. Line No. Change to:

Reason for change:

Page No. Line No. Change to:

Reason for change:

Page No. Line No. Change to:

Reason for change:

Page No. Line No. Change to:

Reason for change:

Page No. Line No. Change to:

Reason for change:

Page No. Line No. Change to:

Reason for change:

SIGNATURE: DATE:

Princess Palmer