Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------
LEONARDA GARCIA,

Plaintiff,

Civil Action No.
1:25-cv-8489-JGK-GS

-against-

SPERBER KAHAN LAW GROUP PLLC
ERIC H. KAHAN and
ARTHUR RANSOME HOUSES LP,

Defendants.
-------------------------------------

REMOTE VIDEOCONFERENCE CONTINUED DEPOSITION OF PRINCESS PALMER, a Non-Party Witness herein, taken by Plaintiff, pursuant to Subpoena, on Friday, August 14, 2026, at 9:04 a.m., before Patricia Guarino, a Shorthand Reporter and notary public, within and for the State of New York.

Page 2

A P P E A R A N C E S :

LAW OFFICE OF AHMAD KESHAVARZ
Attorneys for Plaintiff
16 Court Street, 26th floor
Brooklyn, New York 11241-1026

BY: AHMAD KESHAVARZ, ESQ.
(718) 522-7900
ahmad@newyorkconsumerattorney.com

KAUFMAN DOLOWICH LLP
Attorneys for Defendants
Sperber Kahan Law Group PLLC
and Eric H. Kahan
135 Crossways Park Drive, Suite 201
Woodbury, New York 11797
BY: ADAM MARSHALL, ESQ.
amarshall@kaufmandolowich.com

* * *

Page 3

IT IS HEREBY STIPULATED AND AGREED that all objections, except as to the form of the questions, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within examination may be subscribed and sworn to before any notary public with the same force and effect as though subscribed and sworn to before this court.

Page 4

Whereupon,
PRINCESS PALMER,
after having been first duly sworn, was examined and testified as follows:
EXAMINATION BY MR. KESHAVARZ:
Q. Thank you, Ms. Palmer, for your coming back. I know you have a busy schedule. And fortunately for you I have a flight to catch, so you know I am going to minimize my time to the degree possible. So thank you.
A. Sure.
Q. Again, the standard disclaimers. I'm not your attorney. I don't represent you. Ms. Garcia has a pending case against Ransome LP and the law firm of Kahan. And Prestige was a defendant in the case. They may or may not be again. I'm not sure.
A. Okay.
Q. I don't represent you. I don't represent your interests. I can't provide you legal advice. The only advice I can provide you is to retain an attorney.
Do you understand me?
A. Yes, sir.

Page 5

P. Palmer

Q. And essentially every time I've spoken with you I've given you the same disclaimer?

A. Yes.

Q. And we haven't spoken since the last deposition?

A. No, sir -- I'm sorry, yes, sir, that's correct. Sorry. No, we haven't spoken.

Q. That's fine. That's fine.

Again, ask me to clarify a question if I'm asking it badly.

So last time you were at home. Where are you now?

A. Today I am at one of our residential buildings in the community group space. Should I give you the physical address where I am?

Q. Sure, for the court reporter.

A. Sure. I am sitting at 270 Adam Clayton Powell Jr. Boulevard, New York, New York 10027.

The name of the building is Ennis Frances. It's spelled E-N-N-I-S, F-R-A-N-C-E-S. It's one of the affordable buildings that's owned by Abyssinian Development Corporation. I am sitting in their community room. I have some meetings with residents later today. So that's my basis here today as

Page 6

P. Palmer

opposed to another location.

Q. So I am working from home today. So you might actually see in person my 13-year-old son walking behind me as opposed to just seeing it on the screen.

So let me follow up from the end of our last deposition. Were you able to obtain any documents since you were served a subpoena at all or based on our last conversation? Were you able to obtain any documents?

A. Unfortunately I was not. I've had to request the assistance of our IT director to help do some searches of the electronic files. I started with the Abyssinian Development Corporation organization back in 2011. And some of the documents that you're seeking predate my employment. And she's doing some searches to try to identify the tenant ledger information that you requested and also a copy of the property management agent agreement. I wasn't able to find it in our hard copy files.

Q. I believe we also talked about getting financial reports?

A. Yes, sir. Sorry about that, yes. I

Page 7

P. Palmer

saw your note with the items listed, both of my notes with the items listed.

Q. When do you think you might be able to get those documents?

A. She was out earlier this week. I know she is going to work over the next few days. I've asked her to prioritize so we can target -- can we target Wednesday, the 19th, to complete our document production?

Q. That's fine. That's fine.

A. Okay. Thank you for that.

Q. Mr. Marshall the last time raised an issue about whether those documents were in the scope of the prior subpoena or not.

A. Oh, right.

Q. Regardless of getting into that, I can e-mail you or serve you with a formal subpoena for those documents to Abyssinian. These are documents that Abyssinian has; is that right?

A. Yes, sir.

Q. You're the corporate representative for Abbyssinian today?

A. Yes, sir.

Q. Did you need me to issue you a formal

Page 8

P. Palmer

subpoena for those additional documents or will you voluntarily produce them so we don't have to go into a dispute about whether it's within the scope of the prior subpoena or not? Did you need me to give you a subpoena for those additional documents?

A. It would be helpful, yes, please, to have the subpoena, given the scope of what you're requesting. You're asking us to look at records in a comprehensive way as opposed to a specific period of time or more recent period of time. So it would be helpful if you could memorialize in the subpoena.

Q. Would Abbyssinian accept the subpoena if I e-mail it to you? Would that be effective service? Or did you need me to physically serve your registered agent?

A. E-mail is sufficient.

Q. Okay. Thank you.

MR. KESHAVARZ: Adam, I cut you off. Were you about to get into that answer?

MR. MARSHALL: Yes. I was going to note for the record the prior objections that the documents being requested now are not within the scope of an existing subpoena. So Mr. Keshavarz is going to now

Page 9

P. Palmer

propound a subpoena. I don't care how it's served, obviously, but if he's going to propound an additional subpoena that's fine with me.

THE WITNESS: Thank you.

Q. Since you said it would take you about maybe next Wednesday, could you do to the end of next Friday to produce in the subpoena? Would that be sufficient period of time?

A. Yes, sir.

Q. Thank you.

Now, there were documents that I think would be in the scope of the prior subpoena, and you can tell me if you disagree, which I thought that you were going to send. Issues like the contracts that govern the Ransome LP, Ransome --

A. Yes, sir, the corporation.

Q. And with Abbyssinian and so forth. Do you think you could get those documents by next Friday?

A. Yes, sir.

Q. You don't happen to have possession of those documents now do you that you can e-mail?

A. No. Unfortunately I don't have access

Page 10

P. Palmer

to my files from this location. So I'm not able to do a real time document production of those items. To the extent we need to schedule a follow up call once you have those documents I'm happy to do so.

Q. I appreciate that.

** Just to go through the checklist of what I believe would be encompassed within that and that you'd produce, is any contracts or agreements between or among Abbyssinian, Ransome LP, Ransome Corporation, Prestige, and the owner of the -- of the general -- of the limited partnership, which is I guess Ransome LP, would you agree to produce all of those documents?

A. Yes, with a clarification point. So the limited partner is not Abbyssinian Development Corporation. I'm not sure if you're referring to the general partner.

Q. The general partner being Ransome, PC, correct -- corporation?

A. Ransome Corporation. I think you've been using PC and Corporation interchangeably. Yes.

Q. I apologize if I have. And any agreement with Abbyssinian, with any of those entities, will you agree to that?

Page 11

P. Palmer

A. Yes, sir.

Q. And there was I believe some sort of underwriters organization that was an investor of the LP. Do you recall what that was? Underwriters? Something along those lines. What was the name of that?

A. So from a structure standpoint Arthur Ransome Houses LP is a limited partnership. Abbyssinian Development Corporation is the general partner. And National Equity Fund is the limited partner. So the relationship with National Equity Fund would be outlined in the limited partnership agreement.

Q. So any relationship with that entity, please.

A. I'm sorry, can I just have one minute. Someone walked into my space. I just need to give them a piece of paper. I'm sorry about that.

Q. No problem.

(Discussion held off the record.)

Q. We're going to use the term "Abbyssinian." So can you spell at least that name for the court reporter now?

A. Sure. A-B-Y-S-S-I-N-I-A-N.

Page 12

P. Palmer

Q. Now, we've spoken before about the employees at Abbyssinian. You said there are about twelve employees, but not all at a single location; is that right?

A. Yes, that's correct.

Q. What other locations do the employees work at?

A. Sure. So should I list all locations?

Q. Please.

A. So our main location -- I think in total there are I guess four locations where the twelve employees are allocated. The first location is our main office, which is 2283 Adam Clayton Powell Jr. Boulevard, New York, New York 10030. There are three employees at that location, including myself.

Q. And are any of the employees at the offices of Prestige?

A. Say that -- can you repeat the question?

Q. Are any of the Abbyssinian employees working out of an office for Prestige?

A. No, sir. There's a -- there's a shared location that I'll mention, but no, there are no

Page 13

P. Palmer
Abyssinian employees working out of Prestige locations.
Q. So you're saying you have a shared location between Abyssinian employees and Prestige?
A. Yes, sir.
Q. What is that shared location?
A. The shared location is 50 West 131st Street, New York, New York 10030. That building is Abyssinian Towers or Abby Towers. Abby being spelled A-B-B-Y Towers Apartments LP. So that location we have -- let me see. So there are six Abyssinian Development Corporation employees at that site. Just from a reference standpoint 50 West 131st Street is a senior building. There are 100 residents that live there. This is a HUD building, part of the Abyssinian Development Corporation portfolio. We are general partners.
Our six employees that work at that location, three of them are our service coordinator team. They provide case management and social service activities or programs for the 100 families that are based at that location -- I'm sorry, the families that reside at that location. Excuse me.

Page 14

P. Palmer
The other three employees are in our real estate department. Their primary function is asset management of our 20-plus portfolio.
Also at that location are two Prestige employees. So the senior property manager, at times when we had an assistant manager -- when Prestige had an assistant property manager, and then the office administrative assistant, they had office space at that 50 West 131st Street location. They provide property management services for the residents who reside at 50 West 131st Street.
In addition, to the extent that residents at other Prestige managed buildings need to pay rent, have complaints, need to complete recertifications, et cetera, they will come to that location as a central office to meet with the property management team as needed.
Q. Can you elaborate please on payment of rent, about how that works at the adjunct shared Abyssinian office?
A. So at the shared office the Abyssinian Development Corporation employees have no involvement in the collection of rent. The two Prestige employees that are currently at that

Page 15

P. Palmer
location, if a resident is paying by check or money order residents could reside at Abby Towers Apartments LP, Laura B. Thomas LP, Arthur Ransome Houses LP, 36 West 131st Street HDFC or 301 West 148th Street HDFC.
So those are the entities that Prestige manages. If a resident would like to pay their rent in person by check or money order they would bring that payment to the property manager who sits at 50 West 131st Street.
Q. Thank you.
Who are the employees of Prestige that work at that joint location?
A. Currently the senior property manager that's there, his name is Devon Kelly. D-E-V-O-N. Last name is Kelly, K-E-L-L-Y.
The office assistant I, don't recall her last name. She just started about three or four months ago. Her name is -- Smerlyn. I think it's spelled -- I'm sorry, it's spelled S-M-E-R-L-Y-N. I can send you a follow-up e-mail with her first and last name, and I can double check the first name spelling.
Q. Thank you. I would appreciate that.

Page 16

P. Palmer
And I will forward that on to Adam as well.
You said that one of the Prestige employees was new. Who was the person that the new employee was replacing, if you know?
A. So the new employee -- let me see. So she was -- so she came in as an assistant. Prior to her there was an assistant property manager. The current person is just an office assistant. She doesn't have the same skill set and responsibility as the assistant property manager who was there prior to her joining. So our initial understanding was that she was coming in -- I'm sorry, our initial understanding was that Smerlyn, the new employee that's coming in as the assistant property manager, but as we had additional conversation with Prestige, got a better understanding as to her skill set, it was clarified for us that she was coming in as an assistant and someone that they would be training and grooming to move into a role to take on additional property management responsibilities.
Q. Thank you.
Who was the prior employee for Prestige that left?
A. Sure. That was Detra Williams. She

Page 17

P. Palmer

was the assistant property manager. She departed September of -- was it 2025 or 2024? I believe it was September twenty-twenty -- it was either September '24 or '25. I want to say it was 2025.

Q. Do you know the circumstances of her departure? Do you know why she left?

A. She retired. My understanding is that she purchased a home with her daughter up in the Connecticut area. The commute was going to be much longer than she was anticipating and she ended up retiring.

Q. Okay. Do you know how long she had been working at Prestige?

A. I don't know how long she had been working at Prestige. She joined the Prestige team handling the Abbyssinian portfolio I want to say -- she had been there about two years. So that would be, what, 2022 roughly is when she started working. So sort of supporting the -- supporting Mr. Devon Kelly in the assistant property manager role.

Q. What is the role of Devon Kelly at Prestige?

A. So Devon Kelly is the senior property manager. He would have supervisory responsibility

Page 18

P. Palmer

for the assistant property manager for the office administrative person. He would be the primary point of contact with residents if they were coming to pay rent, if they had work order repairs. If there were open HPD violations that required access he would be the point of contact for tenants. He also is responsible for supervisory or supervising the maintenance team. So the maintenance team would include the building superintendents, handymen and porter staff. He has responsibility for supervising the maintenance team, completing annually evaluations, approving time sheets, reviewing roles and responsibilities. He also, you know, would liaison with the respective person in the back office who oversees regional and property managers I guess across the Prestige portfolio.

Q. Do you know who that is?

A. That person is --

Q. Actually --

A. Her name is Arlayne McGlashan. Spelling is A-R-L-A-Y-N-E. McGlashan is M-C-G-L-A-S-H-A-N.

Q. Did I cut you off? You were speaking before I asked you who that person was.

Page 19

P. Palmer

A. No. I was just trying to make sure that I had captured Mr. Kelly's or Devon Kelly's responsibilities.

Only other thing I would add about his responsibilities is he periodically will do tours and walkthroughs of the buildings in the portfolio regarding maintenance or capital items. Also with vendors also in his capacity as the senior property manager.

Q. Can you elaborate on his role in relation to collection of rent?

A. Yes. So if a tenant were coming to pay rent in person at the 50 West 131st Street location Mr. Kelly would oftentimes be the person to accept the rent payment from the tenant. He would gather rent payment and then he has the responsibility of taking those rent payments whether they be check or money order to the main office of Prestige, which is located in the Bronx. He would take those checks there periodically so that the back office team could deposit and input and process those payments and apply them to the ledger.

Q. Okay.

A. One other responsibility that Mr. Kelly

Page 20

P. Palmer

has that I forgot is for the Abby Towers apartment building where we have the 100 seniors who reside there under a direct HUD program, he has the responsibility of completing their annual building recertifications.

So HUD has an annual recertification, as does the Low-Income Housing Tax Credit Program. So the Low-Income Housing Tax Credit Program and HUD require that each resident provide income and asset documentation on an annual basis to verify that they are income eligible within the guidelines of regulatory agreement. So there is a annual median income threshold that residents have to live below in order to qualify for residency and so that we're in compliance with those regulatory agreements. So he completes those recertifications for those families that reside at the senior building.

Q. Do you know what relationship Mr. Kelly has in terms of filing or litigation of non-payment proceedings against the properties that Prestige manages?

A. His responsibility with -- can you clarify the question? I'm sorry.

Q. Sure. Do you know what relationship he

Page 21

P. Palmer

has in terms of non-payment proceedings that Prestige is involved with?

A. Oh, okay. So Mr. Kelly, one of his responsibilities would be to periodically review the aged accounts receivable or the -- I think they call it a tenant status report, that will tell you the unpaid balance or the arrears on a tenant-by-tenant basis. He would have responsibility for reviewing that report, identifying tenants who are delinquent or past due on their rent. He would be responsible for sending -- I think it's an initial five-day notice or ten-day notice that initially goes to tenants from Prestige Management, prior to the matter being referred to outside landlord-tenant counsel.

Mr. Kelly would work with engaging landlord-tenant counsel and would be involved in providing documents to landlord-tenant counsel as the case would move through court.

He also at times may appear in landlord-tenant court I guess as needed.

Q. Do you know when he might be needed in landlord-tenant court?

A. My understanding is that it will vary

Page 22

P. Palmer

on a case-by-case basis. I don't believe every landlord-tenant or every non-payment proceeding requires presence of Mr. Kelly. So it's more so on a case-by-case basis is my understanding.

Q. Okay. Do you know of Mr. Kelly or anyone's involvement in going to court for non-payment proceedings?

A. Do I know of any involvement of them going to court?

Q. Do you know what they do when they go to court?

A. My understanding is when they go to court they would be providing information on repairs potentially that were outstanding within the unit. So if -- for example, if a resident were in court for non-payment, and resident said, "We were not paying due to outstanding repairs in the apartment," Mr. Kelly may be called to provide information on those repairs.

Q. Okay. Let's talk about the tenant status report. Is Mr. Kelly the one who generates those reports for Prestige or do you know?

A. So those reports would be generated -- so when you say "generated" do you mean just

Page 23

P. Palmer

pressing the button or the input of the data that that is the output of the report?

Q. Input of the data, but also, you know -- let me rephrase.

The tenant status report, is that the document that we were looking at at your prior deposition that itemizes what is owed in terms of the tenant share, Section 8 share? Is that what you meant by tenant status report?

A. No. We were looking at a tenant ledger during the last conversation. The tenant status report is a different report.

So the tenant status report would be similar to -- the tenant status report is a -- it's similar to an aged accounts receivable report. Are you familiar with that or no?

Q. No. Can you please elaborate?

A. Sure. So an aged accounts receivable report would give you summary information on a tenant-by-tenant basis on the unpaid arrears. It would give you the tenant portion. It would also give you any unpaid subsidy on a tenant-by-tenant basis. Again, it would be summary level information. So, you know, for example Jane Doe has

Page 24

P. Palmer

an outstanding tenant balance of $1,000. And that $1,000 would be broken out between aging categories. Current charges, either zero to 30 days, 30 to 60 days, 60 to 90 days would be the typical formats of the aged accounts receivable report.

The tenant status report is a slightly different report. It's more so an activity report that rolls forward the monthly activity on a tenant-by-tenant basis. It would be in a summary level similar to the accounts receivable report. So for example, it would look tenant by tenant. It would tell you the tenant beginning balance. It would tell you the current charge for the month, whether that be the tenant charge or the subsidy portion. It would also tell you the tenant payment for that month. And then it would tell you the ending balance for that tenant. It would be a, you know, summary level tenant by tenant.

The tenant ledger that we discussed during our last conversation is detailed in that it gives you the individual charges and payments on a month by month basis. The tenant status report would only give you charges and payment on a monthly basis. It wouldn't give you that itemized month by

P. Palmer

month in the way that the tenant ledger does.

Q. Okay. Do you know any other role Mr. Kelly has in relation to non-payment proceedings that we haven't discussed so far?

A. No, I don't.

I do want to clarify that I don't believe I answered your question on --

Q. Okay.

A. -- the input of the report versus generating it. I don't think I answered it. I think I went down a different path when I was explaining the report and never answered your question.

So in terms of the input of the data for that report, that occurs at the Prestige back office, at their headquarter office that's in the Bronx. They have an accounts receivable team that will take those tenant checks, tenant money orders. They'll deposit them, post them to the tenant ledger. They would also run any reports that upload or interface for tenants that pay on the online portal. That information is then imported into the Yardi ledger, Y-A-R-D-I. Yardi is the tenant ledger system that houses tenant information, so head of



P. Palmer

household, movements, tenant charges, if the tenant has a subsidy. And each month they use the Yardi system to record and post to the tenant ledgers payments that are received.

So the back office has a responsibility of data input. There's an accounting manager that generates the monthly reports to prepare a monthly reporting package that would include the tenant status report. And then Mr. Kelly has the ability to print a report. So he can print a report. He can print a ledger. He can print a tenant status report. He's not involved, in my understanding, in the input of the information that generates those reports.

Q. Thank you.

Now, the tenant ledger that we went through before, is it Prestige that makes the determination as to how to credit payments by the tenant and how to determine how the full contract rent is reported on the ledger?

MR. MARSHALL: Objection to the form.

A. Can you repeat the question?

Q. Let me just ask, can you elaborate in what way Prestige is involved in determining the



P. Palmer

information that should be included in the tenant ledger?

A. So as the property manager Prestige has the responsibility of maintaining tenant records. So to the extent that -- it kind of goes back to when the tenant initially moved in. There's an initial lease that a tenant would execute. That lease would include the total rent that the tenant is paying. If that tenant has a subsidy there would also be letters or correspondence from either NYCHA or HPD on the subsidy that the tenant is entitled to -- the subsidy that the tenant is entitled to and then the tenant's portion of the total rent would be on a letter. They call it a voucher letter. And that lease and the voucher letter is what's used to set up that tenant in the ledger. So you would enter the head of household, address, contact information. You would then use the lease and the voucher to set up the tenant charges in the ledger system.

Q. Okay. And Prestige does all this for all the properties that it manages?

A. Yes.

Q. Is there any other way that Prestige is



P. Palmer

involved in the rent ledger process other than what we've discussed so far?

A. The only other way would be your initial set up of the -- of the ledger system. So a company such as Yardi would have different software packages that Prestige would be able to choose from. So if it's an affordable building, Yardi has a prepackaged software that's in line with all the reporting that an affordable housing building would give. They have another package that's comparable to what you would have for a HUD building. And so Prestige would make the determination as to which of those Yardi packages are best, given the regulatory structure on the particular project.

Q. So for the Prestige properties -- okay.

Do you know the type of Yardi software that Prestige does use?

A. No, I don't.

Q. What types of functions does a Yardi program that Prestige does -- what type of functions does it perform?

A. I'm going to speak off of my recollection of when I used Yardi in terms of, you know, what I remember about how the system would be

Page 29

P. Palmer

set up.

So once you've created the tenant profile of the, you know, the tenant, the head of household, you list the members in the household from the lease. You list the information from the voucher to the extent the tenant receives a subsidy. You then would set up a Yardi for it to make various recurring entries. So you would set up recurring entries for the monthly tenant charge. You would set up recurring charges if there were a subsidy portion. And you know, then you would have your input from your accounting team of payments as they came in.

You know, you may at the year-end audit, when you have a year-end audit, you would typically do a review of the unpaid accounts receivable to determine if there were any balances that needed to be written off. Then you would go into the Yardi system and record a write off of a portion of the tenant balance or all of the write off depending upon the situation. To the extent the tenant moved out you would go into Yardi and record the move out so that the unit was showing as a vacant as opposed to an occupied unit.

Page 30

P. Palmer

Then you also have other compliance reports that you can generate from Yardi. So for example, annually there is a registered rent roll that goes to New York City Housing Preservation and Development as part of being an affordable project under the regulatory regulation of New York City HPD. So within Yardi you would be able to generate the rent roll under the format that that agency needs to facilitate your compliance reporting.

Q. And those are among the ways that Prestige uses Yardi for the properties it does property management for?

A. Yes. So that would be my understanding based upon my familiarity with Yardi.

Q. Okay. That's your understanding about how Prestige uses it?

A. That's my understanding about how they should use it.

Q. Do you know if they do use it that way?

A. No, I have not had any -- I haven't had any specific conversation. There's kind of general industry protocol. And as I reviewed tenant status reports, you know, I use that assumption when I'm using those reports. And those reports typically

Page 31

P. Palmer

don't contradict what I would anticipate seeing based upon my understanding of the Yardi system.

Q. Okay. But that's kind of the industry standard or industry approach for property management companies like Prestige?

A. Yes.

Q. Okay. And you don't have any reason to think that Prestige doesn't use the Yardi system in that manner, do you?

A. No, I don't. The only other item that comes to mind is the recertification process. So each year families undergo a recertification process to confirm that they continue to be income eligible. There is a separate team at Prestige that sits at a location other than the one in the Bronx that has the responsibility of completing those recertifications annually. And the completion of the recertification, the due date for the recertification, that information is also tracked within the Yardi system so that at any point in time you can print out a report listing the status of your recertifications so that you know when you need to make contact with residents. Some buildings have an annual recertification date for all residents.

Page 32

P. Palmer

And then other buildings have a rolling recertification date that will vary based upon their move-in date.

Q. Do you know the different names, the names of the different types of Yardi packages in terms of rent collection?

A. I know a couple of names from when I used Yardi, but I wouldn't know the full suite of Yardi options.

Q. What do you remember?

A. I remember that Yardi had an affordable software package, and they also had a module that was for low income housing tax credit buildings. And I recall that they had a module that was specific to direct HUD programs. So subsidies that flow direct from HUD to the property as opposed to subsidies that flow through a local -- I think they call it public housing agency or PHA is the reference, Public Housing Authority. So for example, NYCHA is a passthrough of HUD funds. And then a direct program would be direct from HUD to the property with no intermediary at the city level.

Q. Now, as to the direct HUD payments do you mean -- well, what are the direct HUD payments

Page 33

P. Palmer

in relation to the Section 8 program?

A. Sure. So typically Section 8 is used interchangeably to cover multiple types of programs. So Section 8 could refer to a voucher from New York City Housing Preservation Development or HPD. It could refer to a voucher from NYCHA, or it could refer to a program with U.S. HUD, Housing and Urban Development.

One of our buildings at 50 West 131st Street is a HUD building. The subsidy is attached to the units at that building. And the monthly -- the process to maintain the compliance to receive the monthly voucher payment of the subsidy, that is a relationship between the property or the project and HUD or HUD's designee. Whereas one of our other buildings or if a family has a tenant-based voucher, that would flow through either NYCHA or HPD with NYCHA or HPD being the recipient of the HUD monies and then they, you know, would administer the voucher program on behalf of HUD.

Q. Which of those programs that HUD funds -- if HUD stops payment under which program is the tenant not liable for the stopping of the payments?

Page 34

P. Palmer

MR. MARSHALL: Objection to the form.

Q. Let me rephrase that because Adam has a very concerned look on his face. I think I know why.

Section 8 program is one of the direct HUD programs?

A. Section 8 is one of the HUD direct programs? Similar -- yes, yes. That's acceptable.

Go ahead, sorry.

Q. I'm sorry, I didn't mean to cut you off. Are you done?

A. I unfortunately probably need to go into the weeds a little bit to be able to --

Q. Please do.

A. -- clarify.

So I think when we spoke previously we spoke about two types of vouchers, one voucher being a project-based voucher and a second type of voucher being a tenant-based voucher.

Q. Yes.

A. So if it's a HUD program it would be a project-based voucher, where that subsidy or that voucher is attached to the unit. And there's a process called vouchering that happens monthly to

Page 35

P. Palmer

request those funds from HUD. To the extent that there is a tenant who is in non-compliance whether it be -- typically non-compliance in those situations is when the tenant has not recertified. So I'm not aware of a situation where a project-based building that receives direct money from HUD, I'm not aware of a situation where that voucher would be suspended due to lack of -- due to repairs not being made.

Q. So what are the main reasons that HUD would stop making payments to -- to the landlord, to the property management company, and how common are they? What would be the main reasons and how common are each of those reasons?

A. So for a HUD program payment of the subsidy would be stopped in two situations. First situation is if the property failed HUD's annual physical inspection. That inspection process is currently called NSPIRE. So the letter N-S-P-I-R-E. It was previously known as REAC, abbreviate R-E-A-C. So if the building received a score under -- I think if you receive a score under a 65 on a scale zero to 100 it's considered a failure of the annual inspection. You would have a

Page 36

P. Palmer

work out and a cure process to rectify. To the extent that a building or property was non-compliant with that work out plan HUD would have the ability to suspend the subsidy to the entire building. So it wouldn't be on a unit by unit basis. It would be the entire subsidy for that project-based contract.

Q. What other reason is a common reason that HUD would suspend payments?

A. Other situation would be -- well, I've seen it in two other situations. So a new tenant moves in and there may be questions on something of the tenant data that was entered on the voucher. HUD may not make that payment on -- HUD wouldn't make the payment for that specific tenant until when questions on the monthly voucher were clarified. So I've seen that happen for a new move-in. Maybe there was an error with the data input of the social security number. Maybe there was an input error with the date. So if there's an input error on the monthly voucher for a particular tenant, HUD will say you need to make these corrections or we have a clarifying question. So they may withhold payment for the voucher for that individual family pending correction of an administrative error.

Page 37

P. Palmer

Q. Okay.

A. Other situations where the voucher is suspended would be if the tenant failed to complete the annual recertification. So tenants have a 90-day grace period to complete the annual recertification. To the extent it is not completed within that 90-day window then the subsidy for that tenant would be suspended.

Q. Out of the three reasons that HUD would stop payments to the landlord, roughly what percentage or how common would the stopping be because of the failure of the physical inspection?

A. That one I would say is the least common because of the cash flow impact that it would have on the property. So if you fail your HUD inspection your entire subsidy wouldn't pay if you were non-compliant with the work out process. I've had -- in my experience I've had two situations where we failed our inspection. It maybe took us a year to work through the full process, but to the extent that we were, you know, communicative with HUD, providing updates, the subsidy was not terminated. Again, you don't want to lose your payment of your entire subsidy for the full month.

Page 38

P. Palmer

In those situations our subsidy was maybe 90 percent of total revenue for the month. So you're going to be very diligent about making sure that that suspension doesn't happen in connection with a failed inspection.

Q. Would there be a temporary suspension of payments while these problems are being worked out?

A. No.

Q. Do you know how common it is for Prestige properties to have its HUD subsidy suspended for physical repair issues?

A. No.

Q. Do you know how HUD payments are reflected on tenant ledgers?

A. Yes.

Q. How are they reflected?

A. So a HUD payment would be reflected in a manner similar to a Section 8 voucher from either HPD or NYCHA. There's no difference in how they're posted on the ledger in comparison to an HPD subsidy payment or a NYCHA subsidy payment.

Q. Would it be listed as a HUD payment as opposed to a Section 8 payment?

Page 39

P. Palmer

A. I'm trying to think of how it looks in the ledger. I don't recall if there's a different annotation in the ledger for -- if it says HUD versus NYCHA, you know, mainly because you wouldn't have a situation where a project receives HUD and NYCHA and/or HPD. Your project is either going to receive HUD exclusively or it's going to receive a combination of NYCHA and HPD. So based upon the project you know -- you know, if you're looking at a project that has HUD subsidy or NYCHA HPD. So you know from how it's structured from a regulatory standpoint what type of subsidies are hitting that ledger. So that notation isn't -- so it could be a general, you know, subsidy notation. But you know this upon the structure of the project, the source of the subsidy.

Q. But if it's a HUD subsidy, do you know if the ledger would show a HUD payment in the ledger?

A. Repeat that. My screen froze for a second. Can you repeat your question?

Q. Sure.

Where the payment is just from HUD, do you know if the ledger would show HUD payments to

Page 40

P. Palmer

those buildings?

A. When the ledger is just for HUD, would it show HUD payments for just that building?

Q. I asked that really badly and I realized that when you restated it. Wow, that's a really badly asked question.

A. No. It's okay. I was trying to visualize in my head what the ledger looked like as I was repeating the question.

Q. Because the ledger we looked at before said Section 8 for the government share, right?

A. Yes. So that would be again from a regulatory standpoint you know the source of the subsidy for that particular project. So that the HUD projects are very unique in that they receive money directly from HUD.

Q. Do you know one way or the other if when that's the case, if the ledger shows -- says HUD payment as opposed to Section 8, the ledger itself, or do you know?

MR. MARSHALL: Objection to the form.

A. That typically -- I guess in practice that wouldn't happen because it sounds as though -- I guess -- are you thinking that a project could

P. Palmer

receive HUD vouchers and Section 8 vouchers at the same time?

Q. No. No.

A. Because Section 8 vouchers and NYCHA HPD would be the definition. I know that Section 8 is used interchangeably to include HUD. Is that what you're...

Q. Yes.

A. Because you wouldn't have both on one -- you wouldn't have both on one property. You'd have one or the other. You wouldn't have a combination. You would not have a combination of HUD vouchers and Section 8 being NYCHA or HPD all on the same voucher. You're either going to have HUD vouchers coming direct from HUD or you're going to have a combination of NYCHA and HPD vouchers.

Q. When you said you only had two properties -- let me just ask you again.

You said about the instances where there was a building-wide suspension because of HUD. How many times has that happened?

A. Without portfolio, none. We failed inspections twice that caused us to have to go through a work out plan to avoid the suspension of



P. Palmer

the building-wide subsidy. We were successful with that. And neither one of those, you know, buildings with the HUD subsidies were terminated or suspended.

Q. You said before about project-based Section 8. In terms of project-based Section 8 have any of your properties been suspended for any of the Section 8 project-based subsidies?

A. Yes.

Q. Okay. Which ones? Which buildings or which -- which ones were suspended for project-wide Section 8?

A. So when you say "project-wide" do you mean the entire payment of the subsidy or individual vouchers?

Q. I'm trying to figure out your definitions of things, because you know housing programs and I don't. And I'm maybe --

A. No. No worries.

Q. So there's individual Section 8 and there's project-based Section 8, right?

A. Yes.

Q. Project-based Section 8 is for the whole building?

A. Or a part of the building?



P. Palmer

Q. Or part of the building.

A. So for example one of the buildings in our portfolio is a 160 units in the building physically, but the project-based contract with NYCHA only covers 100.1 of those 160 units.

Project-based vouchers -- so a project-based voucher would be a voucher that is associated with the physical unit. So as new families move in, that voucher -- that subsidy is always attached to the unit. If it's a tenant-based voucher that tenant can port their voucher out at will to another location. So there's a difference in the portability. A family can port out a project-based voucher, but when they do that the owner or the landlord is unharmed because the project-based voucher continues to be in place for the unit.

Q. Thank you.

Now, Prestige is the property management agency for all of the Abbyssinian properties?

A. No.

Q. Are they for most of them?

A. They are for maybe -- maybe about 50



P. Palmer

percent, maybe about half. I would have to do the math, but I think it's about 50 percent.

Q. Now, we talked before about different limited partnership entities owning more than one property. Which entities, limited partnerships or corporations does Prestige do the property management for, for Abbyssinian?

A. So a clarification point, there's a one-to-one relationship between the limited partnership entity, and you know, the respective building, unless there's multiple buildings. So you wouldn't have a limited partner that is in multiple entities. It would be, you know, unique to each limited partner. I don't know if I said that right.

So for the properties that Prestige manages, they manage Arthur Ransome Houses LP, Laura B. Thomas LP, Abby Towers Apartments. They manage 301 West 148th Street HDFC, and they manage 36 West 131st Street HDFC. And that's a total of -- it may be just over 300 units out of our 600-plus portfolio. So about half.

Q. Are any of those project-based Section 8?

A. Project-based Section 8? Yes. So Abby

Page 45

P. Palmer

Towers Apartments LP, it's project-based HUD. So in that case the subsidy comes direct from HUD just for that one building that they manage. The others are going to be tenant-based vouchers.

Q. Do you know if any buildings that Prestige manages for Abbyssinian or others, do you know if any of those project-based vouchers have been suspended?

A. Have any of the project-based vouchers been suspended? For other Prestige properties I don't know. As it pertains to the project-based HUD building Abby Towers, we have had situations where individual vouchers were suspended because the tenant failed to complete the annual recertification. We haven't had an instance at Abby Towers, the project-based HUD building, where we had a building-wide suspension of a subsidy.

Q. Have you ever had for Prestige buildings that -- for Abbyssinian buildings that Prestige does the property management for, have there ever been building-wide a project-based suspension?

A. No.

Q. Do you know other buildings that

Page 46

P. Palmer

Prestige does property management for other than for Abbyssinian?

A. I know of a couple, but I don't know their full portfolio.

Q. What portfolios do you know that Prestige does the property management for for project-based voucher buildings?

A. Well, I guess I don't know if they're project-based buildings. I know names of some of them but I don't know the voucher structure for those buildings.

Q. So what properties do you know that Prestige does property management for?

A. I know they manage buildings for HCCI. So letters HCCI. That's the one I hear of, you know, more frequently because I believe Mr. Kelly has some involvement there.

That's actually the only one that's coming to mind right now, is HCCI.

Q. Well, I'm going to have the court reporter leave a blank here.

INSERT: ________________________________________

If you can think of any other properties that Prestige manages can you fill in

Page 47

P. Palmer

that blank?

A. Yes.

Q. Now, when a non-payment action is filed for an HCCI building do you know how the plaintiff -- how the petitioner is reflected in the non-payment proceeding?

A. For HCCI I wouldn't have that information.

Q. Is HCCI the name of the building?

A. No. HCCI would be the name of the landlord entity or the general partner entity. So HCCI would be a comparable non-profit to Abbyssinian Development Corporation. I think they're much bigger than us, but they would be similar in that they are non-profit focused on affordable housing in our similar -- in our same market.

Q. Do you know who the limited partner is for the HCCI buildings?

A. No, sir.

Q. Do you know how I can find that out?

A. Let's see. So the only way to find that out would be by looking up on ACRIS. ACRIS abbreviation is A-C-R-I-S. ACRIS is the public -- I guess it's the public portal used by New York City

Page 48

P. Palmer

to file legal documents. So if you needed a copy of a deed you would go to ACRIS to get that deed. ACRIS -- I believe you need the building address. You need the building address to be able to pull it up to do your search. I think you can search by block and lot. I don't think you can search by entity name. I think it's physical location specific in terms of how you pull up the information.

So you would need the physical address and you would then go into ACRIS and look for a deed or any other publicly filed documents, whether it be a regulatory agreement, et cetera, to try to understand who the limited partner is. You may or may not be able to devise it from that way depending upon, you know, what legal documents had to be filed.

Q. Okay. Do you know -- we talked about the role of Devon Kelly. Do you know if his name is listed as the property manager on the non-payment proceedings that Prestige files?

A. I don't know how the names are listed for the non-payment proceedings.

Q. Do you know if Devon Kelly is one of

Page 49

P. Palmer

the names that Prestige uses as the property manager for Prestige properties?

A. When you say one of the -- can you rephrase the question?

Q. Sure. We had before as an Exhibit A the non-payment proceeding as to Ms. Garcia -- let me see.

How familiar are you about rental arrears non-payment proceedings?

A. I would say I have limited knowledge on how it works. I have a, you know, a very high level understanding of how the process would work. I don't know the details or ins and outs.

Q. Do you know if Devon Kelly would be listed as the agent in the non-payment position for Prestige properties?

A. No, I don't.

Q. Now, we talked about the role of Devon Kelly at Prestige. You started talking about Arlayne McGlashan. Is that the name?

A. Yes.

Q. What's Ms. McGlashan's role at Prestige?

A. So Ms. McGlashan would be the -- she

Page 50

P. Palmer

would be the senior person overseeing all of Prestige's property managers, property management teams, as well as any regional property managers. She would have supervision for, you know, the Prestige property management function.

So she reports directly into the Prestige president. And I think she may be a part owner in Prestige.

Q. Can you elaborate a little bit more on Ms. McGlashan's role at Prestige? Can you break that out in any more detail?

A. Sure. So she would be the person with -- I guess she would have regional property managers that oversee various teams of property managers. As it pertains to the Abbyssinian Development Corporation portfolio that Prestige manages, Ms. McGlashan -- Ms. Arlayne McGlashan would at times attend our monthly meetings where we would discuss financial performance, any vendor issues. We would discuss repairs, maintenance concerns. On a periodic basis she would attend those meetings for the Abbyssinian properties that Prestige manages. To the extent there were questions on financial reporting she may at times

Page 51

P. Palmer

get involved with supporting, you know, Mr. Kelly in answering those questions.

Whenever I have a complaint or an issue with operations, whether it be, you know, delays with reporting, I would take those issues to Ms. McGlashan. If we have a vendor issue where the vendor was looking to, you know, stop services I would have conversation with Ms. McGlashan for her to intercede with the vendor to manage the relationship to avoid the, you know, vendor service suspension.

We would also work together on reviewing major proposals for capital items, going through information from the bid process. Those are some of ways that I interact with Ms. McGlashan on the ADC or the Abbyssinian Development Corporation portfolio.

Q. Let's go back to Ms. McGlashan's role at Prestige generally.

What did you say about regional? I didn't write it down. It was like regional properties or regional -- you used the word "regional" when you talked about her responsibilities. And my handwriting frankly is not

Page 52

P. Palmer

entirely clear

A. It's okay. She has supervisory responsibility for any regional property managers, along with any senior property managers, property managers, assistant property managers. So the Prestige property management function, she is the senior person over that department.

Q. Is she the senior person in relation to collections of rent for Prestige?

A. Is she the senior person responsible for collections of rent? Yes, that would fall under her responsibility since the property managers have the responsibility of reviewing collections, determining whether or not to start legal action. Ms. McGlashan in her role, you know, would have oversight for those functions.

Q. You said the property manager makes the determination about whether to proceed with non-payment litigation for Prestige?

A. Yes. Under the direct -- they would consult internally with Ms. McGlashan with the regional person is how they work it on our properties.

Q. Would that be -- the property manager

Page 53

P. Palmer
that makes decisions about whether to file a non-payment proceeding, was that Devon Kelly?
A. Yes.
Q. Would that have also been Detra Williams at some point?
A. I only -- I only recently learned that Detra Williams had that responsibility when I received the complaint. Prior to that my understanding was that Devon Kelly was making those decisions.
Q. By "the complaint" you mean the lawsuit that you're testifying about?
A. Yes.
Q. Okay. So Devon Kelly would be the person who interacts with the law firms that Prestige hires to proceed non-payment litigation? He would be the person who interacts with that law firm?
A. Yes.
Q. Does he direct the law firm about how to proceed with non-payment proceedings?
A. So when you say "direct the law firm," I understand that to mean that there are different points in time when the law firm needs to get the

Page 54

P. Palmer
approval of the property manager to move to the next step. If that's the context of your question, yes.
Q. What do you mean bit the "next step"?
A. So, for example, tenants receive I think a five-day notice, a 30-day notice. Once those notices have been served and the relevant expiration period or the cure period has expired -- for example, when a tenant gets a 30-day notice I think they have maybe 30 days to respond.
So once the end of those cure periods has been reached the attorney will contact the property manager and say "Are you ready for me to move to petition? Do I have your permission to move to petition," which means now we're going to move forward -- or the attorney is going to move forward with getting a court date.
Other times the attorney will ask property manager, "Are we okay to move to having the warrant for eviction issues?" So it's gone through the case and let's say it was decided in favor of the landlord -- of the property. The court granted the eviction, the landlord-tenant counsel would say, "Okay, Prestige, are you ready for me to have the marshal serve a warrant of eviction?"

Page 55

P. Palmer
Q. The five-day notice and the 30-day notice, what did you mean about -- explain a little bit about what those notices are.
A. So those are -- prior to going to petition to requesting a court date there are notices that a tenant needs to receive in a non-payment proceeding or even a holdover proceeding. I think it's either a five or a ten-day notice and there's a 30-day notice. So the tenant has to be given notice of the non-payment and then given an opportunity to cure prior to moving to petition.
Q. The five-day notice, the 30-day notice -- is there also a 15-day notice or 14-day notice or do you know?
A. I think so. I think the 15 or the 30 may vary depending on what type of proceeding it is. But typically where there's like a five-day notice, the management agent at times will issue that as an initial warning to the tenant. They may or may not issue the 10 or the 15-day notice. They may have legal counsel issue that notice or they may issue it. I get confused on whether it's 15 or 30 depending on the type of case, but there typically

Page 56

P. Palmer
are two letters that the tenant receives prior to going to petition.
Q. So does Prestige forward the accounts to the law firms to send the five-day, 15-day, 30-day notice or does Prestige do that itself?
MR. MARSHALL: Objection to the form.
A. So I've seen it done both ways. In my experience I've seen situations where the property manager has done the five-day notice along with the 15 or the 30-day notice. And then I've seen other situations where the property may do the initial notice, the initial five-day notice, but then they bring in landlord-tenant counsel to either do the 15 or 30-day notice.
So in those situations where the landlord-tenant counsel is brought in to do either the 15 or the 30-day notice, that will be a judgment call based upon whether or not you think that the tenant is going to be responsive.
So if you have a -- if there's the belief that the tenant will not be responsive to the 15, 30-day notice and you're going to have to go to legal -- go to court anyway, you will typically engage the landlord-tenant counsel earlier in the

Page 57

P. Palmer
process so that, you know, the landlord-tenant counsel is handling the 15, 30-day notice. If you believe that the tenant will be responsive to the notices, the property manager, you have to send the five and the 15, 30-day if they believe can resolve the non-payment issue directly with the tenant without having to go to court.
Q. Who makes that decision about whether they think the tenant would be responsive and how to proceed?
A. That would be a decision made by the property manager. The property manager will have a level of familiarity with the tenants within their portfolio and they will make a judgment call as to whether they believe that tenant will be responsive or if they're going to need to, you know, be more assertive and actually go before a judge to get resolution of the non-payment.
Q. Just for clarification, does Prestige make the decision about whether to file a non-payment proceeding or does the law firm make that decision?
A. Prestige makes that decision.
Q. Does Prestige make the decision about

Page 58

P. Palmer
whether to settle a non-payment case and on what terms?
A. Yes.
Q. Does Prestige make the decision about how the litigation should proceed in non-payment petitions?
A. I'm not -- can you rephrase or clarify the question?
Q. Sure. When instances like where the tenant says, "Hey, you're suing on Section 8. I don't owe some or all of this," does Prestige make that decision about whether to proceed with the litigation or to terminate that litigation? Or who makes that decision?
A. So in this situation you're saying there's a non-payment to collect unpaid subsidy? Is that your question?
Q. Yes, or a tenant claims there's no foundation of Section 8 subsidy. Who makes the decision about whether to proceed with the case or whether to terminate the case? Is it Prestige? Is it the law firm? Who makes the decision?
A. That's Prestige.
Q. And Prestige sometimes sues tenants for

Page 59

P. Palmer
the Section 8 share of the rent. That's happened sometimes for Prestige, right?
MR. MARSHALL: Objection to the form.
A. So I was unaware of that, you know, prior to reading the matter -- reading this matter. As a matter of course from a business -- from an industry standpoint, that's not common practice to sue tenant for unpaid subsidy.
The only times I've seen tenants pay for unpaid -- tenants sued for unpaid subsidy, is if the subsidy was suspended due to the tenant failing to recertify with the regulatory agency. You know, that's the only time I've seen that or when the subsidy was terminated. So if a family's voucher was terminated, you know, it could be due to failure to recertify. I've seen something where a tenant actually voluntarily surrendered their voucher. Those are the only times that, you know, you can then -- you know, where you can then charge the tenant the full contract rent, because of the subsidy termination.
Q. I understand that's the only times that Prestige or the law firm is supposed to sue the tenant, but my question is this: Do you know one

Page 60

P. Palmer
way or the other whether Prestige has sued tenants, Section 8 tenants, and the Section 8 tenant has claimed, "Hey, you're suing me for some or all of the government share." Do you know one way or the other whether in fact that has happened with Prestige?
MR. MARSHALL: Objection to the form.
A. So a clarification point, and then I'll answer the question.
So the attorney, the landlord-tenant counsel is looking at the direction of Prestige. They will consult and give information, but in terms of the case moving forward the decision on whether or not to settle those reside with Prestige. I think you mentioned the law firm kind of driving that, but the law firm is going to be in consultation with Prestige as the case is moving through court and the landlord-tenant counsels are going to be looking for, you know, kind of that yes or no from Prestige as the case moves through litigation.
And then to your question --

(Discussion held off the record

Page 61

P. Palmer
due to technical difficulty.)
Prior to reading the claim I was unaware that a tenant had been sued for the unpaid subsidy.
Q. By "the claim" you mean this lawsuit that you're here testifying about?
A. Yes.
Q. Well, my question is this: Do you know one way or the other whether Prestige has sued Section 8 tenants and the tenant has claimed either in an answer or motion or otherwise that Prestige was suing on the Section 8 share? Do you know one way or the other if that -- strike that. Let me start again.
Do you know one way or the other if Prestige has actually filed non-payment petitions and the tenant claims that they're being sued in whole or in part for the Section 8 share? Do you know one way or the other if that has happened for Prestige lawsuits?
MR. MARSHALL: Objection.
That's asked and answered.
A. Prior to reading about the claim that I'm providing testimony, no.

Page 62

P. Palmer
Q. Well, let me clarify.
When non-payment proceeding is filed obviously the tenant either defaults or files an answer. Right?
A. Mm-hmm. Mm-hmm.
Q. You have to say "yes" or "no." You have to verbalize.
A. I need to stop humming, sorry. Bad habit.
Q. No, you can verbalize what your answer is.
A. No, I don't have any answer. I need to listen to the full question. My apologies.
Q. It's okay.
When Prestige files a non-payment proceeding and it claims -- strike that.
You're saying the first time that you know that Prestige has sued on the Section 8 share was as to my client, Ms. Garcia; is that right?
MR. MARSHALL: Objection to the form.
That's asked and answered two times previously.
MR. KESHAVARZ: Well, you can say objection, form.

Page 63

P. Palmer
MR. MARSHALL: You didn't get the message the last one. So I'm going to repeat that it's asked and answered.
MR. KESHAVARZ: I don't think so.
Q. Let me break this down to a few different components.
You read the complaint in this lawsuit, right?
A. Yes.
Q. And you looked at the exhibits in the complaint?
A. I looked at some of the exhibits. It was a very long list of documents. I don't proclaim to have looked at every page of all of the attachments. It was 200-plus pages. So I looked at some things more so than others.
Q. From what you have viewed, did Prestige in fact sue Ms. Garcia for the Section 8 share of the rent?
MR. MARSHALL: Objection.
That's asked and answered as well.
Q. Go ahead.
A. Yes.
Q. Sometimes when Prestige files a

Page 64

P. Palmer
non-payment proceeding for Section 8 tenants the tenant will file an answer and claim in the answer that some of money is Section 8 share; is that right or do you know?
MR. MARSHALL: Objection to the form.
A. I wouldn't know.
Q. So are you saying you don't know one way or the other whether in other non-payment proceedings other than Ms. Garcia, whether tenants have filed answers claiming that Prestige was suing for a Section 8 share? You don't know one way or the other?
A. No. I --
MR. MARSHALL: Objection.
Asked and answered.
You may answer.
A. No. I'm not aware of any other than this matter that we're speaking on today.
Q. I'm trying to ask a different question.
I know you're saying that you don't know of any other instance where Prestige has sued for the Section 8 share. Right? You're saying this is the only time you actually know that, right?
A. Yes.

Page 65

P. Palmer
Q. But my question is different.
My question is: Do you know one way or the other whether answers in non-payment proceedings that Prestige files, do you know one way or the other whether tenants have filed in their answer an allegation that they are being sued for Section 8 share?
MR. MARSHALL: Asked and answered.
A. No, I don't know.
Q. You don't know either way?
MR. MARSHALL: Asked and answered.
MR. KESHAVARZ: Will you stop?
Q. Go ahead. You don't know either way; is that right?
A. That's correct.
Q. So Prestige answers could have been filed in Prestige lawsuits claiming Section 8 was being sued for and you wouldn't know if that's the case?
MR. MARSHALL: Asked and answered.
A. I would have no knowledge of that.
Q. You had no knowledge if the answers were filed claiming that, right?
MR. MARSHALL: Asked and answered.

Page 66

P. Palmer
A. That's correct.
Q. So you wouldn't know one way or the other whether Prestige has filed suits seeking to collect Section 8 share? You wouldn't know one way or the other if that has happened in other Prestige lawsuits, would you?
MR. MARSHALL: Asked and answered.
A. No, I wouldn't know.
Q. Do you know one way or the other whether Prestige takes steps to determine whether they are suing on the Section 8 share? Do you know one way or the other what steps Prestige takes?
A. No, I don't know.
Q. Do you know one way or the other whether Prestige actually takes steps to determine whether they will be suing on the Section 8 share or not? Do you know if they have such a process or not?
A. No, I don't know.
Q. Okay. Do you know one way or the other if Prestige does property management for buildings that have project-based Section 8?
A. Yes.
Q. What do you know about that?

Page 67

P. Palmer
A. I know of one building within the Abbyssinian Development Corporation portfolio that has project-based HUD Section 8 that I'm familiar with. Beyond my building I wouldn't know of any others.
Q. You don't know one way or the other?
A. No.
Q. Prestige is the one that sends out billing ledgers and billing statements to tenants for the properties they manage; is that right?
A. Yes.
Q. And for the properties Prestige manages, they're the ones who are responsible for curing any HQS violations, right?
A. Yes.
Q. We talked earlier about the non-public portal that Prestige uses to exchange documents with Section 8 -- with the Section 8 program, right?
A. Yes.
Q. Refresh my memory about what that portal is and how it's accessing the information in it.
A. So by "non-public portal" are you referring to the portal that's used for HQS

Page 68

P. Palmer
violations?
Q. Well, let me rephrase this more generally.
What portals does Prestige use regarding buildings that are -- regarding tenants that have Section 8 individually or project-based?
A. To clarify, you're asking what portals would Prestige use for project-based for Section 8?
Q. Give me a moment. You think it's hard to answer the questions. To flip through what your questions were is even harder. Let me go through my questions again. Sorry.
Do you know if Williams & Georgia Towers Housing Development Fund Corporation is a project-based Section 8 program -- strike that.
Do you know whether Williams & Georgia Towers Housing Development Fund Corporation has project-based Section 8?
A. No, I don't know.
Q. Tell me about the NYCHA or HPD portals that Prestige has access to.
MR. MARSHALL: Objection to the form.
A. So for the NYCHA portal I can speak to the information in the portal -- I could speak to

Page 69

P. Palmer

the information on the NYCHA portal from the standpoint of the owner portal. I don't know what the additional access is or additional functionality that Prestige would have through the NYCHA portal login for property management agent. I think there is a difference, but I don't know what that difference is for the NYCHA portal.

When I log in as an owner to the NYCHA portal I'm able to see payment vouchers. I'm able to see which units NYCHA paid the voucher, paid the subsidy for a particular month. I'm able to see the tenant profile that would tell me members of household composition. For a voucher holder I can get a NYCHA payment history that would give me the history on contract rent, subsidy portion, tenant portion over the life of the tenancy. I can see upcoming dates for NYCHA unit inspections. I can see open HQS failures for units. And I can see cure documents that the property management agent uploaded in response to those HQS failures when I'm logged into the NYCHA owner portal.

Q. When you said just now about documents that the property management company uploads what did you mean about that?

Page 70

P. Palmer

A. So there would typically be two types of documents that I see when I log in. You know, the first document would be the -- there's a standard form that the property manager has to complete as part of curing an HQS failure. It could be the work order. And then there's also standard form -- it's called an NE-2 -- that NYCHA requires the property manager and the tenant to sign as part of a cure documentation for an HQS failure.

The second document that I see would be information on move-outs. So if there's a vacancy there's a standard form or input screen that the management agent accesses to report vacancies to NYCHA.

Q. Do you know one way or the other whether Prestige has access to that, that has its own login information for NYCHA properties?

A. So industry practice would tell me that they have their own login as a property management agent.

Q. But do you know one way or the other if Prestige actually does?

A. No.

Q. What is the -- well, would you expect

Page 71

P. Palmer

that Prestige would have a login for NYCHA buildings for the properties that it manages for Abbyssinian?

A. Yes.

Q. And does it?

A. I assume that they do. I haven't specifically asked the question.

Q. And would you assume that they do have access for a NYCHA portal for other properties it would manage?

A. Yes.

Q. Is there a separate HPD portal other than NYCHA?

A. Yes.

Q. What's on the HPD portal?

A. So for the HPD portal I do not have owner access. There is an owner portal that HPD has. I've struggled with doing the -- they have kind of a multistep verification, and every time I try to do my multistep verification to set up my owner login for the HPD portal I get error message, so I just stopped trying to set it up. And to the extent I need information on HPD I either request it from the property management agent or I go to the HPD public website where I can see the open number

Page 72

P. Palmer

of complaints and open HPD violations, you know, a building-by-building basis.

Q. Does Prestige have access to the HPD portal?

A. My assumption is that they do, yes.

Q. That would be the industry practice for property management companies?

A. Yes.

Q. And industry practice, would the HPD portal have notices of suspensions, HQS violations, rent letter -- rent -- write-down letters from HPD as to the Section 8 share and tenant share, would those all be on the HPD portal?

A. My knowledge -- my assumption is yes. I've never seen the log -- I've seen the screen once you log into the HPD portal. I have a general knowledge of what should be there.

Q. According to industry practice are those documents that went through the type of -- among the documents that would be in the HPD portal in their industry practice?

A. Yes.

Q. And under industry practice -- sorry if I asked this. I know we asked about it for NYCHA.

Page 73

P. Palmer

Under industry practice Prestige has access to that HPD portal?

A. Yes.

Q. Do you know if the law firms that a property management company hires to file non-payment proceedings, do you know if that's industry practice to have the law firm have access to the HPD portal?

A. No. No, that's not industry practice.

Q. Do you know if Prestige has allowed -- allows its collection law firms to have access to HPD portals?

A. No. I'm not aware of that.

Q. Okay. Thanks.

Does the HPD portal in industry practice have the same information that is in the tenant ledgers that Prestige generates?

A. No.

Q. Do you know in the industry practice whether there would be a ledger or other documents in the HPD portal that would show how much HPD has paid for that specific Section 8 tenant?

A. No. I'm not aware that it's in there.

Q. You don't know either way?

Page 74

P. Palmer

A. No.

Q. Now let's go back to that very painful topic -- painful for me as not an accountant -- of the billing gross potential method.

You said unpaid subsidies due to suspension are recorded as bad debt expenses or a write-off on the billing gross -- under a billing gross potential method?

A. Yes, that's correct.

Q. Maybe I should ask a more open-ended question because you're the expert here.

Let's talk about the billing gross potential method. That's the method that Prestige uses, right?

A. Yes.

Q. If Section 8 ceases a payment for an HQS violation is that supposed to be reflected in the ledger?

A. So under the gross potential method if the subsidy has been suspended the ledger would continue to reflect the monthly charge for the subsidy portion. There would then be a write-off either on a monthly basis or periodically there would be a write-off of the suspended subsidy.

Page 75

P. Palmer

Q. Under industry practice would the write-off -- would it normally be the write-off listed each month that the Section 8 has stopped paying because of HQS violations?

A. Yes. That would be -- that practice would vary by management agent. So from my experience I typically see the billing gross potential method, the subsidy is charged every month. And then, you know, once a -- they would then, you know, once the subsidy is reinstated or, you know, the accounting -- the accounting team that's processing the payments on the voucher at some point they would ask the property manager, you know, "Why is this subsidy not being paid?" They will let the back office or the accounting team know that the subsidy wasn't paid. The ledger system would continue to reflect the billing gross potential method. Once the subsidy was reinstated, at that point in time there would typically be a write-off of any unpaid subsidy.

I think the first time I saw it monthly -- the first time I saw the monthly write-off was on the ledger that you showed at our last deposition where there were some months where

Page 76

P. Palmer

the write-off was done monthly and then other months where there was no write-off.

Normally you continue to charge the billing -- under the gross potential method you continue to bill the monthly subsidy, and then once a determination is made on NYCHA or HPD reinstating the subsidy the property manager would then go in and do the write-off of what was unpaid. And the rationale for waiting until the subsidy is reinstated is because you may recoup some of the subsidy. So for example, if a subsidy was suspended for twelve months and maybe there was a painful work delay on the NYCHA or HPD side, out of that twelve months of suspended subsidy maybe you received two months of reinstatement as opposed to, you know, maybe zero months of reinstatement. So you typically wait until the subsidy is reinstated so that there's clarity as to how much of the suspended subsidy that the agency opted to pay.

Q. So is it industry practice to wait until Section 8 shares reinstated before reflecting a write-off of the amount that Section 8 withheld?

A. Yes. Well, I don't know if that's industry practice. I have one property that

P. Palmer

Prestige does not manage that has had a high rate of subsidy suspensions, and that's been their practice, to wait until a decision is made on reinstatement and then to do a write-off at that time.
Q. Do you know if that's the industry practice for Prestige?
MR. MARSHALL: Objection. Asked and answered.
A. I don't know.
Q. For Ms. Garcia is it your understanding that Section 8 suspended payments because Prestige did not cure HQS violations?
A. Yes, that's my understanding.
Q. Did Section 8 ever reinstate the payments to Prestige for Ms. Garcia?
A. I don't know.
Q. If Section 8 legitimately suspends Section 8 payments because of an HQS violation why is that reflected as a bad debt write-off?
MR. MARSHALL: Objection to the form.
A. So a property will have two revenue streams. One will be the tenant portion and one will be the subsidy portion. So to the extent the subsidy portion -- and in some cases the tenant



P. Palmer

portion -- to the extent they are not collectible there needs to be bad debt expense or write-off recorded to reflect the revenue that the property will not receive.
Q. Okay. Do you know if there was a bad debt write-off in the ledgers as to Ms. Garcia in this case?
A. No, I don't know.
Q. Okay. Let's switch gears quickly.
Did you realize that Arthur Ransome LP has defaulted in this lawsuit that you're testifying about? Did you realize that they had defaulted?
MR. MARSHALL: Objection to the form.
A. I learned that there was a default maybe within the last two or three weeks, is when I learned of the default.
Q. Do you know why Ransome LP defaulted in this lawsuit?
A. There's been a delay in obtaining counsel by -- for Arthur Ransome Houses LP. That would be the reason why there was the default. We are currently working to engage counsel to request a vacate of the default.
Q. Do you know what the status of that is



P. Palmer

in terms of getting an attorney for the LP to try to remove the default? Do you know what the status of that is?
A. No, I don't have an update. I'll likely get an update within the next week or so.
Q. Who would you get an update from?
A. I would get an update from our -- we have counsel that has worked with us on other matters. We've asked them to take a look to see if they are able to assist with this particular legal matter or if they can make a referral to other counsel who could assist. So Hardwick Law Firm is the firm that I'm having those discussions with.
Hardwick is spelled H-A-R-D-W-I-C-K.
Q. Is that the full name of the law firm, Hardwick Law Firm or --
A. I think it's -- I want to say it's Hardwick Law. That's the name of the firm.
Q. Do they know that you are being deposed today and were deposed last week?
A. Yes.
Q. And I assume it's Mr. or Mrs. Hardwick who runs the firm?
A. It's actually Herbert Hardwick.



P. Palmer

H-E-R-B-E-R-T.
Q. When you say the Ransome LP knowledge, do you mean Abyssinian, because Abyssinian -- let me just ask you. Do you mean --
(Discussion held off the record.)
Q. When did Ransome LP first learn about this lawsuit?
A. You know, I actually don't recall. I don't recall when I first had knowledge of the lawsuit. My apologies.
Q. Don't apologize.
When I say Arthur Ransome LP, Abyssinian is essentially the entity that's running that through the general partner for the LP, right?
A. When you say "running that," I just want to clarify what you mean by that.
Q. What I'm trying to get at is when there's a lawsuit filed by -- against Abyssinian LP, is it -- sorry, I mixed up my phrasing.
The structure Ransome LP, there's a general partner who's Ransome Corporation, right?
A. Yes.
Q. And Abyssinian is the sole shareholder of Abyssinian Corporation, right?

Page 81

P. Palmer
MR. MARSHALL: Objection to the form.
A. Yes.
Q. When there's an issue with Abbyssinian LP or Corporation, either one, is the involvement in those Abbyssinian entities managed by both Abbyssinian and Prestige?
A. Is the involvement managed by both Abbyssinian and Prestige? So let's see.
So typically servicing of Arthur Ransome -- Arthur Ransome Houses is serviced in a lawsuit, that servicing would go to Prestige management because they would be listed as the primary point of contact. So they would get the notices, you know, of the lawsuit. Upon receipt of the notice that Arthur Ransome Houses LP had been named, Prestige would then report that to the broker. So the insurance broker would then notify Abbyssinian Development Corporation that the claim was out there. We would then have correspondence with the broker as they looked to determine, you know, if it's reported under property or liability coverage or general coverage. So we would then correspond with the broker on which policy the claim would fall under, and then the broker would update

Page 82

P. Palmer
Abbyssinian Development Corporation on, you know, coverage decision by the respective carrier.
I think in this case some of the servicing have been directly with Prestige. There was some servicing that came to Abbyssinian Development Corporation, but there was some confusion on where all of the Arthur Ransome Houses servicing was happening, and I think that created some of the delay with getting counsel in place.
Q. Do you have those different insurance policies that were being looked at in relation to this lawsuit?
A. I should have them. There may be one I don't have, but I would be able to request whatever I don't have.
Q. Do you think you could forward those insurance policies next Friday when you produce the other documents?
MR. MARSHALL: Same objection as before.
A. Okay. That would be -- what would be -- you need the insurance policies? Can you just give some context?
Q. ** Sure. Any of the insurance policies

Page 83

P. Palmer
that were referenced by the broker in terms of whether or not they would be covering this claim, can you get me those insurance policies?
A. Can I confer with the broker?
Q. Sure.
A. We typically don't provide insurance policies.
Q. Who is the broker in this case?
A. So broker in this case -- let me see. H&N Agency is the current broker.
I believe we had to reach out to the prior broker at USI. They would have been the broker at the date of incident. But we started the inquiry with the initial -- with the current broker, and then had some correspondence with the previous broker because of the -- I think the date of incident fell under the coverage period where USI was the broker in place.
Q. So was there correspondence between different brokers and Abbyssinian going back and forth?
A. So there would be conversation between myself and the two brokers. There wouldn't be any conversation between the two brokers.

Page 84

P. Palmer
Q. Are there documents going back and forth between Abbyssinian and the two brokers?
A. Yes.
Q. What would be the nature of those documents?
A. It would be sharing the claims and then, you know, asking for information on whether the incident was a covered matter.
Q. Was a law firm involved in that on behalf of Abbyssinian?
A. No.
Q. And I'm sorry, the documents were between Abbyssinian and both of the brokers or only one of them?
A. There was -- there were inquiries and questions with both. I think because this date of incident fell outside of when H&N agency was the broker that there was limited correspondence with H&N -- "because the date of incident is X. We weren't the broker at the time. So now you need to go to the prior broker."
Q. ** By next Friday can you give me any of the correspondence that you have between Abbyssinian and the two brokers?

Page 85

P. Palmer

MR. MARSHALL: I'm going to make the same objection noting the scope of the existing subpoena.

Q. You can answer.

A. I would want to confer with the broker. Again, we typically don't provide this type of documentation. I would like an opportunity to confer with the broker on the document request.

Q. Sure. Fair enough.

** I'll just add that among the list of documents in the supplemental subpoena that I'm going to issue.

A. Understood.

MR. MARSHALL: Adam, as you know, we're getting close.

MR. KESHAVARZ: Getting close, I know.

MR. MARSHALL: We're getting past it. I'm giving a friendly warning.

MR. KESHAVARZ: I don't know if we're past it, but I appreciate the friendly warning and I -- well, I think I just had a couple of questions more, but did you want to ask any questions you had, Adam, and then I can --

Page 86

P. Palmer

MR. MARSHALL: I don't expect to at this point, but we're at about 7 hours, 10 minutes at this point.

MR. KESHAVARZ: All right. Just give me a minute just to go through my notes. I think we're done, but just give me a minute to go through my notes.

Off the record.

(Time noted: 11:21 a.m.)

(Recess.)

(Time noted: 11:28 a.m.)

Q. I'm going to mark this Exhibit D. It's going to be the James River Insurance letter.

(Exhibit D so marked for identification.)

Is James River Insurance one of the insurance brokers that you were dealing with?

A. No. James River Insurance would be the carrier for coverage.

Q. ** So one of the requests is also for any correspondence with the insurance companies themselves.

Going to E, this is a payment history portal called ClickPay.

Page 87

P. Palmer

(Exhibit E so marked for identification.)

Is this the payment portal with Prestige that you were referring to in your testimony?

A. Yes.

Q. And that's run by -- that's run by Prestige? It's the Prestige portal?

A. Yes.

Q. Going on to Exhibit F, which will be documents Bates stamped starting PRE 61 through 87.

(Exhibit F so marked for identification.)

My question is this: Going to page 61, do you know what this document is?

A. This is the -- it says it's a Rent Roll. Rent Roll has basic -- it just gives basic information on the tenancies. So tenants, their monthly rent, the date month they moved, lease term. So this is the-- the Rent Roll is the standard property management document.

Q. I'm going to go down to document Bates stamped PRE 70.

On the top left corner it says

Page 88

P. Palmer

"Alternate Balance." Do you know what that means?

A. So Alternate Balance is the acronym or notation used by Prestige when there's a subsidy. So the Alternate Balance would be the subsidy portion for that particular tenant.

Q. The Section 8 share.

So this Alternate Balance ledger, should that have been disclosed to the law firm when the law firm filed suit for non-payment action against my client?

A. If it had been disclosed to the attorney?

Q. Should have been disclosed.

A. I wouldn't be able to comment or answer the...

Q. Is Abbyssinian able to direct Prestige to run rent ledgers?

A. Yes.

Q. Can you direct Ransome -- Prestige to run rent ledger as to my client, Leonarda Garcia, and produce those next week?

A. Can I ask them to run ledgers for Leonarda Garcia?

Q. My client.

Page 89

P. Palmer
A. For what period? For what period of time?
Q. Next week.
A. For the ledger -- how far back do you want to go for the ledger?
Q. Whatever they have. Can you --
A. Is that the Alternate Balance ledger that we're looking at now? I can't see the top.
Q. ** Whatever ledgers that they can generate for my client, can you direct Prestige to generate those and produce them next week?
A. Yes.
Q. Why would Prestige want -- why would one want to generate an Alternate Balance spreadsheet as opposed to regular rent ledgers?
A. So the Alternate Balance ledger allows you to see activity just for the subsidy. So it would exclude -- it should exclude any tenant portion, tenant payment.
Q. That's a type of ledger that Prestige is able to print or generate?
A. Yes. So within Yardi you have the ability to run a tenant only ledger, the Alternate Balance or subsidy only ledger, and then you can

Page 90

P. Palmer
also run a combined ledger that would show both tenant and tenant portion.
Q. Any other types of ledgers and rent?
A. Say that again. I couldn't hear you. I'm sorry.
Q. ** Any other ledger that can be run from Yardi -- any other tenant ledger that can be run from Yardi for my client other than those two kinds?
A. The third kind is just the combined that would have both tenant and subsidy activity.
Q. ** Okay. Can you generate all three, please?
A. Yes.
Q. And just going lastly to --
A. Unfortunately I don't have my charger. I'm almost out of charge.
Q. I'm almost done.
A. I just don't want my phone to die. I'm at like seven percent.
Q. That would be plenty.
Page 67 PRE, the ledger, on 4/1/2024 it lists a bad debt of $12,497.76; is that right?
A. Yes.

Page 91

P. Palmer
Q. Is that the charge out for the Section 8 share while Section 8 suspended payment because of HQS violations?
A. Can you just scroll to the top so I can see which ledger we're looking at, if this is the Alternate Balance?
So this is a combined -- this appears to be a combined ledger where it has the tenant portion and the subsidy portion, because it doesn't have that, you know, Alternate Balance header in that top left corner. So my assumption is that this is a combined ledger in terms of the write-off. Since it's a combined ledger with a bad debt I wouldn't know if it's the write-off of the subsidy or it was a write-off of a tenant portion for whatever reason. I wouldn't know.
Q. Do you know why Prestige waited until 4/1/2024 before it reflected a bad debt of $12,000 on my client's ledger? Do you know why Prestige waited so long?
MR. MARSHALL: Objection to the form.
A. Can you go to the next page, to March?
(Scrolling.)
I think you went one too far. Can you

Page 92

P. Palmer
go back one more page?
Oh, there's no March activity there.
It's just January -- oh, okay, I'm sorry. I can't always see without my glasses on this screen.
So it looks like they received subsidy -- because I see the HPD notation of the $424.08 coming in in February. And I see another payment from HPD in March. When we looked at the ledger on last week there were not any HPD payments. So my assumption would be that the subsidy was reinstated in February of 2026. And once Prestige had information on the subsidy reinstatement they then had enough information to determine what the write-off amount should be, and they did a cumulative write-off of any unpaid subsidy in April.
Again, that's my assumption based on what I see here.
Q. Would that be the industry's practice when Section 8 reinstates payments after it had suspended it? Would it be the industry standard in the billing method that Prestige uses to show the bad debt charge-off only after Section 8 reinstates?
A. That's what I've typically seen. I don't know if that's the industry norm.

P. Palmer

Q. All right. That's about all I have. I appreciate your time. Mr. Marshall has a chance to ask up to seven hours of questions.

MR. KESHAVARZ: Go right ahead, Mr. Marshall.

MR. MARSHALL: I have nothing further for the witness.

Q. I appreciate your time.

Oh, by the way, do you know why -- were there other subpoenas issued for documents to Ransome LP and Abbyssinian? And they were served on Prestige, who was a direct copy management agency, I think there were two or three prior document subpoenas that were never responded to. Did Abbyssinian know that there are prior documents subpoenas?

A. I'm not aware. I would have to follow up with Prestige.

You mentioned that these were Arthur Ransome subpoenas served directly to Prestige?

Q. Arthur Ransome and Abbyssinian. Two of them were served on Prestige.

A. I would have to research the ones that were served to Prestige. I'm not recalling those.



P. Palmer

I recall the one that was served at my home. I'd have to also go into my notes and check into the one that you said was served on Abbyssinian Development Corporation. Off the top of my head I don't remember.

Q. They would -- as part of its responsibilities, job responsibility, Prestige should have forwarded you -- you personally, Ms. Palmer -- a copy of subpoenas, two subpoenas to Ransome LP and to Abbyssinian. They should have forwarded those to you directly. Right?

A. So from a process standpoint they should have forwarded and made me aware. And then there likely should have been conversation on what Prestige was going to provide in response since they serve as the property management agent, and would likely have -- or could likely have documents in the subpoena, so that there would be some coordination between Abbyssinian Development Corporation and Prestige on responding to the subpoenas that were served for Arthur Ransome Houses LP.

Q. And were there any such conversations?

A. No.

Q. As far as you recall, Prestige never



P. Palmer

informed you or Abbyssinian that there were two prior subpoenas as to Ransome and Abbyssinian? As far as you can recall, they never told you that?

A. No. I'm not recollecting now.

Q. Did they ever tell you that there was a lawsuit against Abbyssinian -- against Ransome LP, did they ever tell you that?

MR. MARSHALL: Objection to the form.

A. Yes.

Q. When was the first time that you were informed of that, that Abbyssinian was --

A. Oh, gosh. I don't -- off the top of my head I don't remember when we were first informed.

Q. Within the last couple months or before that?

A. Probably before. But as to the exact date and time I don't remember.

Q. Thank you for your time again.

A. No problem. Safe flight for you.

Take care.

COURT REPORTER: Mr. Keshavarz, could you just state for the record that you are ordering the transcript?

MR. KESHAVARZ: Yes. Electronic only.



P. Palmer

I don't need a hard copy.

COURT REPORTER: Mr. Marshall, are you ordering a copy?

MR. MARSHALL: Yes.

(Time noted: 11:43 a.m.)

Princess Palmer

Subscribed and sworn to
before me this day
of , 2026.

Notary Public

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| P. Palmer | Mr. Keshavarz | 4 |

| EXHIBITS | | PAGE |
|---|---|---|
| D | James River Insurance letter | 86 |
| E | ClickPay payment history portal | 87 |
| F | Rent Roll documents Bates stamped PRE 61 through PRE 87 | 87 |

(Exhibits retained by Mr. Keshavarz)

PRODUCTION REQUEST:

| Page | Line |
|---|---|
| 10 | 7 |
| 82 | 25 |
| 84 | 23 |
| 85 | 11 |
| 86 | 21 |
| 89 | 10 |
| 90 | 7, 13 |

INSERTS:

| Page | Line |
|---|---|
| 46 | 23 |



C E R T I F I C A T I O N

I, PATRICIA GUARINO, a Shorthand Reporter and notary public, within and for the State of New York, do hereby certify:

That PRINCESS PALMER, the witness whose examination is hereinbefore set forth, was first duly sworn by me, and that this transcript of said testimony is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 21st day of August, 2026.

Patricia Guarino

PATRICIA GUARINO



DEPOSITION ERRATA SHEET

Our Assignment No.: J15291482

Case Caption: Garcia vs. Kahan et al

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

______________________

Princess Palmer

Subscribed and sworn to on the ____ day of ________, 20 ____ before me.

______________________________

Notary Public,

in and for the State of ________________________.



DEPOSITION ERRATA SHEET

Page No.____Line No.____Change to:___________

______________________________________________

Reason for change:____________________________

Page No.____Line No.____Change to:___________

______________________________________________

Reason for change:____________________________

Page No.____Line No.____Change to:___________

______________________________________________

Reason for change:____________________________

Page No.____Line No.____Change to:___________

______________________________________________

Reason for change:____________________________

Page No.____Line No.____Change to:___________

______________________________________________

Reason for change:____________________________

Page No.____Line No.____Change to:___________

______________________________________________

Reason for change:____________________________

SIGNATURE:____________________DATE:__________

Princess Palmer

DEPOSITION ERRATA SHEET

Page No.____Line No.____Change to:___________
_____________________________________________
Reason for change:___________________________
Page No.____Line No.____Change to:___________
_____________________________________________
Reason for change:___________________________
Page No.____Line No.____Change to:___________
_____________________________________________
Reason for change:___________________________
Page No.____Line No.____Change to:___________
_____________________________________________
Reason for change:___________________________
Page No.____Line No.____Change to:___________
_____________________________________________
Reason for change:___________________________
Page No.____Line No.____Change to:___________
_____________________________________________
Reason for change:___________________________
Page No.____Line No.____Change to:___________
_____________________________________________
Reason for change:___________________________

SIGNATURE:____________________DATE:__________
Princess Palmer