# PROPERTY MANAGEMENT AGREEMENT

This Agreement is made as of the date set forth herein, between the Owner ("Owner") and Agent ("Agent") identified on the signature page hereof. Certain terms of this Agreement are set forth on the Information Schedule (the "Information Schedule") attached hereto and made a part hereof.

W I T N E S S E T H:

In consideration of the terms, conditions, and covenants hereinafter set forth, Owner and Agent hereby mutually agree as follows:

1. **Definitions**. As used in this Agreement:

(a) **"Building"** shall have the meaning ascribed to such term in Section A of the Information Schedule.

(b) **"Fiscal Year"** shall mean calendar year unless specifically provided to the contrary herein.

(c) **"Gross Collections"** shall mean all amounts actually collected by Agent, as rents or other payments, but excluding (i) income derived from interest or investments, (ii) discounts and dividends on insurance, and (iii) security deposits.

(d) **"Gross Rents"** shall mean revenues collected from Tenants plus any federal assistance paid to Owner with respect to the Building.

(e) **"Lease"** shall mean any Lease in which Owner has agreed to let and Tenant has agreed to accept the dwelling unit of the Building identified in the Lease in accordance with the terms of the Lease.

(f) **"Mortgages"** shall mean, collectively, all mortgages from time to time encumbering the Building and all promissory notes secured thereby.

(g) **"Operating Account"** shall mean an account in Agent's name and designated of record in an account name identifying the Building and approved by Owner in writing, at such financial institution as Owner may specify from time to time in writing.

(h) **"Rent"** shall mean that monthly amount which Tenant is obligated to pay Owner pursuant to the terms of a Lease.

(i) **"Tenant"** shall mean a person or family occupying a dwelling unit in the Building pursuant to a Lease.

2. Appointment and Acceptance. Owner appoints Agent as exclusive agent for the management of the Building, and Agent accepts the appointment, subject to the terms and conditions set forth in this Agreement. Agent represents that it is experienced in professional management of property of the character and occupancy of the Building, and Agent agrees to manage the Building in accordance with the highest professional standards for such property.

3. Management Plan. Attached hereto as Exhibit 1 and by this reference made a part hereof, if applicable, is a copy of the Management Plan for the Building (the "Plan"), prepared and approved by Owner. The Plan, if applicable, contains a comprehensive and detailed description of the policies and procedures to be followed by Agent in the management of the Building, including but not limited to the collection of delinquent rents and charges; and the provisions of this Agreement are to be read in conjunction with and not as a limitation upon the specific obligations of Agent as set forth in the Plan. Agent agrees to comply with all applicable provisions of the Plan, regardless whether specific reference is made thereto in any particular provision of this Agreement.

4. Meeting with Owner. Agent agrees to cause a representative of Agent to confer with Owner and to attend meetings with Owner at any reasonable time or times requested by Owner.

5. Basic Information. As soon as practicable, but not later than final completion of rehabilitation or construction of the Building or any phase thereof, Owner shall furnish Agent with a complete set of general plans and specifications for the Building and copies of all guarantees and warranties pertinent to construction and fixtures and equipment of the Building. With the aid of this information and inspection by competent personnel, Agent shall thoroughly familiarize itself with the character, location, construction, layout, plan and operation of the Building, and especially the electrical, heating, plumbing, and ventilating system, and all other mechanical equipment in the Building.

6. Development Phase. Agent shall facilitate the work of Owner's general contractor in an effort to minimize disturbance of the Tenants and promote timely completion of rehabilitation or construction of the Building. Any disputes between the Agent and the general contractor shall be immediately referred to Owner by Agent. Further, Agent shall do the following during rehabilitation:

(a) Post notices around the construction area warning Tenants and others that area is under construction and trespass may be hazardous;

(b) Respond to Tenant complaints regarding the construction activity and notify Owner thereof; and

(c) Notify Owner of any dangerous condition that emanates from construction.

7. Marketing. Agent shall carry out the marketing activities prescribed in the Plan or approved by Owner in writing. Subject to the prior written approval of Owner, advertising expenses incurred by Agent on behalf of Owner shall be paid out of the Operating Account as expenses of the Building.

8. Leasing. Agent shall offer for rent and shall rent the dwelling units in the Building, upon completion of rehabilitation of each such unit and from time to time thereafter, in accordance with a rent schedule approved in writing by Owner and the leasing guidelines and form of lease referred to hereinbelow. Incident thereto, the following provisions shall apply:

(a) Agent shall show dwelling units for rent in the Building to all prospective Tenants.

(b) Agent shall take and process applications for rentals, including prospective Tenant interviews and credit checks. If an application is rejected, Agent shall promptly give to the applicant a proper written notice stating the reason for rejection.

(c) Agent shall comply with the special low-income housing tax credit requirements concerning leasing and related matters as set forth in Paragraph 9 hereof.

(d) Agent shall be responsible for or shall assist Owner in the certification and recertification of tenants covered by any Housing Assistance Payments Contract that may be applicable to the Building with respect to federal Section 8 rent subsidies, following procedures required by the U.S. Department of Housing and Urban Development ("HUD"). After the first year of certification and recertification of Tenants, the certification and recertification process shall be the sole responsibility of Agent.

(e) Agent shall, subject to prior written approval by Owner of any deviation from Owner's approved rent schedule, Lease form, and leasing guidelines, execute all Leases in Agent's name, identified thereon as agent for Owner.

(f) Agent shall negotiate any commercial leases and concession agreements called for in the Plan or approved in writing by Owner and, subject to prior written approval by Owner of all terms and conditions, shall execute the same in its name, identified thereon as Agent for Owner.

(g) Agent shall collect, deposit, and disburse security deposits, if required, in accordance with the terms of each Lease. The amount of each security deposit shall be as specified in the Plan or as approved by Owner in writing. Security deposits shall be held by Agent in a trust account, separate from all other accounts and funds. Such account shall be in the name of the Agent, also identifying the Building, and designated of record as "Security Deposit Account." Interest on security deposits shall be paid according to law.

(h) Agent shall maintain a current list of acceptable prospective Tenants and undertake all arrangements necessary and incidental to the acceptance of rental applications and the execution of Leases. Agent shall exercise its best efforts (including, but not limited to, placement of advertising, interview of prospective Tenants, assistance in completion of rental applications and execution of Leases, processing of documents and credit and employment verifications, and explanation of the program and operations of Owner), to effect the leasing of dwelling units, renewal of Leases, and, in accordance with the terms of the Lease, subleasing of dwelling units in the Building.

(i) Agent shall perform such other acts and deeds requested by Owner as are reasonable, necessary, and proper in the discharge of Agent's rental duties under this Agreement.

(j) Agent shall prorate the first month's rent collected from a Tenant should the Lease term commence on any other day than the first day of the month. If the Lease term occurs after the twentieth (20th) day of the month, the prorated amount, plus the next month's rent, shall be collected on or before the first day of the Lease term.

(k) Agent shall participate in the inspection of the dwelling unit identified in the Lease together with the Tenant prior to move-in and upon move-out, and shall record in writing any previous damage to the unit and any damage occurring during the Tenant's occupancy.

(l) Agent shall, unless otherwise agreed by Owner and Agent in writing, (i) comply with the leasing guidelines attached hereto as Exhibit 2 and by this reference made a part hereof, and (ii) use for each Lease the form of lease agreement attached hereto as Exhibit 3 and by this reference made a part hereof, together with the form of Low-Income Lease Rider attached hereto as Exhibit 4 and by this reference made a part hereof, if required by Paragraph 9 hereof, without any material changes.

(m) If the Project is a rehabilitation of a pre-1978 built building and contains rental units with one bedroom or

more that are expected to be available to tenants other than the elderly or disabled then the Agent must provide each prospective tenant a copy of the Government Printing Office published informational pamphlet entitled Lead-Based Paint: Protect Your Family and a copy of the Lead Hazard Evaluation report on the building prepared by the Owner's environmental consultant. Furthermore, the Agent agrees to indemnify and hold harmless the Owner for any damages and attorneys' fees incurred by the Owner or Agent for failure to properly implement this paragraph.

9. Tax Credit Requirements. Agent acknowledges that Owner is required under its limited partnership agreement to use best efforts to lease the percentage of the apartment space in the Building set forth in Section B of the Information Schedule (based on number of apartments or floor area, whichever is less) (the **"Credit Units"**) to tenants whose income and rent levels qualify such apartments for inclusion in determining federal low-income housing tax credits (the **"Credits"**) for the Building, and that the Credits will have substantial economic value to Owner and its partners. Agent shall also lease any other qualified space if and as indicated in Section B of the Information Schedule. Owner shall furnish Agent with written descriptions of such requirements as they relate to Agent's leasing and management duties hereunder. Incident thereto, the following provisions shall apply for all Credit Units:

(a) Agent shall, prior to approving each rental application and prior to allowing prospective tenant to take occupancy, (i) require prospective tenant to complete, execute, and deliver the forms of Low-Income Lease Rider, and (ii) obtain from the prospective tenant's employer (if any) the completed and executed form of Employment Verification, all attached hereto as part of Exhibit 4, as may be revised by Owner from time to time, and (iii) shall perform such other verifications of such tenant's non-employment income as are necessary or appropriate, in order to provide necessary certification and verification of the amount of such tenant's annual family income, family size, and any other information reasonably requested by Owner in writing in connection with the Credits. Agent shall require tenants to certify in writing as to such matters on an annual basis, prior to such time as the information is required for tax reporting purposes for the Credits. Owner shall give Agent advance written notice of such requirements. Agent shall, prior to leasing Credit Units, determine tenant income eligibility for purposes of the Credits pursuant to applicable laws, using the Managing Agent's Low-Income Eligibility Worksheet attached hereto as part of Exhibit 4 or such corrective revisions thereof as Owner shall furnish to Agent from time to time upon any revisions in applicable laws. Without Owner's express prior written consent, Agent shall not enter into any lease on behalf of Owner to a tenant who fails to

meet the income eligibility requirements for the Credits. Agent shall complete, execute, and deliver to Owner, upon lease-up of the Credit Units and annually thereafter prior to the time such information is required for tax reporting purposes for the Credits, the form of Managing Agent's Low-Income Leasing Certification attached hereto as Exhibit 5, including a true and correct Rent Roll of all apartment units in the Building in the format attached therewith. Agent shall deliver copies of all leases, riders, certifications, and verifications for the Credit Units to Owner on a monthly basis, and shall deliver copies of annual recertification to Owner prior to the time they are required for tax reporting purposes for the Credits.

(b) Owner shall from time to time furnish Agent with a written schedule of maximum rents for the apartments, depending on family size for purposes of the Credits. Without Owner's express prior written consent, Agent shall not enter into any lease on behalf of Owner at a rental amount exceeding the applicable maximum.

(c) Agent shall maintain and preserve all written records of tenant family income and size, and any other information reasonably requested by Owner in writing in connection with the Credits, throughout the term of the Agreement, and shall turn all such records over to Owner upon the termination or expiration of the Agreement.

(d) If requested by Owner in writing, Agent shall prepare reports of low-income leasing and occupancy in form suitable for submission in connection with the Credits.

(e) Agent shall cause the Project to be maintained in compliance with all local health, safety, and building codes to the extent of available funds, and shall promptly give written notice to Owner and to Owner's Limited Partner, as identified in Paragraph 28 hereof, if Agent receives notice of any such code violation relating to the Building.

10. Collection of Rents, Etc. Agent shall collect when due, directly or through an on-site manager, all rents, charges, and other amounts receivable on Owner's account in connection with the management and operation of the Building. Such receipts shall be held in the Operating Account identifying the Building, separate from all other accounts and funds.

11. Enforcement of Leases. Agent shall secure full compliance by each Tenant with the terms of such Tenant's Lease. Voluntary compliance shall be emphasized, and Agent shall counsel Tenants and make referrals to community agencies in cases of financial hardship or other circumstances deemed appropriate by Agent, all to the end that involuntary termination of tenancies shall be avoided to the maximum extent, consistent with sound

management of the Building. Nevertheless, and subject to any applicable procedures prescribed in the Plan, Agent may, and shall if requested by Owner, lawfully terminate any tenancy when sufficient cause for such termination occurs under the terms of the Tenant's Lease, including, but not limited to, nonpayment of rent. For this purpose, Agent is authorized to consult with legal counsel to be designated by Owner and bring actions for eviction and execute notices to vacate and judicial pleadings incident to such actions; provided, however, that Agent shall keep Owner informed of such actions and shall follow such instructions as Owner may prescribe for the conduct of any such action. Reasonable attorneys' fees and other necessary costs incurred in connection with such actions, as determined by Owner, shall be paid out of the Operating Account. Agent shall properly assess and collect from each Tenant or the security deposit the cost of repairing any damages to the dwelling unit arising during the Tenant's occupancy.

12. <u>Maintenance and Repairs</u>. Agent shall cause the Building to be maintained in a decent, safe, and sanitary condition and in a rentable and tenantable state of repair, all in accordance with the Plan and local codes, and Agent otherwise shall maintain the Building at all times in a condition acceptable to Owner, including, but not limited to, performance of cleaning, painting, decorating, plumbing, carpentry, grounds care, and such other maintenance and repair work as may be necessary. Incident thereto, the following provisions shall apply:

(a) Special attention shall be given to preventive maintenance, and to the greatest extent feasible, the services of regular maintenance personnel shall be used.

(b) Subject to Owner's prior written approval, Agent shall contract with qualified independent contractors for the maintenance and repair of major mechanical systems, and for the performance of extraordinary repairs beyond the capability of regular maintenance personnel. Agent shall obtain prior to commencement of any work appropriate written evidence of such contractor's liability and worker's compensation insurance.

(c) Agent shall systematically and promptly receive and investigate all service requests from Tenants, take such action thereon as may be justified, and keep records of the same. Emergency requests shall be received and serviced on a 24-hour basis. Complaints of a serious nature shall be reported to Owner after investigation. Owner shall have the right to receive copies of all service requests and the reports of action taken thereon.

(d) Agent shall use best efforts to take such action as may be necessary to comply with any and all orders or requirements of federal, state, county, or municipal

authorities having jurisdiction over the Building and orders of any board of fire underwriters, insurance companies, and other similar bodies.

(e) Subject to the provisions of paragraph 19 hereof, Agent is authorized to purchase all materials, equipment, tools, appliances, supplies, and services necessary for proper maintenance or repair of the Building.

(f) Notwithstanding any of the foregoing provisions, the prior approval of Owner shall be required for any expenditure exceeding $500.00 in any one instance for labor, materials, or otherwise, in connection with the maintenance and repair of the Building, except for emergency repairs involving manifest danger to persons or property, or required to avoid suspension of any necessary service to the Building. In the event of emergency repairs, Agent shall notify Owner of the fact promptly, and in no event later than 72 hours from the occurrence of the event.

13. <u>Utilities and Services</u>. In accordance with any applicable provisions of the Plan, Agent shall make arrangements for water, electricity, gas, sewage, and trash disposal, vermin extermination, decorating, laundry facilities, and telephone service in connection with the Building. To the extent available, all utilities shall be paid in accordance with an annual budget plan established by the utility.

14. <u>Personnel</u>. All on-site personnel shall be contracted service providers or employees of Agent and shall be paid from the Operating Account as an expense of the Building. Agent shall at all times have sufficient personnel physically present at the Building for the full and efficient performance of its duties under this Agreement, including physical presence of responsible persons at such times as reasonably may be requested by Owner.

15. <u>Operating Account</u>. Disbursements from the Operating Account shall be governed by the following:

(a) From the funds collected and held by Agent in the Operating Account pursuant to paragraph 10 hereof, and subject to Owner's approved operating budget, Agent shall make the following disbursements promptly when payable, in the following order of priority:

(i) salaries and any other compensation due and payable to the employees referred to in paragraph 14 hereof including Agent's compensation, together with related payroll taxes;

(ii) real estate taxes and assessments, and fire and other hazard insurance premiums (including any required monthly escrow payments therefor),

PRE - 000008

utilities, interest on the Mortgages, amortization of the principal of the Mortgages, fees, and establishment and maintenance of all reserve funds;

(iii) other payments due and payable by Owner as operating expenses incurred pursuant to Owner's approved operating budget and in accordance with this Agreement, and

(iv) distributions to or at the direction of Owner, including distributions to Owner's partners in accordance with Owner's partnership agreement.

(b) In the event that the balance in the Operating Account is at any time insufficient to pay disbursements due and payable under subparagraph 15(a) hereof, Agent shall promptly inform Owner of the fact and Owner may then remit to Agent sufficient funds to cover the deficiency. In no event shall Agent be required to use its own funds to pay such disbursements.

16. Operating Budget. Agent shall prepare a recommended annual operating budget for the Building for each fiscal year during the term of this Agreement, and shall submit the same to Owner at least sixty (60) days before the beginning of such fiscal year. The annual operating budget shall include a schedule of recommended rents to be charged for each dwelling unit, including recommended rent increases with respect to Lease renewals and new Leases. In preparing each proposed annual operating budget, Agent shall use its best efforts to take account of anticipated increases in real estate taxes, utility charges, and other operating costs. To the extent feasible, Agent shall support anticipated increases in real estate taxes and utility charges with written evidence or documentation. Proposed annual operating budgets for the Building shall be subject to approval by Owner. Owner shall promptly inform Agent of any changes incorporated in the approved operating budget, and Agent shall make no expenditures in excess of the amounts set forth in such approved operating budget, for each line item of operation expense itemized, without the prior written approval of Owner, except as permitted pursuant to subparagraph 12(f) hereof for emergency repairs involving manifest danger to persons or property, or required to avoid suspension of any services to the Building.

17. Records and Reports. In addition to any requirements specified in the Plan or other provisions of this Management Agreement, Agent shall have the following responsibilities with respect to records and reports:

(a) Upon execution of this Agreement, Agent immediately shall ascertain the general condition of the Building, including, but not limited to, the taking of an inventory of

all furniture, equipment, tools, and supplies, and shall prepare a report on the physical and financial status of the Building. Within thirty (30) days after the execution of this Agreement, Agent shall provide Owner with a copy of the reports and inventories so prepared.

(b) Agent shall establish and maintain a comprehensive system of records, books, and accounts, including computerized systems, in accordance with the Plan and in a manner satisfactory to Owner. All records, books, and accounts shall be subject to examination at reasonable hours by any authorized representative of Owner, or of Owner's limited partner as identified in paragraph 28 hereof ("Owner's Limited Partner").

(c) Agent shall prepare a monthly report, in accordance with any applicable provisions of the Plan and in form satisfactory to Owner, containing and including at least the following: (i) a statement of income and expenses and accounts receivable and payable for the preceding month, including an itemized list of all delinquent rents as of the tenth (10th) day of the current month, as well as a report on action taken thereon by Agent; (ii) a rent roll/cash receipts form for the previous month; (iii) a disbursements summary for the previous month; (iv) current bank statements with reconciliation of the Operating and Security Deposit Accounts; (v) copies of paid bills and invoices for the previous month; and (vi) a narrative of any unusual actions taken or emergencies responded to, and a full report of any accidents, claims, and potential claims, for the previous month. Agent shall submit each such report to Owner on or before the fifteenth (15th) day of each month, and shall concurrently mail a copy of the entire report to Owner's Limited Partner.

(d) Agent shall promptly furnish such additional information (including monthly occupancy reports) as may be requested from time to time by Owner or Owner's Limited Partner with respect to the renting and financial, physical, or operational condition of the Building.

(e) Agent shall prepare, execute, and file all forms, reports, and returns required by law in connection with the employment of personnel, unemployment insurance, workman's compensation insurance, disability benefits, Social Security, and other similar insurance, and all other benefits or taxes now in effect or hereafter imposed.

(f) Agent shall establish tenant files containing copies of leases, certification forms, notices, and other documentation required by HUD, if and to the extent applicable.

(g) Except as may otherwise be expressly provided in this Agreement, all bookkeeping, data processing services, and management overhead expenses shall be borne by Agent out of its funds and shall not be treated as Building expenses.

18. Fidelity Bond. Agent shall furnish and maintain, at the expense of the Building, for the duration of this Agreement and any extensions thereof, plus thirty (30) days after the expiration or termination thereof, a commercial blanket bond in favor of Owner, in an amount not less than the sum of (a) two (2) months' potential maximum Gross Rents for the Building plus (b) aggregate Tenant security deposits held from time to time, both in amounts as determined by Owner, and in a form and with a company acceptable to Owner, which commercial blanket bond shall cover Agent and all employees hired by Agent in connection with this Agreement. Such fidelity bond shall cover losses discovered by Owner within two (2) years after the occurrence of such losses. Such fidelity bond shall be attached to this Agreement, and such fidelity bond shall contain a written provision that Owner shall be given at least ten (10) days' prior written notice of cancellation.

19. **Bids, Discounts, and Rebates**. Agent shall obtain contracts, materials, supplies, utilities, and services on the most advantageous terms to the Building, and shall solicit competitive bids on all contracts or purchases exceeding $10,000.00 for those items which can be obtained from more than one source. Agent shall secure and credit to Owner all discounts, rebates, or commissions obtainable with respect to purchase, service contracts, and all other transactions on Owner's behalf.

20. Liability of Agent. Except as expressly provided to the contrary herein, the obligations and duties of Agent under this Agreement shall be performed as agent of Owner, but Agent, personally, shall be liable for its breaches of this Agreement; provided, however, that the Agent shall not be responsible for incurring any expenditures in excess of existing or reasonably projected available funds from the Building or funds supplied by Owner. All expenses incurred by Agent in accordance with its obligations and duties under this Agreement and consistent with Owner's approved operating budget, except those due to its breaches of this Agreement and those expressly specified as Agent's expenses herein, shall be for the account of and on behalf of Owner.

21. Indemnification. To the extent permitted by law, Owner agrees to defend, indemnify, and save harmless Agent from all claims and suits in connection with the Building provided that such claims and suits are attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property, and such claims and suits arise, or are alleged to arise, in whole or in part out of any negligent act or omission of Owner, its officers, employees, or agents. Owner agrees to include Agent as an insured in Owner's public liability policy,

but only while Agent is acting as real estate manager for Owner under this Agreement. Owner shall provide Agent with a certificate of insurance evidencing such liability insurance and providing not less than ten (10) days' notice to Agent prior to cancellation.

To the extent permitted by law, Agent agrees to defend, indemnify, and save harmless Owner and its partners from all claims, investigations, and suits, or from actions or failures to act of Agent, with respect to any alleged or actual violation of state or federal labor or other laws pertaining to employees, it being expressly agreed and understood that as between Owner and Agent, all persons employed in connection with the premises are employees of Agent, not Owner. Agent shall at all times keep its employees and contractors insured for statutory workers' compensation and other employee benefits required by all applicable laws, and Agent shall maintain employer's liability insurance for an amount not less than $500,000.00 covering claims and suits by or on behalf of employees and others, not otherwise covered by statutory workers' compensation insurance. Owner and its partners shall be protected in all such insurance by specific inclusion of Owner under an additional insured or alternate employer rider. Agent shall provide Owner with a certificate of insurance evidencing that workers' compensation and employer's liability insurance is in force and providing not less than ten (10) days' notice to Owner prior to cancellation.

22. Insurance. When specifically directed by Owner in writing, Agent shall cause insurance coverage required under the Mortgages, and such additional forms and amounts of insurance as Owner may require, to be placed and kept in effect at all times with insurance companies satisfactory to Owner. Agent shall be designated as an insured while acting as real estate manager for Owner under public liability insurance for a limit of liability acceptable to Agent and Owner. Agent shall investigate and promptly furnish to Owner full written reports of all accidents, claims, and potential claims for damages relating to the Building, and shall cooperate fully with Owner's insurers, regardless of whether the insurance was arranged by Agent or others.

23. Escrow Payments. From the funds collected and deposited by Agent in the Operating Account, Agent shall make any monthly escrow payments required under the Mortgages, for the purpose of funding insurance, tax, and such other reserve or escrow accounts for the Building as Owner may require pursuant to the Mortgages. Agent promptly shall present tax bills and insurance premium notices to the escrow agent for payment and shall furnish Owner with evidence of timely payment of such taxes and insurance premiums.

24. Agent's Compensation. As compensation for all of Agent's ongoing property leasing, management, and related services under this Agreement, beginning in the month following the month

in which a certificate of occupancy for the Building was issued, Agent shall receive a monthly fee in an amount equal to the percentage set forth in Section C of the Information Schedule of the Gross Rents received in that month (the "Management Fee"), to be paid out of the Operating Account and treated as a Building expense. Such fee shall be payable on the tenth (10th) day of the month following the month in which the services were rendered, subject to the provisions of Paragraph 25 hereof.

25. Subordination Agreement. Agent agrees to the following conditions governing amount and timing of payment of Agent's compensation under this Agreement:

(a) The monthly Management Fee shall be deemed earned in its entirety and accrued as an expense to the Building, but except as otherwise provided below, the amount paid in any month shall be reduced by the amount of any Operating Deficits (as defined below), and any unpaid amount shall be paid for such month in the next succeeding month or months in which there are no Operating Deficits, to the extent there is a surplus of Operating Income (as defined below) available for payment of Agent's management fee under the priorities currently specified in Owner's partnership agreement.

(b) **"Operating Deficits"** means any excess of Operating Expenses (as defined below) over Operating Income.

(c) **"Operating Expenses"** means all cash expended, reserved, or required for debts or expenses (including all required or advisable deposits into the reserves described in Owner's partnership agreement, interest, and principal payments on indebtedness, capital expenditures, replacements, expansion, or other reasonable requirements of Owner's business (excluding Agent's cost of doing business which the items of work are costs covered by the Property Management Fee and excluding cash expended from capital contributions or for capital transactions) related to the Building.

(d) **"Operating Income"** means all cash received from operations of Owner in the ordinary course of business (excluding capital contributions and net proceeds of capital transactions) related to the Building.

Notwithstanding the foregoing provisions, funds held in the operating reserve under Owner's partnership agreement shall be used to pay Agent's management fee to the extent that such payment does not reduce the amount of such operating reserve below the amount set forth in Section D of the Information Schedule.

26. Compliance with Laws. In the performance of its obligations under this Agreement, Agent shall comply with applicable local, state, and federal laws and regulations.

PRE - 000013

27. Term of Agreement. This Agreement shall be in effect for the period commencing as of the date hereof and ending on the first (1st) anniversary of the date hereof, and shall be automatically extended for one (1) year periods thereafter until the date set forth in Section F of the Information Schedule, subject to the following conditions:

(a) Either Owner or Agent may elect not to extend this Agreement by notifying the other party at least sixty (60) calendar days in advance of the last day of the initial period hereunder or any annual extension period thereafter.

(b) This Agreement may be terminated by mutual written consent of Owner and Agent.

(c) In the event Agent fails to perform any of its duties hereunder or to comply with any of the provisions hereof, Owner shall notify Agent in writing and Agent shall have ten (10) days thereafter within which to cure such default to the reasonable satisfaction of Owner, and if such default cannot be cured within such ten (10) day period, Agent shall have such additional time as may be necessary to cure the same provided that Agent demonstrates to the continuing satisfaction of Owner that it is diligently pursuing all necessary actions to cure such default and that the same will be cured within a reasonable time without damage or expense to Owner.

(d) In the event a petition in bankruptcy is filed by or against Owner or Agent, or in the event Owner or Agent makes an assignment for the benefit of creditors or takes advantage of any insolvency act, Owner or Agent may terminate this Agreement without notice to the other.

(e) Within five (5) days after the termination of this Agreement, Agent shall close all accounts and pay the balances or assign all certificates of deposit regarding the Building to Owner. Within ten (10) days after the termination of this Agreement, Agent shall deliver to Owner all plans and surveys of the Building in its possession and all books and records concerning the Building. Within thirty (30) days after the termination of this Agreement, Agent shall submit to Owner all reports required under paragraph 17 hereof to the date of such termination, and Agent and Owner shall account to each other with respect to all matters outstanding as of the date of termination.

28. Notices. All notices or other communications required or desired to be given under this Agreement shall be in writing and shall be delivered either personally or by U.S. certified mail, return receipt requested, which shall be deemed delivered upon personal delivery or two (2) business days after mailing, to the parties at the addresses set forth in Section F of the

Information Schedule. In the event of a change in the mailing addresses stated above, any addressee whose address changes hereby agrees to give notice of a new or forwarding address within seven (7) days of the effective date of said change to the other addressee, whereupon subsequent notices shall be addressed to such new or forwarding address.

29. Amendment. This Agreement constitutes the entire agreement between Owner and Agent, and no amendment or modification thereof shall be valid or enforceable except by supplemental agreement in writing, executed by the parties hereto or the party to be bound thereby. In addition, no such amendment or modification shall be valid or enforceable without the prior written consent of Owner's Limited Partner.

30. **Enforceability**. The invalidity of any clause, part, or provision of this Agreement shall not affect the validity of the remaining portions thereof. Owner's remedies under this Agreement are cumulative, and the exercise of one remedy shall not be deemed an election of remedies nor foreclose the exercise of Owner's other remedies. No waiver by Owner of any breach of this Agreement shall be deemed to be a waiver of any other or subsequent breach. Owner or Agent may apply to any court, state or federal, for specific performance of this Agreement, for an injunction against any violation of this Agreement, or for such other relief as may be appropriate, since the injury arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

31. Governing Law. The law of the state in which the Building is located shall govern the interpretation and enforcement of this Agreement.

32. **Captions**. The captions used in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, or describe the scope or the intent of this Agreement.

33. Execution of Counterparts. For the convenience of the parties, this Agreement may be executed in multiple counterparts, each of which shall constitute a complete original of this Agreement, which may be introduced in evidence or used for any other purpose without the production of any other counterparts.

34. **Successors and Assigns**. This Agreement shall inure to the benefit of and constitute a binding obligation upon Owner and Agent and their respective successors and assigns; provided, however, that Agent shall not assign this Agreement, or any of its duties hereunder, without the prior written consent of Owner. In the event Owner's current general partner or any successor general partner of Owner is removed as general partner in accordance with Owner's partnership agreement, any successor general partner

selected in accordance with such partnership agreement shall have authority to act hereunder on behalf of Owner, and until such successor is selected Owner's Limited Partner shall have temporary authority to act hereunder on behalf of Owner.

In Witness Whereof, the parties have executed this Agreement as of the 27th day of Dec, 2007.

Owner: Arthur Hampton Housing LP - [signature] VP.,
a(n) [signature] NY limited partnership

By: Arthur Hampton Housing Corp. [signature] VP.,
a(n) [signature] NY corporation,
general partner

By: ______________________
Title:

Attest:

______________________
Title:

[SEAL]

Agent:

PRESTIGE MANAGEMENT Inc,
a NEW YORK corporation

By: TREVOR WILSON [signature]
Title: PRESIDENT

Attest:
[signature]
Title: SECRETARY

[SEAL]

PRE - 000016

2005 Tab 7a
NYEF 2005 Model Form- 111/05

## INFORMATION SCHEDULE

The following provisions are incorporated into and made a part of the foregoing Property Management Agreement between Owner and Agent to which this Information Schedule is attached.

A. Paragraph 1. The term "Building" means, collectively, the real property commonly known as ____________________, and all improvements, appurtenances, and equipment located thereon, including ________ (___) dwelling units.

B. Paragraph 9. The percentage of apartment space (number of apartments or floor area, whichever is less) to be leased to low-income tenants is ______________ percent (___%). Any other eligible space required to qualify for the Credits and leasing requirements applicable thereto, if any, are as follows: ____________________.

C. Paragraph 24. The Management Fee shall be in an amount equal to (strike inapplicable provision): EIGHT percent ( 8 %) of the Gross Rents received or ______________ ($____________) in each month following the month in which a certificate of occupancy was issued for the Building.

D. Paragraph 25. Funds held in the operating reserve under Owner's partnership agreement shall be used to pay Agent's Management Fee to the extent that such payment does not reduce the amount of such operating reserve below __________ ($________________).

E. Paragraph 27. The date on which the Agreement will terminate, subject to the conditions contained in Paragraph 27(a) through (e) thereof, shall be ____________, 20___.

F. Paragraph 28. The addresses to which all notices required or desired to be given under the Agreement shall be delivered are as follows:

Agent: PRESTIGE MANAGEMENT INC
3485 E TREMONT AVE
BRONX NY 10465

Owner: ______________________________

With a copy to Owner's Limited Partner:

New York Equity Fund 2005 LLC
c/o New York Equity Fund, Inc.
501 Seventh Avenue, 7th Floor
New York, New York 10018
Attn: Asset Management, Director

PRE - 000017

In Witness Whereof, the parties have executed this Addendum as of the ____ day of ______________, 20__.

Owner's General Partner

______________________
______________________
______________________
______________________

Owner: Arthur Ransom Housing, L.P.
______________________, a(n)
______________________ limited partnership
Arthur Ransom Housing Corp
By: ______________________
a(n) ______________________
corporation, general partner

By: ______________________
Title:

**Owner's Limited Partner:**

New York Equity Fund 2005 LLC

**Agent:**

PRESTIGE MANAGEMENT Inc a(n)
NEW YORK corporation
By: ______________________
Title: PRESIDENT

c/o New York Equity Fund
501 Seventh Avenue, 7th Floor
New York, New York 10018
Attention: Director, Asset Management

PRE - 000018