# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
LEONARDA GARCIA,

Plaintiff,

-against-

ERIC H. KAHAN,
SPERBER KAHAN LAW GROUP PLLC,
ARTHUR RANSOME HOUSES LP,
PRESTIGE MANAGEMENT, INC., and
ARTHUR RANSOME HOUSING CORPORATION

Defendants.
-----------------------------------------------------------x

Civil Action No. 1:25-cv-08489-JGK-GS

**FIRST-AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Leonarda Garcia, by her attorneys at The Law Office of Ahmad Keshavarz, brings her complaint against Defendants Sperber Kahan Law Group PLLC, a debt collection law firm, and Eric H. Kahan, Esq., a principal at the firm (collectively "Attorney Defendants") for violating the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq* and New York Judiciary Law § 487; and against Arthur Ransome Houses LP ("Ransome LP"), a landlord, its general partner, Arthur Ransome Housing Corporation ("Ransome Corp.") (collectively "Ransome" or the "Landlord"), and their property management company Prestige Management, Inc. ("Prestige") (and with Ransome, collectively the "Landlord Defendants"), as well as the Attorney Defendants for violating GBL § 349 and committing negligence *per se* and gross negligence, and alleges as follows:

## PRELIMINARY STATEMENT[1]

1. Ms. Garcia is a low-income home health aide and a participant in the Section 8

[1] This summary is for the convenience of Defendants and the Court. The summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

voucher program as administered by the New York City Department of Housing Preservation and Development ("HPD"). She has lived at 151 West 23rd St, Apt. 6-C, New York, New York 10027 for eleven years. Under the Section 8 program, HPD is required to pay a share of the rent (the "government share") and Ms. Garcia is required to pay part of the rent (the "tenant share.") HPD may cease paying its share of the rent if the landlord fails an annual inspection and does not cure. However, under no relevant circumstances is the amount withheld by HPD chargeable to the tenant.

2. Ransome LP, the landlord, and Prestige, its property management company, are required to meet basic Housing Quality Standards ("HQS") to participate in the Section 8 program and receive HPD Section 8 payments. The Landlord Defendants failed their HQS inspection in March 2022, but refused to complete repairs, and consequently HPD ceased paying the government share in May 2022. Among other defects, the Landlord Defendants did not provide heat to Ms. Garcia in the winter.

3. Rather than making repairs to meet the basic HQS standards, the Landlord Defendants decided to do what the law explicitly prohibited: seek to collect the government share from Ms. Garcia.

4. The Landlord Defendants retained Eric H. Kahan, Esq. and the various incarnations of his law firm, most recently Sperber Kahan Law Group PLLC to unlawfully collect this rent from Ms. Garcia.[2] The Attorney Defendants sued Ms. Garcia in 2023 for what was admitted to be solely the government share. Fortunately, Ms. Garcia was eventually able to

---

[2] Mr. Kahan's firm changed during the course of the collection activities from SDK Heiberger LLP, to SKH Heiberger LLP, and finally Sperber Kahan Law Group PLLC. This suit is brought against the most recent incarnation of the firm for activities from approximately April 1, 2024 onward, as the prior incarnations of the firm no longer exist. However, for simplicity the Complaint will use the term "Attorney Defendants" to apply to Mr. Kahan and the various incarnations of his firm. Notably, Mr. Kahan personally took most of the acts that form the basis of the liability during for the various incarnations of his firm.

Case 1:25-cv-08489-JGK-GS Document 1 Filed 10/13/25 Page 3 of 52

retain a legal services organization to represent her and, after months, was able to able to get the case dismissed. Not to be deterred, the Attorney Defendants sued Ms. Garcia again in 2024—once again solely for the government share of rent.

5. Ms. Garcia retained a private attorney and paid him legal fees to defend herself against this second suit and was once again able to get the suit dismissed—this time with a so-ordered stipulation in which the defendants admitted they had wrongly sought Section 8's share of the rent from Ms. Garcia and promised to update their records to reflect Ms. Garcia's timely payment of her share of the rent. Mere months after signing a stipulation to end the 2024 lawsuit, Defendants began threatening Ms. Garcia with a third lawsuit for the government share of rent, in flagrant violation of their promise in the stipulation to update their records to reflect Ms. Garcia's correct rent balance.

6. Ms. Garcia now brings this action to hold Defendants accountable for their campaign of baseless harassment and flagrant abuse of the New York City Housing Courts to attempt to strong-arm her into paying rent she did not owe by Defendants' own admission.

## JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to the FDCPA, 15. U.S.C. § 1692k(d), and under 28 U.S.C. § 1331.

8. This Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 because they share a common nucleus of operative fact with the federal claim and are so related to the federal claim as to form part of the case or controversy under Article III of the United States Constitution.

9. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to Plaintiff's claims herein occurred within

the Southern District of New York.

**PARTIES**

10. Plaintiff Ms. Leonarda Garcia is a natural person residing at 151 West 123rd Street, Apartment 6-C, New York, New York 10027.

**The Landlord: Ransome LP, Ransome Corp. and the role of Abyssinian**

11. Defendant Arthur Ransome Houses LP ("Ransome LP") is a domestic limited partnership organized under the law of the State of New York and residing in New York County, New York. Ransome LP is the owner of the building where Ms. Garcia resides, 151 West 123rd St., New York, NY and the petitioner on the rental arrears lawsuits filed against Ms. Garcia.

12. Ransome LP owns seven buildings with 116 units Exhibit DD[3] (Princess Palmer Deposition Transcript Part 1) 83:18-23.

13. Defendant Arthur Ransome Housing Corporation ("Ransome Corp.") is a domestic business corporation organized under the law of the State of New York and residing in New York County, New York. Ransome Corp. is the general partner for Ransome LP. *Id.*, 24:11-14. Ransome Corp is a passthrough entity, for Abyssinian Development Corporation, with no operations of its own. *Id.*, 27:14-20, 37:9-38:17.

14. The limited partner for Defendant Ransome LP is National Equity Fund ("NEF"), which participates in the partnership as a part of tax credits syndication for Low Income Housing Tax Credit ("LIHTC") program. *Id.*, 24:23-26:3.

15. Abyssinian Development Corporation ("Abyssinian") is the sole shareholder of

[3] All exhibits attached to this complaint are incorporated by reference in their entirety. When this complaint references state court filings on NYSCEF via index number, the filings on NYSCEF in that index number are incorporated by reference, even if only selective filings are attached as exhibits to this complaint. This is being done to minimize the number of electronically available NYSCEF filings that need to be attached as exhibits to this complaint.

Defendant Ransome Corp. *Id.*, 27:1-6; Exhibit EE (Princess Palmer Deposition Transcript Part 2) 81:24-82:3. Princess Palmer is the Chief Operating and Financial Officer for Abyssinian and its most senior employee, reporting directly to the board of directors. Exhibit DD (Palmer Dep. pt. 1) 15:21-17:5, 22:22-23:4.

16. Abyssinian serves as the general partner for approximately 21 properties containing approximately 650 affordable housing units, structured primarily as Low-Income Housing Tax Credit (LIHTC) projects. *Id.*, 17:6-18:11. Of the 21 buildings, 14 to 17 are structured as limited partnerships in which Abyssinian is the sole member of the general partner entity, creating an indirect relationship between Abyssinian and the limited partnership entities. *Id.*, 18:16-19:10. The five limited partnership entities owning approximately 17 to 18 buildings and just under 600 units collectively are: Arthur Ransome Houses LP, Laura B. Thomas Houses, L.P., ADC/Ennis Francis Owner L.P., Abby Towers Apartments L.P., and MZ 2640 Owner L.P. *Id.*, 81:16-83:17.

17. Approximately 20 percent of units in Abyssinian's portfolio are occupied by Section 8 beneficiaries. *Id.*, 102:5-10.

18. Abyssinian, as the general partner, hires and oversees property management companies for Ransome LP, among other things. Abyssinian executed the property management agreement with Prestige on behalf of Ransome LP. *Id.*, 27:1-29:2, 36:21-39:1; Exhibit FF (Prestige Property Management Agreement with the Landlord Defendants).

19. As part of this arrangement, Abyssinian regularly receives monthly reports from Prestige. Exhibit DD (Palmer Dep. pt. 1) 28:20-29:19.

**The Landlord's Property Management Company: Prestige Management, Inc.**

20. Defendant Prestige Management, Inc. ("Prestige") is a domestic limited liability

corporation organized under the law of the State of New York since 1991 with its headquarters and its principal place of business in 1776 Eastchester Road, Suite 210, Bronx, New York 10461.

21. Prestige conducts business and provides services for and on behalf of the Landlord Defendants and other property owners in New York, and their tenants.

22. Prestige has been the property management company for Abyssinian since 2008. *Id.*, 28:18-19.

23. Prestige manages approximately half of properties in Abyssinian's portfolio. The properties Prestige manages for Abyssinian include properties owned in the names of Ransome LP, Laura B. Thomas Houses, L.P., Abby Towers Apartments L.P., 301 West 148th Street HDFC and 36 West 131st Street HDFC. Exhibit EE (Palmer Dep. pt. 2) 43:19-44:22.

24. Of these properties managed by Prestige, tenants receiving project-based Section 8 vouchers live in Abby Towers Apartments L.P. and tenants receiving tenant-based Section 8 vouchers live in other properties. *Id.*, 44:23-45:5.

25. Prestige is and was at all relevant times the property management company responsible for the day-to-day operations of the Landlord Defendants at the 151 West 123rd Street building. Exhibit DD (Palmer Dep. pt. 1) 28:18-19; Exhibit EE (Palmer Dep. pt. 2) 43:19-44:22.

26. Prestige handles all day-to-day operations for the properties it manages, including rent collection, hiring, maintenance, compliance, capital improvement projects (requiring Abyssinian approval), and debt collection. Exhibit DD (Palmer Dep. pt. 1) 19:15-20:2, 40:25-41:23, 53:9-59:16; Exhibit FF (Prestige Property Management Agreement) p. 2 ¶ 3, p. 6 ¶ 10, p. 6-7 ¶ 11, p. 9-11 ¶ 17, pp. 16-18 (identifying parties to agreement). For example, it provides accounting and billing services to Ms. Garcia, representing how much she owes in rent.

27. Prestige uses government agency portals as part of their property management operations. For example, Prestige has access to two HPD portals, a public portal accessible by building address and a private, password-protected, portal for property managers and owners. Exhibit DD (Palmer Dep. pt. 1) 101:24-103:10.

28. The private HPD portal contains HQS inspection notices, HQS suspension notices, subsidy suspension and termination notices, rent breakdown letters, and leases. *Id.*, 110:13-111:11. Prestige has access to the private HPD portal for units with Section 8 tenants in properties owned Ransome LP as well as access to the portal for the New York City Housing Authority ("NYCHA"). *Id.*, 106:18-107:20; Exhibit EE (Palmer Dep. pt. 2) 71:8-11. Prestige uses the private portal to exchange documents with the Section 8 program, including for HQS violations. *Id.*, 67:17-68:2. Law firms handling non-payment proceedings generally do not have access to the private HPD portal. *Id.*, 72:19-73:14.

29. In carrying out its property management duties, Prestige uses Yardi software for tenant ledger management. Prestige's accounts receivable team at its Bronx headquarters inputs tenant payments into the Yardi ledger system, which records tenant information and payments monthly. *Id.*, 25:3-28:15.

30. Prestige uses Yardi to create tenant profiles, record household and subsidy information, set up recurring tenant charges and subsidies, input payments, generate rent ledgers, record write-offs during audits, update unit occupancy status, and generate compliance reports such as the annual rent roll for HPD. *Id.*, 25:23-26:5, 28:20-31:7.

31. With respect to rent ledgers, Prestige can generate three types of tenant ledgers through Yardi: (1) tenant-only ledger, (2) alternate balance or subsidy-only ledger, and (3) combined ledgers showing both tenant and subsidy activity. *Id.*, 89:21-90:3; 90:7-12.

32. A tenant-only ledger lists individual charges and payments on a month-to-month basis. *Id.*, 24:20-23. An alternate balance ledger is a ledger that shows only the activities concerning Section 8 subsidy portion of a tenant's account and would exclude any tenant share or tenant payment. *Id.*, 87:23-88:6, 89:14-90:3. A combined ledger includes the combined activities of both the tenant and Section 8 subsidy. *Id.*, 90:7-12.

33. When generating rent ledgers, Prestige can use gross potential billing or net potential billing methods. Under the "gross potential billing" method, Prestige generates a rent ledger that includes activities concerning the full contract rent—including both Section 8 subsidy portion and tenant portion. Exhibit DD (Palmer Dep. pt. 1) 145:17-146:2. Under the "net potential billing" method, Prestige generates a rent ledger that only includes activities concerning the tenant portion of the rent. *Id.*

34. Of these methods, Prestige uses the gross potential billing method which involves billing the full contract rent, under which method rent ledgers continue to show the full monthly charge for the expected amount of Section 8 subsidy even if Section 8 payments are suspended due to HQS violations. Exhibit EE (Palmer Dep. pt. 2) 74:3-74:16. Under the gross potential billing method, a rent ledger does not separately break out how much of the total balance owed represents the suspended Section 8 share. Exhibit DD (Palmer Dep. pt. 1) 136:8-137:14.

35. Critically, Prestige uses the billing gross potential accounting method, under which ***tenant ledgers continue to show the full monthly subsidy charge even if Section 8 payments are suspended due to HQS violations***. Exhibit EE (Palmer Dep. pt. 2) 74:3-74:16. Prestige then forwards that ledger to the Attorney Defendants and instructs them to use that as the basis to calculate the amount due. In turn, the Attorney Defendants use these deceptive rent

ledgers in connection with the calculation of the amount alleged to be due by the tenant in rent demand letters and non-payment petitions.

36. Under the gross potential billing method, unpaid subsidies due to Section 8 subsidy payment suspension are recorded as bad debt expense (write-offs) and do not cease to be billed. *Id.*, 128:19-132:18**.** Write-offs under this method occur when a tenant vacates with an unpaid balance or when a subsidy is suspended; if the subsidy is later reinstated retroactively, the write-off reflects the unpaid subsidy during the suspension period. *Id.*, 130:22-132:15.

37. Under gross potential billing method is used and Section 8 subsidy payment suspension occurs due to HQS violations, some charges include Section 8 share of the rent, and write-offs for suspended subsidies should occur every month until payments resume. *Id.*, 178:4-182:1.

38. Prestige also directly engages in debt collection activities in non-payment lawsuits. Exhibit FF (Prestige Property Management Agreement) p. 6-7, ¶ 11. Prestige hires law firms to collect rent for Ransome LP. Exhibit DD (Palmer Dep. pt. 1) 42:3-19. Prestige tells law firms how much rent is owed. *Id.*, 54:13-15. Prestige provides tenant ledger to law firms. *Id.*, 55:1-6. Prestige knows and tells law firms whether a tenant was a Section 8 beneficiary and how much were the government share and the tenant share of the rent. *Id.*, 60:19-61:6. Prestige sometimes sends predicate notices itself for Housing Court lawsuits and sometimes forwards tenant accounts to law firms for service of the predicate notices. Exhibit EE (Palmer Dep. pt. 2) 55:5-57:8. Prestige decides whether or not to file a nonpayment proceeding such as the ones against Ms. Garcia. *Id.*, 52:18-53:4, 53:21-54:25, 57:3-57:24. Prestige decides whether to proceed or discontinue a nonpayment proceeding when a tenant claims the landlord is suing for the government share of rent, that is the Section 8 subsidy portion. *Id.*, 58:5-24. A Prestige

employee goes to court in connection with nonpayment proceedings. Exhibit DD (Palmer Dep. pt. 1) 88-14; Exhibit EE (Palmer Dep. pt. 2) 21:17-22. Prestige decides whether to settle a nonpayment lawsuit. Exhibit DD (Palmer Dep. pt. 1) 60:6-18.

39. For the lawsuits Prestige causes to be filed and controls for various landlord entities, including for Ransome LP, the "business address" listed for the landlord's petition is actually the principal business addresses for Prestige, 1776 Eastchester Road, Suite 210, Bronx, New York 10461. Such petition often lists Arlyane McGlashan as the managing agent. The Prestige website lists Ms. McGlashan as the General Manager at Prestige who "aggressively monitors rent collection and legal cases to ensure our goal of zero tolerance for rent arrears." Exhibit CC (Prestige website) p. 2.

40. Prestige's employees carry out various duties to support Prestige's aforementioned operations. For example, Devon Kelly, Senior Property Manager at Prestige, collects rent payments, reviews rent arrears, sends initial late payment notices, coordinates with landlord-tenant attorneys, provides documents for litigation, occasionally sends predicate notices for Housing Court lawsuits, and occasionally appears in Housing Court lawsuits. Exhibit EE (Palmer Dep. pt. 2) 17:22-18:17, 19:11-21:22, 55:5-56:11. Mr. Kelly also decides whether to proceed with non-payment litigation for Prestige, after consultation with his supervisor Arlyane McGlashan. *Id.*, 52:18-53:4, 53:21-54:25, 57:3-57:24. Mr. Kelly is supported by one or more Assistant Property Manager, such as Prestige's former employee Detra Williams. *Id.*, 16:3-17:21).

41. In addition, Arlyane McGlashan, the managing agent listed in many of lawsuits commenced by Prestige on behalf of property owners, oversees all Prestige property management teams, including regional and property managers, and reports directly to the

Prestige president. McGlashan periodically attends meetings related to the Abyssinian portfolio, supports Devon Kelly with financial reporting, manages vendor relationships, reviews major capital proposals, and oversees rent collection functions including reviewing collections and legal actions. *Id.*, 49:19-52:17. Property managers consult internally with McGlashan and the regional person before proceeding with non-payment litigation. *Id.*, 52:18-24.

42. Prestige manages approximately 80 to 90 entities total, each potentially owning more than one property. *Id.*, 52:15-53:11. However, there is no way to directly search New York Courts Electronic Filing System ("NYSCEF") for non-payment petitions where Prestige was the property management company. One would need to know the name of the owner of buildings for whom Prestige provides property management services. And landlords only began filing new non-payment petitions on NYSCEF around 2022.

43. Cross-referencing the limited publicly available information, Prestige is the property management company for at least thirty-eight non-payment petitioners, each of which own one or more buildings.[4] Those petitioners have filed more than three hundred non-payment petitions just since 2022. Each of those non-payment petitions list the business address for the petitioner as 1776 Eastchester Road, Suite 210, Bronx, New York 10461, the address of Prestige. The non-payment petitions list as a "managing agent" for the petitioner persons affiliated with Prestige. Commonly, the person Arlyane McGlashan, the Prestige general manager.

---

[4] Those non-payment petitioners include: 117TH STREET EQUITIES LLC; 1775-85 WALTON AVENUE LP; 2065 Walton Avenue Associates LLC; 360 PRESERVATION LLC; 405 Williams Ave; 587 Dumont Ave; 6120 Grant Central Parkway; 94TH AVENUE JAMAICA LLC; BGN II AFFORDABLE OWNERS LLC; CONEY ISLAND ASSOCIATES 1 MODERATE LLC; E 135 AND 3RD AVE OWNER LLC; EAST HARLEM MEC PARCEL B-WEST HOUSING DEVELOPMENT FUND CORPORATION; F2 OWNER LLC; Heritage Houses Development L.P.; J2 OWNERS LLC; L & M PROSPECT PLAZA, LLC; LINWOOD PARK ASSOCIATES LLC; MACOMBS MANOR ASSOCIATES, LP; MALCOLM H.D.F.C.; Mi Casa Housing Development Fund Corporation; MUTUAL APARTMENTS; PALMER'S DOCK, LLC; QUINCY-GREENE ASSOCIATES, LP; REGENCY TOWERS, LLC; RM 320 STERLING OWNER LLC; ROCKAWAY III LLC; SITE 8 APARTMENTS LLC; ST. NICHOLAS PARK APTS L.P.; Stardom Hall, L.P.; THE BALTON LLC; TWEEMILL HOUSES; VINCENT P CYRUS PLAZA L.P.; WILLIAMS AND GEORGIA TOWERS HOUSING DEVELOPMENT FUND CORP

44. While Ransome LP is the owner of the property and the petitioner in a rental arrears lawsuit, Prestige takes all of the relevant actions for the Landlord. For example, the two rental arrears lawsuits by Ransome LP against Ms. Garcia list Arlyane McGlashan as the managing agent. The invoices and statements sent to Ms. Garcia have an address of "ARTHUR RANSOME 151W123 c/o Prestige Management Inc." Exhibit X (March 28, 2025 rent billing statement); Exhibit BB (June 20, 2025 rent billing statement). Rent payments for the building can be made online at Prestige's website, www.prestigemgt.com. Perhaps most importantly, the So-Ordered Stipulation of Dismissal of the 2024 rental arrears lawsuit against Ms. Garcia—affirmatively admitting *inter alia* that Ms. Garcia did not owe any amount for which she was sued and pledging to correct the landlord's billing records—was signed directly on behalf of Ransome LP by Detra Williams, with the notation "PMI As Agent." Exhibit W (February 6, 2025 So-Ordered Stipulation to Discontinue). On information and belief, PMI stands for Prestige Management, Inc., and Ms. Williams was the account collection manager at Prestige. This shows direct involvement by Prestige providing accounting services, billing services, services, and prosecution in connection with the non-payment lawsuits.

45. For all of these reasons and others, Ransome LP, Ransome Corp. and Prestige are jointly and severally liable for the conduct that forms a basis of this complaint. Consequently, they are jointly referred to as the "Landlord Defendants."

**The Attorney Defendants: Eric H. Kahan and Sperber Kahan Law Group PLLC**

46. Defendant Sperber Kahan Law Group PLLC ("Sperber Kahan") is a debt collection law firm organized under the laws of the State of New York. Sperber Kahan engages in business in New York State and this suit arises out of Sperber Kahan's business in New York State.

47. Sperber Kahan was organized under the laws of the state of New York on November 22, 2024. Prior to the formation of Sperber Kahan, Defendant Kahan represented Landlord Defendants in this case through his prior firm, SKH Heiberger LLP, and an earlier firm, SDK Heiberger LLP.

48. Sperber Kahan, like its predecessor firms, SKH Heiberger LLP, SDK Heiberger LLP, and Sperber Denenberg & Kahan, PC, specializes in collecting putative rental arrears by filing hundreds (if not thousands) of rental arrears lawsuits seeking a monetary judgment as well as possession according to NYSCEF, the New York State Courts Electronic Filing system. Sperber Kahan split from its predecessor SKH Heiberger LLP during the pendency of the 2024 Lawsuit.

49. Defendant Eric H. Kahan is an attorney at law duly admitted to practice in the State of New York with a principal place of business 205 East 42nd Street, New York, NY 10017. Mr. Kahan is a partner of Defendant Sperber Kahan and was a partner of SKH Heiberger LLP and SDK Heiberger LLP.

50. Each year, Mr. Kahan signs hundreds of petitions seeking to collect alleged rental arrear debts from tenants, as well as seeking possession in the same suits according to NYSCEF, the New York State Courts Electronic Filing system.

51. The Attorney Defendants were acting as the agents of the Landlord Defendants in its litigation and other attempts to collect the putative debt. Attorney Defendants were acting within the course and scope of their agency. Attorney Defendants were the freely chosen counsel of the Landlord Defendants. Therefore, the Landlord Defendants are jointly and severally liable for the conduct of the Attorney Defendants.

## STATEMENT OF FACTS

### Ms. Garcia's Rent-Stabilized Tenancy and Section 8 Subsidy

52. Plaintiff Ms. Garcia is a home health aide and mother of three who has lived in her rent-stabilized apartment since 2014. She lives there with two of her children.

53. The building Ms. Garcia lives in is managed by Defendant Prestige. Prestige generates rental invoices to Ms. Garcia each month for rent alleged to be owed.

54. Ms. Garcia has lived in her apartment for twelve years pursuant to an original lease agreement and subsequent renewal lease agreements between her and owner Ransome LP.

55. Ms. Garcia is a participant in the federal tenant-based Housing Choice Voucher Program ("Section 8") administered, in this case, by HPD.

56. Section 8 program encompasses both project-based and tenant-based vouchers. A project-based voucher is associated with a particular residential unit whereas a tenant-based voucher is associated with the tenant who can port out the voucher to a different location.

57. Various Public Housing Agencies ("PHAs") administer the Section 8 program in New York, including HPD and NYCHA.

58. Under Section 8 program regulations, each year HPD determines the share of the monthly rent Ms. Garcia must pay based on her income.

59. Section 8 determines the tenant's portion annually based on income recertification and provides a statement of the government share and tenant share rent breakdown to Prestige, which then bills accordingly. Changes in tenant income cause fluctuations in the tenant portion and corresponding adjustments in the subsidy. Exhibit DD (Palmer Dep. pt. 1) 46:14-49:10, 111:18-113:6.

60. The difference between Ms. Garcia's share of the rent and the actual legally

regulated monthly rent is paid through her Section 8 rent subsidy, which HPD should send directly to Prestige, the property management agent for the Landlord, pursuant to a Housing Assistance Payment contract ("HAP contract").

61. As owner of the 151 West 123rd Street building, Ransome LP is party to a HAP contract with HPD, in which it agreed to comply with Section 8 program regulations in order to receive Section 8 subsidy payments.

62. Under the terms of the HAP contract, the landlord must maintain the apartment in compliance with certain Housing Quality Standards ("HQS").

63. If the apartment fails to pass an annual HQS inspection, HPD may suspend the Section 8 subsidy until the landlord has remedied the failures, and the apartment passes inspection.

64. HQS or HPD violations account for approximately 90 percent of Section 8 payment suspensions. Exhibit DD (Palmer Dep. pt. 1) 69:20-71:18, 164:14-17. A temporary suspension of Section 8 subsidy payments suggests an HQS failure. *Id.*, 126:13-22.

65. A PHA administering Section 8 notifies Prestige before suspending payments and provides the reason for suspension. Cure periods vary by violation class: less serious violations allow 60-90 days; serious violations (e.g., missing smoke detectors) may require correction within days. *Id.*, 99:13-101:23.

66. Retroactive Section 8 payments following a subsidy payment suspension due to HQS or HPD violations are uncommon and at the agency's discretion, typically occurring only when there is evidence repairs were completed earlier but processing was delayed, or when Section 8 made an error. *Id.*, 71:23-73:8.

67. When a PHA suspends payment of government share of rent, the tenant is not

liable for payment for the Section 8 subsidy portion of the rent. A tenancy addendum to a HAP contract provides that the tenant is not liable for payment of the Section 8 subsidy portion of the rent, and that the owner may not terminate the tenancy for nonpayment of the Section 8 subsidy portion of the rent.

68. A tenant who is a Section 8 beneficiary "is not responsible for payment of the portion of the rent to owner covered by the housing assistance payment under the HAP contract between the owner and the PHA" and "[t]he PHA failure to pay the housing assistance payment to the owner is not a violation of the lease between the tenant and the owner." 24 C.F.R. § 982.310(b)(1)-(2).

69. A landlord cannot maintain a nonpayment proceeding against a tenant for arrears caused by the suspension of the Section 8 subsidy, regardless of the cause for suspension.

70. Under established authorities, a tenant is not responsible for payment of the Section 8 subsidy portion of rent absent a new agreement making the tenant liable for that portion. *Prospect Place HDFC v. Gaildon*, 6 Misc. 3d 135(A) (N.Y. App. Term 1st Dep't 2005) ("A Section 8 tenant agrees in the Section 8 lease only to pay the tenant share of the rent. Absent a showing by landlord of a new agreement . . . a Section 8 tenant does not become liable for the Section 8 share of the rent . . . even after the termination of the subsidy" [citation and internal quotation marks omitted]); *Soumas v. Gregg*, 57 Misc. 3d 135(A) (N.Y. App. Term. 1st Dep't 2017) ("Here, no new lease agreement was entered into by the parties obligating the tenant to pay the full contract rent. Thus, a nonpayment proceeding does not lie to recover the Section 8 portion of the rent from the tenant."); *New Hempstead Terrace LLC v. Reeves*, 18 Misc. 3d 1113(A) (N.Y. Dist. Ct. Nassau Cty. 2008) ("This Court holds that petitioner cannot maintain a summary proceeding against respondent to recover in the first instance, absent a good faith

allegation that a new agreement has been reached to make the tenant liable for the Section 8 rent.").

71. A renewal lease for a rent-stabilized unit does not constitute a "new agreement" making the tenant liable to pay Section 8 subsidy portion of the rent. *Vincenzi v. Strong*, 16 Misc. 3d 1121(A), at *2 (N.Y. City Civ. Ct., Bronx County, 2007) (noting that the rent-stabilized renewal lease at issue "could only be renewed on the same terms and conditions as the prior expiring leases," including a landlord's duty not to seek more than a tenant's share of rent under Section 8 program). *See also Pinnacle Bronx W., LLC v. Jennings*, 29 Misc.3d 61, 62 (N.Y. App. Term 1st Dep't 2010); *W & L Assoc., L.L.C. v. Gurevich*, 16 Misc.3d 129(A) (N.Y. App. Term 2nd & 11th Jud. Dists 2007).

72. Ms. Garcia has used her Section 8 voucher in her current rent-stabilized apartment throughout her twelve-year tenancy.

73. Ms. Garcia's monthly rental share established by HPD was $334.00 through and including April 30, 2024, and her share in October 2025 was $390.00 per month, effective May 1, 2024. Exhibit A (September 12, 2024 HPD email), Exhibit B (March 3, 2024 Rent Breakdown Letter).

74. Prestige, in the course and scope of being agent for the Landlord, has charged Ms. Garcia more than her monthly share from at least January 2023 through February 2024, overcharging her by up to $91.20 per month in excess of the HPD-approved rent.

75. Because of the consistently erroneous overcharges on the rent statements Prestige sent to Ms. Garcia, Ms. Garcia overpaid The Landlord Defendants $64.62 per month from May 2023 through December 2023, and $91.20 per month in January and February of 2024, overpaying The Landlord Defendants a total of $699.36 from May 2023 through February 2024.

Exhibit C (Rental Payment History).

76. As will be seen below, among the many ways the Attorney Defendants sought to collect rent from Ms. Garcia, none of which was chargeable to her, they also sought to collect amounts that were based on this inflated monthly rent.

77. HPD suspended Section 8 payment of Ms. Garcia's subsidy for the months May 2022 through February 2024, due to HQS violations for conditions the Landlord Defendants had failed to repair. Exhibit A (September 2024 email chain with HPD, p. 4), Exhibit D (May 20, 2022 HQS Abatement Notice).

**The 2023 Lawsuit for Rent Not Owed**

78. On or about April 3, 2023 the Landlord Defendants sent Ms. Garcia a Fourteen Day Notice stating she owed $5,112.72, falsely stating she had not paid five months of rent of $966.70 November 2022 to March 2022, as well as $279.22 for October 2022. Exhibit E (2023 Lawsuit, p. 9).

79. Panicked, on or about April 4, 2023, Ms. Garcia sent Trevor Wilson, the president of Prestige, notifying him that she has always paid her tenant share of the rent, that Prestige has been failing to make the repairs required by an HPD inspector, that she had repeatedly been reaching out to Mr. Kelly at Prestige to make the repairs, and that she had she received an HPD HAP abatement.

April 4, 2023

Trevor A. Wilson
President
Prestige Management, Inc.
1200 Zerega Avenue
Bronx, NY 10462

Dear Mr. Wilson:

I have been a tenant in your building in Manhattan at 151 West 123rd Street, Apartment 6C since 2014. In all of this time, my rent has ALWAYS been paid on time- every single month. During my tenancy, I was blessed to begin to receive Section 8 assistance from HPD to help with my rent. There was never an issue.

But this changed last year. On March 4, 2022, an HPD inspector came and found some minor apartment issues. Rather than address them and submit the proper paperwork to HPD, your company decided the contrary. On May 20, 2022, I received a letter from HPD notifying me of their HAP abatement.

Over the ensuing months, I reached out continuously to Mr. Kelly of your office, who assured me repeatedly that the proper paperwork would be submitted to HPD to cure the abatement, because all work in the apartment was completed. That was not done.

Yesterday, I received a "Fourteen Day Notice" from your company.

I used to think that this was a good building, and that the landlord cared about its tenants. Your actions (and lack of in sending in the proper paperwork to HPD) clearly show otherwise.

I am requesting that you Immediately remediate this issue and send in the necessary paperwork to HPD to fix the HAP abatement.

**Exhibit GG** (April 4, 2023 Leonarda Garcia letter to Prestige).

80. Despite receiving this letter, rather than looking into the matter and correcting its deficiencies, a few weeks later Prestige directed Kahan to file a non-payment petition against Ms. Garcia.

81. In April 2023, Defendants served Ms. Garcia with a 14-day notice prior to preparing a petition with the 14-day notice attached on April 25, 2023. Exhibit E (original 2023 petition with exhibits).

82. In the petition and the 14-day notice, the Landlord Defendants (falsely) claimed entitlement to $5,112.72. They did not break out the Section 8 share and the tenant share of the months of rent sought, instead claiming rental arrears of $966.70 without explanation or clarification for the months November 2022 through March 2023 and an additional balance of $279.22 for October 2022. *Id.*

83. The petition and the 14-day notice failed to credit Ms. Garcia for the following payments: $398.62 on October 1, 2022; $398.62 on October 30, 2022; $398.62 on December 3, 2022; $398.62 on December 30, 2022; $398.62 on January 29, 2023; and $398.62 on February 27, 2023.

84. A rent ledger later provided by the Attorney Defendants during their prosecution of the 2023 Lawsuit included entries for HPD's Section 8 share of the rent. *See* Exhibit HH (July 13, 2023 rent ledger). The rent ledger also reflected a total monthly rent in excess of the approved total monthly rent that the Landlord Defendants was authorized to charge. Ms. Garcia was shocked and terrified about the lawsuit seeking a judgment for rent, none of which was owed by her, as well as seeking to evict her and her family from their home of then-eleven years. In fact, for years Ms. Garcia had consistently been paying the entirety of her share of the rent and was bewildered that the Defendants were claiming she owed the full rent balance. The ledger was based on gross potential billing method, which does not separately break out how much of the total balance owed represents the suspended Section 8 share.

85. The 2023 petition sought HPD Section 8 share of Ms. Garcia's rent. At this time, *HPD* had stopped paying *its* portion of Ms. Garcia's rent due to unremedied HQS violations. Exhibit A (September 2024 email chain with HPD, p. 4), Exhibit D (2022 HQS abatement notice).

Case 1:25-cv-08489-JGK-GS Document 132-5 Filed 01/30/26 Page 22 of 53

86. The Landlord Defendants knew that it was HPD, not Ms. Garcia, that had ceased paying its share of the rent for their failure to pass the HQS inspection if for no other reason than the notice of failure to pass the HQS inspection was served by HPD on Prestige. Prestige was supposed to make the necessary repairs and to make sure tenants are able to maintain their Section 8 benefits. *See* EXHIBIT FF (Prestige Property Management Agreement) p. 7-8 ¶ 12; *see generally* p. 3, ¶ 8(d) (Prestige responsible for HAP contract certification and recertifications for Section 8 tenants). The Landlord Defendants knew, or should have known, that the reason behind overwhelming majority of Section 8 payment suspensions is an HQS failure. *See* Exhibit DD (Palmer Dep. pt. 1) 71, 126, 160 (90% of the reasons for Section 8 subsidy payment suspensions).

87. On May 1, 2023 the Landlord Defendants, through Mr. Kahan and his then-firm SDK Heiberger LLP, commenced a non-payment of rent proceeding against Ms. Garcia in New York County Housing Court, captioned *Arthur Ransome Houses, L.P. against Leonarda Garcia*, New York City Civil Court Index Number LT-308781-23/NY (the "2023 Lawsuit"). Exhibit E.

88. The Attorney Defendants, with extensive experience with nonpayment proceedings, and Prestige, which is deeply involved in decisions concerning the prosecution of nonpayment proceedings, knew or should have known through years of established authorities that a tenant is not responsible for payment of the Section 8 subsidy portion of rent absent a new agreement making the tenant liable for that portion. They also knew or should have known that a renewal lease for a rent-stabilized unit does not constitute a "new agreement" making the tenant liable to pay Section 8 subsidy portion of the rent.

89. When they commenced the 2023 Lawsuit, Defendants knew that they had not entered into a new lease agreement with Ms. Garcia obligating her to pay the full contract rent

that included the Section 8 subsidy portion.

90. The verified petition in the 2023 Lawsuit alleged rental arrears amounting to $5,112.72 and attached as exhibits the 14-day notice and an Affidavit of Service. *Id.*

91. Notably, the petition failed to plead that Ms. Garcia is an HPD Section 8 voucher holder, and the affidavit of service fails to show that HPD was served with copies of the pleadings as required by federal law when the respondent is a Section 8 voucher holder, and, on information and belief, Defendants in fact never did so. *Id.*

92. The failure of the Attorney Defendants to provide these notices makes it materially more difficult to challenge a collection lawsuit. The disclosure on the eviction petition of the receipt of section 8 allows the court to scrutinize the rental ledger more closely with an eye towards seeing whether the suit is in fact seeking a section 8 portion of the rent. The requirement to provide this notice is so material that the failure to do so subjects the petition to dismissal. *See, e.g. Park Properties Associates, L.P. v. Williams*, 38 Misc. 3d 35 (App. Term, 9th & 10th Jud. Dists. 2012) (reversing order denying tenant's motion to vacate judgment because petition failed to allege tenant was receiving Section 8 rent subsidies). The failure to provide pre-suit disclosure to HPD strips the tenant of an additional mechanism to challenge whether the amount sought is correct.

93. Defendant Eric H. Kahan, Esq. signed the petition, affirming under penalty of perjury "that he has read the foregoing petition and knows the contents thereof; that the same are true to his own knowledge except as to matters stated to be upon information and belief; and as to those matters he believes them to be true." *Id.*

94. Defendant Eric H. Kahan, Esq. knew, or through the exercise of a meaningful attorney review, should have known, there was no lawful basis to sue Ms. Garcia for rent or for

possession because, *inter alia*, he was suing solely for the government share of the rent.

95. On May 12, 2023, after receiving notice of the 2023 Lawsuit via mail, Ms. Garcia had to spend time to go to the courthouse to file a *pro se* answer asserting that the rent had already been paid. Exhibit F (May 12, 2023 initial answer). She was assigned a May 22 court date.

96. On May 22, 2023, Ms. Garcia appeared before the court *pro se* and nervously waited in the court room for her name to be called. On the May 22, 2023 court date, Ms. Garcia was referred to the Legal Aid Society.

97. Ms. Garcia retained the Legal Aid Society for the purpose of defending against the 2023 Lawsuit, and an attorney from the Legal Aid Society entered her Notice of Appearance on June 20, 2023. Exhibit G (June 20, 2023 Notice of Appearance.)

98. On July 13, 2023, the Legal Aid Society filed a motion for leave to amend the answer on Ms. Garcia's behalf, along with a supporting affirmation and a proposed amended answer asserting a number of defenses and counterclaims, including eleven specifically enumerated HQS violations. Exhibit H (Motion and Attorney Affirmation), Exhibit I (Garcia Affirmation), Exhibit J (Proposed Amended Answer).

99. On July 17, 2023, the parties stipulated to adjourn the proceedings until August 31, 2023 to allow the parties to engage in motion practice. Exhibit K (July 17, 2023 Stipulation).

100. On August 2, 2023, Ms. Garcia's counsel at the Legal Aid Society requested and obtained a subpoena compelling Defendants to produce records relating to Ms. Garcia's tenancy, payment history, and Section 8 voucher. Exhibit L (August 2, 2023 Subpoena Request).

101. A series of subsequent stipulations demonstrate that Defendants knew that HPD had ceased making its share of the rent payments for the failure of the landlord to cure HPD

violations. Defendants continued with the suit seeking rent from Ms. Garcia that they knew was not chargeable to her.

102. Most clearly, the September 26, 2023 Stipulation indicated that it was HPD share of the rent that was withheld based on the landlord failing inspections and failing to make repairs (as opposed to Ms. Garcia failing to make her share of the Section 8 rent). Exhibit M ("HPD appeared in court on September 26, 2023 with court file and Rent Breakdown letter indicating that the contested rent is $908 per month and that HPD Section 8 ceased payment due to a failed HQS inspection.") Subsequent so-ordered stipulations adjourning future hearings indicated that the landlord continued to fail to cure the failed inspections, including to failure to provide heat in the winter, specifically during December 2023. Exhibit N (December 6, 2023 so-ordered stipulation) (adjourned for landlord "to complete repairs and cure the subject premises' HPD violations… [including] lack of heat as required by law"), Exhibit O (February 2, 2024 stipulation) (adjourning hearing for landlord to comply with December 6, 2023 so-ordered stipulation to cure HPD violations).

103. On November 21, 2023, Ms. Garcia's counsel also informed the Landlord Defendants' counsel that Ms. Garcia was paying her portion of the rent and that the Landlord Defendants' HQS violations caused Section 8 subsidy payments to stop. Exhibit II (November 21, 2023 Legal Aid Society attorney email).

104. It was only on April 1, 2024 – more than five months after filing and maintaining a frivolous lawsuit against Ms. Garcia – that the landlord finally stipulated to dismiss the suit. The landlord tacitly admitted that it sued Ms. Garcia for rent, none of which was chargeable to her. The stipulation stated the "petition is hereby satisfied" and that "Section 8 appeared and confirmed that they have resumed payments." Exhibit P (April 1, 2024 stipulation). The firm that

Case 1:25-cv-08489-JGK-GS Document 13-2 Filed 01/30/26 Page 25 of 52

signed the stipulation for the landlord was now ***SKH*** Heiberger LLP, a successor to the firm that filed the non-payment petition, ***SDK*** Heiberger LLP.

**The 2024 Lawsuit for Rent Not Owed**

105. On November 1, 2024, seven months to the day after the signing of the stipulation of discontinuance in the 2023 Lawsuit, Defendant Kahan, through purchased the index number LT-319223-24/NY and filed a petition against Ms. Garcia on behalf of Landlord Defendants. Exhibit Q (November 1, 2024 petition) ("2024 Lawsuit).

106. Notably, the law firm that signed the April 1, 2024 stipulation in the 2023 lawsuit that the "Petition has been satisfied," is the same as filed the 2024 lawsuit, SKH Heiberger LLP.

107. The 2024 Lawsuit (falsely) represented that Ms. Garcia owed rent of $11,712.91, sought a judgment based on that amount, and sought to evict Ms. Garcia and her family from their home of eleven years.

108. Like the 2023 Lawsuit, the petition in the 2024 Lawsuit is signed by Defendant Kahan. *Id.*

109. Like the 2023 Lawsuit, the petition in the 2024 Lawsuit seeks back rent from the period of time wherein HPD was not paying the Section 8 share due to the landlord's HQS violations. Exhibit A (September 2024 email chain with HPD, p. 4), Exhibit P (April 1, 2024 Stipulation of Discontinuance), Exhibit Q (November 1, 2024 Petition).

110. The Attorney Defendants, with extensive experience with nonpayment proceedings, and Prestige, which is deeply involved in decisions concerning the prosecution of nonpayment proceedings, knew or should have known through years of established authorities that a tenant is not responsible for payment of the Section 8 subsidy portion of rent absent a new agreement making the tenant liable for that portion. They also knew or should have known that a

renewal lease for a rent-stabilized unit does not constitute a "new agreement" making the tenant liable to pay Section 8 subsidy portion of the rent.

111. When they commenced the 2024 Lawsuit, Defendants knew that they had not entered into a new lease agreement with Ms. Garcia obligating her to pay the full contract rent that included the Section 8 subsidy portion.

112. Like the 2023 Lawsuit, the complaint in the 2024 Lawsuit seeks a total monthly rent in excess of that approved by HPD. Exhibit A (September 2024 email chain with HPD, pp. 1-4), Exhibit P (April 1, 2024 Stipulation of Discontinuance), Exhibit Q (November 1, 2024 Petition).

113. Like the 2023 Lawsuit, the petition in the 2024 Lawsuit seeks back rent including the Section 8 share of Ms. Garcia's rent from the period of more than two years during which HPD was not paying the Section 8 share of Ms. Garcia's rent due to Landlord Defendants' HQS violations.

114. The Landlord Defendants knew, or should have known, that the reason behind overwhelming majority of Section 8 payment suspensions is an HQS failure. *See* Exhibit DD (Palmer Dep. pt. 1) 71, 126, 160 (90% of the reasons for Section 8 subsidy payment suspensions). In addition, the Landlord Defendants knew, or should have known, that a gap in Section 8 subsidy payments shown on a rent ledger—wherein Section 8 subsidy payments stop for a period of time before resuming—suggests an HQS failure. *Id.*, 126:13-22.

115. Unlike the 2023 Lawsuit, the affidavit of service in the 2024 Lawsuit indicates that notice was mailed to HPD. Exhibit R (November 8, 2024 Affidavit of Service). The affidavit states that the notice was served on HPD on September 20, several weeks before the suit was filed on November 1. *Id.*

116. Unlike the 2023 Lawsuit, the 2024 Lawsuit attached a detailed rent ledger. Exhibit S (September 10, 2024 Rent Ledger). The Ledger claimed that Ms. Garcia owed $11,712.91 for rent from July 1, 2022 to September 1, 2024.

117. The 2024 rent ledger clearly demonstrates that Defendants sought rent from Ms. Garcia in excess of her tenant share of the rent. The 2024 rent ledger covers the period from July 2022 to September 2024, and shows a resumption of Section 8 payments by HPD in March 2024. *Id.* at 3. The ledger holds Ms. Garcia responsible for the full amount of the contract rent each month—including in the months where HPD was withholding Section 8 payments. The ledger was based on gross potential billing method, which does not separately break out how much of the total balance owed represents the suspended Section 8 share. The ledger did not write off suspended government share of rent every month, pending resumption of the payment, as it should under the gross potential billing method. Exhibit DD (Palmer Dep. pt. 1) 128:19-132:18**.**

118. The 2024 rent ledger states that the rent alleged to be due is for a time period extending through May of 2024, but the listed amount of $11,712.91 in the ledger and petition reflects the ledger's alleged balance in September 2024, when the ledger appears to have been prepared. *Id.*

119. The 2024 rent ledger clearly shows that Ms. Garcia's consistent monthly payments continued during the period where HPD had suspended payment of the Section 8 share of Ms. Garcia's rent. *Id.* at 2-4. The history and amount of payments made by Ms. Garcia reflected on the rent ledger matches Ms. Garcia's own records of her rental payment history—in which she has always paid her full share of the rent on time. Exhibits C (payment history), S (2024 rent ledger).

120. Combined with Exhibit B, the Rent Breakdown Letter, the 2024 rent ledger

clearly shows Ms. Garcia paid *more* than the tenant share of her rent as defined by HPD and the HAP contract. Exhibits B, S. *See also* Exhibit DD (Palmer Dep. pt. 1) 165:7-173:17 (a reading of the ledger indicates a credit balance for the tenant as of February 27, 2024), 174:22-176:13 (a reading of the ledger indicates a credit balance for the tenant as of September 1, 2024).

121. Ms. Garcia appeared *pro se* on December 10, 2024 and filed an answer asserting several defenses, including that the rent had already been paid, that she had not been properly served with a rent demand as required by law, and that the Landlord Defendants had not made the required repairs. Exhibit T (December 10, 2024 *Pro Se* Answer).

122. Ms. Garcia retained a private attorney, James Fishman of Fishman Law Group PLLC, to defend her from the frivolous lawsuit, and paid him attorney's fees for doing so.

123. On December 15, 2024 Mr. Fishman filed a notice of appearance and verified amended answer. Exhibit U (December 15, 2024 Notice of Appearance and Amended Answer). The amended answer raised an affirmative defense that the landlord was suing Ms. Garcia for the HPD portion of the rent which is not chargeable to a Section 8 recipient. *Id.* at ¶¶ 22-26. The amended answer also noted that HPD had ceased making payments because the landlord had failed the HQS inspection and had not cured. *Id.*

124. At the December 17, 2024 court appearance, Ms. Garcia, through her counsel, and Defendants stipulated to adjourn the proceedings for all purposes until February 6, 2025. Exhibit V (December 17, 2024 Stipulation of Adjournment).

125. Before this February 6, 2025 court date, the parties stipulated to the discontinuation with prejudice of Defendants' lawsuit against Ms. Garcia, and the stipulation was so-ordered on February 6, 2025. Exhibit W (February 6, 2025 So-Ordered Stipulation of Discontinuance With Prejudice). This stipulation was signed by Defendant Kahan on behalf of

his new firm: Defendant Sperber Kahan.

126. In the February 6, 2025 So-Ordered Stipulation (Exhibit W, ¶¶ 1-3), Defendants admitted the following:

a. That the 2024 Lawsuit unlawfully sought the Section 8 share of Ms. Garcia's rent;
b. That Ms. Garcia has no obligation to pay the Section 8 share of her rent;
c. That Ms. Garcia had paid her share of the rent at the time of the initiation of the 2024 Lawsuit; and
d. That Ms. Garcia had continued to pay her share of the rent after the filing of the 2024 Lawsuit, up to the date of the stipulation.

127. In the stipulation (Exhibit W ¶ 4), Defendants also represented—evidently falsely—that they had updated and corrected their records to reflect that Ms. Garcia did not and does not owe the Section 8 share of her rent.

128. Importantly, the stipulation was signed by Eric Kahan on behalf of the latest incarnation of his firm, Sperber Kahan Law Group, LLC, now a defendant in the instant action. Further, the So-Ordered Stipulation was signed directly on behalf of Ransom LP by Detra Williams, with the notation "PMI As Agent." On information and belief, PMI stands for Prestige Management, Inc., the property management company for the property. On information and belief, Ms. Williams is the account collection manager at Prestige Management, Inc.

***The 2025 Lawsuit Threat and Continued Harassment About the False Rental Arrears***

129. Despite stipulating that they had corrected their records to reflect that Ms. Garcia did not and does not owe the Section 8 share of her rent, Landlord Defendants continued to claim a right to collect the Section 8 share from Ms. Garcia, sending her a billing statement reflecting a balance of $12,478.43, including many months of Section 8's share on March 28, 2025. Exhibit X (March 28, 2025 Billing Statement).

130. Shortly thereafter, Attorney Defendants sent a letter to Ms. Garcia notifying her of

their intent to pursue a third unlawful eviction proceeding for the same alleged balance including many months of the Section 8 share of her rent. Exhibit Y (April 8, 2025 Collection Letter).

131. On May 2, 2025, Attorney Defendants, on behalf of Landlord Defendants, sent a pre-suit certification to HPD, notifying them of their intent to pursue a nonpayment eviction proceeding against Ms. Garcia. Exhibit Z (May 2, 2025 Certification to HPD).

132. Crucially, the May 2 Certification to HPD includes a field which can be filled out to indicate the petitioner, in this case Defendants, also intends to seek the Section 8 share of the rent—from HPD, which is ordinarily liable for the Section 8 share, not Ms. Garcia, who as the voucher holder is not liable for the Section 8 share. Defendants did not fill out this section or otherwise indicate any intent to seek Section 8 from HPD. *Id.*

133. On or about May 16, 2025 Ms. Garcia sent a letter to Defendants summarizing the case and putting Defendants on notice as to Defendants' own admissions in prior cases: that Ms. Garcia did not owe the Section 8 share of her rent and that Defendants had unlawfully sought to collect the Section 8 share of Ms. Garcia's rent from her. Exhibit AA (May 16, 2025 Letter to Defendants).

134. This letter also requested written confirmation that Ms. Garcia owes no rent and Defendants will not seek to evict her on that basis—in essence, simply requesting that Defendants confirm in writing their commitment to honoring the terms of their prior stipulations. *Id.*

135. Ms. Garcia's letter did not produce any change in Defendants' behavior. On June 20, 2025, Landlord Defendants issued to Ms. Garcia another rent statement claiming she owed the remarkable sum of $13,237.37, once again claiming an increase to the same large balance of Section 8 back rent—a balance which plainly includes the very rental arrears Defendants had

previously stipulated Ms. Garcia did not and does not owe. Exhibit BB (June 20, 2025 Rent Statement).

136. The Attorney Defendants, with extensive experience with nonpayment proceedings, and Prestige, which is deeply involved in decisions concerning the prosecution of nonpayment proceedings, knew or should have known through years of established authorities that a tenant is not responsible for payment of the Section 8 subsidy portion of rent absent a new agreement making the tenant liable for that portion. They also knew or should have known that a renewal lease for a rent-stabilized unit does not constitute a "new agreement" making the tenant liable to pay Section 8 subsidy portion of the rent.

137. When they sent billing statements in 2025 and threatened suit in 2025, Defendants knew that they had not entered into a new lease agreement with Ms. Garcia obligating her to pay the full contract rent that included the Section 8 subsidy portion.

138. When Defendants sent a predicate notice to the 2023 Lawsuit, commenced the 2023 Lawsuit, sent a predicate notice to the 2024 Lawsuit, commenced the 2024 Lawsuit, sent billing statements in 2025, and threatened suit in 2025, Prestige knew that it could generate a rent ledger based on net potential billing method, under which the ledger would include only the activities concerning tenant portion of rent. Exhibit DD (Palmer Dep. pt. 1) 145:17-146:2. Yet they only used ledgers based on gross potential billing method that reflects the full rent—including both the government share and tenant share of rent—to form the basis of their demands.

139. Prestige also knew that it could generate tenant-only ledger that shows only the activities concerning tenant portion of rent, or an alternate balance/subsidy-only ledger that shows only the activities concerning Section 8 subsidy portion of the rent. *Id.*, 89:21-90:3; 90:7-

12. Yet they only generated combined ledgers that include the combined activities concerning both the government share and the tenant share of rent. *Id.*, 90:7-12.

140. All parties, attorneys, and law firms involved in the February 6, 2025 So-Ordered Stipulation of Discontinuation with Prejudice are also involved in the ongoing efforts to collect yet again from Ms. Garcia.

141. Additionally, in communications with Prestige, which manages the building and serves as Ms. Garcia's point of contact for requesting and coordinating the still-uncompleted repairs, Prestige employees continue to reference Ms. Garcia's falsely alleged rental arrears, even after being informed of the prior lawsuits and stipulations of discontinuance.

***Defendants' Illegal, Baseless Lawsuits Caused Ms. Garcia to Experience Emotional Distress and to Incur Significant Expenses***

142. As a low-income working mother and Section 8 participant, Ms. Garcia is precisely the type of vulnerable consumer the FDCPA was designed to protect.

143. Her life has been severely affected by Defendants' actions. Defendants' conduct caused Ms. Garcia to sustain actual damages, including legal fees, forgone wages because of missing work, and transportation costs for travel back and forth to New York County Housing Court and to meetings and consultations with her attorneys.

144. The prospect of eviction was especially worrying to Ms. Garcia because she has previously been evicted, along with her children (though not for nonpayment; Ms. Garcia resided in what she did not realize was an illegal sublet prior to moving into the Ransome property.) The traumatic experience of eviction was not and is not one Ms. Garcia wants to relive—hence her participation in Section 8 and her timely payment of her share of each month's rent.

145. Moreover, the mental and physical anguish and stress Ms. Garcia has experienced as a result of the various Housing Court cases—including the 2025 action apparently being

prepared by Defendants right now—has plagued her for more than two years.

146. The 2023 Lawsuit made Ms. Garcia feel afraid and powerless, and caused her to lose sleep throughout the duration of the litigation. Once the lawsuit was resolved, the stress was lifted and Ms. Garcia resumed sleeping normally.

147. After the ordeal of the 2023 Lawsuit, in which Defendants similarly sought to collect the Section 8 share from Ms. Garcia in an eviction proceeding, Ms. Garcia was distraught and afraid when she learned of the 2024 Lawsuit. How could this be happening again, and so soon after the resolution of the prior lawsuit?

148. When she learned of the 2024 Lawsuit, all Ms. Garcia's hopes vanished, and she cried from the stress and despair.

149. Ms. Garcia felt very vulnerable and became irritated and dejected. She began to lose sleep again due to the 2024 Lawsuit and has since continued to lose sleep as Defendants continue their campaign of harassing and unlawful debt collection against her.

150. Ms. Garcia's reprieve from debt collection harassment in between the conclusion of the 2024 Lawsuit and the beginning of Defendants' 2025 harassment and threats lasted for less than two months.

151. Defendants' persistent harassment of Ms. Garcia has made her feel unsafe and insecure in her own home, and made her fear for herself and her children.

152. In each instance—in the 2023 Lawsuit, the 2024 Lawsuit, and in the case of this year's harassment and pre-litigation communications—Ms. Garcia was scared, shocked, and upset by the allegation that she owed many thousands of dollars in rent, because she generally pays her bills, including her rent, on time and in full.

153. Ms. Garcia was additionally upset because the repairs which Defendants had

promised to do in the various stipulations were never completed. These repairs are still partially incomplete.

154. As Defendants continue to harass Ms. Garcia and baselessly threaten her with eviction, going so far as threatening to sue *a third time* for the very Section 8 back rent which Defendants stipulated Ms. Garcia did not owe at the conclusion of the 2024 Lawsuit *and* the earlier 2023 Lawsuit, Ms. Garcia's emotional distress and legal expenses are ongoing.

155. Ms. Garcia paid thousands of dollars in attorney's fees flowing from the defense of the 2024 Lawsuit—fees Ms. Garcia would not have incurred but for Defendants' baseless and unlawful 2024 Lawsuit.

156. Ms. Garcia has continued to pay her tenant share of the rent in full throughout this ordeal.

157. On March 6, 2026, approximately five months after the filing of this FDCPA action, Ms. Garcia received a notice from HPD that the Landlord Defendants had again failed the HQS inspection on January 31, 2026 and had not certified to HPD that they had made the repairs. Exhibit JJ (March 6, 2026 HPD Abatement Letter). The HPD notice informed Ms. Garcia that it would again abate payments to the landlord until the repairs were certified complete. This raised a new wave of panic in Ms. Garcia that she would go through this all over again: the Attorney Defendants would again sue her for the section 8 share of the rent that would be suspended because of the landlord's own failure – again – to comply with their repair obligations.

**Defendants' Pattern and Practice of Suing for Section 8 of Rent**

158. The following pattern and practice cases support Plaintiff's claims that the conduct of Prestige and the Attorney Defendants are consumer-oriented, as well as supporting Plaintiff's Judiciary Law § 487 claims against the Attorney Defendants.

159. All of the cases below are for petitioners for whom Prestige is the property management company. That can be seen because, in all cases, the petitioner's business address in the non-payment petition is listed as 1776 Eastchester Road, Suite 210, Bronx, New York 10461, which is the business address for Prestige. In all of the cases the non-payment petition lists as the "managing agent" Arlyane McGlashan, who is the general manager of Prestige. All of the cases are brought by the Attorney Defendants. When tenant ledgers are used, they are all based on the gross potential billing method.

160. Housing Court filings by the Attorney Defendants, concerning properties for which Prestige collects rents, demonstrate a pattern of suing tenants for the portion of rent covered by Section 8 subsidy and not due or owed by the tenants.

161. This pattern of seeking the government share of rent from tenants burdens the tenants and shows no good-faith efforts to recover the correct amount of arrears.

162. Attorney Defendants, who commence nonpayment proceedings on behalf of the Landlord Defendants, either systematically misrepresent that they have performed a meaningful attorney review of each lawsuit prior to filing, or they do perform such a review but nonetheless sue the consumer for the portion of rent covered by Section 8 subsidy.

163. The non-payment petitions illustrate why the misconduct by Prestige and the Attorney Defendants affect other tenants, and, at a minimum, have the potential to affect other tenants, making the misconduct consumer-oriented.

*Katherine Cruz*

164. On March 20, 2024, the Attorney Defendants commenced a non-payment proceeding against Katherine Cruz in *1775-85 Walton Avenue LP v. Katherine Cruz*, New York City Civil Court Index No. LT-311070-24/BX, seeking not only tenant share but also Section 8 subsidy portion of rent. Exhibit KK (*Cruz* Petition).

165. The rent ledger annexed to the petition covered the period from December 2011 through November 2023 and indicated that the tenant was a beneficiary of the Section 8 program. *Id.*, pp. 10-23.

166. The petition was executed by Defendant Eric H. Kahan, as an attorney for SKH Heiberger LLP, representing to the Civil Court and to the tenant that he had performed a meaningful attorney review of the petition. *Id.*, p. 2.

167. Defendant Kahan also affirmed "under penalty of perjury . . . that he has read the foregoing petition and knows the contents thereof; that the same are true to his own knowledge except as to matters stated to be upon information and belief; and as to those matters he believes them to be true." *Id.*, p. 2.

168. According to the ledger, Section 8 subsidy payments stopped after the $1,101.13 "Sec. 8" payment against $1,615.04 monthly rent for August 2022. *Id.*, p. 22. According to another ledger filed with the court, Section 8 subsidy payments resumed in April 2024. Exhibit LL (January 16, 2025 Tenant Ledger) p. 7 of 8. Both ledgers included the full contract rent—including both Section 8 subsidy portion and tenant portion—and were thus based on gross potential billing method, not net potential billing method that would include only the tenant portion of the rent.

169. The petition sought the full monthly rent during the period Section 8 subsidy payments stopped. The $40,678.55 the petition sought matched the third latest "Running Balance" of $40,678.55 shown on the bottom of the second to last page of the annexed rent ledger and apparently did not take into account two payments shown on the last page of the ledger. Exhibit KK (*Cruz* Petition) pp. 22-23. This Running Balance included not just the tenant portion of the rent but the full monthly rent of $1,615.04 for the months Section 8 subsidy payments stopped. *Id.*, p. 22.

170. Defendants sought from the tenant the full monthly rent—including the government share—during the period Section 8 temporarily stopped subsidy payments, without a new lease agreement obligating the tenant to pay the full contract rent. *See id.*, p. 1 (stating that the tenant is in possession of the premises under a lease agreement for the rent stated [¶2] and later adding that "the tenant receives Section 8 rent supplement" [¶7]).

171. In an apparent acknowledgment of this issue, the so-ordered Stipulation of Settlement filed November 20, 2024 noted a reduced arrears claim of $15,828.50 through January 10, 2025, "based on the tenant share only as per subpoenaed Section 8 records. Tenant current share is $131.00 per month." Exhibit MM (November 20, 2024 So-Ordered Stipulation of Settlement).

*Eduviges Martinez*

172. On March 20, 2024, the Attorney Defendants commenced a non-payment proceeding against Eduviges Martinez in *1775-85 Walton Avenue LP v. Eduviges Martinez*, New York City Civil Court Index No. LT-311073-24/BX, seeking not only tenant share but also Section 8 subsidy portion of rent. Exhibit NN (*Martinez* Petition).

173. The rent ledger annexed to the petition covered the period from December 2011 through November 2023 and indicated that the tenant was a beneficiary of the Section 8 program. *Id.*, pp. 10-22.

174. The petition was executed by Defendant Eric H. Kahan, as an attorney for SKH Heiberger LLP, representing to the Civil Court and to the tenant that he had performed a meaningful attorney review of the petition. *Id.*, p. 2.

175. Defendant Kahan also affirmed "under penalty of perjury . . . that he has read the foregoing petition and knows the contents thereof; that the same are true to his own knowledge except as to matters stated to be upon information and belief; and as to those matters he believes them to be true." *Id.*, p. 2.

176. According to the ledger, Section 8 subsidy payments stopped after the $695.99 "Sec. 8" payment against $976.63 monthly rent for August 2022. *Id.*, p. 21-22. A more recent ledger filed with the court did not indicate a resumption of Section 8 payment. Exhibit OO (February 14, 2025 Tenant Ledger). However, the parties and the Civil Court noted on November 20, 2024 that the tenant's "current share [under the Section 8 program] is $196." Exhibit PP (November 20, 2024 So-Ordered Stipulation of Settlement). In any event, both ledgers included the full contract rent—including both Section 8 subsidy portion and tenant portion—and were thus based on gross potential billing method, not net potential billing method that would include only the tenant portion of the rent.

177. The petition sought the full monthly rent during the period Section 8 subsidy payments stopped. The $16,286.97 the petition sought matched the latest "Running Balance" of $16,286.97 shown on the rent ledger. Exhibit NN (*Martinez* Petition) p. 22. This Running Balance included not just the tenant portion of the rent but the full monthly rent of $976.63 for

the months of September 2022 through January 2023 and $1,001.05 for the months of February 2023 through November 2023, the months in which Section 8 subsidy payments stopped. *Id.*

178. Defendants sought from the tenant the full monthly rent—including the government share—during the period Section 8 stopped subsidy payments, without a new lease agreement obligating the tenant to pay the full contract rent. *See Id.*, p. 1 (stating that the tenant is in possession of the premises under a lease agreement for the rent stated [¶2] and later adding that "the tenant receives Section 8 rent supplement" [¶7]).

179. In an apparent acknowledgment of this issue, the so-ordered Stipulation of Settlement filed November 20, 2024 noted a reduced arrears claim of $5,117.00 through November 30, 2024, "based on the tenant share of rent as per subpoenaed Section 8 records. Tenant current share is $196." Exhibit PP (November 20, 2024 So-Ordered Stipulation of Settlement).

*Tanequa Carthens*

180. On June 4, 2024, the Attorney Defendants commenced a non-payment proceeding against Tanequa Carthens in *Heritage Houses Development L.P. v. Tanequa Carthens*, New York City Civil Court Index No. LT-300857-24/HA, seeking not only tenant share but also Section 8 subsidy portion of rent. Exhibit QQ (*Carthens* Petition).

181. The rent ledger annexed to the petition covered the period from July 2022 through March 2024 and indicated that the tenant was a beneficiary of the Section 8 program. *Id.*, pp. 8-9.

182. The petition was executed by Defendant Eric H. Kahan, as an attorney for SKH Heiberger LLP, representing to the Civil Court and to the tenant that he had performed a meaningful attorney review of the petition. *Id.*, p. 2.

183. Defendant Kahan also affirmed "under penalty of perjury . . . that he has read the foregoing petition and knows the contents thereof; that the same are true to his own knowledge except as to matters stated to be upon information and belief; and as to those matters he believes them to be true." *Id.*, p. 2.

184. According to the ledger, Section 8 subsidy payments stopped in the months of November, 2022, December 2022, and January 1, 2023 and resumed in February 2023. *Id.*, p. 8. The ledger included the full contract rent—including both Section 8 subsidy portion and tenant portion—and was thus based on gross potential billing method, not net potential billing method that would include only the tenant portion of the rent.

185. The petition sought the full monthly rent during the period Section 8 temporarily stopped subsidy payments. The $11,995.36 the petition sought matched the latest "Running Balance" of $11,995.36 shown on the rent ledger. *Id.*, p. 9. This Running Balance included what appears to be the full monthly rent of $1,528.38 for the months Section 8 payments stopped—i.e., November, 2022, December 2022, and January 1, 2023. *Id.*, p. 8.

186. Defendants sought from the tenant the full monthly rent—including both the government share and the tenant share—during the period Section 8 temporarily stopped subsidy payments, without a new lease agreement obligating the tenant to pay the full contract rent. *See id.*, p. 1 (stating that the tenant is in possession of the premises under a lease agreement for the rent stated [¶2] and later adding that "the tenant receives Section 8 rent supplement" [¶7]).

*Djenebou Cisse*

187. On October 17, 2023, the Attorney Defendants commenced a non-payment proceeding against Djenebou Cisse in *Heritage Houses Development L.P. v. Djenebou Cisse*,

New York City Civil Court Index No. LT-301809-23/HA, seeking $5,737.07. Exhibit RR (*Cisse* Petition).

188. The petition did not disclose the fact that the tenant was a Section 8 recipient.

189. On November 3, 2023 the tenant filed a pro se answer with an affirmative defense claiming that "The petition seeks Housing Authority Section 8 Part of the rent." Exhibit SS (November 3, 2023 Answer In Person).

190. Thereafter the Attorney Defendants with the permission of the court, issued subpoenas on HPD on August 1, 2024 and again on October 16, 2024, to attend upcoming hearings and bring records[5] itemizing the Section 8 share of rent. Exhibits TT (July 31, 2024 Subpoena for the court's signature) and UU (September 25, 2024 Subpoena for the court's signature). *See also* Exhibit VV (LT-301809-23/HA NYSCEF Document List).

191. On the November 12, 2024 return date referenced in the second subpoena for the HPD witness to appear with records, the case was dismissed by a so-ordered stipulation that the "Petition [is] satisfied." Exhibit WW (November 12, 2024 So-Ordered Stipulation of Discontinuance).

192. The above provides factual support that the Attorney Defendants, on behalf of Prestige, filed suit against a Section 8 tenant for the Section 8 share of the rent, and certainly did not disclose on the petition that the tenant was a Section 8 beneficiary.

---

[5] Complete certified copies of all documentation and/or payments in connection with the Section 8 subsidy for Respondent Djenebou Cisse residing at the address 56 East 131st Street, Apartment 4-D, New York, New York 10037 for the period from January 2022 through present. The requested documents include but are not limited to re-certifications, inspection reports, cancelled checks, payments made by HPD to Petitioner, notices of Respondent's share of the rent sent to Respondent and all other documents that indicate the Respondent's share of the rent from January 2022 to present at the subject premises

## FIRST CLAIM

### Violations of Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*.
### (Against Attorney Defendants)

193. Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

194. The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692 (e); *see also Hamilton v. United Healthcare of La., Inc.* 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

195. Congress designed the FDCPA to be enforced primarily through private parties, such as Plaintiff, acting as "private attorneys general." *See* S. Rep. No. 382, 95th Con,. 1st Sess. 5, ("The committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance . . . ."); and *Jacobson v. Healthcare Fin. Servs.*, 516 F.3d 85, 91 (2d Cir. 2008) ("In this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated Counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

196. The obligation alleged to be owed by Plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the rental arrears were incurred for a residential apartment.

197. Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt" as defined by 15 U.S.C. § 1692a(5).

198. For the reasons set forth in the "Parties" section of this Complaint, the Attorney Defendants are each a "debt collector" as defined in 15 U.S.C. § 1692a(6).

199. The Attorney Defendants violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f. By way of example and not limitation Defendant violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the services rendered or compensation which may be lawfully received; falsely representing or implying that a communication is from an attorney; threatening to take and actually taking an action prohibited by law; using any false, deceptive or misleading representations or means; using unfair or unconscionable means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

200. As a direct and proximate result of the Attorney Defendants' violations, Plaintiff has suffered damages, including, *inter alia*, significant emotional distress, embarrassment, humiliation, legal fees, forgone wages because of missing work, and associated transportation costs, for travel back and forth to New York County Housing Court.

201. The injuries inflicted on Plaintiff by the Attorney Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

202. Plaintiff suffered economic injuries that historically has provided a basis for

lawsuits in American courts, including but not limited to foregone wages and costs of transportation to court.

203. Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: wrongful litigation, negligence, invasion of privacy, defamation, intrusion upon seclusion, and abuse of process.

## <u>SECOND CLAIM</u>

### Violation of GBL § 349
### (Against All Defendants)

204. Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

205. New York General Business Law § 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state." An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. § 349(h).

206. As enumerated above, Defendants violated N.Y. Gen. Bus. § 349 et seq. by using deceptive acts and practices in the conduct of their businesses.

207. Defendants' misconduct was consumer-oriented.

208. "The 'consumer-oriented' requirement may be satisfied by showing that the conduct at issue 'potentially affects similarly situated consumers.' " *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010) (quoting *Oswego Laborers' Loc. 214 Pension Fund*, 647 N.E. 2d at 745) (emphasis added).

209. The facts supporting the meeting of the consumer-oriented element is throughout

the factual allegations in the complaint – especially as to pattern and practices section of the complaint. Without limitation, the following additional facts support the consumer-oriented element. (To the degree the consumer-oriented conduct applies to the Attorney Defendants, they would also support the Judiciary Law § 487 claim.).

210. First, a landlord cannot maintain a nonpayment proceeding against a tenant for arrears caused by the suspension or even termination of the Section 8 subsidy, regardless of the cause for suspension or termination. Under established authorities, a tenant is not responsible for payment of the Section 8 subsidy portion of rent absent a new agreement making the tenant liable for that portion. When Defendants sued Ms. Garcia twice, in neither instance – nor in any of the pattern and practice cases cited herein – did the non-payment petition allege that they were able to sue for amounts alleged because there was a new lease that allowed the tenant to be sued after the suspension (or even termination) of the section 8 subsidy payments. This failure provides a factual basis for Plaintiff to assert on information and belief that Prestige forwards accounts to the Attorney Defendants to file non-payment actions, that Attorney Defendants file the non-payment actions, and Prestige and the Attorney Defendants press the non-payment actions, without a lawful basis.

211. Second, Prestige and Attorney Defendants regularly seek to collect the Section 8 share of the rent. That is seen from the pattern and practice cases. This is also shown by the multiple times they have done so against Ms. Garcia for years now: the two non-payment petitions against Ms. Garcia solely for the Section 8 share of the rent, the predicate notice to Ms. Garcia that they would initiate a third lawsuit doing the same, and for Prestige, the multiple bills, invoices, and letters seeking the collect the Section 8 share.

212. Similarly, the very face of the rent ledgers as to Ms. Garcia in the two lawsuits

and threat of a third – as well as the rent ledgers in the pattern and practice cases – demonstrate to Prestige and Attorney Defendants that they are almost certainly suing for the Section 8 share. HQS or HPD violations account for approximately 90 percent of Section 8 payment suspensions. Exhibit DD (Palmer Dep. pt. 1) 69:20-71:18, 164:14-17. 67. The black-letter law is that a tenant who is a Section 8 beneficiary "is not responsible for payment of the portion of the rent to owner covered by the housing assistance payment under the HAP contract between the owner and the PHA" and "[t]he PHA failure to pay the housing assistance payment to the owner is not a violation of the lease between the tenant and the owner." 24 C.F.R. § 982.310(b)(1)-(2).

213. Third, Prestige uses the billing gross potential accounting method, under which tenant ledgers continue to show the full monthly subsidy charge even if Section 8 payments are suspended due to HQS or other HPD violations. Exhibit EE (Palmer Dep. pt. 2) 74:3-74:16. Prestige then forwards that ledger to the Attorney Defendants and instructs them to use that as the basis to calculate the amount due. In turn, the Attorney Defendants use these deceptive rent ledgers in connection with the calculation of the amount alleged to be due by the tenant in rent demand letters and non-payment petitions. These ledgers were used in connection with the non-payment actions against Ms. Garcia and the pattern and practice tenants. Notably, Prestige could just as easily generate a "tenant-only" ledger which shows only the amount the tenant actually owes, Exhibit EE (Palmer Dep. pt. 2) 89:21-90:3; 90:7-12, but did not do so in any of the non-payment actions against Ms. Garcia or the pattern and practice tenants. Prestige could just as easily use this method in the standard form invoices and billing statements it uses as to Ms. Garcia and the tenants of all the properties it manages. However, the billing statements and invoices sent to Ms. Garcia – and the pre-suit demand notice served on her and HPD – do not. The accounting services and billing services Prestige provides to Ms. Garcia – as well as to the

Attorney Defendants to use in their lawsuits – use a deceptive billing mechanism.

214. Fourth, in the 2023 non-payment petition against Ms. Garcia and one pattern and practice cases (*Djenebou Cisse*) does not disclose on the face of the petition that the tenant is a Section 8 recipient, does not attach a notice of suit or intent to file to HPD, both of which are required. This strips tenants of important statutory and regulatory tenant protections.

215. Defendants committed the above-described acts willfully and/or knowingly.

216. Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiff and unless enjoined will cause further irreparable injury.

217. As a direct and proximate result of those violations of N.Y. Gen. Bus. § 349 et seq., Plaintiff has suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, exemplary, and damages, together with costs and attorney's fees.

218. The Defendants' deceptive conduct towards Plaintiff is the type of conduct that has a broad impact on consumers at large.

219. That the relevant steps may be taken in a matter of minutes shows a high degree of moral culpability. Defendants' violations were willful and knowing, or, at minimum, evince a conscious and reckless disregard for basic fairness and for the law. Defendants' wrongful and deceptive acts caused injury and damages to Plaintiff.

220. As a direct and proximate result of Defendants' violations, Plaintiff has suffered damages, including, *inter alia*, legal fees, significant emotional distress, embarrassment, and humiliation.

221. The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for

lawsuits in American courts.

222. Plaintiff suffered economic injuries that historically have provided a basis for lawsuits in American courts, including but not limited to out of pocket expenses for printing and for postage.

223. Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: wrongful litigation, negligence, invasion of privacy, defamation, intrusion upon seclusion, and abuse of process.

224. Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

## THIRD CLAIM

### Violation of New York Judiciary Law § 487
### (Against Attorney Defendants)

225. Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein, especially as to the pattern and practice evidence and the evidence and argument in the GBL 349 section above to the degree it relates to the Attorney Defendants.

226. New York Judiciary Law § 487 creates a private right of action against an attorney or counselor who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party;" or "willfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for."

227. Judiciary Law § 487 is a traditional cause of action in American courts - N.Y.

Judiciary Law § 487 is "the modern-day counterpart of a statute dating from the first decades after Magna Carta; its language virtually (and remarkably) unchanged from that of a law adopted by New York's Legislature two years before the United States Constitution was ratified." *Amalfitano v. Rosenberg*, 12 N.Y.3d 8, 14 (2009).

228. Plaintiff is entitled to actual damages, treble damages, and attorneys' fees and costs for the violations of N.Y. Judiciary Law § 487, and Plaintiff so seeks.

## FOURTH CLAIM

### Negligence Per Se and Gross Negligence (Against All Defendants)

229. Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

230. Defendants' failure to exercise even slight care or diligence amounts to gross negligence.

231. Moreover, had Defendants exercised even slight diligence they would have known their conduct was unlawful.

232. Defendants' actions evince a reckless disregard for the rights of Plaintiff and others. The actions have the appearance of intentional wrongdoing. Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

233. Defendants' conduct demonstrates a high degree of moral culpability and willful or wanton negligence or recklessness. As a result, Plaintiff is entitled to a punitive damage award.

234. Attorney Defendants owed Ms. Garcia a duty pursuant to the FDCPA, which is designed to protect consumers in part by prohibiting debt collectors from using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of

the debt; using false, deceptive or misleading representations or means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

235. Creditors and debt collectors in general owe debtors a duty of reasonable care in collecting their debts. *Hawkins-El v. First American Funding, LLC*, 891 F. Supp. 2d 402, 412 (E.D.N.Y. 2012), aff'd 529 F. Appx. 45 (2d Cir. 2013).

236. GBL § 349 also imposes on Defendants a duty to not engage in deceptive acts and unlawful practices in the conduct of their business.

237. Defendants breached these duties.

238. As a direct and proximate result of Defendants' breach of these duties, Ms. Garcia suffered compensable harm, including actual damages and emotional distress.

239. Defendants' conduct was so flagrant as to transcend mere carelessness and constitute willful negligence or recklessness. Defendants have engaged in a pattern and practice of similar behavior against other tenants as indicated in the pattern and practice section and the GBL 349 sections above. As a result, Ms. Garcia is entitled to actual and punitive damages.

240. To the degree that the negligence per se and gross negligence claims are inconsistent with intentional misconduct, those allegations are made in the alternative.

## **DEMAND FOR JURY TRIAL**

241. In accordance with Fed. R. Civ. P. 38(b), Ms. Garcia demands a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court:

(a) Assume jurisdiction of this action;

(b) Declare that Defendants Sperber Kahan Law Group PLLC and Eric H. Kahan violates the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq* and New York General Business Law § 349;

(c) Declare that Defendants Sperber Kahan Law Group PLLC and Eric H. Kahan violated New York Judiciary Law § 487;

(d) Declare that all Defendants violated New York General Business Law § 349;

(e) Enjoin Defendants from committing similar deceptive practices in the future;

(f) Award plaintiff actual damages;

(g) Award plaintiff statutory damages pursuant to 15 U.S.C. § 1692k(a) and GBL §§ 349(c) and 349(h);

(h) Award plaintiff treble damages under NY Judiciary Law § 487 and treble damages up to $1,000 under New York General Business Law § 349;

(i) Award plaintiff exemplary and punitive damages;

(j) Award plaintiff costs and attorneys' fees;

(k) Award plaintiff such other and further relief as may be just and proper.

Case 1:25-cv-08489-JGK-GS Document 132 Filed 10/01/26 Page 52 of 52

Dated: September 30, 2026

*/s/ Ahmad Keshavarz*

___________________

Ahmad Keshavarz
The Law Office of Ahmad Keshavarz
16 Court St., 26th Floor
Brooklyn, NY 11241
Tel: (347) 308-4859
Fax: (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com